Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILSON WAI, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MARQETA, INC., SIMON KHALAF, and MICHAEL MILOTICH,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Wilson Wai ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Marqeta, Inc. ("Marqeta" or the "Company"), analysts' reports and advisories about the Company, and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired publicly traded Marqeta securities between August 7, 2024 and November 4, 2024, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Further, the Company maintains an office within this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7. Defendant Marqeta describes itself as follows:

[Marqeta] was incorporated in the state of Delaware in 2010 and creates digital payment technology for innovation leaders. The Company's modern card issuing platform empowers its customers to create customized and innovative payment card programs, giving them the configurability and flexibility to build better payment experiences.

The Company provides all of its customers issuer processor services and for most of its customers it also acts as a card program manager. The Company primarily earns revenue from processing card transactions for its customers.

8. The Company is incorporated in Delaware and its headquarters are in Oakland, California. Marqeta common stock trades on the NASDAQ under the ticker symbol "MQ".

9. Defendant Simon Khalaf ("Khalaf") has served as Marqeta's Chief Executive Officer ("CEO") since January 31, 2023.

10. Defendant Michael "Mike" Milotich ("Milotich") has served as Marqeta's Chief Financial Officer ("CFO") since February 2022.

11. Defendants Khalaf and Milotich are sometimes referred to herein as the "Individual Defendants."

12. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

13.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading Statements
### Issued During the Class Period

16.     On August 7, 2024, Marqeta filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2024 (the "2Q24 Report"). Attached to the 2Q24 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Khalaf and Milotich attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

17.     The 2Q24 Report incorporated by reference the risk disclosures from the 2023 Annual Report filed with the SEC on Form 10-K on February 28, 2024 for the year ended December 31, 2023 (the "2023 Annual Report").

18.     The 2023 Annual Report contained the following risk disclosure regarding future net revenue growth:

> ***Future net revenue growth depends on our ability to attract new customers and retain existing customers in a cost-effective manner.***
>
> If we are unable to attract new customers, retain existing customers on favorable terms, and grow and develop those relationships to drive increased processing volumes, our business, results of operations, financial condition, and future prospects would be adversely affected.
>
> If we fail to attract new customers, including customers in new use cases, industry verticals, and geographies, and to expand our platform in a way that serves the needs of these customers, and to onboard them quickly, then we may not be able to continue to grow our net revenue.
>
> Our customers generally are not subject to any minimum volume commitments under their contracts and have no obligation to continue using our platform, products, or services.

> Accordingly, these customers may have, or may enter into in the future, similar agreements with our competitors, which could adversely affect our ability to drive the processing volume and revenue growth that we seek to achieve. Some of our customer contracts provide for a termination clause that allows our customers to terminate their contract at any time following a limited notice period.
>
> The loss of customers or reductions in their processing volumes, particularly any loss of or reductions by Block, may adversely affect our business, results of operations, and financial condition. To achieve continued growth, we must not only maintain our relationships with our existing customers, but also encourage them to renew their contracts with us and to increase adoption and usage of our products. For example, customers can have multiple card programs on our platform across different use cases and geographies. However, we cannot assure you that customers will continue to use our platform or that we will be able to continue processing transactions on our platform at the same rate as we have in the past.

19. The statement in ¶ 18 was materially false and misleading at the time it was incorporated by reference in the 2Q24 Report because, in addition to the factors stated above, future net revenue growth also depended on a favorable regulatory environment, and the Company was at risk of missing its financial projections for gross profit growth and net revenue growth as a result of a stricter regulatory environment.

20. The 2023 Annual Report contained the following statement regarding regulation:

> ***Our business is subject to extensive regulation and oversight in a variety of areas, directly and indirectly through our relationships with Issuing Banks and Card Networks, which regulations are subject to change and to uncertain interpretation. Compliance with such laws and regulations could result in additional costs and any failure to comply could materially harm our business and financial condition.***
>
> We, our vendors, our partners, and our customers are subject to a wide variety of laws, regulations, and industry standards, including supervision and examination with respect to the foregoing by multiple authorities and governing bodies and in multiple countries, which govern numerous areas important to our business. While we currently operate our business in an effort to ensure our business itself is not subject to the same level of regulation as the Issuing Banks and Card Networks that we partner with, Issuing Banks and Card Networks operate in a highly regulated environment, and there is a risk that those regulations could become applicable to or impact us.
>
> As a program manager, we are responsible for aligning compliance with Issuing Bank requirements and Card Network rules, and we help create regulatory compliant card programs for our customers. In some cases, we have in the past and could continue to be exposed to liability or indemnification claims from our customers or partners in connection with the services we provide.

