# Exhibit B

Adam M. Apton (SBN 316506)
**LEVI & KORSINSKY LLP**
Email: aapton@zlk.com
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID FORD, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>MARQETA, INC., SIMON KHALAF and MICHAEL MILOTICH,<br><br>                    Defendants. | Case File No. 4:24-cv-08892<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge: |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff David Ford ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Marqeta, Inc. ("Marqeta" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Marqeta's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Marqeta securities between May 7, 2024 and November 4, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants provided investors with material information concerning Marqeta's gross profit and EBITDA guidance for the fiscal year 2024. Defendants' statements concerned, among other things, growth in new business bookings and onboarding timelines ahead of their full-year plan in addition to making significant operational improvements and confidence in driving growth of its newer customers and embedded finance use cases.

3. Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts related to Marqeta's onboarding strategy, including program management and compliance services in anticipation of the heightened regulatory environment in order to

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

launch and ramp up new customers. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Marqeta's securities at artificially inflated prices.

4. The truth emerged on November 4, 2024, Marqeta issued a press release announcing negative third quarter 2024 results. During the corresponding earnings call, Defendants disclosed that an increased operational burden and heightened regulatory changes impacted both Marqeta's and its customers' onboarding and compliance teams. The incremental scrutiny and rigor had therefore translated into significant onboarding delays for new customers. As a result, Marqeta lowered its outlook for the full year 2025.

5. Investors and analysts reacted immediately to Marqeta's revelations. The price of Marqeta's stock declined from $5.95 per share on November 4, 2024 to $3.42 per share on November 5, 2024.

## JURISDICTION AND VENUE

6. Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Marqeta is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## THE PARTIES

11. Plaintiff purchased Marqeta common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Marqeta is attached hereto.

12. Marqeta, Inc. is a Delaware corporation with its principal executive offices located at 180 Grand Avenue, 6th Floor, Oakland, California 94612. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "MQ."

13. Defendant Simon Khalaf ("Khalaf") was, at all relevant times, the Chief Executive Officer, President and Director of Marqeta.

14. Defendant Michael Milotich ("Milotich") was, at all relevant times, the Chief Financial Officer of Marqeta.

15. Defendants Khalaf and Milotich are sometimes referred to herein as the "Individual Defendants." Marqeta together with the Individual Defendants are referred to herein as the "Defendants."

16. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Marqeta's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

17. Marqeta is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

18. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Marqeta under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A. Company Background

19. Marqeta, Inc. operates a cloud-based open application programming interface platform that delivers card issuing and transaction processing services. It offers its solutions in various verticals, including financial services, on-demand services, expense management, and e-commerce enablement, as well as buy now, pay later.

### B. The Defendants Materially Misled Investors Concerning Marqeta's Profit and Earnings Guidance for Fiscal Year for 2024

#### *May 7, 2024*

20. On May 7, 2024, Marqeta issued a press release announcing its first quarter 2024 financial results, highlighting, in pertinent part, that "Total Processing Volume (TPV) increased by 33% year-over-year, rising to $67 billion from $50 billion in the first quarter of 2023…Adjusted EBITDA was $9 million in the first quarter of 2024, increasing by $14 million year-over year. Adjusted EBITDA margin was 8% in the first quarter of 2024, an increase of 10 percentage points versus last year." CEO Simon Khalaf was quoted stating, in relevant part:

> Our business once again showed itself to be on a solid trajectory this quarter. Alongside continued scale and operational efficiencies, we saw growth from both major fintech customers expanding into new use cases and geographies, as well as growth from newer customers and embedded finance use cases. All put together, it speaks volumes to the breadth and depth of the Marqeta platform.

21. The press release also highlighted several business updates demonstrating its business growth and momentum, stating in pertinent part:

> Marqeta announced the global expansion of its U.S. partnership with Uber Eats into eight additional markets: Canada, Australia, Mexico, Brazil, Colombia, Peru, Chile and Costa Rica. Marqeta's platform allows Uber Eats to reduce effort and time-to-

4

market for each subsequent new market launch, showcasing the global reach of Marqeta's platform and the strong partnership with Uber since 2020.

Marqeta supported the launch of a new and improved Klarna Card, open to all U.S. Klarna users, which is built into the Klarna app and provides flexible payment options with no revolving credit, allowing users to either pay a monthly statement in full with no interest, or pay over time. The card comes with personalized spending and budgeting recommendations and up to 10% cashback when used inside the Klarna app. Marqeta has supported Klarna's business since 2016, across multiple card projects in North America, Europe and Australia and New Zealand.

Marqeta announced that it will power the Rain Card, a branded debit card that will enable Rain's customers, such as McDonald's, Taco Bell, Hilton and Marriott, to disburse earned wages onto cards seamlessly. In addition, through its strategic partnership with Rain, Marqeta can expand the scope of its early wage access offerings to add more value for employers across diverse sectors of the economy.

22. During the same-day earnings call, CEO Khalaf elaborated on Marqeta's performance and confidently spoke about the Company's expectations for Marqeta in 2024, stating, in relevant part:

> ***Our first quarter results demonstrate how the strong foundation we built in 2023 is leading to growth with new and existing Marqeta customers and speaks volumes to the strength and depth of the Marqeta platform. We started the year strong with net revenue, gross profit and adjusted EBITDA outpacing expectations.***
>
> Total processing volume or TPV was $67 billion in the first quarter, a 33% increase compared to the same quarter of 2023. In Q1, we had a day where we processed over $1 billion in TPV, a significant milestone for the company. Our net revenue of $118 million in the quarter contracted 46% year-over-year, which included a decrease of 58 percentage points from the revenue presentation change related to our Cash App contract renewal.
>
> First and foremost, the accelerated bookings we started in late 2022 and our relentless focus on converting them to gross profit are starting to pay off. For example, we launched a program with Trade Republic and new customers signed in late 2022. Trade Republic is Europe's largest broker and leading savings platform headquartered in Germany. Trade Republic uses Marqeta to power an innovative consumer debit card that combines spending and savings for their 4 million customers across 17 markets.
>
> The company chose Marqeta due to our ability to reliably deliver innovation and easy geographic expansion. Over 1 million people joined the waiting list for the highly innovative card in just a few weeks. Second, in addition to launching and scaling new customers, we continue to focus on expanding with our existing

5

customers. Uber Eats recently expanded with us into Latin and South America, Canada and Australia, bringing to 9, the number of markets served.

