# EXHIBIT B

Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

STEPHANIE SMITH, derivatively on behalf of MARQETA, INC.,

Plaintiff,

v.

SIMON KHALAF, MICHAEL MILOTICH, NAJUMA ATKINSON, ALPESH CHOKSHI, MARTHA CUMMINGS, JASON GARDNER, R. MARK GRAF, JUDSON C. LINVILLE, KIRAN PRASAD, HELEN RILEY, and GODFREY SULLIVAN,

Defendants,

and

MARQETA, INC.,

Nominal Defendant.

Case No.:

**DEMAND FOR JURY TRIAL**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Stephanie Smith ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Marqeta, Inc. ("Marqeta" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Simon Khalaf ("Khalaf"), Michael Milotich ("Milotich"), Najuma Atkinson ("Atkinson"), Alpesh Chokshi ("Chokshi"), Martha Cummings ("Cummings"), Jason Gardner ("Gardner"), R. Mark Graf ("Graf"), Judson C. Linville ("Linville"), Kiran Prasad ("Prasad"), Helen Riley ("Riley"), and Godfrey Sullivan ("Sullivan") (collectively, the "Individual Defendants," and together with Marqeta, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Marqeta, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Khalaf and Milotich for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Marqeta, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 7, 2024 through November 4, 2024, inclusive (the "Relevant Period").

2. Marqeta is a card issuing platform that purports to "encompass[] debit, prepaid, and credit programs" and "provide[] banking and money movement, risk management, and rewards products."[1] The Company represents that it delivers both "a scaled solution to [its] customers to maximize the benefit of their card programs[]" and "robust card program management, allowing [its] customers to embed Marqeta in their offering without having to build certain complex elements or customer support services."[2]

3. The Relevant Period began on May 7, 2024 when the Company published a press release announcing its financial results for the first quarter of 2024. In relevant part, the press release represented that "Total Processing Volume (TPV) increased by 33% year-over-year, rising to $67 billion from $50 billion in the first quarter of 2023"; that "Adjusted EBITDA was $9 million in the first quarter of 2024, increasing by $14 million year-over year"; and that "Adjusted EBITDA margin was 8% in the first quarter of 2024, an increase of 10 percentage points versus last year."

4. During an earnings call the Company hosted later that day to discuss these results, Defendant Khalaf, Marqeta's Chief Executive Officer ("CEO"), touted Marqeta's purported accomplishments, stating that these positive financial results "demonstrate[d] how the strong foundation [Marqeta] built in 2023 [was] leading to growth with new and existing Marqeta customers" and "sp[oke] volumes to the strength and depth of the Marqeta platform." He also represented that the Company "*started the year with net revenue, gross profit, and adjusted EBITDA outpacing expectations*."[3]

5. Throughout the Relevant Period, the Individual Defendants repeatedly misled investors regarding Marqeta's onboarding strategy, including program management and compliance services. In particular, the Individual Defendants failed to disclose to investors that the industry for smaller banks was undergoing heightened regulatory scrutiny that

---

[1] https://www.sec.gov/ix?doc=/Archives/edgar/data/1522540/000162828024007663/mq-20231231.htm
[2] *Id.*
[3] All emphasis has been added unless otherwise noted herein.

Verified Shareholder Derivative Complaint

would, *inter alia*, increase the operational burden facing the Company and, as a result, delay the launch of Marqeta's new programs.

6. The truth fully emerged on November 4, 2024 when, after the market closed, Marqeta published a press release announcing its financial results for the third quarter of 2024. Notably, Marqeta lowered its guidance for net revenue growth and gross profit growth, providing fourth quarter guidance of 10-12% net revenue growth and 13-15% gross profit growth, which failed to meet the Company's previously projected guidance of 16-18% net revenue growth and 22-24% gross profit growth. In explaining these results, the Company admitted that its fourth quarter guidance "reflects several changes ***that became apparent over the last few months with regard to heightened scrutiny of the banking environment and specific customer program changes***."

7. On this news, the price per share of the Company's common stock fell $2.53, or 42.5%, from a closing price of $5.95 per share on November 4, 2024 to close at $3.42 per share on November 5, 2024.

8. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company had understated the negative impact that enhanced regulatory scrutiny in the smaller banking industry was having on its operations and business outlook; and (2) due to the foregoing, the Company would be forced to slash its guidance for the fourth quarter of 2024. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9. During the Relevant Period, the Individual Defendants further breached their fiduciary duties by causing Marqeta to repurchase its own stock at prices that were

4

Verified Shareholder Derivative Complaint

artificially inflated due to the foregoing misrepresentations and material omissions. Indeed, during the Relevant Period, approximately 20,358 shares of Marqeta's common stock were repurchased, costing the Company over $107,524. As the Company's stock was actually worth only $3.42 per share, the price at which it was trading when markets closed on November 4, 2024, the Company overpaid for repurchases of its own stock by over $37,900 in total.

10. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, one of the Individual Defendants sold shares of Company common stock at inflated prices for total proceeds of approximately $219,917.

11. Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

12. In light of the Individual Defendants' misconduct—which has subjected the Company, its President and Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective

5

Verified Shareholder Derivative Complaint

engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Khalaf's and Defendant Milotich's liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18. Venue is proper in this District because Marqeta's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19. Plaintiff is a current shareholder of Marqeta. Plaintiff has continuously held Marqeta common stock since purchasing the stock on June 11, 2021.

### Nominal Defendant Marqeta

Verified Shareholder Derivative Complaint

20. Marqeta is a Delaware corporation with its headquarters at 180 Grand Avenue, 6th Floor, Oakland, California 94612. Marqeta's common stock trades on The Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "MQ."

**Defendant Khalaf**

21. Defendant Khalaf has served as the Company's CEO and as a Company director since January 2023. He also serves as a member of the Payments Innovation Committee.

22. For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Khalaf received $16,294,313 in total compensation from the Company, which consisted of $571,458 in salary, $7,396,047 in stock awards, $7,620,111 in option awards, $690,000 in non-equity incentive plan compensation, and $16,697 in all other compensation.

23. The Schedule 14A the Company filed with the SEC on April 25, 2024 (the "2024 Proxy Statement") stated the following about Defendant Khalaf:

> Mr. Khalaf was appointed as Chief Executive Officer of Marqeta and as a member of our board of directors in January 2023. Prior to his appointment, he had served as our Chief Product Officer since June 2022. Before joining Marqeta, Mr. Khalaf was SVP of Twilio Inc., a publicly-traded cloud communications platform developer, with responsibility for Twilio's Core Products, from May 2019 to June 2022. From June 2017 to May 2019, Mr. Khalaf was SVP and General Manager, Media Products, at Verizon, Inc., a publicly-traded communications company. Mr. Khalaf holds a Master of Science in Electrical Engineering from Syracuse University and a Bachelor of Engineering in Electrical Engineering from American University of Beirut.
>
> *Qualifications:* We believe that Mr. Khalaf is qualified to serve as a member of our board of directors because of his extensive business experience in product and technology, his experience in management and his perspective as our Chief Executive Officer, and his knowledge of the industry that we operate in.

**Defendant Milotich**

24. Defendant Milotich has served as the Company's CFO since February 2022.

25. For the 2023 Fiscal Year, Defendant Milotich received $3,576,606 in total compensation from the Company, which consisted of $475,000 in salary, $1,160,202 in stock awards, $1,499,101 in option awards, $428,000 in non-equity incentive plan compensation, and $14,303 in all other compensation.

26. The 2024 Proxy Statement stated the following about Defendant Milotich:

Mr. Milotich has served as our Chief Financial Officer since February 2022. Prior to joining Marqeta, Mr. Milotich was Senior Vice President, Head of Corporate Finance and Investor Relations at Visa Inc., a publicly traded global financial platform company, from November 2018 to February 2022. He previously served in a number of finance roles of increasing seniority at Visa since 2011, most recently as Senior Vice President, Head of Investors Relations from April 2018 to November 2018 and Vice President, Corporate FP&A and Business Analyst Lead from December 2014 to April 2018. Mr. Milotich holds a Master of Business Administration in Strategy and Finance from the Stern School of Business at New York University and a Bachelor of Arts in Business Economics from the University of California, Santa Barbara.

**Defendant Atkinson**

27. Defendant Atkinson has served as a Company director since April 2023. She also serves as Chair of the Compensation Committee and as a member of the Nomination and Governance Committee.

28. For the 2023 Fiscal Year, Defendant Atkinson received $635,297 in total compensation from the Company, which consisted of $35,302 in fees earned or paid in cash and $599,995 in RSUs.

29. The 2024 Proxy Statement stated the following about Defendant Atkinson:

Ms. Atkinson has served as a member of our board of directors since April 2023. Ms. Atkinson has served as Executive Vice President and Special Advisor People & Culture of Hasbro, Inc., a publicly traded play and entertainment company, since April 2024 and previously served as Hasbro's Chief People Officer from May 2022 to April 2024 and Executive Vice President of Human Resources from October 2021 to May 2022. From September 2019 to October 2021, Ms. Atkinson served as Senior Vice

Verified Shareholder Derivative Complaint

President of Global HR Services for Dell Technologies, Inc., a publicly traded information technology company. Prior to that, she served in various positions of responsibility at Dell Technologies in the Human Resources, Customer Experience, and Strategy functions since 1999. Ms. Atkinson holds a bachelor's degree from Fisk University in Political Science and a master's degree in Organizational Management from Trevecca Nazarene University.

*Qualifications:* We believe that Ms. Atkinson is qualified to serve as a member of our board of directors because of her extensive experience in executive leadership at several public companies.

**Defendant Chokshi**

30.     Defendant Chokshi has served as a Company director since June 2024. He also serves as a member of the Nomination and Governance Committee and the Payments Innovation Committee.

31.     The 2024 Proxy Statement stated the following about Defendant Chokshi:

Mr. Chokshi has served as President of Rotomaire, Inc., dba Banyan since January 2024. Mr Chokshi previously served as Global Head of Business Development and Strategy for Personal Banking and Wealth at Citigroup Inc. from August 2018 to December 2023. Mr. Chokshi has also served as a Senior Advisor at Long Ridge Equity Partners and Zenon since January 2024. Prior to Citigroup, he served as Head of National Accounts at Visa, a publicly traded financial technology company, from 2015 to 2018. Prior to joining Visa, Mr. Chokshi served in various leadership roles at American Express Company, a publicly traded multinational financial services corporation, from 2001 to 2015. Mr. Chokshi holds an MBA from the Wharton School, University of Pennsylvania and a Bachelor of Science in Electrical Engineering and a Bachelor of Science in Economics, both from the University of Pennsylvania.

*Qualifications:* We believe that Mr. Chokshi is qualified to serve as a member of our board of directors because of his experience in management and his knowledge of the global financial services industry.

**Defendant Cummings**

9

Verified Shareholder Derivative Complaint

32.     Defendant Cummings has served as a Company director since January 2021. She also serves as Chair of the Nomination and Governance Committee and as a member of the Audit Committee.

