# EXHIBIT C

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDUARDO PRECIADO, Derivatively on Behalf of Nominal Defendant MARQETA, INC., <br><br> Plaintiff, <br><br> v. <br><br> SIMON KHALAF, NAJUMA ATKINSON, ALPESH CHOKSHI, MARTHA CUMMINGS, JASON GARDNER, R. MARK GRAF, JUDSON C. LINVILLE, KIRAN PRASAD, HELEN RILEY, GODFREY SULLIVAN, and MICHAEL MILOTICH, <br><br> Defendants, <br><br> and <br><br> MARQETA, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Eduardo Preciado ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of Nominal Defendant Marqeta, Inc. ("Marqeta" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Marqeta, legal filings, news reports, securities analysts' reports about the Company, the securities class actions *Wai v. Marqeta, Inc., et al.*, No. 4:24-cv-08874-YGR (N.D. Cal.) and *Ford v. Marqeta Inc., et al.*, No. 4:24-cv-08892-YGR (N.D. Cal.), and other publicly available information.

## **NATURE OF THE ACTION**

1. This is a shareholder derivative action brought by Plaintiff on behalf of Marqeta against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least May 7, 2024 and November 4, 2024, inclusive (the "Relevant Period"), and for violations of the federal securities laws, as set forth below.

2. Marqeta is a financial technology company specializing in payment solutions. The Company operates a card issuing platform that allows businesses to issue a variety of different branded debit, credit, and prepaid card products to their customers. The Company's primary clients include small banks, financial services companies, and digital wallet companies.

3. Throughout the Relevant Period, the Individual Defendants failed to disclose that its business, operations, and prospects were materially adversely impacted by a shift in the regulatory landscape involving heightened scrutiny of the smaller banking industry.

4. The truth emerged on November 4, 2024, when the Company reduced its fourth

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

quarter 2024 guidance, explaining that "[o]ur "fourth quarter guidance reflects several changes that became apparent *over the last few months* with regards to the heightened scrutiny of the banking environment and specific customer program changes."[1]

5. During an earnings call, hosted by Marqeta on the same day, the Company further revealed that the shift in the regulatory landscape applicable to the Company's banking partners had an adverse impact regarding Marqeta's customer onboarding timelines for new deal launches, stating that "*the time to launch new programs grew 30% to 40% from 2023, and we expect that increase to remain for at least 2 additional quarters as we and our bank partners become more agile in launching programs in this new environment.*"

6. On this news, the price of Marqeta's stock declined 42.5% in one day, from a close of $5.95 per share on November 4, 2024 to a close of $3.42 per share on November 5, 2024.

7. Further, prior to the corrective disclosures, one Company insider sold shares of Company stock while in possession of material non-public information. This Company insider reaped hundreds of thousands of dollars in illicit profits, selling Company stock at prices that were artificially inflated due to the false and misleading statements detailed herein.

8. As a result of the foregoing, the Securities Class Actions were filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

9. In light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Actions, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

---

[1] Unless indicated otherwise, all emphasis is added.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

11. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Marqeta is headquartered in this District, Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**PARTIES**

*Plaintiff*

15. Plaintiff is, and has been at all relevant times, a shareholder of Marqeta.

*Nominal Defendant*

16. Nominal Defendant Marqeta is incorporated under the laws of Delaware with its principal executive offices located at 180 Grand Avenue, Oakland, California 94612. Marqeta's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "MQ."

*Individual Defendants*

17. Defendant Simon Khalaf ("Khalaf") has served as the Company's Chief Executive Officer ("CEO") and as a member of the Board since January 2023. Defendant Khalaf further serves

3

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

as a member of the Payments Innovation Committee. Defendant Khalaf is named as a defendant in the Securities Class Actions. According to the Company's public filings, Defendant Khalaf received $16,294,313 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Khalaf beneficially owned 2,011,621 shares of Marqeta Class A common stock, worth roughly $11 million.[2]

18.     Defendant Najuma Atkinson ("Atkinson") has served as a member of the Board since April 2023 and serves as Chair of the Compensation Committee and as a member of the Nomination and Governance Committee. According to the Company's public filings, Defendant Atkinson received $635,297 in 2023 in compensation from the Company.

19.     Defendant Alpesh Chokshi ("Chokshi") has served as a member of the Board since June 2024 and serves as a member of the Nomination and Governance Committee and the Payments Innovation Committee.

20.     Defendant Martha Cummings ("Cummings") has served as a member of the Board since January 2021 and serves as Chair of the Nomination and Governance Committee and as a member of the Audit Committee. According to the Company's public filings, Defendant Cummings received $249,998 in 2023 in compensation from the Company. On June 25, 2024, while the price of Marqeta stock was artificially inflated due to the Individual Defendants' false and misleading statements and omissions detailed herein, Defendant Cummings sold 40,241 shares of Company stock while in possession of material non-public information, at an average price of $5.46 per share, reaping $219,917 in proceeds.

21.     Defendant Jason Gardner ("Gardner") founded Marqeta and has served as a member of the Board since November 2010. Defendant Gardner previously served as the Company's CEO from November 2010 until January 2023 and as Executive Chairman of the Board from January 2023 until June 2024. Defendant Gardner additionally serves as Chair of the Payments innovation Committee. According to the Company's public filings, Defendant Gardner received $600,764 in

---

[2] Valuations of the Individual Defendants' holdings of Company stock are based on the $5.43 per share closing price of Marqeta stock on April 22, 2024.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2023 in compensation from the Company. As of April 22, 2024, Defendant Gardner beneficially owned roughly 51.5 million shares of Marqeta Class B common stock, granting him approximately 49.98% of the total voting power in the Company.

22. Defendant R. Mark Graf ("Graf") has served as a member of the Board since July 2024 and serves as Chair of the Audit Committee.

23. Defendant Judson C. Linville ("Linville") has served as a member of the Board since May 2020 and serves as Non-Executive Chair of the Board and as a member of the Compensation Committee. According to the Company's public filings, Defendant Linville received $299,995 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Linville beneficially owned 100,021 shares of Marqeta Class A common stock, worth $543,114.

24. Defendant Kiran Prasad ("Prasad") has served as a member of the Board since September 2022 and serves as a member of the Audit Committee and the Compensation Committee. According to the Company's public filings, Defendant Prasad received $249,998 in 2023 in compensation from the Company.

25. Defendant Helen Riley ("Riley") has served as a member of the Board since May 2020 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Riley received $249,998 in 2023 in compensation from the Company.

26. Defendant Godfrey Sullivan ("Sullivan") has served as a member of the Board since May 2021 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Sullivan received $249,998 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Sullivan beneficially owned 221,371 shares of Marqeta Class A common stock, worth roughly $1.2 million.

*Officer Defendant*

27. Defendant Michael Milotich ("Milotich") has served as the Company's Chief Financial Officer ("CFO") since February 2022. Defendant Milotich is named as a defendant in the Securities Class Actions. According to the Company's public filings, Defendant Milotich received $3,576,606 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Milotich

5

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

beneficially owned 1,465,320 shares of Marqeta Class A common stock, worth roughly $8 million.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

28. By reason of their positions as officers and/or directors of Marqeta, and because of their ability to control the business and corporate affairs of Marqeta, the Individual Defendants owed Marqeta and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Marqeta in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Marqeta and its shareholders so as to benefit all shareholders equally.