Class Action Complaint for Violation of the Federal Securities Laws

We are directly, and indirectly through our contractual relationships with customers, Issuing Banks, and Card Networks, subject to regulation in areas which may include privacy, data protection and information security, global sanctions regimes and export controls, and anti-bribery, and those relating to payments services (such as payment processing and settlement services), AI, consumer protection, AML, escheatment, and compliance with PCI DSS.

As our business and platform continue to develop and expand, we may become subject to additional laws, rules, regulations, and industry standards, including possible additional examination and supervision, in the United States and internationally. New or changing laws or regulations could require us to incur significant expenses and devote significant management attention to ensure compliance and could also prompt our Issuing Banks to alter their dealings with us in ways that may have adverse consequences for our business.

We may not be able to respond quickly or effectively to, or accurately predict the scope or applicability of, regulatory, legislative, or other developments, which may in turn impair our ability to offer our existing or planned features, products, and services and/or increase our cost of doing business. In addition, we may become subject to audits, inquiries, whistleblower complaints, adverse media coverage, investigations, or criminal or civil sanctions, all of which may have an adverse effect on our reputation, business, results of operations, and financial condition.

As a result of our business relationships, we may also be subject to direct or indirect supervision and examination by various authorities. The CFPB, for example, has indicated it has dormant authority to examine certain companies whose services may pose risk to consumers, which may include our company. The CFPB has also published guidance on third party risk management, which places additional vendor compliance oversight expectations for certain companies operating in the financial services industry. As a program manager, we may be viewed as overseeing third party relationships on behalf of our Issuing Banks and, as such, it is possible that regulators could hold us responsible for actual or perceived deficiencies in our oversight and control of third party relationships. New or expanded regulation or changes in interpretation or enforcement of existing regulations may have an adverse effect on our business, results of operations, and financial condition due to increased compliance costs and new restrictions affecting the offering of our platform, products and services.

Further, while we do not handle or interact with cryptocurrency and we only process transactions on our platform in fiat currencies, certain cryptocurrency businesses use our platform to provide card products to their customers and end users. The regulation of cryptocurrency is rapidly evolving and varies significantly among jurisdictions and is subject to substantial uncertainty. Various legislative and executive bodies in the U.S. and other countries may adopt laws, regulations, or guidance, or take other actions, which may impact our Issuing Banks and restrain the growth of cryptocurrency businesses and in turn impact the net revenue associated with our cryptocurrency business customers.

Class Action Complaint for Violation of the Federal Securities Laws

> While we have developed policies and procedures designed to assist in compliance with laws and regulations, no assurance can be given that our compliance policies and procedures will be effective. If we fail to comply or are alleged or perceived to have failed to comply with applicable laws and regulations, we may be subject to litigation or regulatory investigations or other proceedings, we may have to pay fines and penalties or become subject to civil or criminal liability or have additional obligations or restrictions imposed upon our business, and our customer relationships and reputation may be adversely affected, which could have a material adverse effect on our business, results of operations, and financial condition. In some cases, regardless of fault, it may be less time-consuming or costly to settle these matters, which may require us to implement certain changes to our business practices, provide remediation to certain individuals, or make a settlement payment to a given party or regulatory body.

21. The statement in ¶ 20 was materially false and misleading at the time it was incorporated by reference in the 2Q24 Report because it omitted that the Company was at risk of failing to meet certain projected financial figures due to heightened regulatory scrutiny since 2023, or that regulatory scrutiny had even increased since 2023.

22. On August 7, 2024, the Company had its Q2 2024 Earnings Call (the "Q2 2024 Call"). Defendant Milotich made the following statement on the Q2 2024 Call:

> Now let's shift to our second half in full year outlook. As we move into Q3 we begin the first chapter of a new era for Marqeta, where we aim to deliver sustainable, profitable growth. We are returning to growth now that we have lapped the resetting of the large majority of our customer contracts and the Cash App renewal in particular. We have established longer term partnerships with our customers where we can work together to drive growth with win-win outcomes. In addition, we expect to be adjusted EBITDA positive going forward at an increasing rate over time, renewed expense discipline, a focus on efficiency and optimization and the real realization of our platform, economies of scale as the business flourishes, has put us on a clear path to GAAP profitability in the coming years. ***We expect both Q3 and Q4 net revenue growth to be between 16% to 18% in line with what we indicated last quarter***. Therefore, full year, net revenue growth is expected to contract 24% to 27% again, consistent with the expectations we shared last quarter. ***Q3 gross profit growth is expected to grow between 25% and 27% while Q4 is expected to grow approximately three points slower than Q3.*** As a result, second half growth is consistent with the expectations we shared last quarter.
> 
> Both quarters are expected to benefit from non-block gross profit growth of over 30% which is accelerating from the first half as we have now lapped heavy renewal activity, as well as the growing contribution from the ramping of new cohorts driven by improving sales last year. The gross profit growth slows a little from Q3 to Q4 mostly due to the difference in year over year comparisons, where Q3 has a slightly easier comp due to higher bank fees last year, while Q4 has a slightly tougher comp due to a strong 2023 holiday

season, particularly in BNPL, as well as lapping a platform partner bonus. We expect the gross profit margin to be in the low 70s in both Q3 and Q4 as network incentive levels increase from Q2 therefore we expect full year gross profit growth to be 79% consistent with expectations we shared last quarter.