. . .

***Previously, several of our customers, namely fintechs, chose to take program management and other services in-house only to reverse course later given the complexity and regulatory requirements associated with scale. Now many customers look to Marqeta to ease a significant amount of operational burden. During the first quarter, about 20 of our existing customers added program management products and/or optional services from our programs like disputes, compliance reporting and 3D Secure.***

***Going forward, we believe compliance-related services, in particular, will be a key selling point and differentiator for our platform. Many competitors do not offer the same level of service and many prospective customers don't want to do this work themselves, especially when we have the advantage of both expertise and economies of scale. While ramping our previously booked programs as a top priority, we're also focused on the significant embedded finance opportunities right before us, like the $2 trillion market for accelerated wage access or AWA.***

As we look to capture this tremendous opportunity, we're working with multiple distribution partners to increase our reach and expand our offering. While we've seen tremendous growth from early large adopters like Uber and Walmart's One finance, we're approaching other channels to bring our solution to a broader market. In April, we announced our new customer Rain, a financial wellness benefits provider that uses technology to help companies give employees greater control over their finances.

. . .

***In summary, we're starting the year strong and seeing the foundation we laid over the last year start to deliver solid financial results. Our revamped sales efforts are beginning to pay off as the new embedded finance customers gain traction. In addition, our strong existing customer base continues to expand with us a testament to the value they get from our platform.***

(Emphasis added.)

23.     Defendant Milotich highlighted Marqeta's first quarter performance and full year 2024 outlook stating, in pertinent part:

Our Q1 results represent a strong start to the year with all of our key metrics exceeding our expectations. TPV grew 33% with broad-based outperformance, particularly in BNPL, on-demand delivery and financial services. The stronger-than-expected TBV growth drove net revenue to the high end of our expected range. Gross profit meaningfully outperformed due to those volume gains and the benefit of capturing additional network incentives, which I will discuss later in more detail.

6

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Finally, continued execution of efficiency initiatives, particularly the streamlining of technology costs, when coupled with our higher gross profit led to significantly higher adjusted EBITDA of $9 million in the quarter. Q1 TPV was $67 billion, a year-over-year increase of 33% for the fourth straight quarter. Non-Block TBV grew approximately 15 points faster than Block growth.

. . .

On-demand delivery growth remained in the double digits, accelerating quarter-over-quarter as our customers expanded into new merchant categories and geographies. Q1 had our highest on-demand delivery TPV growth in the last 2 years. Expense management growth accelerated for the second straight quarter, growing on par with the overall company, driven mainly by strong performance from our top customers. In fact, one of these customers have been increasing the share of their volume on our platform after seeking platform diversification with a competitor in the past.

. . .

Now let's shift to our Q2 and full year outlook. We expect Q2 net revenue to contract between 47% and 50%. This is in line with the expectations we shared last quarter with the exception of the 2-point revenue presentation impact related to the renegotiated platform partnership. Consistent with what we have seen in the last 3 quarters, we have assumed a 65 to 70 percentage point negative impact of the cash app renewal.

. . .

Second, we now expect the mix of our TPV to be more heavily weighted toward the Powered by Marqeta business, which materially impacts net revenue but has a much lesser impact on gross profit. This will lower the revenue growth by approximately 1 point. Gross profit is now expected to grow 7% to 9%, lifting the bottom of the range from what we have shared previously.

TPV year-to-date has been a little stronger, helping the first half gross profit growth, but the majority of the Q1 gross profit upside was related to incentives that are specific to Q1 because of the way our incentive contracts are structured. Our expectations for the second half gross profit growth remained unchanged for now at 23% to 26%.

***These changes in our net revenue and gross profit expectations highlight why we focus on gross profit as the measure of value we deliver for our customers. Our net revenue can be noisy based on our business mix and revenue presentation. Based on our continued success with cost optimization and efficiency initiatives, we are raising our full year adjusted EBITDA margin to positive 1% to 3%. We still expect positive adjusted EBITDA for 3 out of our 4 quarters in 2024 with Q2 being the exception.***

(Emphasis added.)

7

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

24.     During a question-and-answer portion of the same earnings call, Defendants touted Marqeta's success and displayed confidence in continued growth through new bookings and customers ramping ahead of schedule in a discussion with Wolfe analyst as follows:

<Q: Darrin David Peller -Wolfe Research, LLC- Analyst> Listen, just on new bookings. You obviously have talked over bookings being more material contributor in the back half of the year for those that you've already bought. Just curious if you could touch on how the cohorts are trending? Any variance you guys are seeing with regards to those customers ramping? And then just a quick follow-up. I'll just ask together on credit and maybe a little more on what the pipeline is looking like there and if we spend conversion there.

<A: Michael Milotich> *So far, what we're seeing is we're a little bit ahead of schedule. So we had said we expected about $20 million in revenue coming from these new cohorts for 2024 and then that ramping to $60 million next year. And in Q1, it's obviously early, but we are a little bit ahead based on a couple of customers launching a little more quickly than we expected and 1 or 2 also ramping a little faster than we had projected. That being said, because of, as you can imagine, the ramp of a card program, it takes a little bit of time. So we're, I guess, encouraged by the first couple of months, but the real value will be generated, say, 4 to 7, 8 months after the launch, when you really start to see what kind of momentum those programs have and what kind of volume they can generate. But we're off to a good start, a little bit ahead of schedule.*

<A: Simon Khalaf> On the credit side, again, like we said, our focus is to do a hell of a job on the initial accounts and partners that we have established. I'd say we're looking really good on the consumer credit side. I'd say for one particular reason, which is most of the brands that align with our vision on credit are thinking about a co-brand as an engagement tool and not just a loyalty tool. And kind of like addressing the top of the funnel, which is bringing more users or regain me the usage that have lost versus making my loyal customers more loyal.