33.     For the 2023 Fiscal Year, Defendant Cummings received $249,998 in total compensation from the Company, which consisted of $50,000 in fees earned or paid in cash and $199,998 in RSUs.

34.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Cummings made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2024-06-25 | 40,241 | $5.46 | $219,917 |

Thus, in total, before the fraud was exposed, she sold 40,241 shares of Company common stock on inside information, for which she received approximately $219,917 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

35.     The 2024 Proxy Statement stated the following about Defendant Cummings:

Ms. Cummings has served as a member of our board of directors since January 2021. From July 2018 to March 2020, Ms. Cummings served as Executive Vice President, Head of Compliance Strategy & Operations at Wells Fargo Bank N.A., a publicly traded global financial services company. Previously, from October 2012 to June 2018, Ms. Cummings served as Senior Vice President and Senior Supervisory Officer at the Federal Reserve Bank of New York. Ms. Cummings holds a Master of Business Administration from the Wharton School of Business and a Master of Arts in International Studies from the Lauder Institute of the University of Pennsylvania and a Bachelor of Arts in Economics from the University of Minnesota.

*Qualifications:* We believe that Ms. Cummings is qualified to serve as a member of our board of directors because of her experience in management and her knowledge of the global financial services industry.

10

Verified Shareholder Derivative Complaint

**Defendant Gardner**

36.     Defendant Gardner founded Marqeta and served as the Company's CEO until January 2023. He has also served as a Company director since November 2010 and served as Executive Chairman of the Board from January 2023 to June 2024. In addition, Defendant Gardner serves as Chair of the Payments Innovation Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Gardner beneficially owned approximately $51.5 million shares of the Company's outstanding Class B Common Stock, representing 49.98% of total voting power.

37.     For the 2023 Fiscal Year, Defendant Gardner received $600,764 in total compensation from the Company, which consisted of $349,872 in salary, $247,500 in non-equity incentive plan compensation, and $3,392 in all other compensation.

38.     The 2024 Proxy Statement stated the following about Defendant Gardner:

Mr. Gardner founded Marqeta and served as our Chief Executive Officer until January 2023. He has served as a member of our board of directors since November 2010, taking on the role of Executive Chairman in January 2023. Mr. Gardner holds a Bachelor of Arts in Political Science from Arizona State University.

Qualifications: We believe that Mr. Gardner is qualified to serve as a member of our board of directors because of his experience and perspective as our Founder and former Chief Executive Officer.

**Defendant Graf**

39.     Defendant Graf has served as a Company director since July 2024. He also serves as Chair of the Audit Committee.

40.     The Company's website states the following about Defendant Graf:

Mr. Graf served as Chief Financial Officer of Discover Financial Services, a publicly traded financial services company, from April 2011 to September 2019. He has served on the board of directors of Harmony Biosciences Holdings, Inc., a publicly traded commercial-stage pharmaceutical company since November 2020, and Signet Jewelers Limited, a publicly traded retail

11

Verified Shareholder Derivative Complaint

jeweler, since July 2017. Mr. Graf holds a Bachelor of Science in Economics from the Wharton School of the University of Pennsylvania.[4]

**Defendant Linville**

41.     Defendant Linville has served as a Company director since May 2020. He also serves as Non-Executive Chair of the Board and as a member of the Compensation Committee.

42.     For the 2023 Fiscal Year, Defendant Linville received $299,995 in total compensation from the Company, which consisted of $50,000 in fees earned or paid in cash and $249,995 in RSUs.

43.     The 2024 Proxy Statement stated the following about Defendant Linville:

Mr. Linville has served as a member of our board of directors since May 2020. Since October 2019, Mr. Linville has served as a Senior Advisor at General Atlantic LLC, a global growth equity firm. He previously served as the Chief Executive Officer of Global Cards and Consumer Services at Citigroup Inc., a publicly traded global financial services institution, from November 2010 to September 2018. Mr. Linville currently serves as a member of the Board of Visitors of Duke University's Fuqua School of Business and as a member of the Board of Trustees of Lafayette College. Mr. Linville holds a Doctor of Psychology in Clinical Psychology from the College of Medicine at Drexel University and a Bachelor of Arts in Psychology from Lafayette College.

*Qualifications:* We believe that Mr. Linville is qualified to serve as a member of our board of directors because of his extensive business experience in the financial industry, his experience in management, and his knowledge of the industry that we operate in.

**Defendant Prasad**

44.     Defendant Prasad has served as a Company director since September 2022. He also serves as a member of the Audit Committee and the Compensation Committee.

---

[4] https://investors.marqeta.com/governance/board-of-directors

12

Verified Shareholder Derivative Complaint

45. For the 2023 Fiscal Year, Defendant Prasad received $249,998 in total compensation from the Company, which consisted of $50,000 in fees earned or paid in cash and $199,998 in RSUs.

46. The 2024 Proxy Statement stated the following about Defendant Prasad:

Mr. Prasad has served as a member of our board of directors since September 2022. From May 2021 to November 2023, Mr. Prasad served as Head of Product at Next Door Holdings, Inc., a publicly traded internet-related services company. He previously served as Vice President of Product for LinkedIn, a networking-focused social media platform and subsidiary of Microsoft Corporation, from January 2018 to April 2021. Mr. Prasad holds a Bachelor of Science in Computer Science and Computational Mathematics from Michigan State University and a Master of Science in Computer Science from the University of Michigan.

*Qualifications:* We believe that Mr. Prasad is qualified to serve as a member of our board of directors because of his extensive business experience in product and technology, his experience in management, and his knowledge of the industry that we operate in.

**Defendant Riley**

47. Defendant Riley has served as a Company director since May 2020. She also serves as a member of the Audit Committee.

48. For the 2023 Fiscal Year, Defendant Riley received $249,998 in total compensation from the Company, which consisted of $50,000 in fees earned or paid in cash and $199,998 in RSUs.

49. The 2024 Proxy Statement stated the following about Defendant Riley:

Ms. Riley has served as a member of our board of directors since May 2020. Since June 2015, Ms. Riley has served as the Chief Financial Officer at X Development LLC, a research and development company and subsidiary of Alphabet Inc., a publicly traded internet-related services and products company. Ms. Riley currently serves on the board of directors of Eventbrite Inc., a publicly traded global service ticketing platform. Ms. Riley holds a Master of Business Administration from Harvard Business School and a Bachelor of Arts in Philosophy, Politics and Economics and a Master of Arts from the University of Oxford.

Verified Shareholder Derivative Complaint

Qualifications: We believe that Ms. Riley is qualified to serve as a member of our board of directors because of her experience in management, knowledge of the global financial services industry, and experience as a board member of a public company.

**Defendant Sullivan**

50. Defendant Sullivan has served as a Company director since May 2021. He also serves as a member of the Audit Committee.

51. For the 2023 Fiscal Year, Defendant Sullivan received $249,998 in total compensation from the Company, which consisted of $50,000 in fees earned or paid in cash and $199,998 in RSUs.

52. The 2024 Proxy Statement stated the following about Defendant Sullivan:

Mr. Sullivan has served on our board of directors since May 2021. Mr. Sullivan previously served as President and Chief Executive Officer of Splunk, Inc., a publicly traded big data company, from September 2008 to November 2015 and as a member of the board of directors of Splunk, Inc. from December 2011 to June 2019, including as chairman of the board of directors from December 2011 until March 2019. Mr. Sullivan has served as a member of the board of directors of CrowdStrike Holdings, Inc., a publicly traded cybersecurity company, since December 2017 and Gitlab Inc., a publicly traded devops software company, since January 2020. Mr. Sullivan previously served on the board of directors of Citrix Systems, Inc., a publicly traded enterprise software company, from February 2005 to June 2018. Mr. Sullivan holds a Bachelor of Business Administration in Real Estate and Economics from the Hankamer School of Business at Baylor University.

*Qualifications:* We believe Mr. Sullivan is qualified to serve as a member of our board of directors because of his extensive experience in leadership, business, and software, and his experience as a board member of several public companies.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

53. By reason of their positions as officers, directors, and/or fiduciaries of Marqeta and because of their ability to control the business and corporate affairs of Marqeta, the Individual Defendants owed Marqeta and its shareholders fiduciary

14

Verified Shareholder Derivative Complaint

obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Marqeta in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Marqeta and its shareholders so as to benefit all shareholders equally.

54.     Each director and officer of the Company owes to Marqeta and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

55.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Marqeta, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

56.     To discharge their duties, the officers and directors of Marqeta were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

57.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Marqeta, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

58.     As senior executive officers and/or directors of a publicly-traded company

15

Verified Shareholder Derivative Complaint

whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

59. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Marqeta were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Marqeta's corporate governance and applicable codes of conduct and/or ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Marqeta conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of

the business and internal affairs of Marqeta and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Marqeta's operations would comply with all applicable laws and Marqeta's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

60. Each of the Individual Defendants further owed to Marqeta and the shareholders the duty of loyalty requiring that each favor Marqeta's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

61. At all times relevant hereto, the Individual Defendants were the agents of each other and of Marqeta and were at all times acting within the course and scope of such agency.

62. Because of their advisory, executive, managerial, directorial, and controlling positions with Marqeta, each of the Individual Defendants had access to adverse, nonpublic

information about the Company.

63. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Marqeta.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

64. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

65. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

66. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Marqeta was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct

Verified Shareholder Derivative Complaint

complained of herein.

67. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

68. At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Marqeta and was at all times acting within the course and scope of such agency.

## MARQETA'S CODE OF CONDUCT

69. Marqeta's Code of Business Conduct and Ethics (the "Code of Conduct") represents that it "is intended to help build and maintain trust, confidence and credibility with our customers, partners, vendors and others by adhering to our commitments, displaying honesty and integrity and achieving our business objectives through ethical conduct." The Code of Conduct further states that it "does not cover every issue that may arise in the course of Marqeta's many business activities, rather it sets out basic principles designed to guide all employees, directors and officers ('Marqetans')."

70. In the section "Compliance with Laws, Rules, and Regulations," the Code of Conduct states:

> Marqeta must comply with the laws, rules and regulations applicable to its business activities, those of its banking partners and those of its customers. Although you are not expected to know the details of these laws, rules and regulations, it is important to know enough about them to determine when to seek advice from your manager and Marqeta's Legal, Risk & Compliance Department ("LRC"). You must abide by applicable law in the country where you are located. In some instances, there may be a conflict between the applicable laws of two or more countries, states, or provinces. If you

encounter a conflict, or if a local law conflicts with a policy referenced in this Code, you should consult with your manager, HRBusiness Partner (HRBP) or LRC to determine the appropriate course of action. To assist in this effort, Marqeta has provided employees with various policies and procedures which provide guidance for complying with these laws, rules and regulations. In addition, the Company holds information and training sessions, including an annual compliance program provided by LRC, to assist employees in achieving compliance with the laws and regulations applicable to Marqeta and its activities. It is Marqeta's policy to make full, fair, accurate, timely and understandable disclosure in compliance with applicable laws, rules and regulations in all periodic reports required to be filed by the Company and in other public communications.