29. Each director and officer of the Company owes to Marqeta and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

30. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Marqeta, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31. To discharge their duties, the officers and directors of Marqeta were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

32. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Marqeta, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the

6

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

NASDAQ, the Individual Defendants had a duty: to ensure that Marqeta implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

34. To discharge their duties, the officers and directors of Marqeta were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Marqeta were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Marqeta's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Marqeta conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the

7

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

business and internal affairs of Marqeta and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that Marqeta's publicly disclosed financial information would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

35. Each of the Individual Defendants further owed to Marqeta and the shareholders the duty of loyalty requiring that each favor Marqeta's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

36. At all times relevant hereto, the Individual Defendants were the agents of each other and of Marqeta and were at all times acting within the course and scope of such agency.

37. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Marqeta.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38. In committing the wrongful acts alleged herein, the Individual Defendants have

8

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

40.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

41.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Marqeta, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

42.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

43.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Marqeta and at all times acted within the course and scope of such agency.

## MARQETA'S CODE OF CONDUCT

44.     The Code of Conduct states its purpose is to "help build and maintain trust, confidence and credibility with our customers, partners, vendors and others by adhering to our

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

commitments, displaying honesty and integrity and achieving our business objectives through ethical conduct."

45.     The Code of Conduct applies to "all employees, directors and officers," referred to in the Code of Conduct as "Marqetans," and those who violate the Code of Conduct "may be subject to disciplinary action, to the extent permitted by applicable law."

46.     In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states the following:

Marqeta must comply with the laws, rules and regulations applicable to its business activities, those of its banking partners and those of its customers. Although you are not expected to know the details of these laws, rules and regulations, it is important to know enough about them to determine when to seek advice from your manager and Marqeta's Legal, Risk & Compliance Department ("LRC"). You must abide by applicable law in the country where you are located. In some instances, there may be a conflict between the applicable laws of two or more countries, states, or provinces. If you encounter a conflict, or if a local law conflicts with a policy referenced in this Code, you should consult with your manager, HR Business Partner (HRBP) or LRC to determine the appropriate course of action.

To assist in this effort, Marqeta has provided employees with various policies and procedures which provide guidance for complying with these laws, rules and regulations. In addition, the Company holds information and training sessions, including an annual compliance program provided by LRC, to assist employees in achieving compliance with the laws and regulations applicable to Marqeta and its activities.

It is Marqeta's policy to make full, fair, accurate, timely and understandable disclosure in compliance with applicable laws, rules and regulations in all periodic reports required to be filed by the Company and in other public communications.

47.     In a section titled "Conflicts of Interest," the Code of Conduct states the following, in pertinent part:

Your obligation to conduct the Company's business in an honest and ethical manner includes the ethical handling of actual, apparent and potential conflicts of interest between personal and business relationships. A "conflict of interest" arises when there is a real or perceived private interest that interferes, or could reasonably be expected to interfere, in some way, with the interests of the Company.

10
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

48.     With respect to insider trading, the Code of Conduct states the following, in pertinent part:

Marqetans who have access to confidential information about Marqeta, our customers or partners are not permitted to use or share that information for stock trading purposes or for any other purpose except the proper conduct of our business. All non- public information about Marqeta, our customers or partners should be considered "confidential information." To use material, non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal.

49.     In a section titled "Competition and Fair Dealing," the Code of Conduct states that "[w]e seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, **never through unethical or illegal business practices**." (Emphasis in original).

50.     In a section titled "Recordkeeping," the Code of Conduct states the following:

The Company requires honest and accurate recording and reporting of information in order to conduct its business and to make responsible business decisions. Accurate information is essential to the Company's ability to meet legal and regulatory obligations and forms the basis of its earnings statements and financial reports.

Generally, all of Marqeta's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to Marqeta's system of internal controls. Many employees regularly use business expense accounts, which must be documented and recorded accurately. If you are not sure whether a certain expense is proper, ask your manager or the Finance Department.

51.     With respect to Marqeta's corporate assets, the Code of Conduct states, in pertinent part, the following:

You should endeavor to protect Marqeta's assets and ensure their efficient use. Marqetans must use the Company's assets solely for legitimate business purposes of the Company and not for any personal benefit or the personal benefit of anyone else. Theft, carelessness, and waste have a direct impact on the Company's financial performance.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **MARQETA'S AUDIT COMMITTEE CHARTER**

52.     Pursuant to Marqeta's Audit Committee Charter, the purpose of the Audit Committee is to:

> Assist the Board in its oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the qualifications, independence and performance of the Company's independent auditors engaged for the purpose of issuing an audit report or performing other audit, review or attest services for the Company (the "Independent Auditors"), (4) the Company's governance, policies, and processes for monitoring and mitigating risks, and (5) the performance of the Company's internal audit function.

53.     In a subsection titled "Audited Financial Statements and Annual Audit," the Audit Committee Charter states the following:

> The Committee will review and discuss with management (including the Company's Senior Accounting Executive) and with the Independent Auditors the Company's annual audited financial statements, including (a) all critical accounting estimates, policies and practices used or to be used by the Company, (b) all other required disclosures on Form 10-K before the filing of the Company's Annual Report on Form 10-K, and (c) any significant financial reporting issues that have arisen in connection with the preparation of the audited financial statements. The Committee will review:

> - analyses prepared by management, the internal auditors, and/or the Independent Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements. The Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the Independent Auditors. The Committee may also review other material written communications between the Independent Auditors and management, such as any management letter or schedule of unadjusted differences;

> - adequacy of the Company's internal controls over financial reporting; and

> - major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and the potential effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the Company's financial statements.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

54. The Audit Committee Charter further states the following with respect to the Company's internal controls:

> If brought to the attention of the Committee, the Committee will discuss with the Chief Executive Officer and Chief Financial Officer of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

55. With respect to Marqeta's internal audit function, the Audit Committee Charter states the following:

> At least annually, the Committee will evaluate the performance, responsibilities, budget and staffing of the Company's internal audit function and review and approve the internal audit plan. Such evaluation will include a review of the responsibilities, budget and staffing of the Company's internal audit function with the Independent Auditors.
>
> - In connection with the Committee's evaluation of the Company's internal audit function, the Committee may evaluate the performance of the senior officer or officers responsible for the internal audit function.
>
> - The Committee any process of appointment and/or replacement, including dismissal, of the senior executive of the internal audit function

56. In a subsection titled "Earnings Disclosures," the Audit Committee Charter states that "[t]he Committee will discuss the information to be included in the Company's earnings disclosures, such as press releases, forward looking guidance, and financial information (paying particular attention to the use of 'pro forma' or 'adjusted' non-GAAP information)."

57. With respect to the Company's risk assessment and risk management functions, the Audit Committee Charter states the following:

> The Committee will oversee the Company's management of Key Risks (defined below) as identified through the annual risk assessment, as well as the governance, policies, and processes for monitoring and mitigating such risks.

13

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

"Key Risks" within the purview of the Committee include risks related to:

- operations, including business continuity;

- revenue concentration;

- relationships with banks or similarly regulated entities;

- financial risks;

- adoption of systems and infrastructure relating to the reconciliation of funds;

- modifications to the Company's underwriting processes, procedures and strategies;

- negative publicity or reputational risk, industry trends and general economic conditions;

- material litigation;

- platform performance and reliability, privacy concerns and security breaches;

- federal and state regulations; and

- international regulations.