(Emphasis added).

23. The statement in ¶ 22 was materially false and misleading at the time it was made because it omitted that the Company was unlikely to achieve the net revenue growth and gross profit growth figures as a result of heightened regulatory scrutiny.

24. The statements referenced in ¶¶ 18, 20, and 22 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Marqeta understated the regulatory challenges affecting its business outlook; (2) as a result, Marqeta would have to cut its guidance for the fourth quarter of 2024 and; (3) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

25. On November 4, 2024, after market hours, Marqeta issued a press release entitled "Marqeta Reports Third Quarter 2024 Financial Results." (the "Third Quarter Press Release") In addition to reporting the Company's Third Quarter results, the announcement gave fourth quarter guidance of 10-12% Net Revenue Growth and 13-15% Gross Profit Growth, as opposed to the projected 16-18% net revenue growth and 22-24% gross profit growth figures mentioned in ¶ 22.

26. The press release further stated that the Company's guidance "reflects several changes that *became apparent over the last few months* with regards to the heightened scrutiny of the banking environment and specific customer program changes." (Emphasis added).

27. On the accompanying November 4, 2024 earnings call, Defendant Khalaf made the following statement, revealing that the Company knew about heightened regulatory scrutiny affecting the Company's business from the beginning of the year:

With all this great progress, why is our guidance for Q4 softer than expected? ***Well, last year, the regulatory environment changed amongst the smaller banks that support many of our customers' program***. ***As a company, we anticipated this change and invested in program management in general and compliance services in particular***.

We believe that these investments have positioned us well in the medium and long term and increased the moat around our platform, especially in embedded finance. ***However, we underestimated the increased operational burden these changes made on both Marqeta's and the bank's onboarding and compliance teams. The incremental scrutiny in rigor translated into delays in launching new programs***. These delays have also been aggravated by the increased demand from new bookings in 2023 and the first half of 2024.

***On average, the time to launch new programs grew 30% to 40% from 2023, and we expect that increase to remain for at least two additional quarters***, as we and our bank partners become more agile in launching programs in this new environment. Given the standard ramp time for programs in our industry, these delays will cause volume and gross profit to be pushed out a few months.

(Emphasis added).

28. The Q3 2024 Earnings call included the following exchange between an analyst and Defendant Milotich, further showing that the Company was aware of heightened regulatory risk scrutiny being a material risk since the beginning of 2024:

**Analyst**: Hi. Thank you for taking my question this evening. Can you comment on your visibility at this point, given everything that's going on in terms of these regulatory-driven sort of changes is -- are you confident that you're seeing sort of a bottoming out of the -- of the sort of pain here or could we get to next quarter and see that things have deteriorated further. And I'm also just wondering whether there's a risk that some bookings may get terminated if the implementation timeline stretches out for too long.

\*     \*     \*

**Mike Milotich**: Yes, just maybe I'll just give some color on just the specifics on some of the delays, Ramsey. ***So if you look at the first few months of 2024, the regulatory scrutiny had clearly ratcheted up with more than 10 consent orders affecting the banks in our space***. And so ***what we saw was an initial spike in the time to launch that was more than 2x the average in 2023***. So 2023 onboarding and delivery was typically around 150 days roughly.

***And in Q1, Q2, that rose to over 300 days. This was expected given the sort of initial changes and sort of shock of all the changes that were happening***. But at the start of Q3, we expected things to get back to where we had been in 2023. But the new programs on average took about 30% to 40% longer to launch. And so the time still remained over 200 days when it had previously been about 150 days.

Class Action Complaint for Violation of the Federal Securities Laws

> So that just gives you a little more color on sort of the magnitude of what's happening. And to just address your second question in terms of visibility, so we had 15 programs that were delayed on average of 70 days. But when you break that down into components, so five of those 15 actually did launch in Q3, but just much later than expected. Nine programs are now expected to launch in Q4.

(Emphasis added).

29. On this news, Marqeta's stock price fell $2.53 per share, or 42.5%, to close at $3.42 per share on November 5, 2024.

30. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

31. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of the Company during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

32. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

34. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

35. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

36. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

37. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- the Company's securities are traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

38. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

39. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

40. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

41. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

42.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

43.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

44.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

45.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in

the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

46. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

47. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

48. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

49. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

50. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

51. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

Class Action Complaint for Violation of the Federal Securities Laws

52. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

53. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

54. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

55. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

Class Action Complaint for Violation of the Federal Securities Laws

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Date: December 9, 2024                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
/s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*