So that fits exactly with how we perceive the credit market going and also it's a great thing for our platform because it operates in real time, and the rewards engine could be changed in a real-time basis in order to increase engagement and not just loyalty. And on the commercial side, it's actually better than we had expected. We did not anticipate such strong demand in commercial credit.

*And most of it is driven by, I'd say, the aggregator marketplaces that have great visibility into the performance of a small- to medium-sized business. So just to give you an example, at all lending that JPMorgan has done last year, only 2.6% of that went to small businesses. But small businesses account for like 53% of our GDP. I think we should have anticipated this great demand, but we didn't, but I think it's actually a very good sign for us.*

(Emphasis added.)

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

25. Defendant Milotich elaborated on Marqeta's ramp of EBITDA margins for the future, answering a question from an analyst at Wells Fargo as follows:

<Q: Andrew Thomas Bauch- Wells Fargo - Analyst> I wanted to just talk to the adjusted EBITDA outperformance in the quarter. Nice to see the EBITDA positive and the cash headwinds coming to an end in unison in the third quarter here. So how should we think about the ramp of EBITDA margins as we progress beyond these headwinds that you guys have been experiencing? Meaning the amount of flow-through or in your ways you want to invest in the business?

<A: Michael Milotich> The way we've thought about it is that we believe we can grow our gross profit in the 20-plus percent, so in the 20s. And we also believe that if we're growing at that pace that we only need to grow our expenses in the low double digits, that there should be at least a 10-point gap. Once we lap all this and we get a normalized base to grow off of starting in '25 and '26 that there should be about a 10-point gap at least between our gross profit growth and our expense growth.

And that's just the benefit of a platform business and reaching our economies of scale. And so when you start to look at that 10-point gap in growth and you start to grow that out a year or 2, you'll see that the EBITDA comes in pretty significant chunks. It doesn't just drip in. It's becomes a meaningful gap as our volume and business just keeps getting bigger and bigger. And so that's really the formula we're looking at.

*And just to get a little more specificity, because we're so head count and technology-driven, our cost structure. What we see is between merit increases and things we'd get to our employee base as well as the variable costs we have of running our platform with Cloud costs and other data tools that we use, just those 2 things, our expenses would probably grow in the like mid- to high single-digit range, assuming we continue to compound at this kind of clip in terms of volume.*

*And so with that then, it's all a matter of how much more are we going to be investing incrementally to drive additional capabilities on the platform. And that's where we've said we think that anywhere from, say, 3 to 5 points of growth should be enough investment on top of the existing investment capacity we already have, which includes over 300 people who are focused on our platform today. And so that's the model that we are projecting our business going forward.*

(Emphasis added.)

### *May 20, 2024*

26. On May 20, 2024, Defendant Khalaf presented on behalf of the Company at the 52nd J.P. Morgan Annual Global Technology, Media & Communications Conference. During the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

interview-structured presentation, CEO Khalaf pertinently discussed Marqeta's growing pipeline and compliance platforms in relation to the Company's risk management. In relevant part:

<Q: Tien-Tsin Huang – JPMorgan – Analyst> I mean, just thinking about some of the hot markets you've been in, expense management, BNPL, on-demand delivery, we've seen ups and downs, at least reflected in the stock prices. But your bookings have been strong, and it sounds like things are running a little bit ahead of plan. How healthy would you say your core end markets are?

<A: Simon Khalaf> *I'd say that on the booking side, as we talked about, we are ahead of plan, and the pipeline is growing faster than our bookings, which is a very good thing. So we're not draining the pipeline to make the quarter. And I'd say there's many reasons for that. The first one is, as we tackle the embedded finance market, by definition, they're bigger players. So the numbers are significantly higher.*

*The second one, the expansions with our customers is now occurring at a faster pace. I hate to call it the resurgence of fintech, but there are some fintechs that have now scaled, and I think that the dry spell or whatever last year is helping them, because the winners are winning more. So -- and they're expanding with us, either selling more products or expanding in other countries. And then we have, I'd say, the core use cases that we have reenabled that is fueling our pipeline as well. So from a bookings perspective, again, it's a win rate from a bigger pipeline, and it's looking very healthy.*

<Q: Tien-Tsin Huang – JPMorgan – Analyst> Yes. Well, that's consistent. You said you're going after enterprises. At Investor Day, you said you were moving away from the VC-backed players, which makes sense. And now you've got enterprise, you have marketplace. So could we expect larger deals in general, and the trade-off could be slower implementations? How should we evaluate that?

<A: Simon Khalaf> Yes. We intentionally do not want to trade a large number with a slower implementation cycle, right? So the good thing on the enterprise side is we are the program manager. So if you look at some of the deals that we've closed in fintech that took some time, we were not the program manager. So they had the relationship with the banks themselves. Things are slow. Banks are not the fastest moving organizations.

So us being the program manager, it actually makes the programs go smoother, if not even faster. So we're not trading that. So the answer is yes, there are going to be bigger deal, but the -- and we monitor this. The average and the median of the deployment cycles are coming down by about 11% year-over-year. So while we've broadened the pipe, we haven't compromised the deployment time.

<Q: Tien-Tsin Huang – JPMorgan – Analyst> So I know also enterprises are going to be a lot more careful around risk management, and I think compliance appears to be an asset for you because you've fought through that as you scaled up a lot of

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

big players, including Cash App and Block. So is that a differentiator in your mind, Simon? Is there more to do on the compliance side?