71. Marqeta addresses "Insider Trading" within the Code of Conduct in detail, stating:

Marqetans who have access to confidential information about Marqeta, our customers or partners are not permitted to use or share that information for stock trading purposes or for any other purpose except the proper conduct of our business. All non- public information about Marqeta, our customers or partners should be considered "confidential information." To use material, non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal. In this regard, Marqeta has adopted a Policy on Insider Trading. If you have any questions regarding the use of confidential information or the Policy on Insider Trading, please contact LRChelp@marqeta.com.

72. In the section "Conflicts of Interest" the Code of Conduct states:

Your obligation to conduct the Company's business in an honest and ethical manner includes the ethical handling of actual, apparent and potential conflicts of interest between personal and business relationships. A "conflict of interest" arises when there is a real or perceived private interest that interferes, or could reasonably be expected to interfere, in some way, with the interests of the Company. A conflict situation can arise when a Marqetan, or their immediate family members sharing the same household, takes actions or has interests that may make it difficult to perform Company work. Conflictsof interest can also arise when a Marqetan, or members of their immediate family sharing the same household, receives improper benefits or personal benefits from third parties as a result of their position in the Company. In addition, a

20

Verified Shareholder Derivative Complaint

Marqetan's involvement with other companies can interfere with the Company's ability to target such companies for business or corporate development opportunities, which may already be in progress, unbeknownst to the Marqetan. In light of the foregoing, Marqetans (excluding non-executive board directors) are prohibited from (i) working for* or (ii) holding or obtaining a direct or indirect financial or equity interest in** the following companies unless approved in writing by Marqeta's Legal, Risk & Compliance Department ("LRC") or, in certain cases for an executive officer, Marqeta's Audit Committee: ● anyprivate company ● acurrent or potential competitor, ● acurrent or potential customer, ● acurrent or potential strategic partner (including our card network, issuing bank, or BIN sponsor partners), ● acurrent or potential strategic vendor (including our card fulfillment vendors), or ● greater than 1% of the total market capitalization of any public company. * "Working for" should be interpreted broadly and includes, but is not limited to, direct employment, consulting, advising, board directorship, etc. ** A passive equity investment of less than 1% of the total market capitalization of a public company (e.g., IRAs, 401Ks, ETFs, mutual funds, and typical personal brokerage account investing up to 1% of the total market cap of a public company) and investments in real estate (e.g., including homes, real estate developments, and rental properties) are exempted from the forgoing prohibition and do not need to be disclosed to LRC. In order to request LRC's approval to engage in any of the foregoing, you must complete the Marqeta LRC Approval Request Form. LRC will respond to your submission within 5 business days where practical. Conflicts of interest may not always be clear-cut and it is not possible to describe every situation in which a conflict of interest may arise. Therefore, if you have a question, you should consult your manager, HRBP or LRChelp@marqeta.com.

73.     In the section "Competition and Fair Dealing," the Code of Conduct states the following:

We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices. Misappropriating proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited. We should each endeavor to respect the rights of, and deal fairly with, the Company's clients, vendors and competitors. No one in the course of conducting Marqeta's business should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other

Verified Shareholder Derivative Complaint

intentional unfair-dealing practice.

74. In the section "Waivers of the Code of Business Conduct and Ethics," the Code of Conduct states:

> The Company will waive application of the policies set forth in this Code only where circumstances warrant granting a waiver. Any waiver of this Code for executive officers or directors may be made only by Marqeta's Board of Directors and will be promptly disclosed to the public if and as required by law.

75. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting proceeds of approximately $219,917. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Marqeta's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## MARQETA'S AUDIT COMMITTEE CHARTER

76. Marqeta also maintains an Audit Committee Charter which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purposes of the Audit Committee:

> The purposes of the Committee are to: 1. Assist the Board in its oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the qualifications, independence and performance of the Company's independent auditors engaged for the purpose of issuing an audit report or performing other audit, review or attest services for the Company (the "Independent Auditors"), (4) the Company's governance, policies, and processes for monitoring and mitigating risks, and (5) the performance of the Company's internal audit

function; and 2. Review and approve the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

77. In a section titled "Unaudited Quarterly Financial Statements," the Audit Committee Charter outlines the following responsibilities and duties of the Audit Committee:

> The Committee will discuss with management and the Independent Auditors, before the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and other disclosures required to be included on Form 10-Q, (2) such issues as may be brought to the Committee's attention by the Independent Auditors pursuant to Statement on Auditing Standards No. 100, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements and Quarterly Report on Form 10-Q.

78. Regarding "Earnings Disclosures," the Audit Committee Charter states that "[t]he Committee will discuss the information to be included in the Company's earnings disclosures, such as press releases, forward looking guidance, and financial information (paying particular attention to the use of 'pro forma' or 'adjusted' non-GAAP information).

79. In a section titled "Risk Assessment and Management" the Audit Committee Charter states the following:

> The Committee will oversee the Company's management of Key Risks (defined below) as identified through the annual risk assessment, as well as the governance, policies, and processes for monitoring and mitigating such risks. "Key Risks" within the purview of the Committee include risks related to: ● operations, including business continuity; ● revenue concentration; ● relationships with banks or similarly regulated entities; ● financial risks; ● adoption of systems and infrastructure relating to the reconciliation of funds; ● modifications to the Company's underwriting processes, procedures and strategies; ● negative publicity or reputational risk, industry trends and general economic conditions; ● material litigation; ● platform performance and reliability, privacy concerns and security breaches; ● federal and state regulations; and ● international regulations.

> In furtherance of these purposes, the Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board may

from time to time prescribe; however, risk assessment and risk management are the responsibility of the Company's management. The Committee has an oversight role and, in fulfilling that role, it relies on the reviews and reports described below. The Committee may, as and to the extent it determines appropriate, review with management and take action with respect to: ● Setting the tone and developing a culture within the Company regarding Key Risks, promoting open risk discussion, and promoting integration of risk management into the Company's processes and goals; ● The Company's risk identification, risk assessment, risk tolerance and risk mitigation and management practices for addressing Key Risks, and the guidelines, policies, procedures, processes and training for these undertakings; ● Management's implementation of the risk policies, procedures and training reviewed with the Committee; ● Reports and presentations provided by management regarding the effectiveness of management's undertakings with respect to the identification, assessment, mitigation, and management of Key Risks; ● The oversight and review of any management led investigations and/or the undertaking of any Committee or Board led investigations or review of advice and counsel received from third party advisors, which the Committee will have the power to engage in its reasonable discretion; and ● Other matters as the Board determines relevant to the Committee's oversight of Key Risks assessment, mitigation, training and management.

80. With respect to "Procedures for Addressing Complaints and Concerns," the Audit Committee Charter states:

a. The Committee will review and approve management's policies and procedures for (1) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and (2) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters or other concerns regarding the Company or its management. b. The Committee may review and reassess the adequacy of these procedures periodically, and no less than annually, and adopt any changes to such procedures that it deems necessary or appropriate.

81. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches

24

Verified Shareholder Derivative Complaint

of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

82. Marqeta is a card issuing platform that purports to "encompass[] debit, prepaid, and credit programs" and "provide[] banking and money movement, risk management, and rewards products."[5] The Company represents that it delivers both "a scaled solution to [its] customers to maximize the benefit of their card programs[]" and "robust card program management, allowing [its] customers to embed Marqeta in their offering without having to build certain complex elements or customer support services."[6]

## FALSE AND MISLEADING STATEMENTS

### *May 7, 2024 Press Release and Earnings Call*

83. The Relevant Period began on May 7, 2024 when the Company published a press release announcing its financial results for the first quarter of 2024 ("1Q24"). Among other things, the press release touted that "Total Processing Volume (TPV) increased by 33% year-over-year, rising to $67 billion from $50 million in the first quarter of 2023"; that "Adjusted EBITDA was $9 million in the first quarter of 2024, increasing by $14 million year-over-year"; and that "Adjusted EBITDA margin was 8% in the first quarter of 2024, an increase of 10 percentage points versus last year." In addition, Defendant Khalaf was quoted as stating the following, in relevant part:

> Our business once again showed itself to be on a solid trajectory this quarter. Alongside continued scale and operational efficiencies, we saw growth from

[5] https://www.sec.gov/ix?doc=/Archives/edgar/data/1522540/000162828024007663/mq-20231231.htm
[6] *Id.*

25

Verified Shareholder Derivative Complaint

both major fintech customers expanding into new use cases and geographies, as well as growth from newer customers and embedded finance use cases. All put together, it speaks volumes to the breadth and depth of the Marqeta platform.

84. With respect to Marqeta's business growth and momentum, the press release stated the following, in relevant part:

Marqeta announced the global expansion of its U.S. partnership with Uber Eats into eight additional markets: Canada, Australia, Mexico, Brazil, Colombia, Peru, Chile and Costa Rica. Marqeta's platform allows Uber Eats to reduce effort and time-to-market for each subsequent new market launch, showcasing the global reach of Marqeta's platform and the strong partnership with Uber since 2020.

Marqeta supported the launch of a new and improved Klarna Card, open to all U.S. Klarna users, which is built into the Klarna app and provides flexible payment options with no revolving credit, allowing users to either pay a monthly statement in full with no interest, or pay over time. The card comes with personalized spending and budgeting recommendations and up to 10% cashback when used inside the Klarna app. Marqeta has supported Klarna's business since 2016, across multiple card projects in North America, Europe and Australia and New Zealand.

Marqeta announced that it will power the Rain Card, a branded debit card that will enable Rain's customers, such as McDonald's, Taco Bell, Hilton and Marriott, to disburse earned wages onto cards seamlessly. In addition, through its strategic partnership with Rain, Marqeta can expand the scope of its early wage access offerings to add more value for employers across diverse sectors of the economy.

85. Later that day, the Company hosted an earnings call with analysts and investors to discuss its 1Q24 financial results. During the call, Defendant Khalaf continued to tout the Company's performance, representing that Marqeta's 1Q24 results "demonstrate how the strong foundation [Marqeta] built in 2023 is leading to growth with new and existing" Company customers and "speaks volumes to the strength and depth of the Marqeta platform." In relevant part, Defendant Khalaf stated the following:

Verified Shareholder Derivative Complaint

*Our first quarter results demonstrate how the strong foundation we built in 2023 is leading to growth with new and existing Marqeta customers and speaks volumes to the strength and depth of the Marqeta platform. We started the year strong with net revenue, gross profit and adjusted EBITDA outpacing expectations.*

Total processing volume or TPV was $67 billion in the first quarter, a 33% increase compared to the same quarter of 2023. In Q1, we had a day where we processed over $1 billion in TPV, a significant milestone for the company. Our net revenue of $118 million in the quarter contracted 46% year-over-year, which included a decrease of 58 percentage points from the revenue presentation change related to our Cash App contract renewal.

First and foremost, the accelerated bookings we started in late 2022 and our relentless focus on converting them to gross profit are starting to pay off. For example, we launched a program with Trade Republic and new customers signed in late 2022. Trade Republic is Europe's largest broker and leading savings platform headquartered in Germany. Trade Republic uses Marqeta to power an innovative consumer debit card that combines spending and savings for their 4 million customers across 17 markets.