In furtherance of these purposes, the Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board may from time to time prescribe; however, risk assessment and risk management are the responsibility of the Company's management. The Committee has an oversight role and, in fulfilling that role, it relies on the reviews and reports described below. The Committee may, as and to the extent it determines appropriate, review with management and take action with respect to:

- Setting the tone and developing a culture within the Company regarding Key Risks, promoting open risk discussion, and promoting integration of risk management into the Company's processes and goals;

- The Company's risk identification, risk assessment, risk tolerance and risk mitigation and management practices for addressing Key Risks, and the guidelines, policies, procedures, processes and training for these undertakings;

- Management's implementation of the risk policies, procedures and training reviewed with the Committee;

14
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Reports and presentations provided by management regarding the effectiveness of management's undertakings with respect to the identification, assessment, mitigation, and management of Key Risks;

- The oversight and review of any management led investigations and/or the undertaking of any Committee or Board led investigations or review of advice and counsel received from third party advisors, which the Committee will have the power to engage in its reasonable discretion; and

- Other matters as the Board determines relevant to the Committee's oversight of Key Risks assessment, mitigation, training and management.

58. With respect to legal and regulatory compliance, the Audit Committee Charter states the following:

The Committee may discuss with management and the Independent Auditors, and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements. After these discussions, the Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures for complying with legal and regulatory requirements.

## SUBSTANTIVE ALLEGATIONS

*Background*

59. Marqeta is a financial technology company specializing in payment solutions. The Company operates a card issuing platform that allows businesses to issue a variety of different branded debit, credit, and prepaid card products to their customers. The Company's primary clients include small banks, financial services companies, and digital wallet companies.

60. Throughout the Relevant Period, the Individual Defendants failed to disclose that its business, operations, and prospects were materially adversely impacted by a shift in the regulatory landscape involving heightened scrutiny of the smaller banking industry.

*Materially False and Misleading Statements*

61. On May 7, 2024, the Company issued a press release announcing its financial results for the first quarter of 2024 (the "1Q24 Release"). The 1Q24 Release touted an increase in "Total

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Processing Volume (TPV) [] by 33% year-over-year, rising to $67 billion from $50 billion in the first quarter of 2023," adding that "Adjusted EBITDA was $9 million in the first quarter of 2024, increasing by $14 million year-over-year, [and] Adjusted EBITDA margin was 8% in the first quarter of 2024, an increase of 10 percentage points versus last year." The 1Q24 Release further quoted Defendant Khalaf as stating the following:

> Our business once again showed itself to be on a solid trajectory this quarter. Alongside continued scale and operational efficiencies, we saw growth from both major fintech customers expanding into new use cases and geographies, as well as growth from newer customers and embedded finance use cases. All put together, it speaks volumes to the breadth and depth of the Marqeta platform.

62.     The 1Q24 Release further provided the following updates, highlighting the Company's prospects:

> Marqeta announced the global expansion of its U.S. partnership with Uber Eats into eight additional markets: Canada, Australia, Mexico, Brazil, Colombia, Peru, Chile and Costa Rica. Marqeta's platform allows Uber Eats to reduce effort and time-to-market for each subsequent new market launch, showcasing the global reach of Marqeta's platform and the strong partnership with Uber since 2020.

> Marqeta supported the launch of a new and improved Klarna Card, open to all U.S. Klarna users, which is built into the Klarna app and provides flexible payment options with no revolving credit, allowing users to either pay a monthly statement in full with no interest, or pay over time. The card comes with personalized spending and budgeting recommendations and up to 10% cashback when used inside the Klarna app. Marqeta has supported Klarna's business since 2016, across multiple card projects in North America, Europe and Australia and New Zealand.

> Marqeta announced that it will power the Rain Card, a branded debit card that will enable Rain's customers, such as McDonald's, Taco Bell, Hilton and Marriott, to disburse earned wages onto cards seamlessly. In addition, through its strategic partnership with Rain, Marqeta can expand the scope of its early wage access offerings to add more value for employers across diverse sectors of the economy.

63.     On the related earnings call, hosted by Marqeta on the same day (the "1Q24 Earnings Call"), Defendant Khalaf stated the following regarding the Company's financial performance and expectations moving forward:

16

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Our first quarter results demonstrate how the strong foundation we built in 2023 is leading to growth with new and existing Marqeta customers and speaks volumes to the strength and depth of the Marqeta platform. We started the year strong with net revenue, gross profit and adjusted EBITDA outpacing expectations.*

Total processing volume or TPV was $67 billion in the first quarter, a 33% increase compared to the same quarter of 2023. In Q1, we had a day where we processed over $1 billion in TPV, a significant milestone for the company. Our net revenue of $118 million in the quarter contracted 46% year-over-year, which included a decrease of 58 percentage points from the revenue presentation change related to our Cash App contract renewal.

First and foremost, the accelerated bookings we started in late 2022 and our relentless focus on converting them to gross profit are starting to pay off. For example, we launched a program with Trade Republic and new customers signed in late 2022. Trade Republic is Europe's largest broker and leading savings platform headquartered in Germany. Trade Republic uses Marqeta to power an innovative consumer debit card that combines spending and savings for their 4 million customers across 17 markets.

The company chose Marqeta due to our ability to reliably deliver innovation and easy geographic expansion. Over 1 million people joined the waiting list for the highly innovative card in just a few weeks. Second, in addition to launching and scaling new customers, we continue to focus on expanding with our existing customers. Uber Eats recently expanded with us into Latin and South America, Canada and Australia, bringing to 9, the number of markets served.

\* \* \*

*Previously, several of our customers, namely fintechs, chose to take program management and other services in-house only to reverse course later given the complexity and regulatory requirements associated with scale. Now many customers look to Marqeta to ease a significant amount of operational burden. During the first quarter, about 20 of our existing customers added program management products and/or optional services from our programs like disputes, compliance reporting and 3D Secure.*

*Going forward, we believe compliance-related services, in particular, will be a key selling point and differentiator for our platform. Many competitors do not offer the same level of service and many prospective customers don't want to do this work themselves, especially when we have the advantage of both expertise and economies of scale. While ramping our previously booked programs as a top priority, we're also focused on the significant embedded finance opportunities right before us, like the $2 trillion market for accelerated wage access or AWA.*

As we look to capture this tremendous opportunity, we're working with multiple distribution partners to increase our reach and expand our offering. While we've seen

17

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

tremendous growth from early large adopters like Uber and Walmart's One finance, we're approaching other channels to bring our solution to a broader market. In April, we announced our new customer Rain, a financial wellness benefits provider that uses technology to help companies give employees greater control over their finances.

\* \* \*

***In summary, we're starting the year strong and seeing the foundation we laid over the last year start to deliver solid financial results. Our revamped sales efforts are beginning to pay off as the new embedded finance customers gain traction. In addition, our strong existing customer base continues to expand with us a testament to the value they get from our platform.***

64. Also during the 1Q24 Earnings Call, Defendant Milotich stated the following regarding the Company's financial performance and full year 2024 guidance:

Our Q1 results represent a strong start to the year with all of our key metrics exceeding our expectations. TPV grew 33% with broad-based outperformance, particularly in BNPL, on-demand delivery and financial services. The stronger-than-expected TBV growth drove net revenue to the high end of our expected range. Gross profit meaningfully outperformed due to those volume gains and the benefit of capturing additional network incentives, which I will discuss later in more detail.

Finally, continued execution of efficiency initiatives, particularly the streamlining of technology costs, when coupled with our higher gross profit led to significantly higher adjusted EBITDA of $9 million in the quarter. Q1 TPV was $67 billion, a year-over-year increase of 33% for the fourth straight quarter. Non-Block TBV grew approximately 15 points faster than Block growth.

\* \* \*

On-demand delivery growth remained in the double digits, accelerating quarter-over-quarter as our customers expanded into new merchant categories and geographies. Q1 had our highest on-demand delivery TPV growth in the last 2 years. Expense management growth accelerated for the second straight quarter, growing on par with the overall company, driven mainly by strong performance from our top customers. In fact, one of these customers have been increasing the share of their volume on our platform after seeking platform diversification with a competitor in the past.