<A: Simon Khalaf> Yes. Absolutely. No, no, absolutely. I mean, I always look at expertise and scale. So we can do it better and we can do it cheaper. So one is like, okay, so why? *One is the investment we have put in. We have spent in this platform. So if you look at it on the dispute side, whether you're doing Reg E or you're doing Reg Z. So Reg Z is for credit, Reg E is for debit. You have to put an IVR, you have to program it for telephony, you have to build a chatbot, you have to understand the intent of the consumer, you have to build a queuing management system, you have to submit to the network, and you have to track all these and instrument it to make sure the consumers are happy. Well, guess what? We've built that. So that is not easy work.*

*Same thing with banking, with banking secrecy, anti-money laundering, putting that machinery together, sampling it against lists, so on and so forth. That's all been done. And the scale we operate at, our unit economic is significantly better than what each customer can get on their own. So in addition to the unit economics, you've got multiple expertise that we can help them. So if somebody wants to do debit, money movement, credit, BNPL, 1 program management layer. And I think that's a huge differentiator for us.*

<Q: Tien-Tsin Huang – JPMorgan – Analyst> And when you're competing against some of your peers on the compliance side, is it very observable for your clients as they're making decisions on the compliance front?

<A: Simon Khalaf> They are. No, absolutely. *And I'd say that some of the fintech players, they're very smart and they built it on their own for a specific program. They did not realize that as they want to branch out of the program they have established, they have to kind of rebuild it. So I mean, at the end of the day, every fintech wants to become a bank. So without the license, but offer banking services.*

And it's not that they stopped and thought, hmm, I'm going to do consumer, business, commercial, lending, whatever. So let me start by building this great program management layer and start building services underneath it. No. They said, look, I'm going to do BNPL. I'm going to have great program management for that. But then they get into the revolver and say, hmm, that's going to be hard. So there's no question that the program management layer and the investment we've made have become great competitive differentiators for us.

(Emphasis added).

### *August 7, 2024*

27.     On August 7, 2024, Marqeta issued a press release announcing its second quarter 2024 financial results, reporting, in pertinent part, that "Total Processing Volume (TPV) of $71

11
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

billion, representing a year-over-year increase of 32% driven by volume growth across several use cases." CEO Khalaf commented on the results, stating in relevant part:

> The second quarter demonstrates the great returns on our reinvigorated go-to-market approach combined with our ability to deliver innovation at scale. We signed a pioneering techbank, launched a new payment innovation that reimagines what a card can be, and deepened the array of services we can offer globally, all while continuing to grow our TPV and operate with focused efficiency.

28. The press release also announced Marqeta's newly signed deals and recent business updates, stating in pertinent part:

> Marqeta announced it has signed a five year deal with Varo Bank, N.A., the first nationally-chartered consumer techbank in the U.S., to become its issuer processor. Varo selected Marqeta for its ability to combine sophisticated virtual, tokenized and physical card issuing technology for the more than five million cards it has in market, with faster speed to market, helping Varo achieve its goals of helping people save and manage their money more easily.

> We recently announced that we are the first US. issuer-processor certified by Visa to support Visa Flexible Credential, which will allow a single card product to toggle between payment methods on each transaction, bringing multiple funding sources to one card. Cardholders can choose whether to use debit, credit or "pay-in-four" with Buy Now Pay Later. Currently, we are partnering with Affirm, the first program announced in the US to offer Visa Flexible Credential, to enable this capability for their Affirm Card. This reinforces Marqeta's commitment to innovation and provides us with further differentiation in the BNPL landscape.

> Marqeta signed Zoho, a global tech company serving over 700 thousand businesses, which transforms how SMBs and enterprises work with a comprehensive suite of more than 50 business management applications. Zoho selected Marqeta for its ability to deliver expense management and embedded finance expertise to launch a card solution that enables businesses to manage expenses efficiently while also supporting their long-term growth.

29. During the corresponding earnings call discussing results, Defendant Khalaf highlighted Marqeta's revenue and gross profit growth, as well as its business diversification, stating in relevant part:

> Our second quarter results came in ahead of expectations, and once again, we demonstrated significant discipline in operating expenses without compromising our growth trajectory, scale, service or innovation.

> I'll now briefly discuss our quarterly results before diving into company updates. The second quarter's net revenue, gross profit and adjusted EBITDA exceeded our expectations. Total processing volume, or TPV, was $71 billion in the second

quarter, a 32% increase compared to the same quarter of 2023. Our net revenue of $125 million in the quarter contracted 46% year-over-year, which included a decrease of 60 percentage points from the revenue presentation change related to our Cash App contract renewal.

. . .

Our second quarter results demonstrate the continued demand for what has differentiated Marqeta's platform, our ability to deliver solutions for diverse consumer and commercial use cases while continuously innovating and expanding value-added program management services. As discussed in our recent State of Payments report, which we released 2 weeks ago, consumers continue to branch out in financial services, looking for alternatives to traditional banks. 1/3 of consumer survey said they were only -- they were using digital-only banks with 63% of 18- to 34-year-old saying they will be open to banking with a nontraditional financial service providers. These trends have given modern and digital banks a genuine foothold in the market.

. . .

We anticipate more momentum to come in 2025. I'm thrilled to share that Varo Bank, which has 5 million cards in the market recently chose Marqeta as their partner for its card processing business. Varo will trust us to migrate their customers over from their current processor in 2025 for a 5-year exclusive contract. Varo is uniquely positioned as a techbank with its own bank charter, given its greater control over its product stack and user interface. To realize this advantage, Varo sought a nimble and sophisticated partner to help them innovate quickly as they look to offer their consumers real-time insights into their transactions.