The company chose Marqeta due to our ability to reliably deliver innovation and easy geographic expansion. Over 1 million people joined the waiting list for the highly innovative card in just a few weeks. Second, in addition to launching and scaling new customers, we continue to focus on expanding with our existing customers. Uber Eats recently expanded with us into Latin and South America, Canada and Australia, bringing to 9, the number of markets served.

. . .

*Previously, several of our customers, namely fintechs, chose to take program management and other services in-house only to reverse course later given the complexity and regulatory requirements associated with scale. Now many customers look to Marqeta to ease a significant amount of operational burden. During the first quarter, about 20 of our existing customers added program management products and/or optional services from our programs like disputes, compliance reporting and 3D Secure.*

*Going forward, we believe compliance-related services, in particular, will be a key selling point and differentiator for our platform. Many competitors do not offer the same level of service and many prospective customers don't want to do this work themselves, especially when we have the advantage of*

27

Verified Shareholder Derivative Complaint

*both expertise and economies of scale. While ramping our previously booked programs as a top priority, we're also focused on the significant embedded finance opportunities right before us, like the $2 trillion market for accelerated wage access or AWA.*

As we look to capture this tremendous opportunity, we're working with multiple distribution partners to increase our reach and expand our offering. While we've seen tremendous growth from early large adopters like Uber and Walmart's One finance, we're approaching other channels to bring our solution to a broader market. In April, we announced our new customer Rain, a financial wellness benefits provider that uses technology to help companies give employees greater control over their finances.

. . .

*In summary, we're starting the year strong and seeing the foundation we laid over the last year start to deliver solid financial results. Our revamped sales efforts are beginning to pay off as the new embedded finance customers gain traction. In addition, our strong existing customer base continues to expand with us a testament to the value they get from our platform.*

86.     Also during the call, Defendant Milotich continued to discuss the Company's 1Q24 performance and full year outlook for 2024, stating the following, in relevant part:

Our Q1 results represent a strong start to the year with all of our key metrics exceeding our expectations. TPV grew 33% with broad-based outperformance, particularly in BNPL, on-demand delivery and financial services. The stronger-than-expected TBV growth drove net revenue to the high end of our expected range. Gross profit meaningfully outperformed due to those volume gains and the benefit of capturing additional network incentives, which I will discuss later in more detail.

Finally, continued execution of efficiency initiatives, particularly the streamlining of technology costs, when coupled with our higher gross profit led to significantly higher adjusted EBITDA of $9 million in the quarter. Q1 TPV was $67 billion, a year-over-year increase of 33% for the fourth straight quarter. Non-Block TBV grew approximately 15 points faster than Block growth.

. . .

On-demand delivery growth remained in the double digits, accelerating quarter-over-quarter as our customers expanded into new merchant categories and geographies. Q1 had our highest on-demand delivery TPV growth in the

28

Verified Shareholder Derivative Complaint

last 2 years. Expense management growth accelerated for the second straight quarter, growing on par with the overall company, driven mainly by strong performance from our top customers. In fact, one of these customers have been increasing the share of their volume on our platform after seeking platform diversification with a competitor in the past.

. . .

Now let's shift to our Q2 and full year outlook. We expect Q2 net revenue to contract between 47% and 50%. This is in line with the expectations we shared last quarter with the exception of the 2-point revenue presentation impact related to the renegotiated platform partnership. Consistent with what we have seen in the last 3 quarters, we have assumed a 65 to 70 percentage point negative impact of the cash app renewal.

. . .

Second, we now expect the mix of our TPV to be more heavily weighted toward the Powered by Marqeta business, which materially impacts net revenue but has a much lesser impact on gross profit. This will lower the revenue growth by approximately 1 point. Gross profit is now expected to grow 7% to 9%, lifting the bottom of the range from what we have shared previously.

TPV year-to-date has been a little stronger, helping the first half gross profit growth, but the majority of the Q1 gross profit upside was related to incentives that are specific to Q1 because of the way our incentive contracts are structured. Our expectations for the second half gross profit growth remained unchanged for now at 23% to 26%.

***These changes in our net revenue and gross profit expectations highlight why we focus on gross profit as the measure of value we deliver for our customers. Our net revenue can be noisy based on our business mix and revenue presentation. Based on our continued success with cost optimization and efficiency initiatives, we are raising our full year adjusted EBITDA margin to positive 1% to 3%. We still expect positive adjusted EBITDA for 3 out of our 4 quarters in 2024 with Q2 being the exception.***

87. Later, during the question-and-answer ("Q&A") segment of the call, Defendants Milotich and Khalaf continued to tout the Company's success and express confidence in Marqeta's continued growth through customers ramping ahead of schedule and new bookings, stating the following, in relevant part:

Verified Shareholder Derivative Complaint

<Q: Darrin David Peller -Wolfe Research, LLC- Analyst> Listen, just on new bookings. You obviously have talked over bookings being more material contributor in the back half of the year for those that you've already bought. Just curious if you could touch on how the cohorts are trending? Any variance you guys are seeing with regards to those customers ramping? And then just a quick follow-up. I'll just ask together on credit and maybe a little more on what the pipeline is looking like there and if we spend conversion there.

<A: Michael Milotich> *So far, what we're seeing is we're a little bit ahead of schedule. So we had said we expected about $20 million in revenue coming from these new cohorts for 2024 and then that ramping to $60 million next year. And in Q1, it's obviously early, but we are a little bit ahead based on a couple of customers launching a little more quickly than we expected and 1 or 2 also ramping a little faster than we had projected. That being said, because of, as you can imagine, the ramp of a card program, it takes a little bit of time. So we're, I guess, encouraged by the first couple of months, but the real value will be generated, say, 4 to 7, 8 months after the launch, when you really start to see what kind of momentum those programs have and what kind of volume they can generate. But we're off to a good start, a little bit ahead of schedule.*

<A: Simon Khalaf> On the credit side, again, like we said, our focus is to do a hell of a job on the initial accounts and partners that we have established. I'd say we're looking really good on the consumer credit side. I'd say for one particular reason, which is most of the brands that align with our vision on credit are thinking about a co-brand as an engagement tool and not just a loyalty tool. And kind of like addressing the top of the funnel, which is bringing more users or regain me the usage that have lost versus making my loyal customers more loyal.

So that fits exactly with how we perceive the credit market going and also it's a great thing for our platform because it operates in real time, and the rewards engine could be changed in a real-time basis in order to increase engagement and not just loyalty. And on the commercial side, it's actually better than we had expected. We did not anticipate such strong demand in commercial credit.

*And most of it is driven by, I'd say, the aggregator marketplaces that have great visibility into the performance of a small- to medium-sized business. So just to give you an example, at all lending that JPMorgan has done last year, only 2.6% of that went to small businesses. But small businesses account for like 53% of our GDP. I think we should have anticipated this*

30

Verified Shareholder Derivative Complaint

*great demand, but we didn't, but I think it's actually a very good sign for us.*

88.     In addition, when asked by a Wells Fargo analyst to elaborate on the Company's ramp of EBITDA margins for the future, Defendant Milotich stated the following, in relevant part:

<Q: Andrew Thomas Bauch- Wells Fargo - Analyst> I wanted to just talk to the adjusted EBITDA outperformance in the quarter. Nice to see the EBITDA positive and the cash headwinds coming to an end in unison in the third quarter here. So how should we think about the ramp of EBITDA margins as we progress beyond these headwinds that you guys have been experiencing? Meaning the amount of flow-through or in your ways you want to invest in the business?

<A: Michael Milotich> The way we've thought about it is that we believe we can grow our gross profit in the 20-plus percent, so in the 20s. And we also believe that if we're growing at that pace that we only need to grow our expenses in the low double digits, that there should be at least a 10-point gap. Once we lap all this and we get a normalized base to grow off of starting in '25 and '26 that there should be about a 10-point gap at least between our gross profit growth and our expense growth.

And that's just the benefit of a platform business and reaching our economies of scale. And so when you start to look at that 10-point gap in growth and you start to grow that out a year or 2, you'll see that the EBITDA comes in pretty significant chunks. It doesn't just drip in. It's becomes a meaningful gap as our volume and business just keeps getting bigger and bigger. And so that's really the formula we're looking at.

*And just to get a little more specificity, because we're so head count and technology-driven, our cost structure. What we see is between merit increases and things we'd get to our employee base as well as the variable costs we have of running our platform with Cloud costs and other data tools that we use, just those 2 things, our expenses would probably grow in the like mid- to high single-digit range, assuming we continue to compound at this kind of clip in terms of volume.*

*And so with that then, it's all a matter of how much more are we going to be investing incrementally to drive additional capabilities on the platform. And that's where we've said we think that anywhere from, say, 3 to 5 points of growth should be enough investment on top of the existing investment*

31

Verified Shareholder Derivative Complaint

*capacity we already have, which includes over 300 people who are focused on our platform today. And so that's the model that we are projecting our business going forward.*

*May 20, 2024 52nd J.P. Morgan Annual Global Technology, Media & Communications Conference*

89.     On May 20, 2024, Defendant Khalaf attended the 52nd J.P. Morgan Annual Global Technology, Media & Communications Conference, where he presented on behalf of Marqeta. During his presentation, Defendant Khalaf touted the Company's growing pipeline and compliance platforms with respect to its risk management, stating the following, in relevant part:

<Q: Tien-Tsin Huang – JPMorgan – Analyst> I mean, just thinking about some of the hot markets you've been in, expense management, BNPL, on-demand delivery, we've seen ups and downs, at least reflected in the stock prices. But your bookings have been strong, and it sounds like things are running a little bit ahead of plan. How healthy would you say your core end markets are?

<A: Simon Khalaf> *I'd say that on the booking side, as we talked about, we are ahead of plan, and the pipeline is growing faster than our bookings, which is a very good thing. So we're not draining the pipeline to make the quarter. And I'd say there's many reasons for that. The first one is, as we tackle the embedded finance market, by definition, they're bigger players. So the numbers are significantly higher.*

*The second one, the expansions with our customers is now occurring at a faster pace. I hate to call it the resurgence of fintech, but there are some fintechs that have now scaled, and I think that the dry spell or whatever last year is helping them, because the winners are winning more. So -- and they're expanding with us, either selling more products or expanding in other countries. And then we have, I'd say, the core use cases that we have reenabled that is fueling our pipeline as well. So from a bookings perspective, again, it's a win rate from a bigger pipeline, and it's looking very healthy.*

<Q: Tien-Tsin Huang – JPMorgan – Analyst> Yes. Well, that's consistent. You said you're going after enterprises. At Investor Day, you said you were moving away from the VC-backed players, which makes sense. And now

Verified Shareholder Derivative Complaint

you've got enterprise, you have marketplace. So could we expect larger deals in general, and the trade-off could be slower implementations? How should we evaluate that?

<A: Simon Khalaf> Yes. We intentionally do not want to trade a large number with a slower implementation cycle, right? So the good thing on the enterprise side is we are the program manager. So if you look at some of the deals that we've closed in fintech that took some time, we were not the program manager. So they had the relationship with the banks themselves. Things are slow. Banks are not the fastest moving organizations.