\* \* \*

Now let's shift to our Q2 and full year outlook. We expect Q2 net revenue to contract between 47% and 50%. This is in line with the expectations we shared last quarter with the exception of the 2-point revenue presentation impact related to the renegotiated platform partnership. Consistent with what we have seen in the last 3

18
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

quarters, we have assumed a 65 to 70 percentage point negative impact of the cash app renewal.

\* \* \*

Second, we now expect the mix of our TPV to be more heavily weighted toward the Powered by Marqeta business, which materially impacts net revenue but has a much lesser impact on gross profit. This will lower the revenue growth by approximately 1 point. Gross profit is now expected to grow 7% to 9%, lifting the bottom of the range from what we have shared previously.

TPV year-to-date has been a little stronger, helping the first half gross profit growth, but the majority of the Q1 gross profit upside was related to incentives that are specific to Q1 because of the way our incentive contracts are structured. Our expectations for the second half gross profit growth remained unchanged for now at 23% to 26%.

***These changes in our net revenue and gross profit expectations highlight why we focus on gross profit as the measure of value we deliver for our customers. Our net revenue can be noisy based on our business mix and revenue presentation. Based on our continued success with cost optimization and efficiency initiatives, we are raising our full year adjusted EBITDA margin to positive 1% to 3%. We still expect positive adjusted EBITDA for 3 out of our 4 quarters in 2024 with Q2 being the exception.***

65.     Later during the 1Q24 Earnings Call, the following exchange occurred among Defendants Milotich, Khalaf, and an analyst from Wolfe Research:

**Darrin David Peller – Wolfe Research, LLC - Analyst**
Listen, just on new bookings. You obviously have talked over bookings being more material contributor in the back half of the year for those that you've already bought. Just curious if you could touch on how the cohorts are trending? Any variance you guys are seeing with regards to those customers ramping? And then just a quick follow-up. I'll just ask together on credit and maybe a little more on what the pipeline is looking like there and if we spend conversion there.

**Defendant Milotich**
***So far, what we're seeing is we're a little bit ahead of schedule. So we had said we expected about $20 million in revenue coming from these new cohorts for 2024 and then that ramping to $60 million next year. And in Q1, it's obviously early, but we are a little bit ahead based on a couple of customers launching a little more quickly than we expected and 1 or 2 also ramping a little faster than we had projected. That being said, because of, as you can imagine, the ramp of a card program, it takes a little bit of time. So we're, I guess, encouraged by the first couple of months, but the real value will be generated, say, 4 to 7, 8 months after the launch, when you really start to see what kind of momentum those programs have and what kind of volume***

19
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*they can generate. But we're off to a good start, a little bit ahead of schedule.*

**Defendant Khalaf**
On the credit side, again, like we said, our focus is to do a hell of a job on the initial accounts and partners that we have established. I'd say we're looking really good on the consumer credit side. I'd say for one particular reason, which is most of the brands that align with our vision on credit are thinking about a co-brand as an engagement tool and not just a loyalty tool. And kind of like addressing the top of the funnel, which is bringing more users or regain me the usage that have lost versus making my loyal customers more loyal.

So that fits exactly with how we perceive the credit market going and also it's a great thing for our platform because it operates in real time, and the rewards engine could be changed in a real-time basis in order to increase engagement and not just loyalty. And on the commercial side, it's actually better than we had expected. We did not anticipate such strong demand in commercial credit.

*And most of it is driven by, I'd say, the aggregator marketplaces that have great visibility into the performance of a small- to medium-sized business. So just to give you an example, at all lending that JPMorgan has done last year, only 2.6% of that went to small businesses. But small businesses account for like 53% of our GDP. I think we should have anticipated this great demand, but we didn't, but I think it's actually a very good sign for us.*

66.     An analyst then posed the following question regarding the Company's adjusted EBITDA outlook:

**Andrew Thomas Bauch – Wells Fargo – Analyst**
I wanted to just talk to the adjusted EBITDA outperformance in the quarter. Nice to see the EBITDA positive and the cash headwinds coming to an end in unison in the third quarter here. So how should we think about the ramp of EBITDA margins as we progress beyond these headwinds that you guys have been experiencing? Meaning the amount of flow-through or in your ways you want to invest in the business?

67.     In response, Defendant Milotich stated:

The way we've thought about it is that we believe we can grow our gross profit in the 20-plus percent, so in the 20s. And we also believe that if we're growing at that pace that we only need to grow our expenses in the low double digits, that there should be at least a 10-point gap. Once we lap all this and we get a normalized base to grow off of starting in '25 and '26 that there should be about a 10-point gap at least between our gross profit growth and our expense growth.

And that's just the benefit of a platform business and reaching our economies of scale.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

And so when you start to look at that 10-point gap in growth and you start to grow that out a year or 2, you'll see that the EBITDA comes in pretty significant chunks. It doesn't just drip in. It's becomes a meaningful gap as our volume and business just keeps getting bigger and bigger. And so that's really the formula we're looking at.

*And just to get a little more specificity, because we're so head count and technology-driven, our cost structure. What we see is between merit increases and things we'd get to our employee base as well as the variable costs we have of running our platform with Cloud costs and other data tools that we use, just those 2 things, our expenses would probably grow in the like mid- to high single-digit range, assuming we continue to compound at this kind of clip in terms of volume.*

*And so with that then, it's all a matter of how much more are we going to be investing incrementally to drive additional capabilities on the platform. And that's where we've said we think that anywhere from, say, 3 to 5 points of growth should be enough investment on top of the existing investment capacity we already have, which includes over 300 people who are focused on our platform today. And so that's the model that we are projecting our business going forward.*

68. On May 20, 2024, Defendant Khalaf participated at the 52nd J.P. Morgan Annual Global Technology, Media & Communications Conference on behalf of the Company. During the Conference, the following exchange occurred between an analyst from J.P. Morgan and Defendant Khalaf:

**Tien-Tsin Huang – J.P. Morgan – Analyst**
I mean, just thinking about some of the hot markets you've been in, expense management, BNPL, on-demand delivery, we've seen ups and downs, at least reflected in the stock prices. But your bookings have been strong, and it sounds like things are running a little bit ahead of plan. How healthy would you say your core end markets are?

**Defendant Khalaf**
*I'd say that on the booking side, as we talked about, we are ahead of plan, and the pipeline is growing faster than our bookings, which is a very good thing. So we're not draining the pipeline to make the quarter. And I'd say there's many reasons for that. The first one is, as we tackle the embedded finance market, by definition, they're bigger players. So the numbers are significantly higher.*

*The second one, the expansions with our customers is now occurring at a faster pace. I hate to call it the resurgence of fintech, but there are some fintechs that have now scaled, and I think that the dry spell or whatever last year is helping them, because the winners are winning more. So -- and they're expanding with us, either selling more products or expanding in other countries. And then we have, I'd say, the core use cases that we have reenabled that is fueling our pipeline as well. So*

*from a bookings perspective, again, it's a win rate from a bigger pipeline, and it's looking very healthy.*

**Tien-Tsin Huang – J.P. Morgan – Analyst**
Yes. Well, that's consistent. You said you're going after enterprises. At Investor Day, you said you were moving away from the VC-backed players, which makes sense. And now you've got enterprise, you have marketplace. So could we expect larger deals in general, and the trade-off could be slower implementations? How should we evaluate that?