The TPV growth and momentum goes well beyond financial services. In fact, 10 out of our top 20 customers grew over 50% year-over-year during the quarter. The use cases include expense management, SMB working capital, Buy Now, Pay Later in addition to financial services. This speaks to the strength of the Marqeta platform and its ability to support innovation at scale across a variety of use cases, solidifying Marqeta's platform play.

. . .

We offer solutions ranging from expense management to commercial credit and working capital to help these businesses operate with improved efficiencies and capitalization, investing more in their business and having more time to execute and innovate rather than having them manage antiquated back-office applications. This has driven the continued growth in expense management as TPV for this vertical grew slightly more than our average TPV growth during the quarter.

To add to that growth, we have signed Zoho during the quarter. Zoho is a global technology company serving over 700,000 businesses from SMBs to enterprises with a comprehensive suite of business management applications. Zoho chose Marqeta as their partner because of our expertise in launching card solutions that enables businesses to manage expenses efficiently. Marqeta was also chosen

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

because of the breadth and depth of our platform, which enables businesses to accelerate growth globally.

While digital banking and expense management continue to perform well on our platform, we continue to innovate in e-commerce and digital payments. We recently announced that we are the first U.S. issuer processor certified by Visa to support Visa Flexible Credential. With some Visa Flex cards, consumers can allow a single card product to toggle between payment methods on each transaction, bringing multiple funding sources to 1 card. Cardholders can choose whether to use debit, credit, pay-in-for with Buy Now, Pay Later or even pay using rewards points.
. . .

***The combination of the innovation we power with the ability to execute at scale, truly differentiates Marqeta. As our customer reach scale and the regulatory environment change, the guidance we provide our customers becomes a true differentiator. That's why we continue to enhance both program management and compliance.*** With the launch of our new office in Warsaw, Poland, we're now equipped to support more program management capabilities for our European customers, allowing us to deepen our already successful offering in the market.

Program management is important to our long-term growth for the following reasons. First, increased services add incremental net revenue, typically with higher gross profit margins. In the second quarter, net revenue driven by our suite of risk solutions, such as 3DS and risk control, increased by 61% year-over-year.

Second, it improves our customers' speed to market and our time to realize gross profit. As an example, if a customer looks to secure a bank partner without a system, this can take 9 to 12 months. However, without assistance, we can bring this time down dramatically.

***Third, it positions us well with companies looking to offer embedded finance. These companies can focus on their brand and their customer experience while leaving cumbersome details around offerings such as dispute to Marqeta. All these updates speak to our platform's breadth, depth and scale, while our ability to innovate demonstrate our expertise, delivering solutions for consumer and commercial debit and credit in countries around the world with modern flexible architecture is very appealing to both existing customers and new prospects.***

(Emphasis added).

30.     On the same call Defendant Milotich discussed Marqeta's second half and full year 2024 outlook stating, in pertinent part:

Now let's shift to our second half and full year outlook. As we move into Q3, we began the first chapter of a new era for Marqeta, where we aim to deliver sustainable, profitable growth. We are returning to growth now that we have lapped the resetting of the large majority of our customer contracts and the Cash App

14

renewal in particular, we have established longer-term partnerships with our customers where we can work together to drive growth with win-win outcomes.

In addition, we expect to be adjusted EBITDA positive going forward at an increasing rate over time, renewed expense discipline, a focus on efficiency and optimization and the realization of our platform economies of scale as the business flourishes has put us on a clear path to GAAP profitability in the coming years.

*We expect both Q3 and Q4 net revenue growth to be between 16% to 18%, in line with what we indicated last quarter. Therefore, full year net revenue growth is expected to contract 24% to 27%, again, consistent with the expectations we shared last quarter. Q3 gross profit growth is expected to grow between 25% and 27%, while Q4 is expected to grow approximately 3 points lower than Q3. As a result, second half growth is consistent with the expectations we shared last quarter. Both quarters are expected to benefit from non-Block gross profit growth of over 30%, which is accelerating from the first half as we have now lapped heavy renewal activity, as well as the growing contribution from the ramping of new cohorts driven by improving sales last year.*
. . .

To wrap up, the business has had an exciting turning point as we enter into the second half of 2024. Our Q2 results demonstrate the continued momentum in our business. TPV growth remains robust at 32%, fueled by strong results across financial services, expense management and BNPL use cases among both well-established customers as well as those who are newer to our platform. As Simon mentioned, the TPV for 10 of our top 20 customers grew by over 50% in Q2.

Gross profit growth was weighed down by the Cash App renewal for the last time and accelerating non-Block growth signals the strong underlying growth of the business. Well executed efficiency and optimization initiatives continue to lower adjusted operating expenses without sacrificing innovation or platform resiliency, compliance and security.

*As we begin the second half of 2024, we expect TPV growth to remain over 30% based on the current trajectory and the newer programs that are still ramping. The variety of use cases across consumer and commercial in multiple geographies showcases the strength of our platform. With the large concentration of contract renewals behind us, the TPV growth is expected to translate into gross profit growth in the mid-20s with some quarterly variation.*

(Emphasis added).

31.     During the question-and-answer segment of the same earnings call, Defendants touted Marqeta's existing customer base as well as its ongoing potential for growth, stating in part:

15

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<Q: Ramsey El-Assal- Barclays- Analyst> Separately, I guess I also wanted to ask, with the renewals behind you, how should we think about the growth algorithms balance between new customer versus existing customer growth? I think you guys have highlighted a lot of new opportunity on this call. I'm just kind of curious, in your mind, what is shaping up to be the more powerful drivers sort of today and in your projections between sort of harvesting growth from the clients you have today versus new customers that you think may drive kind of an incremental share of growth as we move forward?