So us being the program manager, it actually makes the programs go smoother, if not even faster. So we're not trading that. So the answer is yes, there are going to be bigger deal, but the -- and we monitor this. The average and the median of the deployment cycles are coming down by about 11% year-over-year. So while we've broadened the pipe, we haven't compromised the deployment time.

<Q: Tien-Tsin Huang – JPMorgan – Analyst> So I know also enterprises are going to be a lot more careful around risk management, and I think compliance appears to be an asset for you because you've fought through that as you scaled up a lot of big players, including Cash App and Block. So is that a differentiator in your mind, Simon? Is there more to do on the compliance side?

<A: Simon Khalaf> Yes. Absolutely. No, no, absolutely. I mean, I always look at expertise and scale. So we can do it better and we can do it cheaper. So one is like, okay, so why? *One is the investment we have put in. We have spent in this platform. So if you look at it on the dispute side, whether you're doing Reg E or you're doing Reg Z. So Reg Z is for credit, Reg E is for debit. You have to put an IVR, you have to program it for telephony, you have to build a chatbot, you have to understand the intent of the consumer, you have to build a queuing management system, you have to submit to the network, and you have to track all these and instrument it to make sure the consumers are happy. Well, guess what? We've built that. So that is not easy work.*

*Same thing with banking, with banking secrecy, anti-money laundering, putting that machinery together, sampling it against lists, so on and so forth. That's all been done. And the scale we operate at, our unit economic is significantly better than what each customer can get on their own. So in addition to the unit economics, you've got multiple expertise that we can*

33

Verified Shareholder Derivative Complaint

*help them. So if somebody wants to do debit, money movement, credit, BNPL, 1 program management layer. And I think that's a huge differentiator for us.*

<Q: Tien-Tsin Huang – JPMorgan – Analyst> And when you're competing against some of your peers on the compliance side, is it very observable for your clients as they're making decisions on the compliance front?

<A: Simon Khalaf> They are. No, absolutely. *And I'd say that some of the fintech players, they're very smart and they built it on their own for a specific program. They did not realize that as they want to branch out of the program they have established, they have to kind of rebuild it. So I mean, at the end of the day, every fintech wants to become a bank. So without the license, but offer banking services.*

And it's not that they stopped and thought, hmm, I'm going to do consumer, business, commercial, lending, whatever. So let me start by building this great program management layer and start building services underneath it. No. They said, look, I'm going to do BNPL. I'm going to have great program management for that. But then they get into the revolver and say, hmm, that's going to be hard. So there's no question that the program management layer and the investment we've made have become great competitive differentiators for us.

***August 7, 2024 Press Release***

90.    On August 7, 2024, the Company published a press release disclosing its financial results for the second quarter of 2024 ("2Q24"). The press release announced, *inter alia*, "Total Processing Volume (TPV) of $71 billion, representing a year-over-year increase of 32% driven by volume growth across several use cases." In discussing these results, Defendant Khalaf stated the following, in relevant part:

The second quarter demonstrates the great returns on our reinvigorated go-to-market approach combined with our ability to deliver innovation at scale. We signed a pioneering techbank, launched a new payment innovation that reimagines what a card can be, and deepened the array of services we can offer globally, all while continuing to grow our TPV and operate with focused efficiency.

91.    In addition, with respect to the Company's recently signed deals and new

business updates, the press release announced the following, in relevant part:

> Marqeta announced it has signed a five year deal with Varo Bank, N.A., the first nationally-chartered consumer techbank in the U.S., to become its issuer processor. Varo selected Marqeta for its ability to combine sophisticated virtual, tokenized and physical card issuing technology for the more than five million cards it has in market, with faster speed to market, helping Varo achieve its goals of helping people save and manage their money more easily.
>
> We recently announced that we are the first US. issuer-processor certified by Visa to support Visa Flexible Credential, which will allow a single card product to toggle between payment methods on each transaction, bringing multiple funding sources to one card. Cardholders can choose whether to use debit, credit or "pay-in-four" with Buy Now Pay Later. Currently, we are partnering with Affirm, the first program announced in the US to offer Visa Flexible Credential, to enable this capability for their Affirm Card. This reinforces Marqeta's commitment to innovation and provides us with further differentiation in the BNPL landscape.
>
> Marqeta signed Zoho, a global tech company serving over 700 thousand businesses, which transforms how SMBs and enterprises work with a comprehensive suite of more than 50 business management applications. Zoho selected Marqeta for its ability to deliver expense management and embedded finance expertise to launch a card solution that enables businesses to manage expenses efficiently while also supporting their long-term growth.

92.  The same day, the Company also filed its quarterly report on Form 10-Q for 2Q24 (the "2Q24 10-Q"). The 2Q24 10-Q attached certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Khalaf and Milotich attesting to its accuracy. In addition, the 2Q24 10-Q incorporated by reference the risk disclosures from the Form 10-K the Company filed with the SEC on February 28, 2024 for the 2023 Fiscal Year (the "2023 10-K"). With respect to risks associated with future net revenue growth, the 2Q24 10-Q incorporated the following risk disclosure from the 2023 10-K by reference:

> ***Future net revenue growth depends on our ability to attract new customers and retain existing customers in a cost-effective manner.***

If we are unable to attract new customers, retain existing customers on favorable terms, and grow and develop those relationships to drive increased processing volumes, our business, results of operations, financial condition, and future prospects would be adversely affected.

If we fail to attract new customers, including customers in new use cases, industry verticals, and geographies, and to expand our platform in a way that serves the needs of these customers, and to onboard them quickly, then we may not be able to continue to grow our net revenue.

Our customers generally are not subject to any minimum volume commitments under their contracts and have no obligation to continue using our platform, products, or services.

Accordingly, these customers may have, or may enter into in the future, similar agreements with our competitors, which could adversely affect our ability to drive the processing volume and revenue growth that we seek to achieve. Some of our customer contracts provide for a termination clause that allows our customers to terminate their contract at any time following a limited notice period.

The loss of customers or reductions in their processing volumes, particularly any loss of or reductions by Block, may adversely affect our business, results of operations, and financial condition. To achieve continued growth, we must not only maintain our relationships with our existing customers, but also encourage them to renew their contracts with us and to increase adoption and usage of our products. For example, customers can have multiple card programs on our platform across different use cases and geographies. However, we cannot assure you that customers will continue to use our platform or that we will be able to continue processing transactions on our platform at the same rate as we have in the past.

93.    Moreover, with respect to regulation, the 2Q24 10-Q incorporated by reference the following risk disclosure from the 2023 10-K:

*Our business is subject to extensive regulation and oversight in a variety of areas, directly and indirectly through our relationships with Issuing Banks and Card Networks, which regulations are subject to change and to uncertain interpretation. Compliance with such laws and regulations could*

36

Verified Shareholder Derivative Complaint

***result in additional costs and any failure to comply could materially harm our business and financial condition.***

We, our vendors, our partners, and our customers are subject to a wide variety of laws, regulations, and industry standards, including supervision and examination with respect to the foregoing by multiple authorities and governing bodies and in multiple countries, which govern numerous areas important to our business. While we currently operate our business in an effort to ensure our business itself is not subject to the same level of regulation as the Issuing Banks and Card Networks that we partner with, Issuing Banks and Card Networks operate in a highly regulated environment, and there is a risk that those regulations could become applicable to or impact us.

As a program manager, we are responsible for aligning compliance with Issuing Bank requirements and Card Network rules, and we help create regulatory compliant card programs for our customers. In some cases, we have in the past and could continue to be exposed to liability or indemnification claims from our customers or partners in connection with the services we provide.

We are directly, and indirectly through our contractual relationships with customers, Issuing Banks, and Card Networks, subject to regulation in areas which may include privacy, data protection and information security, global sanctions regimes and export controls, and anti-bribery, and those relating to payments services (such as payment processing and settlement services), AI, consumer protection, AML, escheatment, and compliance with PCI DSS.

As our business and platform continue to develop and expand, we may become subject to additional laws, rules, regulations, and industry standards, including possible additional examination and supervision, in the United States and internationally. New or changing laws or regulations could require us to incur significant expenses and devote significant management attention to ensure compliance and could also prompt our Issuing Banks to alter their dealings with us in ways that may have adverse consequences for our business.

We may not be able to respond quickly or effectively to, or accurately predict the scope or applicability of, regulatory, legislative, or other developments, which may in turn impair our ability to offer our existing or planned features, products, and services and/or increase our cost of doing business. In addition, we may become subject to audits, inquiries, whistleblower complaints,

37

Verified Shareholder Derivative Complaint

adverse media coverage, investigations, or criminal or civil sanctions, all of which may have an adverse effect on our reputation, business, results of operations, and financial condition.

As a result of our business relationships, we may also be subject to direct or indirect supervision and examination by various authorities. The CFPB, for example, has indicated it has dormant authority to examine certain companies whose services may pose risk to consumers, which may include our company. The CFPB has also published guidance on third party risk management, which places additional vendor compliance oversight expectations for certain companies operating in the financial services industry. As a program manager, we may be viewed as overseeing third party relationships on behalf of our Issuing Banks and, as such, it is possible that regulators could hold us responsible for actual or perceived deficiencies in our oversight and control of third party relationships. New or expanded regulation or changes in interpretation or enforcement of existing regulations may have an adverse effect on our business, results of operations, and financial condition due to increased compliance costs and new restrictions affecting the offering of our platform, products and services.

Further, while we do not handle or interact with cryptocurrency and we only process transactions on our platform in fiat currencies, certain cryptocurrency businesses use our platform to provide card products to their customers and end users. The regulation of cryptocurrency is rapidly evolving and varies significantly among jurisdictions and is subject to substantial uncertainty. Various legislative and executive bodies in the U.S. and other countries may adopt laws, regulations, or guidance, or take other actions, which may impact our Issuing Banks and restrain the growth of cryptocurrency businesses and in turn impact the net revenue associated with our cryptocurrency business customers.

While we have developed policies and procedures designed to assist in compliance with laws and regulations, no assurance can be given that our compliance policies and procedures will be effective. If we fail to comply or are alleged or perceived to have failed to comply with applicable laws and regulations, we may be subject to litigation or regulatory investigations or other proceedings, we may have to pay fines and penalties or become subject to civil or criminal liability or have additional obligations or restrictions imposed upon our business, and our customer relationships and reputation may be adversely affected, which could have a material adverse effect on our business, results of operations, and financial condition. In some cases,

Verified Shareholder Derivative Complaint

regardless of fault, it may be less time-consuming or costly to settle these matters, which may require us to implement certain changes to our business practices, provide remediation to certain individuals, or make a settlement payment to a given party or regulatory body.

94. Later that day, the Company hosted an earnings call to discuss its 2Q24 results. During the call, Defendant Khalaf touted the Company's revenue, gross profit growth, and business diversification, stating the following, in relevant part:

Our second quarter results came in ahead of expectations, and once again, we demonstrated significant discipline in operating expenses without compromising our growth trajectory, scale, service or innovation.