**Defendant Khalaf**
Yes. We intentionally do not want to trade a large number with a slower implementation cycle, right? So the good thing on the enterprise side is we are the program manager. So if you look at some of the deals that we've closed in fintech that took some time, we were not the program manager. So they had the relationship with the banks themselves. Things are slow. Banks are not the fastest moving organizations.

So us being the program manager, it actually makes the programs go smoother, if not even faster. So we're not trading that. So the answer is yes, there are going to be bigger deal, but the -- and we monitor this. The average and the median of the deployment cycles are coming down by about 11% year-over-year. So while we've broadened the pipe, we haven't compromised the deployment time.

**Tien-Tsin Huang – J.P. Morgan – Analyst**
So I know also enterprises are going to be a lot more careful around risk management, and I think compliance appears to be an asset for you because you've fought through that as you scaled up a lot of big players, including Cash App and Block. So is that a differentiator in your mind, Simon? Is there more to do on the compliance side?

**Defendant Khalaf**
Yes. Absolutely. No, no, absolutely. I mean, I always look at expertise and scale. So we can do it better and we can do it cheaper. So one is like, okay, so why? *One is the investment we have put in. We have spent in this platform. So if you look at it on the dispute side, whether you're doing Reg E or you're doing Reg Z. So Reg Z is for credit, Reg E is for debit. You have to put an IVR, you have to program it for telephony, you have to build a chatbot, you have to understand the intent of the consumer, you have to build a queuing management system, you have to submit to the network, and you have to track all these and instrument it to make sure the consumers are happy. Well, guess what? We've built that. So that is not easy work.*

*Same thing with banking, with banking secrecy, anti-money laundering, putting that machinery together, sampling it against lists, so on and so forth. That's all been done. And the scale we operate at, our unit economic is significantly better than what each customer can get on their own. So in addition to the unit economics, you've got multiple expertise that we can help them. So if somebody wants to do debit, money movement, credit, BNPL, 1 program management layer. And I think*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*that's a huge differentiator for us.*

**Tien-Tsin Huang – J.P. Morgan – Analyst**
And when you're competing against some of your peers on the compliance side, is it very observable for your clients as they're making decisions on the compliance front?

**Defendant Khalaf**
They are. No, absolutely. *And I'd say that some of the fintech players, they're very smart and they built it on their own for a specific program. They did not realize that as they want to branch out of the program they have established, they have to kind of rebuild it. So I mean, at the end of the day, every fintech wants to become a bank. So without the license, but offer banking services.*

And it's not that they stopped and thought, hmm, I'm going to do consumer, business, commercial, lending, whatever. So let me start by building this great program management layer and start building services underneath it. No. They said, look, I'm going to do BNPL. I'm going to have great program management for that. But then they get into the revolver and say, hmm, that's going to be hard. So there's no question that the program management layer and the investment we've made have become great competitive differentiators for us.

69.     On August 7, 2024, the Company issued a press release, announcing its financial results for the second quarter of 2024 (the "2Q24 Release"). The 2Q24 Release highlighted "Total Processing Volume (TPV) of $71 billion, representing a year-over-year increase of 32% driven by volume growth across several use cases." The 2Q24 Release quoted Defendant Khalaf as stating:

The second quarter demonstrates the great returns on our reinvigorated go-to-market approach combined with our ability to deliver innovation at scale. We signed a pioneering techbank, launched a new payment innovation that reimagines what a card can be, and deepened the array of services we can offer globally, all while continuing to grow our TPV and operate with focused efficiency.

70.     The 2Q24 Release additionally provided the following updates, emphasizing the Company's positive growth prospects:

Marqeta announced it has signed a five year deal with Varo Bank, N.A., the first nationally-chartered consumer techbank in the U.S., to become its issuer processor. Varo selected Marqeta for its ability to combine sophisticated virtual, tokenized and physical card issuing technology for the more than five million cards it has in market, with faster speed to market, helping Varo achieve its goals of helping people save and manage their money more easily.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

We recently announced that we are the first US. issuer-processor certified by Visa to support Visa Flexible Credential, which will allow a single card product to toggle between payment methods on each transaction, bringing multiple funding sources to one card. Cardholders can choose whether to use debit, credit or "pay-in-four" with Buy Now Pay Later. Currently, we are partnering with Affirm, the first program announced in the US to offer Visa Flexible Credential, to enable this capability for their Affirm Card. This reinforces Marqeta's commitment to innovation and provides us with further differentiation in the BNPL landscape.

Marqeta signed Zoho, a global tech company serving over 700 thousand businesses, which transforms how SMBs and enterprises work with a comprehensive suite of more than 50 business management applications. Zoho selected Marqeta for its ability to deliver expense management and embedded finance expertise to launch a card solution that enables businesses to manage expenses efficiently while also supporting their long-term growth.

71.     During the related earnings call, hosted by Marqeta on the same day (the "2Q24 Earnings Call"), Defendant Khalaf touted the Company's purportedly strong financial performance and prospects, stating:

Our second quarter results came in ahead of expectations, and once again, we demonstrated significant discipline in operating expenses without compromising our growth trajectory, scale, service or innovation.

I'll now briefly discuss our quarterly results before diving into company updates. The second quarter's net revenue, gross profit and adjusted EBITDA exceeded our expectations. Total processing volume, or TPV, was $71 billion in the second quarter, a 32% increase compared to the same quarter of 2023. Our net revenue of $125 million in the quarter contracted 46% year-over-year, which included a decrease of 60 percentage points from the revenue presentation change related to our Cash App contract renewal.

\* \* \*

Our second quarter results demonstrate the continued demand for what has differentiated Marqeta's platform, our ability to deliver solutions for diverse consumer and commercial use cases while continuously innovating and expanding value-added program management services. As discussed in our recent State of Payments report, which we released 2 weeks ago, consumers continue to branch out in financial services, looking for alternatives to traditional banks. 1/3 of consumer survey said they were only -- they were using digital-only banks with 63% of 18- to 34-year-old saying they will be open to banking with a nontraditional financial service providers. These trends have given modern and digital banks a genuine foothold in the market.

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

* * *

We anticipate more momentum to come in 2025. I'm thrilled to share that Varo Bank, which has 5 million cards in the market recently chose Marqeta as their partner for its card processing business. Varo will trust us to migrate their customers over from their current processor in 2025 for a 5-year exclusive contract. Varo is uniquely positioned as a techbank with its own bank charter, given its greater control over its product stack and user interface. To realize this advantage, Varo sought a nimble and sophisticated partner to help them innovate quickly as they look to offer their consumers real-time insights into their transactions.

The TPV growth and momentum goes well beyond financial services. In fact, 10 out of our top 20 customers grew over 50% year-over-year during the quarter. The use cases include expense management, SMB working capital, Buy Now, Pay Later in addition to financial services. This speaks to the strength of the Marqeta platform and its ability to support innovation at scale across a variety of use cases, solidifying Marqeta's platform play.

* * *

We offer solutions ranging from expense management to commercial credit and working capital to help these businesses operate with improved efficiencies and capitalization, investing more in their business and having more time to execute and innovate rather than having them manage antiquated back-office applications. This has driven the continued growth in expense management as TPV for this vertical grew slightly more than our average TPV growth during the quarter.

To add to that growth, we have signed Zoho during the quarter. Zoho is a global technology company serving over 700,000 businesses from SMBs to enterprises with a comprehensive suite of business management applications. Zoho chose Marqeta as their partner because of our expertise in launching card solutions that enables businesses to manage expenses efficiently. Marqeta was also chosen because of the breadth and depth of our platform, which enables businesses to accelerate growth globally.