<A: Simon Khalaf > Yes. I'll give an answer and then hand it over to Mike. Ramsey, it is kind of yes and yes. So, we are excited that the new cohorts are on track to generate $20 million in revenue, which is what we've guided. So, we're on track with that, and again, speaks volume to how fast we can onboard new customers and get them ramped up. So, that's a growth vector. Our customers also are growing, some of them geographically. Others, they're launching multiple programs. So, that also factors into our growth calculations. But Mike, you can give more color over the multiyear.

<A: Michael Milotich> Yes. I think -- what I would say is if you look at our bookings through the first half, roughly half of it are expansions with existing customers versus new logos, if you will, or new customer bases. So, it's a nice balance between the 2. We still have a lot of established customers who still have a lot of growth potential. And so, we continue to try to do more business with them as well as bringing in new pieces of business.

The other thing I would say is also just even within our programs that are already live with our existing customers, again, the growth is really significant. We talked about 10 of our 20 customers have their TPV growing over 50%, but 8 of those 10 are growing more than 75%. So, it's really -- we have several customers who really have caught on to something that's very much resonating in the market, and they're growing really fast, even separate from necessarily doing additional business with us, so they'll come over time. So, it's a very nice combination for us to have in the coming quarters to get growth from both new and existing customers.

32.     On the same call, Defendant Khalaf was questioned regarding recent cybersecurity events and its relation to increased regulatory scrutiny:

<Q: William Alfred Nance - Goldman Sachs- Analyst> I wanted to ask about some of the cybersecurity events that happened recently with the Evolve hack. And just wondering if you could talk about maybe some of the ramifications for the broader ecosystem. And I guess, A, how that's impacting some of the partner banks in the ecosystem? And then, B, if there's any impact on pipelines or kind of new program upstarts that may be impacted by increased regulatory scrutiny?

<A: Simon Khalaf > *The short answer is no. The little bit long answer is that there is the CrowdStrike event that did not impact us -- predominantly in Mac shop. I mean, we had a customer at CrowdStrike, but thanks to a great effort by our*

16

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*security team, we were not impacted, neither were our customers impacted in any major way. So, that's good. In terms of the other security and regulatory scrutiny, I don't expect it to create a medium-term or long-term challenges.*

On the contrary, I would say they are going to create a lot of tailwinds for Marqeta because of the flight to quality syndrome. We have demonstrated our ability to scale and in a compliant manner. In terms of like Evolve specifically, our business on Evolve is not big, but Evolve is a great partner of ours. But most of the issues, I'd say, do not involve Marqeta.

And some of the challenges that we've actually read in the press, we don't have intimate knowledge, right, are something that will not impact Marqeta because we've invested heavily in those -- I'd say in the chrome around our solution, whether it's settlement or reconciliation. This is something that we've done beautifully as we've scaled. So, I would say that we're looking good, and this is actually working in favor of Marqeta.

(Emphasis added.)

33.     Defendant Milotich was asked about the Company's pipeline conversion and visibility for gross profit growth pertinently stating:

<Q: Andrew Garth Schmidt - Citigroup- Analyst> If I could just go back to the November 2023 Analyst Day, I recall you had to make some assumptions around pipeline, conversion, and then which segments would grow at which rates. Maybe you could talk about how some of those key assumptions are trending. Obviously, some good wins announced in the quarter, so it seems fairly positive. But curious about how some of those key assumptions are trending and how that influences your visibility for gross profit growth in the out years.

<A: Michael Milotich> *Yes. I think for the most part, of course, there's always puts and takes. You don't get everything right. But I would say on a bigger picture level, we're very much on trend. We had said that we expected $20 million in revenue from customers who essentially had not launched prior to 2024 in the year, and we're on track to deliver that. And that number is expected to go up to 60% -- or $60 million, sorry, next year. So, we feel good that the new business that we're onboarding is on track.*

I think in terms of when we look at the existing business and how it's trending, I would say it's about as expected with maybe slightly different -- a slightly different mix than maybe we'd anticipated a year ago. I think some of the things that Simon has highlighted in financial services and this concept where just many, many companies, particularly in embedded finance, have some neobank aspects to their strategy in terms of how they want to engage their users or their employees. And so, I would say that's an area we're probably seeing more demand than we had thought 9 months ago. So, that's probably the earliest place where we're really seeing a lot of embedded finance activity.

17

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*But big picture wise, we're largely on track and things are as planned, with the 1 exception being our ability to manage costs effectively. That's the 1 place where we're noticeably ahead where we expected 9 months ago.*

<Q: Andrew Garth Schmidt - Citigroup- Analyst> And then lot of questions this quarter on cyclicality and macro. Obviously, it doesn't seem to be showing up in your results, pretty strong growth. But maybe you could just remind us the components of cyclicality and maybe more towards the fourth quarter where we do get a heightened shopping season with BNPL and such and what the sensitivity is there.

<A: Michael Milotich> *So far, we're seeing very stable trends, even our July TPV growth is in line with Q2. And if you actually go back much further, what you see is really for about 18 months, our TPV growth has been incredibly stable, which we're quite happy about because our base is getting materially larger and we're still able to maintain this growth that's called like sort of low to mid-30s growth on a very consistent basis. So, we're certainly not seeing anything macro-wise that seems to be disrupting that trajectory and including the month of July. So, so far, we see things trending quite stable.*

One of the other things we also look at is the mix of our spend. So, we look at the spend by what's high discretionary, what's low discretionary, and kind of a medium bucket, everything in between. And when we cut our TPV that way, what we're seeing is each of those 3 buckets is growing at roughly the same rate. So, right now, at this point, too, with this compounding growth we're getting very nicely, the mix of our business by sort of discretionary buckets is not changing a whole lot. So, everything is fairly stable.

The last question that you had about the holiday season. So, the only thing that's material for us is that, yes, in Q4, the mix of our volume shifts a little bit more to BNPL, right? Just given the role that BNPL plays in retail holiday shopping, in particular, the mix of our volume shifts a couple of points to BNPL in the fourth quarter compared to the rest of the year. But otherwise, everything is pretty stable. That's the only thing that's noticeable in Q4 versus the other quarters of the year.