I'll now briefly discuss our quarterly results before diving into company updates. The second quarter's net revenue, gross profit and adjusted EBITDA exceeded our expectations. Total processing volume, or TPV, was $71 billion in the second quarter, a 32% increase compared to the same quarter of 2023. Our net revenue of $125 million in the quarter contracted 46% year-over-year, which included a decrease of 60 percentage points from the revenue presentation change related to our Cash App contract renewal.

. . .

Our second quarter results demonstrate the continued demand for what has differentiated Marqeta's platform, our ability to deliver solutions for diverse consumer and commercial use cases while continuously innovating and expanding value-added program management services. As discussed in our recent State of Payments report, which we released 2 weeks ago, consumers continue to branch out in financial services, looking for alternatives to traditional banks. 1/3 of consumer survey said they were only -- they were using digital-only banks with 63% of 18- to 34-year-old saying they will be open to banking with a nontraditional financial service providers. These trends have given modern and digital banks a genuine foothold in the market.

. . .

We anticipate more momentum to come in 2025. I'm thrilled to share that Varo Bank, which has 5 million cards in the market recently chose Marqeta as their partner for its card processing business. Varo will trust us to migrate their customers over from their current processor in 2025 for a 5-year exclusive contract. Varo is uniquely positioned as a techbank with its own bank charter, given its greater control over its product stack and user interface. To realize this advantage, Varo sought a nimble and sophisticated partner to

Verified Shareholder Derivative Complaint

help them innovate quickly as they look to offer their consumers real-time insights into their transactions.

The TPV growth and momentum goes well beyond financial services. In fact, 10 out of our top 20 customers grew over 50% year-over-year during the quarter. The use cases include expense management, SMB working capital, Buy Now, Pay Later in addition to financial services. This speaks to the strength of the Marqeta platform and its ability to support innovation at scale across a variety of use cases, solidifying Marqeta's platform play.

. . .

We offer solutions ranging from expense management to commercial credit and working capital to help these businesses operate with improved efficiencies and capitalization, investing more in their business and having more time to execute and innovate rather than having them manage antiquated back-office applications. This has driven the continued growth in expense management as TPV for this vertical grew slightly more than our average TPV growth during the quarter.

To add to that growth, we have signed Zoho during the quarter. Zoho is a global technology company serving over 700,000 businesses from SMBs to enterprises with a comprehensive suite of business management applications. Zoho chose Marqeta as their partner because of our expertise in launching card solutions that enables businesses to manage expenses efficiently. Marqeta was also chosen because of the breadth and depth of our platform, which enables businesses to accelerate growth globally.

While digital banking and expense management continue to perform well on our platform, we continue to innovate in e-commerce and digital payments. We recently announced that we are the first U.S. issuer processor certified by Visa to support Visa Flexible Credential. With some Visa Flex cards, consumers can allow a single card product to toggle between payment methods on each transaction, bringing multiple funding sources to 1 card. Cardholders can choose whether to use debit, credit, pay-in-for with Buy Now, Pay Later or even pay using rewards points.

. . .

***The combination of the innovation we power with the ability to execute at scale, truly differentiates Marqeta. As our customer reach scale and the regulatory environment change, the guidance we provide our customers becomes a true differentiator. That's why we continue to enhance both program management and compliance.*** With the launch of our new office in Warsaw, Poland, we're now equipped to support more program management

40

Verified Shareholder Derivative Complaint

capabilities for our European customers, allowing us to deepen our already successful offering in the market.

Program management is important to our long-term growth for the following reasons. First, increased services add incremental net revenue, typically with higher gross profit margins. In the second quarter, net revenue driven by our suite of risk solutions, such as 3DS and risk control, increased by 61% year-over-year.

Second, it improves our customers' speed to market and our time to realize gross profit. As an example, if a customer looks to secure a bank partner without a system, this can take 9 to 12 months. However, without assistance, we can bring this time down dramatically.

***Third, it positions us well with companies looking to offer embedded finance. These companies can focus on their brand and their customer experience while leaving cumbersome details around offerings such as dispute to Marqeta. All these updates speak to our platform's breadth, depth and scale, while our ability to innovate demonstrate our expertise, delivering solutions for consumer and commercial debit and credit in countries around the world with modern flexible architecture is very appealing to both existing customers and new prospects.***

95.     Later on the call, Defendant Milotich provided information with respect to the Company's outlook for the second half and full year 2024, stating the following, in relevant part:

Now let's shift to our second half and full year outlook. As we move into Q3, we began the first chapter of a new era for Marqeta, where we aim to deliver sustainable, profitable growth. We are returning to growth now that we have lapped the resetting of the large majority of our customer contracts and the Cash Apprenewal in particular, we have established longer-term partnerships with our customers where we can work together to drive growth with win-win outcomes.

In addition, we expect to be adjusted EBITDA positive going forward at an increasing rate over time, renewed expense discipline, a focus on efficiency and optimization and the realization of our platform economies of scale as the business flourishes has put us on a clear path to GAAP profitability in the coming years.

41

Verified Shareholder Derivative Complaint

*We expect both Q3 and Q4 net revenue growth to be between 16% to 18%, in line with what we indicated last quarter. Therefore, full year net revenue growth is expected to contract 24% to 27%, again, consistent with the expectations we shared last quarter. Q3 gross profit growth is expected to grow between 25% and 27%, while Q4 is expected to grow approximately 3 points lower than Q3. As a result, second half growth is consistent with the expectations we shared last quarter. Both quarters are expected to benefit from non-Block gross profit growth of over 30%, which is accelerating from the first half as we have now lapped heavy renewal activity, as well as the growing contribution from the ramping of new cohorts driven by improving sales last year.* The gross profit growth slows a little from Q3 to Q4 mostly due to the difference in year over year comparisons, where Q3 has a slightly easier comp due to higher bank fees last year, while Q4 has a slightly tougher comp due to a strong 2023 holiday season, particularly in BNPL, as well as lapping a platform partner bonus. We expect the gross profit margin to be in the low 70s in both Q3 and Q4 as network incentive levels increase from Q2 therefore we expect full year gross profit growth to be 79% consistent with expectations we shared last quarter.

. . .

To wrap up, the business has had an exciting turning point as we enter into the second half of 2024. Our Q2 results demonstrate the continued momentum in our business. TPV growth remains robust at 32%, fueled by strong results across financial services, expense management and BNPL use cases among both well-established customers as well as those who are newer to our platform. As Simon mentioned, the TPV for 10 of our top 20 customers grew by over 50% in Q2.

Gross profit growth was weighed down by the Cash App renewal for the last time and accelerating non-Block growth signals the strong underlying growth of the business. Well executed efficiency and optimization initiatives continue to lower adjusted operating expenses without sacrificing innovation or platform resiliency, compliance and security.

*As we begin the second half of 2024, we expect TPV growth to remain over 30% based on the current trajectory and the newer programs that are still ramping. The variety of use cases across consumer and commercial in multiple geographies showcases the strength of our platform. With the large concentration of contract renewals behind us, the TPV growth is expected to translate into gross profit growth in the mid-20s with some quarterly variation.*

Verified Shareholder Derivative Complaint

96. During the Q&A portion of the call, Defendants Khalaf and Milotich continued to boast of the Company's existing customer base and ongoing growth potential, stating the following, in relevant part:

<Q: Ramsey El-Assal- Barclays- Analyst> Separately, I guess I also wanted to ask, with the renewals behind you, how should we think about the growth algorithms balance between new customer versus existing customer growth? I think you guys have highlighted a lot of new opportunity on this call. I'm just kind of curious, in your mind, what is shaping up to be the more powerful drivers sort of today and in your projections between sort of harvesting growth from the clients you have today versus new customers that you think may drive kind of an incremental share of growth as we move forward?

<A: Simon Khalaf > Yes. I'll give an answer and then hand it over to Mike. Ramsey, it is kind of yes and yes. So, we are excited that the new cohorts are on track to generate $20 million in revenue, which is what we've guided. So, we're on track with that, and again, speaks volume to how fast we can onboard new customers and get them ramped up. So, that's a growth vector. Our customers also are growing, some of them geographically. Others, they're launching multiple programs. So, that also factors into our growth calculations. But Mike, you can give more color over the multiyear.

<A: Michael Milotich> Yes. I think -- what I would say is if you look at our bookings through the first half, roughly half of it are expansions with existing customers versus new logos, if you will, or new customer bases. So, it's a nice balance between the 2. We still have a lot of established customers who still have a lot of growth potential. And so, we continue to try to do more business with them as well as bringing in new pieces of business.

The other thing I would say is also just even within our programs that are already live with our existing customers, again, the growth is really significant. We talked about 10 of our 20 customers have their TPV growing over 50%, but 8 of those 10 are growing more than 75%. So, it's really -- we have several customers who really have caught on to something that's very much resonating in the market, and they're growing really fast, even separate from necessarily doing additional business with us, so they'll come over time. So, it's a very nice combination for us to have in the coming quarters to get growth from both new and existing customers.

Verified Shareholder Derivative Complaint

97. Defendant Milotich was also asked about recent cybersecurity events and how they related to increased regulatory scrutiny. In response, he stated the following, in relevant part:

<Q: William Alfred Nance - Goldman Sachs- Analyst> I wanted to ask about some of the cybersecurity events that happened recently with the Evolve hack. And just wondering if you could talk about maybe some of the ramifications for the broader ecosystem. And I guess, A, how that's impacting some of the partner banks in the ecosystem? And then, B, if there's any impact on pipelines or kind of new program upstarts that may be impacted by increased regulatory scrutiny?

<A: Simon Khalaf> *The short answer is no. The little bit long answer is that there is the CrowdStrike event that did not impact us -- predominantly in Mac shop. I mean, we had a customer at CrowdStrike, but thanks to a great effort by our security team, we were not impacted, neither were our customers impacted in any major way. So, that's good. In terms of the other security and regulatory scrutiny, I don't expect it to create a medium-term or long-term challenges.*

*On the contrary, I would say they are going to create a lot of tailwinds for Marqeta because of the flight to quality syndrome. We have demonstrated our ability to scale and in a compliant manner. In terms of like Evolve specifically, our business on Evolve is not big, but Evolve is a great partner of ours. But most of the issues, I'd say, do not involve Marqeta.*

*And some of the challenges that we've actually read in the press, we don't have intimate knowledge, right, are something that will not impact Marqeta because we've invested heavily in those -- I'd say in the chrome around our solution, whether it's settlement or reconciliation. This is something that we've done beautifully as we've scaled. So, I would say that we're looking good, and this is actually working in favor of Marqeta.*

98. Moreover, when asked about Marqeta's pipeline conversion and visibility for gross profit growth, Defendant Milotich responded the following, in relevant part:

<Q: Andrew Garth Schmidt - Citigroup- Analyst> If I could just go back to the November 2023 Analyst Day, I recall you had to make some assumptions around pipeline, conversion, and then which segments would grow at which

44

Verified Shareholder Derivative Complaint

rates. Maybe you could talk about how some of those key assumptions are trending. Obviously, some good wins announced in the quarter, so it seems fairly positive. But curious about how some of those key assumptions are trending and how that influences your visibility for gross profit growth in the out years.