While digital banking and expense management continue to perform well on our platform, we continue to innovate in e-commerce and digital payments. We recently announced that we are the first U.S. issuer processor certified by Visa to support Visa Flexible Credential. With some Visa Flex cards, consumers can allow a single card product to toggle between payment methods on each transaction, bringing multiple funding sources to 1 card. Cardholders can choose whether to use debit, credit, pay-in-for with Buy Now, Pay Later or even pay using rewards points.

* * *

***The combination of the innovation we power with the ability to execute at scale,***

25

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*truly differentiates Marqeta. As our customer reach scale and the regulatory environment change, the guidance we provide our customers becomes a true differentiator. That's why we continue to enhance both program management and compliance.* With the launch of our new office in Warsaw, Poland, we're now equipped to support more program management capabilities for our European customers, allowing us to deepen our already successful offering in the market.

Program management is important to our long-term growth for the following reasons. First, increased services add incremental net revenue, typically with higher gross profit margins. In the second quarter, net revenue driven by our suite of risk solutions, such as 3DS and risk control, increased by 61% year-over-year.

Second, it improves our customers' speed to market and our time to realize gross profit. As an example, if a customer looks to secure a bank partner without a system, this can take 9 to 12 months. However, without assistance, we can bring this time down dramatically.

*Third, it positions us well with companies looking to offer embedded finance. These companies can focus on their brand and their customer experience while leaving cumbersome details around offerings such as dispute to Marqeta. All these updates speak to our platform's breadth, depth and scale, while our ability to innovate demonstrate our expertise, delivering solutions for consumer and commercial debit and credit in countries around the world with modern flexible architecture is very appealing to both existing customers and new prospects.*

72.     Also during the 2Q24 Earnings Call, Defendant Milotich stated the following regarding the Company's 2024 outlook:

Now let's shift to our second half and full year outlook. As we move into Q3, we began the first chapter of a new era for Marqeta, where we aim to deliver sustainable, profitable growth. We are returning to growth now that we have lapped the resetting of the large majority of our customer contracts and the Cash App renewal in particular, we have established longer-term partnerships with our customers where we can work together to drive growth with win-win outcomes.

In addition, we expect to be adjusted EBITDA positive going forward at an increasing rate over time, renewed expense discipline, a focus on efficiency and optimization and the realization of our platform economies of scale as the business flourishes has put us on a clear path to GAAP profitability in the coming years.

*We expect both Q3 and Q4 net revenue growth to be between 16% to 18%, in line with what we indicated last quarter. Therefore, full year net revenue growth is expected to contract 24% to 27%, again, consistent with the expectations we shared last quarter. Q3 gross profit growth is expected to grow between 25% and 27%, while Q4 is expected to grow approximately 3 points lower than Q3. As a result, second*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*half growth is consistent with the expectations we shared last quarter. Both quarters are expected to benefit from non-Block gross profit growth of over 30%, which is accelerating from the first half as we have now lapped heavy renewal activity, as well as the growing contribution from the ramping of new cohorts driven by improving sales last year.*

* * *

To wrap up, the business has had an exciting turning point as we enter into the second half of 2024. Our Q2 results demonstrate the continued momentum in our business. TPV growth remains robust at 32%, fueled by strong results across financial services, expense management and BNPL use cases among both well-established customers as well as those who are newer to our platform. As Simon mentioned, the TPV for 10 of our top 20 customers grew by over 50% in Q2.

Gross profit growth was weighed down by the Cash App renewal for the last time and accelerating non-Block growth signals the strong underlying growth of the business. Well executed efficiency and optimization initiatives continue to lower adjusted operating expenses without sacrificing innovation or platform resiliency, compliance and security.

*As we begin the second half of 2024, we expect TPV growth to remain over 30% based on the current trajectory and the newer programs that are still ramping. The variety of use cases across consumer and commercial in multiple geographies showcases the strength of our platform. With the large concentration of contract renewals behind us, the TPV growth is expected to translate into gross profit growth in the mid-20s with some quarterly variation.*

73.     Later during the 2Q24 Earnings Call, the following exchange occurred among an analyst from Barclays and Defendants Khalaf and Milotich:

**Ramsey El-Assal – Barclays – Analyst**
Separately, I guess I also wanted to ask, with the renewals behind you, how should we think about the growth algorithms balance between new customer versus existing customer growth? I think you guys have highlighted a lot of new opportunity on this call. I'm just kind of curious, in your mind, what is shaping up to be the more powerful drivers sort of today and in your projections between sort of harvesting growth from the clients you have today versus new customers that you think may drive kind of an incremental share of growth as we move forward?

**Defendant Khalaf**
Yes. I'll give an answer and then hand it over to Mike. Ramsey, it is kind of yes and yes. So, we are excited that the new cohorts are on track to generate $20 million in revenue, which is what we've guided. So, we're on track with that, and again, speaks volume to how fast we can onboard new customers and get them ramped up. So, that's

27
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a growth vector. Our customers also are growing, some of them geographically. Others, they're launching multiple programs. So, that also factors into our growth calculations. But Mike, you can give more color over the multiyear.

**Defendant Milotich**

Yes. I think -- what I would say is if you look at our bookings through the first half, roughly half of it are expansions with existing customers versus new logos, if you will, or new customer bases. So, it's a nice balance between the 2. We still have a lot of established customers who still have a lot of growth potential. And so, we continue to try to do more business with them as well as bringing in new pieces of business.

The other thing I would say is also just even within our programs that are already live with our existing customers, again, the growth is really significant. We talked about 10 of our 20 customers have their TPV growing over 50%, but 8 of those 10 are growing more than 75%. So, it's really -- we have several customers who really have caught on to something that's very much resonating in the market, and they're growing really fast, even separate from necessarily doing additional business with us, so they'll come over time. So, it's a very nice combination for us to have in the coming quarters to get growth from both new and existing customers.

74.     Also during the 2Q24 Earnings Call, an analyst from Goldman Sachs asked the following question regarding the potential implications of a recent cybersecurity breach with respect to the regulatory environment applicable to the Company:

**William Alfred Nance – Goldman Sachs – Analyst**

I wanted to ask about some of the cybersecurity events that happened recently with the Evolve hack. And just wondering if you could talk about maybe some of the ramifications for the broader ecosystem. And I guess, A, how that's impacting some of the partner banks in the ecosystem? And then, B, if there's any impact on pipelines or kind of new program upstarts that may be impacted by increased regulatory scrutiny?

**Defendant Khalaf**

*The short answer is no. The little bit long answer is that there is the CrowdStrike event that did not impact us -- predominantly in Mac shop. I mean, we had a customer at CrowdStrike, but thanks to a great effort by our security team, we were not impacted, neither were our customers impacted in any major way. So, that's good. In terms of the other security and regulatory scrutiny, I don't expect it to create a medium-term or long-term challenges.*

On the contrary, I would say they are going to create a lot of tailwinds for Marqeta because of the flight to quality syndrome. We have demonstrated our ability to scale and in a compliant manner. In terms of like Evolve specifically, our business on Evolve is not big, but Evolve is a great partner of ours. But most of the issues, I'd say,

do not involve Marqeta.

And some of the challenges that we've actually read in the press, we don't have intimate knowledge, right, are something that will not impact Marqeta because we've invested heavily in those -- I'd say in the chrome around our solution, whether it's settlement or reconciliation. This is something that we've done beautifully as we've scaled. So, I would say that we're looking good, and this is actually working in favor of Marqeta.