(Emphasis added.)

34.     The above statements in Paragraphs 20 to 33 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth areas of fintech, including on-demand delivery, BNPL and digital banking, while also downplaying the potential for longer customer onboarding timelines for new deal launches caused by heighted regulatory scrutiny. In truth, Marqeta's investment in compliance and program management capabilities

were inadequate to deal with regulatory scrutiny facing its banking partners leading to significantly longer onboarding delays for new customers.

### C. The Truth Emerges during Marqeta's Third Quarter Results and Reduces Fourth Quarter and Full Year 2025 Growth Outlook

*November 4, 2024*

35. On November 4, 2024, the Company reported third quarter and pertinently cut their full year 2025 growth outlook stating, "Our fourth quarter guidance reflects several changes that became apparent over the last few months with regards to the heightened scrutiny of the banking environment and specific customer program changes."

36. During the same-day earnings call, Defendant Khalaf addressed the softening guidance for Q4 2024, stating, in pertinent part:

> With all this great progress, why is our guidance for Q4 softer than expected? Well, last year, the regulatory environment changed amongst the smaller banks that supports many of our customers' programs.
>
> As a company, we anticipated this change and invested in program management in general and compliance services in particular. We believe that these investments have positioned us well in the medium and long term and increase the most around our platform, especially in embedded finance. However, we underestimated the increased operational burden these changes made on both Marqeta's and the bank's onboarding and compliance teams. The incremental scrutiny and rigor translated into delays in launching new programs.
>
> ***These delays have also been aggravated by the increased demand from new bookings in 2023 and the first half of 2024. On average, the time to launch new programs grew 30% to 40% from 2023, and we expect that increase to remain for at least 2 additional quarters as we and our bank partners become more agile in launching programs in this new environment.***
>
> ***Given the standard ramp time for programs in our industry, these delays will cause volume and gross profit to be pushed out a few months. Now with a more complete understanding of the implications, we're taking a more holistic approach to ramping the programs we have already signed. We are also signing up new banks to add capacity and open up new choices for our customers while making our processes standardized across all banks we support.***
>
> We are confident these changes will give us the agility we need. However, it will take a few months to completely solve the problem and drain the backlog that has been built up. We view the headwinds from the more challenging bank environment as short term, merely slowing down our progress rather than a change in the

trajectory of our business nor impacting our path to profitability. In fact, we remain confident in our strategy, business trajectory and execution.

(Emphasis added.)

37. On the same call, Defendant Milotich discussed the Company's outlook for Q4 2024, stating, in relevant part:

Now let me walk through our latest outlook for Q4. We expect Q4 net revenue growth to be between 10% and 12% and Q4 gross profit growth to be between 13% and 15%, a 6- and 9-point reduction, respectively, compared to what we shared in early August. The change in our expectations is primarily driven by 2 factors, both of which stem to some degree from the heightened regulatory environment from our bank partners.

First, we now expect significantly fewer new programs will launch and ramp up in the second half of the year, lowering gross profit growth by approximately 6 points. We were not quick enough with solutions and new processes for our bank partners, and they are more focused on maintaining current programs in the heightened regulatory environment than launching new programs. In some cases, this environment also delays our customers' launch plans. Now that we have a backlog of programs to launch, it will take time to work through it.

Delays of a few months pushes launches into Q4 and the first half of 2025. Because of the ramp trajectory of TPV in the first year of a program, a few months delay meaningfully impacts Q4. The impact is larger on gross profit than revenue since newer programs with subscale volume tend to have high gross margins until our customers work through the initial volume tiers in our contracts.

Why does this change in assumptions seem so sudden? We have been very aware of the scrutiny and working through it with our bank partners, investing significantly more in our compliance efforts since the start of this year to raise our program management standards ahead of the rising tide. ***However, in the past 2 to 3 months, it has become clear we greatly underestimated the magnitude and time horizon for all parties to adapt to the new standards. We are actively executing the solution for this challenge, working closely with existing bank partners to optimize our processes to improve the efficiency of program approval and onboarding.***

(Emphasis added.)

38. During the question-and-answer segment of the call, Defendant Khalaf was asked if the product launch delays were industry wide:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<Q: Sanjay Harkishin Sakhrani – Keefe, Bruyette, & Woods, Inc.- Analyst> I guess, Mike, you mentioned or Simon did that what you were seeing is not dissimilar to what others have seen in the industry. I mean, have you guys validated that? Have your competitors also seen similar product launch delays?

<A: Simon Khalaf > Good question. Actually, as a team, we were at Money20/20 last week, which is the conference for new financial services. And I'd say that the #1 thing that was discussed was how everyone is now taking compliance in general and regulatory compliance seriously. And everybody is talking about the delays, but they're also talking about the flight to quality, which is they're coming to Marqeta because we were the entity that has invested early on in the cycle.

And also, we heard a lot of folks that thought that they could use BaaS players as kind of like an alternative to Marqeta, that actually has disappeared because a lot of folks mentioned that they're seeing almost these solutions fizzle out in terms of the ability to take on scale programs. So yes, we're not unique into that -- into this environment. But I do believe we had a head start in compliance, and we will get over this hump in terms of the operational burden that ourselves and a couple of our bank partners have faced.

39.     The aforementioned press release and statements made by the Individual Defendants are fraudulent and in direct contrast to statements Defendants' prior statements, including those made during the May 7, 2024, May 20, 2024 and August 7, 2024, earnings calls and presentations. On those calls, Defendants continually touting growth in new business bookings and onboarding timelines ahead of full-year plan, in addition to making significant operational improvements and confidence in driving growth of its newer customers and embedded finance use cases. In truth, the Company's ongoing investment in compliance and program management capabilities were inadequate to deal with regulatory scrutiny facing its banking partners thereby leading to significantly longer onboarding delays for new customers. Defendants misled investors by providing the public with materially flawed statements of confidence and growth projections which did not account for these variables.