<A: Michael Milotich> *Yes. I think for the most part, of course, there's always puts and takes. You don't get everything right. But I would say on a bigger picture level, we're very much on trend. We had said that we expected $20 million in revenue from customers who essentially had not launched prior to 2024 in the year, and we're on track to deliver that. And that number is expected to go up to 60% -- or $60 million, sorry, next year. So, we feel good that the new business that we're onboarding is on track.*

I think in terms of when we look at the existing business and how it's trending, I would say it's about as expected with maybe slightly different -- a slightly different mix than maybe we'd anticipated a year ago. I think some of the things that Simon has highlighted in financial services and this concept where just many, many companies, particularly in embedded finance, have some neobank aspects to their strategy in terms of how they want to engage their users or their employees. And so, I would say that's an area we're probably seeing more demand than we had thought 9 months ago. So, that's probably the earliest place where we're really seeing a lot of embedded finance activity.

*But big picture wise, we're largely on track and things are as planned, with the 1 exception being our ability to manage costs effectively. That's the 1 place where we're noticeably ahead where we expected 9 months ago.*

<Q: Andrew Garth Schmidt - Citigroup- Analyst> And then lot of questions this quarter on cyclicality and macro. Obviously, it doesn't seem to be showing up in your results, pretty strong growth. But maybe you could just remind us the components of cyclicality and maybe more towards the fourth quarter where we do get a heightened shopping season with BNPL and such and what the sensitivity is there.

<A: Michael Milotich> *So far, we're seeing very stable trends, even our July TPV growth is in line with Q2. And if you actually go back much further, what you see is really for about 18 months, our TPV growth has been incredibly stable, which we're quite happy about because our base is getting materially larger and we're still able to maintain this growth that's called like sort of low to mid-30s growth on a very consistent basis. So, we're*

Verified Shareholder Derivative Complaint

*certainly not seeing anything macro-wise that seems to be disrupting that trajectory and including the month of July. So, so far, we see things trending quite stable.*

One of the other things we also look at is the mix of our spend. So, we look at the spend by what's high discretionary, what's low discretionary, and kind of a medium bucket, everything in between. And when we cut our TPV that way, what we're seeing is each of those 3 buckets is growing at roughly the same rate. So, right now, at this point, too, with this compounding growth we're getting very nicely, the mix of our business by sort of discretionary buckets is not changing a whole lot. So, everything is fairly stable.

The last question that you had about the holiday season. So, the only thing that's material for us is that, yes, in Q4, the mix of our volume shifts a little bit more to BNPL, right? Just given the role that BNPL plays in retail holiday shopping, in particular, the mix of our volume shifts a couple of points to BNPL in the fourth quarter compared to the rest of the year. But otherwise, everything is pretty stable. That's the only thing that's noticeable in Q4 versus the other quarters of the year.

99.     The statements in ¶¶83-98 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company had understated the negative impact that enhanced regulatory scrutiny in the smaller banking industry was having on its operations and business outlook; (2) the Company's investment in compliance and project management capabilities were inadequate to handle regulatory scrutiny facing its banking partners, leading to substantially longer onboarding delays for new customers; and (3) due to the foregoing, the Company would be forced to slash its guidance for the fourth quarter of 2024. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

100.   The truth fully emerged on November 4, 2024 when, after the market closed, Marqeta published a press release announcing its financial results for the third quarter of 2024. Notably, Marqeta lowered its guidance for net revenue growth and gross profit

growth, providing fourth quarter guidance of 10-12% net revenue growth and 13-15% gross profit growth, which failed to meet the Company's previously projected guidance of 16-18% net revenue growth and 22-24% gross profit growth. In explaining these results, the Company admitted that its fourth quarter guidance "reflects several changes *that became apparent over the last few months with regard to heightened scrutiny of the banking environment and specific customer program changes*."

101. During the earnings call the Company hosted the same day to discuss these results, Defendant Khalaf addressed the change in guidance, stating:

> With all this great progress, why is our guidance for Q4 softer than expected? Well, last year, the regulatory environment changed amongst the smaller banks that supports many of our customers' programs.
>
> As a company, we anticipated this change and invested in program management in general and compliance services in particular. We believe that these investments have positioned us well in the medium and long term and increase the most around our platform, especially in embedded finance. However, we underestimated the increased operational burden these changes made on both Marqeta's and the bank's onboarding and compliance teams. The incremental scrutiny and rigor translated into delays in launching new programs.
>
> *These delays have also been aggravated by the increased demand from new bookings in 2023 and the first half of 2024. On average, the time to launch new programs grew 30% to 40% from 2023, and we expect that increase to remain for at least 2 additional quarters as we and our bank partners become more agile in launching programs in this new environment.*
>
> *Given the standard ramp time for programs in our industry, these delays will cause volume and gross profit to be pushed out a few months. Now with a more complete understanding of the implications, we're taking a more holistic approach to ramping the programs we have already signed. We are also signing up new banks to add capacity and open up new choices for our customers while making our processes standardized across all banks we support.*

We are confident these changes will give us the agility we need. However, it will take a few months to completely solve the problem and drain the backlog that has been built up. We view the headwinds from the more challenging bank environment as short term, merely slowing down our progress rather than a change in the trajectory of our business nor impacting our path to profitability. In fact, we remain confident in our strategy, business trajectory and execution.

102. Also on the call, Defendant Milotich made statements regarding Marqeta's outlook for the fourth quarter of 2024, stating the following, in relevant part:

Now let me walk through our latest outlook for Q4. We expect Q4 net revenue growth to be between 10% and 12% and Q4 gross profit growth to be between 13% and 15%, a 6- and 9-point reduction, respectively, compared to what we shared in early August. The change in our expectations is primarily driven by 2 factors, both of which stem to some degree from the heightened regulatory environment from our bank partners.

First, we now expect significantly fewer new programs will launch and ramp up in the second half of the year, lowering gross profit growth by approximately 6 points. We were not quick enough with solutions and new processes for our bank partners, and they are more focused on maintaining current programs in the heightened regulatory environment than launching new programs. In some cases, this environment also delays our customers' launch plans. Now that we have a backlog of programs to launch, it will take time to work through it.

Delays of a few months pushes launches into Q4 and the first half of 2025. Because of the ramp trajectory of TPV in the first year of a program, a few months delay meaningfully impacts Q4. The impact is larger on gross profit than revenue since newer programs with subscale volume tend to have high gross margins until our customers work through the initial volume tiers in our contracts.

Why does this change in assumptions seem so sudden? We have been very aware of the scrutiny and working through it with our bank partners, investing significantly more in our compliance efforts since the start of this year to raise our program management standards ahead of the rising tide. ***However, in the past 2 to 3 months, it has become clear we greatly underestimated the magnitude and time horizon for all parties to adapt to the new standards.***

48

Verified Shareholder Derivative Complaint

*We are actively executing the solution for this challenge, working closely with existing bank partners to optimize our processes to improve the efficiency of program approval and onboarding.*

103.   In addition, Defendant Milotich stated the following, in relevant part:

**Analyst**: Hi. Thank you for taking my question this evening. Can you comment on your visibility at this point, given everything that's going on in terms of these regulatory-driven sort of changes is -- are you confident that you're seeing sort of a bottoming out of the -- of the sort of pain here or could we get to next quarter and see that things have deteriorated further. And I'm also just wondering whether there's a risk that some bookings may get terminated if the implementation timeline stretches out for too long.

* * *

**Mike Milotich**: Yes, just maybe I'll just give some color on just the specifics on some of the delays, Ramsey. *So if you look at the first few months of 2024, the regulatory scrutiny had clearly ratcheted up with more than 10 consent orders affecting the banks in our space*. And so *what we saw was an initial spike in the time to launch that was more than 2x the average in 2023*. So 2023 onboarding and delivery was typically around 150 days roughly.

*And in Q1, Q2, that rose to over 300 days. This was expected given the sort of initial changes and sort of shock of all the changes that were happening*. But at the start of Q3, we expected things to get back to where we had been in 2023. But the new programs on average took about 30% to 40% longer to launch. And so the time still remained over 200 days when it had previously been about 150 days. So that just gives you a little more color on sort of the magnitude of what's happening. And to just address your second question in terms of visibility, so we had 15 programs that were delayed on average of 70 days. But when you break that down into components, so five of those 15 actually did launch in Q3, but just much later than expected. Nine programs are now expected to launch in Q4.

104.   Later, when asked by an analyst during the Q&A portion of the call if the product launch delays Marqeta was experiencing were industry wide, Defendant Khalaf responded the following, in relevant part:

<Q: Sanjay Harkishin Sakhrani – Keefe, Bruyette, & Woods, Inc.- Analyst>
I guess, Mike, you mentioned or Simon did that what you were seeing is not dissimilar to what others have seen in the industry. I mean, have you guys

49

Verified Shareholder Derivative Complaint

validated that? Have your competitors also seen similar product launch delays?

<A: Simon Khalaf > Good question. Actually, as a team, we were at Money20/20 last week, which is the conference for new financial services. And I'd say that the #1 thing that was discussed was how everyone is now taking compliance in general and regulatory compliance seriously. And everybody is talking about the delays, but they're also talking about the flight to quality, which is they're coming to Marqeta because we were the entity that has invested early on in the cycle.

And also, we heard a lot of folks that thought that they could use BaaS players as kind of like an alternative to Marqeta, that actually has disappeared because a lot of folks mentioned that they're seeing almost these solutions fizzle out in terms of the ability to take on scale programs. So yes, we're not unique into that -- into this environment. But I do believe we had a head start in compliance, and we will get over this hump in terms of the operational burden that ourselves and a couple of our bank partners have faced.

105.   On this news, the price per share of the Company's common stock fell $2.53, or 42.5%, from a closing price of $5.95 per share on November 4, 2024 to close at $3.42 per share on November 5, 2024.

106.   Analysts also responded negatively to these disclosures, with Wells Fargo analysts reporting on the Company's "unfortunate and untimely setback" and stating that "[w]hile management attempted to reassure investors that the challenges had 'bottomed' & revenues would return once delays were alleviated, we think this message will fall on deaf ears for the foreseeable future."

## REPURCHASES DURING THE RELEVANT PERIOD

107.   During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $107,524 to repurchase approximately 20,358 shares of its own common stock at artificially inflated prices from May 2024 through September 2024.

108.   According to the 2Q24 10-Q, between May 1, 2024 and May 31, 2024, the

Verified Shareholder Derivative Complaint

Company repurchased 5,400 shares of its own common stock at an average price per share of approximately $5.44, for a total cost to the Company of approximately $29,376.[7]

109. As the Company's stock was actually worth only $3.42 per share, the price at which it was trading when markets closed on November 4, 2024, the Company overpaid by approximately $10,908 for repurchases of its own stock between May 1, 2024 and May 31, 2024.

110. According to the 2Q24 10-Q, between June 1, 2024 and June 30, 2024, the Company repurchased 5,559 shares of its own common stock at an average price per share of approximately $5.35, for a total cost to the Company of approximately $29,741.