75.     Finally, during the 2Q24 Earnings Call, the following exchange occurred between an analyst from Citigroup and Defendant Milotich regarding the Company's visibility for gross profit growth and the macroeconomic environment relevant to Marqeta:

**Andrew Garth Schmidt – Citigroup – Analyst**
If I could just go back to the November 2023 Analyst Day, I recall you had to make some assumptions around pipeline, conversion, and then which segments would grow at which rates. Maybe you could talk about how some of those key assumptions are trending. Obviously, some good wins announced in the quarter, so it seems fairly positive. But curious about how some of those key assumptions are trending and how that influences your visibility for gross profit growth in the out years

**Defendant Milotich**
*Yes. I think for the most part, of course, there's always puts and takes. You don't get everything right. But I would say on a bigger picture level, we're very much on trend. We had said that we expected $20 million in revenue from customers who essentially had not launched prior to 2024 in the year, and we're on track to deliver that. And that number is expected to go up to 60% -- or $60 million, sorry, next year. So, we feel good that the new business that we're onboarding is on track.*

I think in terms of when we look at the existing business and how it's trending, I would say it's about as expected with maybe slightly different -- a slightly different mix than maybe we'd anticipated a year ago. I think some of the things that Simon has highlighted in financial services and this concept where just many, many companies, particularly in embedded finance, have some neobank aspects to their strategy in terms of how they want to engage their users or their employees. And so, I would say that's an area we're probably seeing more demand than we had thought 9 months ago. So, that's probably the earliest place where we're really seeing a lot of embedded finance activity.

**Andrew Garth Schmidt – Citigroup – Analyst**
And then lot of questions this quarter on cyclicality and macro. Obviously, it doesn't seem to be showing up in your results, pretty strong growth. But maybe you could just remind us the components of cyclicality and maybe more towards the fourth quarter where we do get a heightened shopping season with BNPL and such and what the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

sensitivity is there.

**Defendant Milotich**

*So far, we're seeing very stable trends, even our July TPV growth is in line with Q2. And if you actually go back much further, what you see is really for about 18 months, our TPV growth has been incredibly stable, which we're quite happy about because our base is getting materially larger and we're still able to maintain this growth that's called like sort of low to mid-30s growth on a very consistent basis. So, we're certainly not seeing anything macro-wise that seems to be disrupting that trajectory and including the month of July. So, so far, we see things trending quite stable.*

One of the other things we also look at is the mix of our spend. So, we look at the spend by what's high discretionary, what's low discretionary, and kind of a medium bucket, everything in between. And when we cut our TPV that way, what we're seeing is each of those 3 buckets is growing at roughly the same rate. So, right now, at this point, too, with this compounding growth we're getting very nicely, the mix of our business by sort of discretionary buckets is not changing a whole lot. So, everything is fairly stable.

The last question that you had about the holiday season. So, the only thing that's material for us is that, yes, in Q4, the mix of our volume shifts a little bit more to BNPL, right? Just given the role that BNPL plays in retail holiday shopping, in particular, the mix of our volume shifts a couple of points to BNPL in the fourth quarter compared to the rest of the year. But otherwise, everything is pretty stable. That's the only thing that's noticeable in Q4 versus the other quarters of the year.

76. The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) shifts in the regulatory landscape applicable to the Company's banking partners were having adverse impacts regarding Marqeta's customer onboarding timelines for new deal launches; (ii) the Company's investment in compliance and program management capabilities was inadequate to adjust to the shift in the regulatory environment; and (iii) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

77. On November 4, 2024, Marqeta reported its third quarter 2024 financial results and reduced its fourth quarter and 2025 growth outlook, stating that Marqeta's "fourth quarter guidance

reflects several changes *that became apparent over the last few months* with regards to the heightened scrutiny of the banking environment and specific customer program changes."

78.     Importantly, the Individual Defendants admitted that they had knowledge of changes regarding heightened scrutiny for a "few months" prior to the disclosure.

79.     During an earnings call, hosted by Marqeta on the same day (the "3Q24 Earnings Call"), Defendant Khalaf elaborated on the Company's reduced outlook:

> With all this great progress, why is our guidance for Q4 softer than expected? Well, last year, the regulatory environment changed amongst the smaller banks that supports many of our customers' programs.
>
> As a company, we anticipated this change and invested in program management in general and compliance services in particular. We believe that these investments have positioned us well in the medium and long term and increase the most around our platform, especially in embedded finance. However, we underestimated the increased operational burden these changes made on both Marqeta's and the bank's onboarding and compliance teams. The incremental scrutiny and rigor translated into delays in launching new programs.
>
> *These delays have also been aggravated by the increased demand from new bookings in 2023 and the first half of 2024. On average, the time to launch new programs grew 30% to 40% from 2023, and we expect that increase to remain for at least 2 additional quarters as we and our bank partners become more agile in launching programs in this new environment.*
>
> *Given the standard ramp time for programs in our industry, these delays will cause volume and gross profit to be pushed out a few months. Now with a more complete understanding of the implications, we're taking a more holistic approach to ramping the programs we have already signed. We are also signing up new banks to add capacity and open up new choices for our customers while making our processes standardized across all banks we support.*
>
> We are confident these changes will give us the agility we need. However, it will take a few months to completely solve the problem and drain the backlog that has been built up. We view the headwinds from the more challenging bank environment as short term, merely slowing down our progress rather than a change in the trajectory of our business nor impacting our path to profitability. In fact, we remain confident in our strategy, business trajectory and execution.

80.     Also during the 3Q24 Earnings Call, Defendant Milotich stated the following regarding the Company's fourth quarter outlook:

31

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Now let me walk through our latest outlook for Q4. We expect Q4 net revenue growth to be between 10% and 12% and Q4 gross profit growth to be between 13% and 15%, a 6- and 9-point reduction, respectively, compared to what we shared in early August. The change in our expectations is primarily driven by 2 factors, both of which stem to some degree from the heightened regulatory environment from our bank partners.

First, we now expect significantly fewer new programs will launch and ramp up in the second half of the year, lowering gross profit growth by approximately 6 points. We were not quick enough with solutions and new processes for our bank partners, and they are more focused on maintaining current programs in the heightened regulatory environment than launching new programs. In some cases, this environment also delays our customers' launch plans. Now that we have a backlog of programs to launch, it will take time to work through it.

Delays of a few months pushes launches into Q4 and the first half of 2025. Because of the ramp trajectory of TPV in the first year of a program, a few months delay meaningfully impacts Q4. The impact is larger on gross profit than revenue since newer programs with subscale volume tend to have high gross margins until our customers work through the initial volume tiers in our contracts.

Why does this change in assumptions seem so sudden? We have been very aware of the scrutiny and working through it with our bank partners, investing significantly more in our compliance efforts since the start of this year to raise our program management standards ahead of the rising tide. ***However, in the past 2 to 3 months, it has become clear we greatly underestimated the magnitude and time horizon for all parties to adapt to the new standards. We are actively executing the solution for this challenge, working closely with existing bank partners to optimize our processes to improve the efficiency of program approval and onboarding.***

81.     During the 3Q24 Earnings Call, the following exchange occurred between Defendant Khalaf and an analyst from Keefe, Bruyette, & Woods:

**Sanjay Harkishin Sakhrani – Keefe, Bruyette, & Woods, Inc. – Analyst**
I guess, Mike, you mentioned or Simon did that what you were seeing is not dissimilar to what others have seen in the industry. I mean, have you guys validated that? Have your competitors also seen similar product launch delays?

**Defendant Khalaf**
Good question. Actually, as a team, we were at Money20/20 last week, which is the conference for new financial services. And I'd say that the #1 thing that was discussed was how everyone is now taking compliance in general and regulatory compliance seriously. And everybody is talking about the delays, but they're also talking about the flight to quality, which is they're coming to Marqeta because we were the entity that has invested early on in the cycle.