40.     A number of well-known analysts who had been following Marqeta downgraded the Company's stock and/or lowered their price targets in response to Marqeta's disclosures. For example, J.P. Morgan released a statement regarding Marqeta's recent issues, stating, in pertinent part:

21

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

As the BIN sponsorship environment came under regulatory pressure earlier this year, onboarding timelines became heavily extended (from ~150 days in 2023 to >300 in 1H24), which management previously expected to improve in 3Q. For context, this dynamic was generally undiscussed by management until now, with MQ as recently as last quarter articulating that new business onboarding was proceeding generally on track. Ultimately, this expected bottleneck relief didn't happen, and in 3Q onboarding times were still 30-40% higher than last year, resulting in a delay in bookings conversion and lower NTM growth.

41. Similarly, Wells Fargo released a statement as to Marqeta's "unfortunate and untimely setback", stating, "[w]hile management attempted to reassure investors that the challenges had 'bottomed' & revenues would return once delays were alleviated, we think this message will fall on deaf ears for the foreseeable future."

42. As a result, investors and analysts reacted immediately to Marqeta's revelations. The price of Marqeta's stock declined from $5.95 per share on November 4, 2024 to $3.42 per share on November 5, 2024.

### D. Loss Causation and Economic Loss

43. During the Class Period, as detailed herein, Marqeta and the Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Marqeta's common stock and operated as a fraud or deceit on Class Period purchasers of Marqeta's common stock by materially misleading the investing public. Later, when Marqeta and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Marqeta's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Marqeta's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

44. Marqeta's stock price fell in response to the corrective event on November 4, 2024, as alleged *supra*. On November 4, 2024, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Marqeta's forecasting processes and growth guidance.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**E.     Presumption of Reliance; Fraud-On-The-Market**

45.     At all relevant times, the market for Marqeta's common stock was an efficient market for the following reasons, among others:

(a)     Marqeta's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     Marqeta communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Marqeta was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Marqeta was reflected in and incorporated into the Company's stock price during the Class Period.

46.     As a result of the foregoing, the market for Marqeta's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Marqeta's stock price. Under these circumstances, all purchasers of Marqeta's common stock during the Class Period suffered similar injury through their purchase of Marqeta's common stock at artificially inflated prices, and a presumption of reliance applies.

47.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**F.     No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

48.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

49.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

50.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Marqeta who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Marqeta's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

52. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Marqeta's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Marqeta or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of October 31, 2024, there were 465 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

53. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

55. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Marqeta;

25

(c)    whether the Individual Defendants caused Marqeta to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Marqeta's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

56.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder*

57.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

59.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and,

26
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Marqeta common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Marqeta's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

60. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Marqeta's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

61. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

62. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Marqeta's internal affairs.

63. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Marqeta's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Marqeta's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Marqeta's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

64. During the Class Period, Marqeta's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Marqeta's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Marqeta's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Marqeta's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

65. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the

28

disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

67.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Marqeta's misstatements.

69.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Marqeta which had become materially false or misleading.

70.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Marqeta disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Marqeta to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Marqeta's common stock.

71.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Marqeta to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

72. By reason of the above conduct, the Individual Defendants and/or Marqeta are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 10, 2024      Respectfully Submitted,

**LEVI & KORSINSKY, LLP**

/s/ Adam Apton

Adam M. Apton (SBN 316506)
Email: aapton@zlk.com
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671

*Attorneys for Plaintiff*

30
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, DavidJ Ford , duly certify and say, as to the claims asserted under the federal

Name

securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in Marqeta, Inc. which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury that the foregoing is true and correct. Executed this:

12/04/2024

Date

DavidJ Ford

Name

Signature

Schedule of Transactions

David J. Ford

Marqeta, Inc.

Class Period: May 7, 2024 to November 4, 2024, inclusive

| Date | Purchase/Sale | Quantity | Price |
|------|---------------|----------|-------|
| 6/26/2024 | P | 11 | $5.35 |
| 7/11/2024 | P | 56 | $5.43 |
| 9/16/2024 | P | 11 | $5.00 |
| 9/23/2024 | S | 11 | $5.20 |
| 9/26/2024 | P | 17.743708 | $4.96 |
| 10/1/2024 | P | 11 | $4.80 |
| 10/1/2024 | P | 3 | $4.81 |
| 10/8/2024 | P | 11 | $4.71 |

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
DAVID FORD

**DEFENDANTS**
MARQETA, INC., SIMON KHALAF and MICHAEL MILOTICH

**(b)** County of Residence of First Listed Plaintiff    Charlotte County, FL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Alameda County, CA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
LEVI & KORSINSKY LLP; 445 South Figueroa Street, 31st Floor, Los Angeles, CA 90071

Tel: (213) 985-7290

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment Of Veteran's Benefits
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury -Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury – Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities– Employment
- ☐ 446 Amer. w/Disabilities–Other
- ☐ 448 Education

### PRISONER PETITIONS

**HABEAS CORPUS**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**OTHER**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee– Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC § 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC § 158
- ☐ 423 Withdrawal 28 USC § 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent–Abbreviated New Drug Application
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS–Third Party 26 USC § 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC § 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation–Transfer | ☒ 8 Multidistrict Litigation–Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 78j(b) and 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5

Brief description of cause:
Violations of the federal securities laws

## VII. REQUESTED IN COMPLAINT:

✓ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE                    DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

**(Place an "X" in One Box Only)**   ☒ SAN FRANCISCO/OAKLAND   ☐ SAN JOSE   ☐ EUREKA-MCKINLEYVILLE

DATE   12/10/2024          SIGNATURE OF ATTORNEY OF RECORD          s/ Adam M. Apton