111. As the Company's stock was actually worth only $3.42 per share, the price at which it was trading when markets closed on November 4, 2024, the Company overpaid by approximately $10,729 for repurchases of its own stock between June 1, 2024 and June 30, 2024.

112. According to the Form 10-Q the Company filed with the SEC on November 4, 2024 for the quarterly period ended September 30, 2024 (the "3Q24 10-Q"), between July 1, 2024 and July 31, 2024, the Company repurchased 2,058 shares of its own common stock at an average price per share of approximately $5.40, for a total cost to the Company of approximately $11,113.

113. As the Company's stock was actually worth only $3.42 per share, the price at which it was trading when markets closed on November 4, 2024, the Company overpaid by approximately $4,075 for repurchases of its own stock between July 1, 2024 and July 31, 2024.

114. According to the 3Q24 10-Q, between August 1, 2024 and August 31, 2024, the Company repurchased 4,026 shares of its own common stock at an average price per share of approximately $5.13, for a total cost to the Company of approximately $20,653.

115. As the Company's stock was actually worth only $3.42 per share, the price at

---

[7] Upon information and belief, these shares were repurchased during the Relevant Period.

Verified Shareholder Derivative Complaint

which it was trading when markets closed on November 4, 2024, the Company overpaid by approximately $6,884 for repurchases of its own stock between August 1, 2024 and August 31, 2024.

116. According to the 3Q24 10-Q, between September 1, 2024 and September 30, 2024, the Company repurchased 3,315 shares of its own common stock at an average price per share of approximately $5.02, for a total cost to the Company of approximately $16,641.

117. As the Company's stock was actually worth only $3.42 per share, the price at which it was trading when markets closed on November 4, 2024, the Company overpaid by approximately $5,304 for repurchases of its own stock between September 1, 2024 and September 30, 2024.

118. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $37,900.

## DAMAGES TO MARQETA

119. As a direct and proximate result of the Individual Defendants' conduct, Marqeta has lost and will continue to lose and expend many millions of dollars.

120. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy judgments associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

121. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

122. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and

payments of any fines or settlement amounts associated with the Company's violations.

123. Such losses include the Company's overpayment of over $37,900 for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

124. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

125. As a direct and proximate result of the Individual Defendants' conduct, Marqeta has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

126. Plaintiff brings this action derivatively and for the benefit of Marqeta to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Marqeta, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Khalaf and Milotich.

127. Marqeta is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128. Plaintiff is, and has been at all relevant times, a shareholder of Marqeta. Plaintiff will adequately and fairly represent the interests of Marqeta in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

129. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

Verified Shareholder Derivative Complaint

130. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Marqeta's Board consisted of the following ten individuals: Defendants Khalaf, Atkinson, Chokshi, Cummings, Gardner, Graf, Linville, Prasad, Riley, and Sullivan (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the ten Director-Defendants that were on the Board at the time this action was filed.

131. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by over $37,900 for repurchases of its own stock while the stock price was artificially inflated due to the false and misleading representations discussed herein, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

132. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Marqeta to issue materially false and misleading statements. Specifically, the Director-Defendants caused Marqeta to issue false and misleading statements which were intended to make Marqeta appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

133. Additional reasons that demand on Defendant Khalaf is futile follow. Defendant Khalaf has served as the Company's CEO and as a Company director since January 2023. He also serves as a member of the Payments Innovation Committee. The Company provides Defendant Khalaf with his principal occupation, for which he receives handsome compensation, including over $16 million for the 2023 Fiscal Year. Thus, as the

Company admits, he is a non-independent director. As the Company's highest officer and an influential member of the Board, Defendant Khalaf was ultimately responsible for the issuance of all of the false and misleading statements made during the Relevant Period, including those statements he personally made. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Moreover, Defendant Khalaf is named as a defendant in the Securities Class Actions. For these reasons, Defendant Khalaf breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134. Additional reasons that demand on Defendant Atkinson is futile follow. Defendant Atkinson has served as a Company director since April 2023. She also serves as Chair of the Compensation Committee and as a member of the Nomination and Governance Committee. Defendant Atkinson has received and continues to receive handsome compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Atkinson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

135. Additional reasons that demand on Defendant Chokshi is futile follow. Defendant Chokshi has served as a Company director since June 2024. He also serves as a member of the Nomination and Governance Committee and the Payments Innovation Committee. As a trusted Company director, he conducted little, if any, oversight of the

scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Chokshi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

136. Additional reasons that demand on Defendant Cummings is futile follow. Defendant Cummings has served as a Company director since January 2021. She also serves as Chair of the Nomination and Governance Committee and as a member of the Audit Committee. Defendant Cummings has received and continues to receive handsome compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, during the Relevant Period and while the price of the Company's common stock was artificially inflated due to the misrepresentations alleged herein, Defendant Cummings engaged in lucrative insider trading, obtaining personal proceeds of approximately $219,917. These insider sales further demonstrate her motive in facilitating and participating in the scheme. For these reasons, Defendant Cummings breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

137. Additional reasons that demand on Defendant Gardner is futile follow. Defendant Gardner founded Marqeta and served as the Company's CEO until January 2023. He has also served as a Company director since November 2010 and served as Executive Chairman of the Board from January 2023 to June 2024. In addition, Defendant Gardner serves as Chair of the Payments Innovation Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Gardner beneficially owned

approximately $51.5 million shares of the Company's outstanding Class B Common Stock, representing 49.98% of total voting power. Defendant Gardner has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gardner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

138. Additional reasons that demand on Defendant Linville is futile follow. Defendant Linville has served as a Company director since May 2020. He also serves as Non-Executive Chair of the Board and as a member of the Compensation Committee. Defendant Linville has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Linville breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

139. Additional reasons that demand on Defendant Graf is futile follow. Defendant Graf has served as a Company director since July 2024. He also serves as Chair of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Graf breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

140. Additional reasons that demand on Defendant Prasad is futile follow. Defendant Prasad has served as a Company director since September 2022. He also serves as a member of the Audit Committee and the Compensation Committee. Defendant Prasad has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Prasad breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

141. Additional reasons that demand on Defendant Riley is futile follow. Defendant Riley has served as a Company director since May 2020. She also serves as a member of the Audit Committee. Defendant Riley has received and continues to receive handsome compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Riley breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

142. Additional reasons that demand on Defendant Sullivan is futile follow. Defendant Sullivan has served as a Company director since May 2021. He also serves as a member of the Audit Committee. Defendant Sullivan has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and

58

Verified Shareholder Derivative Complaint

misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Sullivan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

143. Additional reasons that demand on the Board is futile follow.

144. Defendants Cummings, Graf, Prasad, Riley, and Sullivan (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

145. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical

Verified Shareholder Derivative Complaint

manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

146. Marqeta has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Marqeta any part of the damages Marqeta suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

147. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

148. The acts complained of herein constitute violations of fiduciary duties owed by Marqeta's officers and directors, and these acts are incapable of ratification.

149. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Marqeta. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue

themselves or certain of the officers of Marqeta, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

150. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Marqeta to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

151. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

152. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153. The Individual Defendants, by virtue of their positions with Marqeta and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Marqeta and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Marqeta to engage in the illegal conduct and practices complained of herein.

154. Plaintiff, on behalf of Marqeta, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of

**the Exchange Act**

155. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Marqeta. Not only is Marqeta now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Marqeta by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately 20,358 of its own shares at artificially inflated prices, damaging Marqeta.

157. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and practiced in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

158. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Marqeta not misleading.

159. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Marqeta.

160.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

161.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

162.    Plaintiff, on behalf of Marqeta, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

163.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

164.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Marqeta's business and affairs.

165.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

166.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Marqeta.

167.    In breach of their fiduciary duties owed to Marqeta, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company had understated the negative impact that enhanced regulatory scrutiny in the

smaller banking industry was having on its operations and business outlook; and (2) due to the foregoing, the Company would be forced to slash its guidance for the fourth quarter of 2024. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

168. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

169. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $219,917.

170. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

171. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Marqeta's securities.

172. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the

Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Marqeta's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

173. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

174. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Marqeta has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

175. Plaintiff, on behalf of Marqeta, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

176. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Marqeta.

178. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Marqeta that was tied to the performance or artificially inflated valuation of Marqeta, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided

65

Verified Shareholder Derivative Complaint

to the Individual Defendants who breached their fiduciary duties to the Company.

179. Plaintiff, as a shareholder and a representative of Marqeta, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

180. Plaintiff, on behalf of Marqeta, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Abuse of Control

181. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Marqeta, for which they are legally responsible.

183. As a direct and proximate result of the Individual Defendants' abuse of control, Marqeta has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

184. Plaintiff, on behalf of Marqeta, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

185. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Marqeta in a manner consistent with the operations of a publicly held corporation.

187. As a direct and proximate result of the Individual Defendants' gross

mismanagement and breaches of duty alleged herein, Marqeta has sustained and will continue to sustain significant damages.

188. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

189. Plaintiff, on behalf of Marqeta, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

190. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

192. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Marqeta to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

193. In addition, the Individual Defendants caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

194. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

195. Plaintiff, on behalf of Marqeta, has no adequate remedy at law.

## EIGHTH CLAIM
### Against Defendants Khalaf and Milotich for Contribution Under Sections 10(b) and 21D of the Exchange Act

196. Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

197. Marqeta and Defendants Khalaf and Milotich are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Khalaf's and Defendant Milotich's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

198. Defendants Khalaf and Milotich, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

199. Accordingly, Defendants Khalaf and Milotich are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

200. As such, Marqeta is entitled to receive all appropriate contribution or indemnification from Defendants Khalaf and Milotich.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Marqeta, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Marqeta;

(c) Determining and awarding to Marqeta the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and

Verified Shareholder Derivative Complaint

severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Marqeta and the Individual Defendants to take all necessary actions to reform and improve Marqeta's corporate governance and internal procedures to comply with applicable laws and to protect Marqeta and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Marqeta to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Marqeta restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Verified Shareholder Derivative Complaint

Dated: February 4, 2025                    Respectfully submitted,

                                           **THE BROWN LAW FIRM, P.C.**

                                           */s/*Robert C. Moest
                                           Robert C. Moest, Of Counsel, SBN 62166
                                           2530 Wilshire Boulevard, Second Floor
                                           Santa Monica, CA 90403
                                           Telephone: (310) 915-6628
                                           Facsimile: (310) 915-9897
                                           Email: RMoest@aol.com

                                           **THE BROWN LAW FIRM, P.C.**
                                           Timothy Brown
                                           767 Third Avenue, Suite 2501
                                           New York, NY 10017
                                           Telephone: (516) 922-5427
                                           Facsimile: (516) 344-6204
                                           Email: tbrown@thebrownlawfirm.net

                                           *Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

Docusign Envelope ID: EEE144B9-ABA2-4A01-B337-36A96D68C06A

## **VERIFICATION**

I, Stephanie Smith, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 04__ day of February, 2025.

DocuSigned by:

**STEPHANIE SMITH**

008DFBEDC840407...

Stephanie Smith