32
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

And also, we heard a lot of folks that thought that they could use BaaS players as kind of like an alternative to Marqeta, that actually has disappeared because a lot of folks mentioned that they're seeing almost these solutions fizzle out in terms of the ability to take on scale programs. So yes, we're not unique into that -- into this environment. But I do believe we had a head start in compliance, and we will get over this hump in terms of the operational burden that ourselves and a couple of our bank partners have faced.

82. Market commentators reacted negatively to the disclosures. For instance, J.P. Morgan issued the following statement in the wake of the Company's 3Q24 Earnings Call:

As the BIN sponsorship environment came under regulatory pressure earlier this year, onboarding timelines became heavily extended (from ~150 days in 2023 to >300 in 1H24), which management previously expected to improve in 3Q. *For context, this dynamic was generally undiscussed by management until now, with MQ as recently as last quarter articulating that new business onboarding was proceeding generally on track.* Ultimately, this expected bottleneck relief didn't happen, and in 3Q onboarding times were still 30-40% higher than last year, resulting in a delay in bookings conversion and lower NTM growth.

83. Similarly, Wells Fargo reported that, with respect to the Company's "unfortunate and untimely setback," "[w]hile management attempted to reassure investors that the challenges had 'bottomed' & revenues would return once delays were alleviated, we think this message will fall on deaf ears for the foreseeable future."

84. On this news, the price of Marqeta's stock declined a staggering 42.5% in one day, from a close of $5.95 per share on November 4, 2024 to a close of $3.42 per share on November 5, 2024.

*Insider Sales*

85. During the Relevant Period, Defendant Cummings made unusually timed sales of Company stock while in possession of material non-public information concerning the Company's financial condition and business prospects.

86. Defendant Cummings reaped hundreds of thousands of dollars in profits selling her personal holdings of Company stock at an average price of $5.46 per share, more than 150% of the stock's closing price of $3.42 per share after the corrective disclosures on November 5, 2024.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Stock Repurchases During the Relevant Period*

87. According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed herein, the Individual Defendants caused the Company to repurchase approximately 20,358 shares of its own stock, for more than $107,524.

88. Given that the price of Marqeta stock was $3.42 per share after the corrective disclosures on November 5, 2024, the true value of the 20,358 repurchased shares was roughly $69,624. Accordingly, the Individual Defendants caused the Company to overpay by approximately $37,900.

## DAMAGE TO THE COMPANY

89. As a direct and proximate result of the misconduct detailed above, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending against and incurring potential class-wide liability in the Securities Class Actions.

90. These damages also include the costs of remediating deficiencies in the Company's procedures and controls, compensation and benefits paid to current and former members of the Board and Company executives, who breached their fiduciary duties to Marqeta, and reputational harm and loss of goodwill.

91. Furthermore, as a direct and proximate result of the misconduct detailed herein, Marqeta has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and management's breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

92. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

93. Marqeta is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

34

94.     Plaintiff is a current shareholder of Marqeta and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

95.     A pre-suit demand on the Board of Marqeta is futile and, therefore, excused. At the time this action was commenced, the ten-member Board was comprised of Defendants Khalaf, Linville, Gardner, Atkinson, Chokshi, Cummings, Graf, Prasad, Riley, and Sullivan (the "Director Defendants"). Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

96.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

97.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

98.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

99.     Defendant Gardner is not disinterested or independent and is therefore incapable of considering a demand. Defendant Gardner founded the Company and served as the CEO from its inception in 2010 until January 2023. Thus, the Company admits that Defendant Gardner is a non-independent director. Further, Defendant Gardner cannot be reasonably expected to consider with

35
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

disinterestedness whether to sue fellow directors of a company that he founded and has helped to build from inception.

100. Defendant Khalaf is not disinterested or independent and is therefore incapable of considering a demand. Defendant Khalaf has served as the Company's CEO since January 2023. Thus, the Company admits that Defendant Khalaf is a non-independent director. Further, Defendant Khalaf is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Actions based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

101. Defendants Cummings, Graf, Prasad, Riley, and Sullivan serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, the audits of the financial statements, and oversight with respect to the Company's risk management function and its legal and regulatory compliance. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

102. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

103.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Importantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein.

104.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

105.    The acts complained of herein constitute violations of fiduciary duties owed by Marqeta's officers and directors, and these acts are incapable of ratification.

106.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Marqeta. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Marqeta, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if

such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

107. If there is no directors' and officers' liability insurance, then the directors will not cause Marqeta to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

108. Thus, for all of the reasons set forth above, all of Marqeta's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

**Against the Individual Defendants for Violations of § 10(b)**
**of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

109. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110. The Individual Defendants participated in a scheme with the purpose and effect of defrauding Marqeta. Not only is Marqeta now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Marqeta by the Individual Defendants.

111. During the Relevant Period, the Individual Defendants caused the Company to overpay by approximately \$37,900 to repurchase roughly 20,358 shares of its own stock.

112. The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

113. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to

make the statements made about Marqeta not misleading.

114. The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Marqeta.

115. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

116. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

117. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

119. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

120. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

39
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

121. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

122. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Actions, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Actions, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

123. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

125. Plaintiff, on behalf of Marqeta, has no adequate remedy at law.

## COUNT IV

**Against Defendant Cummings
For Breach of Fiduciary Duties (*Brophy* Claim)**

126. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127. During the Relevant Period, the Defendant Cummings held a position within the Company that provided her access to confidential, proprietary information concerning the Company's financial condition and future business prospects. Notwithstanding her duty to refrain from trading in Marqeta common stock under the circumstances, Defendant Cummings sold personal holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

128. The insider sales detailed herein were not part of any regular pattern of sales and were suspicious in terms of timing and amount.

129. The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which Defendant Cummings misappropriated to her own benefit when she sold Marqeta stock. At the time of her stock sale, Defendant Cummings was aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease. Defendant Cummings' sales of stock while in possession and control of this material, adverse, non-public information was a breach of her fiduciary duties of loyalty and good faith.

130. Plaintiff, on behalf of Marqeta, has no adequate remedy at law.

## COUNT V

**Against the Individual Defendants
For Unjust Enrichment**

131. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132. By their wrongful acts, violations of law, and false and misleading statements and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Marqeta.

133. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Marqeta that were tied to the performance or artificially inflated valuation of Marqeta, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

134. Defendant Cummings was further unjustly enriched with respect to insider sales of Company stock.

135. Plaintiff, as a shareholder and a representative of Marqeta, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

136. Plaintiff, on behalf of Marqeta, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants
### For Abuse of Control

137. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138. The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

139. As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

140. Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT VII

### Against the Individual Defendants
### For Waste of Corporate Assets

141. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

42

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

142. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

143. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

144. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

145. Plaintiff, on behalf Marqeta, has no adequate remedy at law.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: February 27, 2025

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP

By:   */s/ Alex J. Tramontano*
      ALEX J. TRAMONTANO

Betsy C. Manifold (182450)
Rachele R. Byrd (190634)
Alex J. Tramontano (276666)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
tjm@rl-legal.com
sa@rl-legal.com

*Attorneys for Plaintiff*

44
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Docusign Envelope ID: D9E1400B-C555-4208-B2A7-32D404D88072

## VERIFICATION

I, Eduardo Preciado, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of February, 2025.

DocuSigned by:

*Eduardo Preciado*

A541D2E5EDEA4B9...

Eduardo Preciado