Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Jason Krajcer (SBN 234235)
  *jkrajcer@glancylaw.com*
Christopher Fallon (SBN 235684)
  *cfallon@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Tyler Hogge and Lead Counsel for the Class*

[Parties and Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MARQETA, INC. SECURITIES LITIGATION, | Case No. 4:24-cv-08874-YGR<br><br>**AMENDED COMPLAINT** |

1

## TABLE OF CONTENTS

2    I.      NATURE OF THE ACTION AND OVERVIEW ................................................. 1

3    II.     JURISDICTION AND VENUE ........................................................................ 7

4    III.  PARTIES ......................................................................................................... 8

5          A.     Lead Plaintiff ....................................................................................... 8

6          B.     Defendants ............................................................................................ 8

7          C.     Relevant Non-Parties .......................................................................... 9

8    IV.  BACKGROUND ............................................................................................ 11

9          A.     Overview of the Company ................................................................. 11

10         B.     Pre-Class Period Events ..................................................................... 14

11                 1.      During 2023 And The First Half Of 2024, Regulatory Scrutiny On The

12                            FinTech Industry And Banks Serving The FinTech Industry Increases

13                            ................................................................................................ 14

14                 2.      Marqeta Restructuring Results In Compliance Staffing Shortages,

15                            While Management Isolates Onboarding From Compliance Operations ........................................................................................... 18

16                 3.      Marqeta Identifies A Material Weakness In IT Controls, Causing

17                            Onboarding Delays ............................................................................ 20

18    V.     CLASS PERIOD EVENTS ........................................................................... 22

19          A.     Defendants Announce Results For Q4 And FY 2023, Issue Guidance For

20                      FY 2024, And Project Sharp Ramp Up Of Growth During Second Half Of 2024, Touting Improved Launch Times And Investments In Regulatory Compliance

21                      ................................................................................................ 22

22          B.     During March 4, 2024 Morgan Stanley Technology, Media & Telecom

23                      Conference, Defendants Continue To Tout Marqeta's Accelerated Launch Times ............................................................................................... 26

24          C.     Defendants Announce Results For Q1 2024, Maintaining Gross Profit Growth

25                      Projections For The Second Half Of 2024 And Insisting That Launch Of New Customers Was Proceeding Ahead Of Schedule ............................... 28

26          D.     Defendants Continue To Represent Operational Improvements And

27                      Accelerated Program Delivery At J.P. Morgan Global Technology, Media and Communications Conference On May 20, 2024 ................................. 30

28

E.    Defendants Announce Results For Q2 2024 And Continue To Represent That The Onboarding Of New Customers Was On Track ........................................ 31

F.    The Truth Emerges .................................................................... 35

VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD ................................................ 39

A.    Fourth Quarter and Full Year Results for 2023 ................................ 39

B.    March 4, 2024 Morgan Stanley Technology, Media & Telecom Conference .. 46

C.    Q1 2024 Financial Results ........................................................... 48

D.    May 20, 2024 J.P. Morgan Global Technology, Media and Communications Conference ............................................................................. 53

E.    Q2 2024 Results ..................................................................... 54

VII.    LOSS CAUSATION ........................................................................ 61

VIII.    ADDITIONAL ALLEGATIONS CONCERNING FALSITY AND SCIENTER ...... 62

A.    Particular Details In Defendants' Admissions Show That They Knew About The Increased Onboarding Times And Resulting Launch Delays During Q1 2024 And Q2 2024 But Deliberately Refrained From Disclosing Those Delays And Instead Made Misleading Claims About Marqeta's Launch Times ........ 62

B.    Defendants Made Misleading Statements During Q3 2024 Earnings Call In Order To Conceal And Minimize Defendants' Misconduct .......................... 64

C.    Onboarding Of New Customers Was A Core Operation, Launch Time Was A Critical Performance Metric, And Regulatory Compliance Was A Core Competency That Defendants Claimed Was A Competitive Differentiator ... 65

D.    Defendants Were Aware Of Circumstances At Marqeta That Magnified The Risk Of Further Increasing Onboarding Times And Launch Delays .............. 68

IX.    CLASS ACTION ALLEGATIONS ........................................................ 72

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE ............................ 74

XI.    NO SAFE HARBOR ........................................................................ 75

XII.    CLAIMS FOR RELIEF .................................................................... 76

XIII.    PRAYER FOR RELIEF .................................................................... 80

XIV.    JURY TRIAL DEMANDED .............................................................. 80

# GLOSSARY OF DEFINED TERMS

| TERM | DESCRIPTION |
| --- | --- |
| 2023 10-K | Marqeta's Form 10-K for the year ended December 31, 2023 filed with the SEC on February 28, 2024. |
| ACH | Automated Clearing House |
| Acquiring Banks | The financial institutions that merchants use to hold funds and manage their business. Acquiring Banks may work with an Acquirer Processor to provide access to the Card Networks. |
| Acquirer Processor | Connectors of Acquiring Banks and merchants to the Card Networks, to facilitate the flow of card payment information to an Issuing Bank. |
| AI | Artificial Intelligence |
| AML | Anti-Money Laundering |
| APIs | Application Programming Interfaces |
| AWA | Accelerated Wage Access |
| BaaS | Banking as a Service |
| Baker | Jerry Baker, Marqeta Head of Regulatory Compliance (August 2022- March 2024). |
| Block | Block, Inc., formerly known as Square, Inc. |
| BNPL | Buy Now Pay Later |
| Bank Secrecy Act | Bank Secrecy Act |
| Card Network | The provider of the infrastructure for settlement and card payment information that flows between an Issuer Processor and an Acquirer Processor. |
| Carlisle | Alan Carlisle, Marqeta Chief Compliance Officer (December 2023-present). |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| CFPB | Consumer Financial Protection Bureau |
| Class Period | February 28, 2024 and November 4, 2024, inclusive |
| Company | Marqeta, Inc. |
| Defendants | Marqeta, Inc., Simon Khalaf and Michael Milotich |
| Exchange Act | Securities Exchange Act of 1934 |
| FE1 | Former Employee 1 |
| FE2 | Former Employee 2 |
| FE3 | Former Employee 3 |
| FE4 | Former Employee 4 |
| FDIC | Federal Deposit Insurance Corporation |
| GTM | Go-To-Market |
| Gardner | Jason Gardner, Marqeta Founder and CEO (2010-January 2023); Director (2010-present); Executive Chairman of the Board (January 2023-present). |
| Individual Defendants | Simon Khalaf, and Michael Milotich |
| IPO | Initial Public Offering |
| JIT | Just In Time |
| Latson | Graydon Latson, Marqeta Senior Compliance Manager (September 2021- March 2024). |

| | |
|---|---|
| Issuing Bank | A financial institution that issues a payment card (debit, prepaid, or credit) either on its own behalf or on behalf of a business. |
| Issuer Processors | Providers of a technology platform, ledger, and infrastructure to support a card issuer and connects with a Card Network to facilitate payment transactions. |
| Khalaf | Defendant Simon Khalaf |
| Milotich | Defendant Michael Milotich |
| MQ | Marqeta, Inc. |
| MSA | Master Services Agreement |
| MxM | Managed by Marqeta |
| NASDAQ | NASDAQ Stock Market |
| OCC | Office of the Comptroller of the Currency |
| PCI DSS | Payment Card Industry Data Security Standard |
| PxM | Powered By Marqeta |
| Q1 2024 10-Q | Marqeta's Form 10-Q for Q1 2024 filed with the SEC on May 7, 2024. |
| Q2 2024 10-Q | Marqeta's Form 10-Q for Q2 2024 filed with the SEC on August 7, 2024. |
| Reg E | Regulation E |
| Reg Z | Regulation z |
| SEC | Securities and Exchange Commission |
| SMB | Small and Medium Sized Businesses |
| SOC | System and Organization Controls |
| Sumner | Crystal Sumner, Marqeta Chief Legal and Compliance Officer (June 2016- February 2023); Chief Legal Officer and Interim Chief People Officer (February 2024-February 2024); Chief Administrative Officer (February 2024 – present). |
| TPV | Total Processing Volume |
| VC | Venture Capital |

Lead Plaintiff Tyler Hogge, individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Marqeta, Inc. ("Marqeta" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Marqeta; and (c) review of other publicly available information concerning Marqeta.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired Marqeta securities between February 28, 2024 and November 4, 2024, inclusive (the "Class Period"). Lead Plaintiff pursues claims against Defendants (as defined herein) under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Marqeta is a financial services company with debit, prepaid, and credit programs. Marqeta provides issuer processor services and program management services to its customers. Marqeta typically connects customers to an Issuing Bank[1] to act as the Bank Identification Number (BIN) sponsor for the customer's card program, manages the customer's card program on behalf of the Issuing Bank, and provides a full range of services, including configuring many of the critical resources required by a customer's production environment. Marqeta's initial public offering (IPO) took place on June 8, 2021, with its shares beginning to trade the next day on the Nasdaq Global Select Market under the ticker symbol "MQ."

---

[1] An "Issuing Bank" is a financial institution that issues a payment card (debit, prepaid, or credit) either on its own behalf or on behalf of a business.

3.      Prior to the Class Period, regulatory scrutiny on the fintech industry and banks supporting the fintech industry began to intensify, which affected the operating environment of companies like Marqeta.  In March 2023, the Federal Deposit Insurance Corporation ("FDIC") entered into a consent order with Cross River Bank ("Cross River"), a fintech focused bank.[2]  In June 2023, the FDIC, Federal Reserve Board, and Office of the Comptroller of the Currency ("OCC") issued new interagency guidance on managing risks associated with third-party relationships, including relationships with fintech companies. First Fed Bank ("First Fed"), another bank focused on providing services to fintech companies, entered into a consent order with the FDIC in November 2023.[3]  In January and February 2024, the FDIC entered into consent orders with several other fintech focused banks (*see* ¶17, *infra*), including Sutton Bank ("Sutton"),[4] which was Marqeta's largest Issuing Bank partner by processing volume.

4.      In addition, in May 2023, Marqeta announced that it was restructuring in order to increase efficiency and reduce adjusted operating expenses by $40 million to $45 million on an annual run rate basis.  Defendants stated that this restructuring would include a 15% headcount reduction.  Following the restructuring, Marqeta's regulatory compliance department was severely understaffed.  According to a former employee, in December 2023, after repeated requests from Marqeta's Head of Regulatory Compliance for additional employees, Defendants approved the hiring of 10 or 11 new employees for the regulatory compliance department.  However, according

---

[2] https://orders.fdic.gov/sfc/servlet.shepherd/document/download/0693d000007xEStAAM?operationContext=S1

[3] https://orders.fdic.gov/sfc/servlet.shepherd/document/download/0693d00000B3IGwAAN?operationContext=S1

[4] https://orders.fdic.gov/sfc/servlet.shepherd/document/download/0693d00000CTBl4AAH?operationContext=S1

to the former employee, the vast majority of these positions were still not filled when the employee left the Company in April 2024.  Instead, Defendants delayed filling the majority of these positions until the summer of 2024.

5.    The Class Period starts on February 28, 2024, when Marqeta announced its financial results for Q4 2023 and FY 2023.  During Marqeta's earnings call to discuss those results, Defendants provided guidance for FY 2024, projecting a contraction of net revenue between 20% to 24%, but an increase in gross profit growth of 6% to 9%.  Marqeta's guidance for the second half of 2024, however, was very different from its guidance for the first half of 2024.  After a first half that was expected to be weighed down by certain issues relating to the renewal of Marqeta's Cash App program, Defendants expected strong results in the second half of 2024, with net revenue growth of 23% to 26% and gross profit growth of 23% to 26%.  According to Defendants, the rapid acceleration of growth in the second half was expected to be driven in substantial part by the launch and ramping up of new programs throughout the year.

6.    During the Q4 2023 earnings call, Marqeta CEO Simon Khalaf cited improved launch times for new programs as one of the key factors driving Marqeta's momentum entering 2024.  He stated:

> In addition to growing our bookings, ***we also made great strides in accelerating the time to launch for new programs signed to convert these bookings into revenue and gross profits faster. On average, the time between close and launch in Q4 of this year was about 100 days better than the previous year***. This was achieved without adding significant resources by focusing on solutions architecture and using preconfigured card constructs.[5]

7.    This statement was highly misleading, because at that time, the improvement in launch times had completely eroded and the trend had reversed itself.  As Defendants subsequently admitted at the end of the Class Period, Marqeta's average time for the onboarding and delivery of

---

[5] Unless otherwise indicated, all emphasis in this Complaint has been added.

new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 2024 and Q2 2024 due to heightened regulatory scrutiny.  At the time of Khalaf's statement (February 28, 2024), Q1 2024 was already 66% complete, so the "great strides in accelerating the time to launch new programs" had already been overtaken by even greater strides in the wrong direction.

8.    During the Q4 2023 call, Defendants also made misleading statements about the strength of Marqeta's regulatory compliance capabilities and its level of investment in regulatory compliance.  In response to an analyst's question about the regulatory environment for banking as a service ("BaaS") and embedded finance, Khalaf stated that Defendants were "comfortable with the regulatory environment," that Marqeta had invested "a lot" in regulatory compliance, and that Defendants took regulatory compliance "very seriously."  Marqeta CFO Mike Milotich added that despite "some disruption in the marketplace" relating to regulatory scrutiny, Marqeta's investments in regulatory compliance provided it with a competitive advantage as customers made a "flight to quality" in selecting a platform for their card programs.

9.    These statements were materially misleading, because, *inter alia*, (1) Defendants were already experiencing significant increases in onboarding times during Q1 2024 and internally attributed the resulting launch delays to heightened regulatory scrutiny, and (2) while Defendants had approved the hiring of additional regulatory compliance personnel due to severe understaffing of the regulatory compliance department, the vast majority of those hires had not yet been made.

10.    Throughout the Class Period, Defendants continued to issue materially misleading statements about the speed with which Marqeta launched new programs and whether Marqeta's onboarding of new programs was on track with Marqeta's projections.  For example, during Marqeta's Q1 2024 earnings call on May 7, 2024, an analyst asked how Marqeta was "faring now" in comparison to its previously reported 100-day improvement in launching new programs.  Khalaf

responded by touting Marqeta's "***significant operational improvements***" that he called "Marqeta-in-a-Box," which he said "***reduce[d] a lot of the upfront cycles***" and drove "***tremendous improvement north of 10%***."

11.     During the same call, another analyst pointed out that Defendants' guidance was based on new bookings being a "more material contributor in the back half of the year" and asked whether Defendants were seeing any "variance" from the ramping of new customers.  Khalaf responded that Marqeta was "***a little bit ahead of schedule*** . . . . ***based on a couple of customers launching a little more quickly than we expected, and one or two also ramping a little faster than we had projected***."

12.     Khalaf, however, failed to disclose that onboarding times remained over 300 days, more than double the average onboarding time in 2023, which was delaying launches.  He also failed to disclose that during March and April 2024, three members of Marqeta's regulatory compliance team were fired and/or quit in rapid succession (including the Head of Regulatory Compliance and a Senior Compliance Manager), which heightened the risk of even further increasing onboarding times and worsening launch delays.

13.     Indeed, even after two full quarters of >300 day launch times—which were completely out of line with the metric that Khalaf touted at the beginning of the Class Period and never updated—Defendants continued to insist that Marqeta's onboarding of new bookings was on track.  During the Company's Q2 2024 earnings call on August 7, 2024, Khalaf told investors that "new cohorts are on track to generate $20 million in revenue, which is what we've guided" and that this "***speaks volumes to how fast we can onboard new customers and get them ramped up***."  Khalaf also stated that "***the new business that we're onboarding is on track***."

14.     On November 4, 2024, after market hours, Marqeta issued a press release reporting its Q3 2024 financial results and substantially reducing its Q4 2024 guidance.  Specifically, Marqeta reduced its guidance for Q4 net revenue growth from 16%-18% to 10%-12%, and it reduced its

guidance for gross profit growth from 22%-24% to 13%-15%. The press release stated, "Our fourth quarter guidance reflects several changes that became apparent over the last few months with regards to the heightened scrutiny of the banking environment and specific customer program changes."

15.    During its earnings call that day, Khalaf attributed the weakened guidance to a change in the regulatory environment that occurred "last year" (*i.e.*, 2023), which "increased [the] operational burden . . . on both Marqeta's and the bank's onboarding and compliance teams" and "translated into delays in launching new programs." Milotich stated that the delays in launching new programs contributed in part to Q3 2024 gross profit growth being "2 points lower than expected." Contrary to Defendants' prior statements touting operational improvements driving faster launch and ramp times, Khalaf stated that the "new environment" caused Marqeta's launch time to increase "30% to 40% from 2023."

16.    During the same call, Milotich stated that while Marqeta "anticipated challenges as a result of the increased scrutiny," it "significantly underestimated the impact of constrained resources and evolving processes." He further acknowledged that Defendants were "very aware of the scrutiny" during early 2024, but claimed that "in the past 2 to 3 months, it has become clear we greatly underestimated the magnitude and time horizon for all parties to adapt to the new standards."

17.    Most importantly, Milotich admitted that the average time for onboarding and delivery of new bookings was over 300 days during the first two quarters of 2024, which was more than a 2x increase over the average time during 2023:

> So if you look at the first few months of 2024, the regulatory scrutiny had clearly ratcheted up with more than 10 consent orders affecting the banks in our space. And so what we saw was an initial spike in the time to launch that was more than 2x the average in 2023. **So 2023 onboarding and delivery was typically around 150 days roughly. And in Q1, Q2, that rose to over 300 days**. This was expected given the sort of initial changes and sort of shock of all the changes that were happening. But at the start of Q3, we expected things to get back to where we had been in 2023. But the new programs on average took about 30% to 40% longer to launch. And so the time still remained over 200 days when it had previously been about 150 days.

18.    This admission was shocking. Not only did Milotich admit that launch times during Q3 2024 were materially elevated (over 200 days, which was 30% to 40% higher than the average

in 2023), but, worse still, he admitted that launch times during Q1 and Q2 2024 were even higher (over 300 days, which was more than 100% higher than the average in 2023). Defendants' earlier projections, therefore, contained a key undisclosed assumption—that launch times would radically improve during the second half of the year, contrary to the trends during the first half of the year. Defendants not only concealed this assumption, but they affirmatively misled investors by continually representing throughout the Class Period that Marqeta was seeing speeded up launch and delivery times when in fact the trends throughout Q1 and Q2 2024 were precisely the opposite.

19.    The market was stunned by these revelations. On the news, Marqeta's stock price dropped from a closing price of $5.95 per share on November 4, 2024 to a closing price of $3.42 per share on November 5, 2024, a decline of roughly 42.5%, wiping out over $1.3 billion in market capitalization in a single day.

## II.    JURISDICTION AND VENUE

20.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged securities law violations, and/or the effects of the violations, occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this Judicial District.

23.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

III.    **PARTIES**

A.    **Lead Plaintiff**

24.    Lead Plaintiff Tyler Hogge, as set forth in the Certification filed at Docket No. 21-2, incorporated by reference herein, acquired Marqeta securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures

B.    **Defendants**

25.    Marqeta, Inc. is a Delaware corporation with its principal executive offices located at 180 Grand Avenue, 6th Floor, Oakland, California 94612.  During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "MQ."

26.    Defendant Simon Khalaf ("Khalaf") was the Chief Executive Officer and a Director of Marqeta from January 31, 2023 until February 2025.  Khalaf joined Marqeta in June of 2022 as Chief Product Officer.  Before joining Marqeta, Khalaf was SVP of Twilio Inc., a publicly-traded cloud communications platform developer, with responsibility for Twilio's Core Products, from May 2019 to June 2022.  From June 2017 to May 2019, Khalaf was SVP and General Manager, Media Products, at Verizon, Inc., a publicly-traded communications company.  Khalaf holds a Master of Science in Electrical Engineering from Syracuse University and a Bachelor of Engineering in Electrical Engineering from American University of Beirut.

27.    Defendant Michael Milotich ("Milotich") has served as Chief Financial Officer of Marqeta since February 2022 and replaced Khalaf as interim CEO in February 2025.  Prior to joining Marqeta, Milotich was SVP, Head of Corporate Finance and Investor Relations at Visa Inc. from November 2018 to February 2022.  He previously served in a number of finance roles of increasing seniority at Visa since 2011, most recently as Senior Vice President, Head of Investors Relations from April 2018 to November 2018 and Vice President, Corporate FP&A and Business Analyst Lead from December 2014 to April 2018. Milotich holds a Master of Business Administration in Strategy and Finance from the Stern School of Business at New York University and a Bachelor of Arts in Business Economics from the University of California, Santa Barbara.

28.     Defendants Khalaf and Milotich are sometimes referred to herein as the "Individual Defendants."   Marqeta together with the Individual Defendants are referred to herein as the "Defendants."

29.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Marqeta's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.   Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

**C.     Relevant Non-Parties**

30.     Jerry Baker ("Baker") was the Head of Regulatory Compliance at Marqeta from August 2022 until March 2024.   Prior to his role at Marqeta, Baker was the Director of Risk Management and Compliance – US Cards and Banking Operations for Discovery Financial Services.

31.     Graydon Latson ("Latson") was a Senior Compliance Manager at Marqueta from September 2021 until March 2024.  Prior to his role at Marqeta, Latson was a Compliance Officer at Acorns from July 2019 until September 2024, and Vice President, Senior Compliance Officer at PIMCO from April 2007 until July 2019 .

32.     Crystal Sumner ("Sumner") was Marqeta's Chief Legal and Compliance Officer from June 2016 until February 2023, at which time she became Chief Legal Officer and Interim Chief People Officer.   In February 2024, Sumner was named Chief Administrative Officer and continues to serve in that position.

AMENDED COMPLAINT                              9
Case No. 4:24-cv-08874-YGR

33.    Alan Carlisle ("Carlisle") was announced as Marqeta's Chief Compliance Officer in December 2023 and continues to serve in that position.  Carlisle has also been a freelance strategic advisor for various companies since 2022 and continues to hold that position.  From December 2016 until July 2022, Carlisle was the SVP, Enterprise Chief Compliance Officer at SoFi.

34.    Jason Gardner  ("Gardner") was the founder of Marqeta and served as its CEO until January 2023, at which time he was named its Executive Chairman of the Board.  Gardner has been a member of Marqeta's Board of Directors since November 2010.

35.    Former employee 1 ("FE1") was a Compliance Manager at Marqeta who joined Marqeta in November 2023.  Prior to joining Marqeta, FE1 worked with Baker at Discover Financial Services.  FE1's day-to-day responsibilities included overseeing all compliance and legal policies, compliance procedures training and compliance program development from an operational standpoint.  FE1 reported to Baker, until he was terminated in March 2024, at which time she began reporting to Carlisle.  FE1 resigned in April 2024 because of the Company's "systematic and profound disinterest in compliance."

36.    Former employee 2 ("FE2") worked in Governance, Risk and Compliance from May 2021 until July 2022 and was Senior, Cybersecurity Governance & Risk Management at Marqeta from July 2022 until July 2024.  FE2 helped build Marqeta's IT cybersecurity risk program and created and tracked risks at the Company through a tool called OneTrust.  FE2 joined the compliance teams on calls concerning Reg E and Reg Z so FE2 could provide a risk perspective and determine what could be done to track these in OneTrust.  FE2 helped build Marqeta's IT cybersecurity risk program and created and tracked risks at the Company through a tool called OneTrust.  FE2 explained that there was a dashboard within the tool that showed how many risks the Company had, and they were tagged and categorized by priority.  They would also show whether the risks affected things like System and Organization Controls ("SOC") audits and Sarbanes Oxley audits.  FE2 left Marqeta in July 2024 because FE2 felt its future was in jeopardy, stating that "you tend to get a gut instinct when a ship is going down, and that was the instinct."

37.    Former employee 3 ("FE3") was a Senior Privacy Manager from November 2021 until July 2023, and Director of Privacy and Data Protection at Marqeta from July 2023 until

December 2024.  FE3 was hired to implement and upgrade the privacy program, which included ensuring the Company was meeting regulatory requirements under the General Data Protection Regulation, a European Union regulation governing data privacy. FE3 reported to Anna Chu-Sumida, Vice President of Cybersecurity Strategy and Governance, Risk and Compliance.  Chu-Sumida reported to Chief Compliance Officer Dan Adams until late 2023, at which time she began reporting to the Chief Information Security Officer.  FE3 left Marqeta in December 2024 because FE3 was too expensive and Marqeta was trying to save money.

38.    Former employee 4 ("FE4) was a Senior Operations Analyst at Marqeta from February 2023 until September 2024.  FE4 worked on the global customer support operations team, which reported to Head of Global Customer Support Beth Zosh, who reported to SVP Matt Sollie. FE4's team was involved in the onboarding process and was responsible for making sure that customers were set up to take phone calls and handle emails.

## IV.    BACKGROUND

### A.    Overview of the Company

39.    Marqeta is a financial services company with debit, prepaid, and credit programs, and provides banking and money movement, risk management, and rewards products.   The Company operates as a single operating segment and reporting unit.  Marqeta's customers can issue debit, prepaid, and credit cards, including instant provision of a tokenized card to a digital wallet. Marqeta allows it customers to control transaction processing though dynamic spend controls and real-time decision making via its Just-in-Time ("JIT") Funding feature.  Marqeta for Banking provides its customers access to a suite of bank account and money movement features offered through its Issuing Bank partners, including demand deposit accounts, direct deposit with early pay, automated clearing house ("ACH"), cash loads, and fee-free ATMs, bill pay, and instant funding capabilities.  Marqeta's RiskControl product handles risk and compliance concerns, including fraudulent transactions, verifying the identity of cardholder applicants, authenticating cardholders and authorizing online transactions, and managing disputes and chargebacks.

40.    The Marqeta dashboard is a self-service portal that allows its customers to access and manage all aspects of their card program, including card configuration, servicing cardholders,

tracking data and insights, managing disputes, and accessing RiskControl capabilities.  In addition to providing customers with issuer processor services, Marqeta acts as a card program manager for most of its customers.  Marqueta's products are offered through Managed By Marqeta ("MxM") and Powered By Marqeta ("PxM"), which are distinguished by the customer's level of control and responsibility.

41.    With MxM, Marqeta typically connects customers to an Issuing Bank to act as the BIN sponsor for the customer's card program, manages the customer's card program on behalf of the Issuing Bank, and provides a full range of services including configuring many of the critical resources required by a customer's production environment.  In addition to providing the customer access to the Marqeta dashboard, Marqeta manages tasks related to launching a card program, such as defining and managing the program with the Card Networks[6] and Issuing Bank, operating the program and managing certain profitability components, and managing compliance with applicable regulations, the Issuing Bank, and Card Network rules.  Also available are a variety of managed services, including dispute management, fraud scoring, card fulfillment, reconciliation, and cardholder support services.

42.    With PxM, Marqeta provides customers access to the Marqeta dashboard via application programming interfaces ("APIs"), provides payment processing, and assists with certain configuration elements that enable the customer to use the platform independently.  PxM customers are typically responsible for other elements of the card program, including defining and managing the program with the Card Networks and Issuing Bank as well as managing compliance with applicable regulations, the Issuing Bank, and Card Network rules.

43.    Customers may adopt some combination of the MxM managed services even when not adopting the full MxM offering.

44.    Because Marqeta operates as a single operating segment and reporting unit, it does not break down how much of its revenues derive from its MxM customers as opposed to its PxM

---

[6] "Card Networks" provide the infrastructure for settlement and card payment information that flows between an Issuer Processor and an Acquirer Processor.

1  customers.  In its Form 10-K for the year ended December 31, 2023 filed on February 28, 2024 (the

2  "2023 10-K"), Marqeta stated that it "*primarily* earns revenue from processing card transactions for

3  its customers."   The 2023 10-K also states that Marqeta "provides *all of its customers issuer*

4  *processor services* and *for most of its customers it also acts as a card program manager*."

5        45.    Marqeta's debit and prepaid card programs are subject to various federal and state

6  laws and regulations, including among other statutes and regulations, the Electronic Fund Transfer

7  Act and its implementing Regulation E, which establishes the basic rights, liabilities, and

8  responsibilities of consumers who use electronic fund transfer services and of financial institutions

9  that offer these services.  Regulation E includes requirements specific to consumer prepaid accounts,

10 including certain accounts that are capable of being loaded with funds and whose primary function

11 is to conduct transactions with multiple, unaffiliated merchants, at ATMs, or for person-to-person

12 transfers.  These regulations include, among other things, disclosure of fees to the consumer prior

13 to the creation of a prepaid account, liability limits and error-resolution requirements, regulation of

14 prepaid accounts with overdraft and credit features, and the submission of prepaid account

15 agreements to the Consumer Financial Protection Bureau and the publication of such agreements to

16 the general public.

17        46.    Marqeta is directly or indirectly subject to various federal and state consumer credit

18 protection regimes as a result of its credit platform and relationship with originating Issuing Banks,

19 including, among others the Equal Credit Opportunity Act and Regulation B promulgated

20 thereunder, the Fair Credit Reporting Act, as amended by the Fair and Accurate Credit Transactions

21 Act, and Regulation V promulgated thereunder, the Truth-in-Lending Act, as amended by the Credit

22 Card Accountability, Responsibility, and Disclosure Act of 2009, and Regulation Z promulgated

23 thereunder, and the Military Lending Act.

24        47.    According to FE1, Marqeta had to comply with both Regulation E ("Reg E") and

25 Regulation Z ("Reg Z") and was particularly focused on Reg Z.  Reg Z refers to the Truth in Lending

26 Act, which regulates credit, how to treat account balances upon account termination, billing

27 resolution, determination of APR, advertising, records retention and a variety of other transaction

28 related matters.  Reg E, the Electronic Funds Transfer Act, regulates all transactions that move

money from one place to another, which includes ATMs, point of sale transfers, international money transfers, things around disclosures, procedures for resolving errors and other issues. FE1 said Marqeta's compliance team was responsible for all responses to external auditors, including auditors from the bank partners and regulators, as well as conduct compliance training and risk assessments.

48. FE1 said the regulatory compliance team met weekly, the compliance team as a whole met monthly, and the compliance and legal departments additionally met together on a monthly basis. The weekly regulatory compliance team meeting was attended by Carlisle, Baker and Latson. The monthly compliance meetings included these same individuals, as well as Erika Giovanetti, Head of Anti-financial Crimes Risk and Compliance, and the entire legal department, including Sumner. FE1 also attended the Company's all-hands meetings via Teams at least monthly.

**B.    Pre-Class Period Events**

**1.    During 2023 And The First Half Of 2024, Regulatory Scrutiny On The FinTech Industry And Banks Serving The FinTech Industry Increases**

49. Prior to Marqeta's announcement of restructuring in May 2023, *see* ¶58, *infra*, on April 27, 2023, Gilles Gade, the CEO of Cross River issued a press release stating, "Regulatory scrutiny on banks in general is increasing and the events with [Silicon Valley Bank] will only expand those efforts with a specific focus on banks that support fintech."[7] The following day the FDIC revealed that it had entered into a March 8, 2023 consent order with Cross River.[8][9] The FDIC alleged Cross River engaged in "unsafe and unsound" practices related to fair lending laws and regulations and failed to "establish and maintain internal controls, information systems, and prudent credit underwriting practices." The order prohibited Cross River from entering into any new partnerships with third parties or offering new credit products without the FDIC's approval and required it to bolster its oversight and monitoring of internal controls, information systems, credit underwriting practices and internal audit systems related to consumer protection laws.

---

[7] https://www.crossriver.com/newsroom/q1-message-from-gilles

[8] https://www.fdic.gov/news/press-releases/2023/pr23032.html

[9] *See* ¶3, n.2, *supra*.

50.     In June 2023, the FDIC, Federal Reserve Board, and OCC issued interagency guidance on managing risks associated with third-party relationships, including relationships with fintech companies.  The guidance stated that "[s]upervisory reviews will evaluate risks and the effectiveness of risk management to determine whether activities are conducted in a safe and sound manner and in compliance with applicable laws and regulations."

51.     On November 21, 2023, First Fed, another fintech focused bank, entered into a consent order with the FDIC in connection with Quin Ventures, a fintech it developed through a joint venture with POM Peace of Mind, Inc. in 2021.[10]  The FDIC said First Fed "engaged in unsafe or unsound banking practices [and] deceptive and unfair acts and practices in or affecting commerce."  First Fed was required to correct all violations set forth in the order and implement policies that would enhance its third-party oversight.  First Fed was also required to obtain the FDIC regional director's written non-objection prior to entering into a binding commitment or agreement with a new third party.

52.     In January and February 2024, a number of financial institutions with BaaS partnerships entered into consent orders with regulators.  Among other issues, the FDIC found banks had failed to adequately ensure compliance related to the Bank Secrecy Act ("BSA"), lack of adequate internal controls and information systems relative to their size and the complexity of its third-party relationships, lack of oversight of business arrangements, weaknesses in board supervision of asset growth.  FE3 said consent orders impacted most of the banks Marqeta dealt with and were a somewhat frequent topic of conversation among Marqeta attorneys.

53.     Blue Ridge Bank ("Blue Ridge"), a fintech focused bank, entered a consent order on January 24, 2024 with the OCC.[11]  The OCC said the Blue Ridge was in "troubled condition" due to its failure to establish and maintain a strong and well-staffed Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") compliance program.  The OCC alleged that Blue Ridge's BSA/AML program experienced systemic internal controls breakdowns and had weak independent testing.

---

[10] See ¶3, n.3, supra.

[11] https://occ.gov/static/enforcement-actions/eaAA-ENF-2023-68.pdf

1    Blue Ridge was required to obtain permission from the OCC prior to starting up any new third-party

2    fintech relationships or growing ones that were already active.  Blue Ridge was also required to

3    implement and adhere to various corrective measures related to risks posed by third-party

4    relationships and its Bank Secrecy Act Risk Assessment Program.

5    54.    Lineage Bank was another fintech focused bank that entered into a consent order

6    with the FDIC on January 30, 2024 in connection with allegations of unsafe or unsound banking

7    practices relating to its Third-Party Risk Management Program and its fintech partners.[12]  Lineage

8    was required to implement an enhanced risk management program, increase capital levels, and let

9    go of some fintech partners.

10    55.    On February 1, 2024, Sutton Bank ("Sutton") entered into a consent order with the

11    FDIC.[13]  Sutton was Marqeta's largest Issuing Bank partner by processing volume.  For the years

12    ended December 31, 2023, 2022 and 2021, 76%, 82% and 90% of Marqeta's Total Processing

13    Volume was settled through Sutton Bank, respectively.  The consent order required Sutton to revise

14    its AML/CFT program designed to maintain bank compliance with the Bank Secrecy Act within

15    180 days.  Sutton was required to "develop appropriate policies and procedures relating to third-

16    party risk management," and compile an inventory of those relationships. It also ordered Sutton to

17    designate program managers responsible for customer identification programs, transaction

18    monitoring, independent testing and reporting suspicious activity for each partnership.  Within 60

19    days of the order, Sutton was required to devise a plan to review all prepaid card customers since

20    July 1, 2020, to ensure the bank knows their true identities.

21    56.    On February 27, 2024, Piermont bank entered into a consent order with the FDIC.[14]

22

23    _____

    [12]

24    https://orders.fdic.gov/sfc/servlet.shepherd/document/download/0693d00000BrElHAAV?operatio
    nContext=S1

25

26    [13] *See* ¶3, n.4, *supra*.

    [14]
27    https://orders.fdic.gov/sfc/servlet.shepherd/document/download/0693d00000CMxbNAAT?operati
28    onContext=S1

1 The order required Piermont to review all transactions since September 2022 to ensure all suspicious

2 activity was reported and to review Electronic Funds Transfer Act disputes since August 2020.  It

3 also outlined requirements related to maintaining "an appropriate number" of bank officers,

4 establishing systems and procedures to maintain compliance, ensuring an appropriately sized

5 internal audit, and assessing whether the bank's board committee members have appropriate

6 expertise. Within 90 days of the order, Piermont was ordered to conduct a review of the data,

7 documents and records related to its operations, bank activities and third-party relationships. That

8 assessment was required to consider whether the data "appropriately enables the bank to operate . . .

9 in a safe and sound manner," and to determine whether its third-party relationships comply with

10 laws and regulations.  Piermont was given 120 days to review whether its third-party relationships

11 program has the appropriate due diligence procedures, written agreement parameters, policies

12 related to oversight and monitoring, data, systems and reporting, and recommendation and approval

13 processes.

14       57.    An April 3, 2024 article discussing the increased regulatory scrutiny stated that

15 "[t]hroughout the banking sector, there's a general sense of regulatory dread around which bank

16 will wind up in the news next."[15]  The CEO of Piermont, one of the banks that received a consent

17 order stated, "Every bank that touches BaaS is getting an enforcement action."[16]  The April 3, 2024

18 article stated that "Banks with BaaS relationships or fintech partnerships should expect the FDIC to

19 dig deeper into those relationships, especially as they relate to BSA-related compliance. It's past

20 time to ensure that all activities remain 100% compliant with federal banking laws, particularly in

21 BSA-related activity."  Matthew Smith, president of Bankers Helping Bankers, noted that "Banks

22 that chose to outsource their risk [to third-party partners] will continue to be at risk of regulatory

23 scrutiny."[17]

---

24

25 [15]    https://www.emarketer.com/content/two-more-banks-with-baas-partnerships-hit-with-fdic-consent-orders

26 [16] *Id.*

27 [17]    https://www.bankingdive.com/news/piermont-sutton-bank-fdic-consent-orders-aml-bsa-baas-

28 third-party-partners/711815/

2.    **Marqeta Restructuring Results In Compliance Staffing Shortages, While Management Isolates Onboarding From Compliance Operations**

58.    In January 2023, Gardner stepped down as Marqeta's CEO and was named its Executive Chairman of the Board and Defendant Khalaf assumed the CEO position. FE3 said that Marqeta's company culture "went to crap" when Gardner stepped down as CEO. On May 9, 2023, Defendants Khalaf and Milotich announced that they were restructuring the Company to increase efficiency and reduce adjusted operating expenses by $40 million to $45 million on an annual run rate basis and that this restructuring would include a 15% headcount reduction. On November 7, 2023, Marqeta held its Q3 2023 earnings call and Defendant Milotich informed investors that Marqeta intended to add headcount in a lower cost jurisdiction, yet "these hires are being delayed through the middle of next year."

59.    When FE1 joined Marqeta as a Compliance Manager in November 2023, there were only three other employees assigned to regulatory compliance - Baker, Latson, and Annia Prado, Consumer Compliance Manager. FE1 said Latson was hired in 2021 and Baker was hired in 2022 to build the Company's regulatory compliance program and was also responsible for compliance testing. When FE1 joined Marqeta, FE1 noticed immediately that resources were a problem and added that a company the size of Marqeta can't build a regulatory program with two people. FE1 said resources were a problem immediately and while Marqeta advertised itself as a compliance-first company, not just a payment processor, it was not set up to be a compliance-first company. FE1 said Marqeta did not have the staffing resources, tools or data to do that.

60.    FE1 also said Marqeta did not have an international compliance team and the compliance team informed the C-suite executives that they were not certified to do foreign compliance, much less in the sheer number of countries that Marqeta works in. FE1 said there was one person dedicated to compliance in the EU who quit because she wasn't properly supported. FE1 said Marqeta was also hiring for regulatory compliance positions in Poland; however, these positions ended up performing tasks more related to data analytics. FE1 provided an example of an international compliance failure where Marqeta was the payment processing company for a vendor in Quebec and account disclosures were not being offered in French in violation of local laws.

61.     In December 2023, Marqeta announced that Carlisle had been appointed its Chief Compliance Officer. FE1 said Baker told Carlisle and Sumner that the regulatory compliance team needed additional resources, and Baker briefed FE1 on those conversations. FE1 said Baker had been making these requests consistently for at least a year prior to FE1's hiring. FE1 also made direct requests to Carlisle and Sumner for additional resources, on a weekly basis, and sometimes multiple times a week, and they acknowledged that compliance was understaffed. FE1 recounted a January 2024 one-on-one virtual meeting over Teams that FE1 had with Sumner where they discussed that the regulatory compliance team was understaffed. During this meeting, FE1 also told Sumner that FE1 was "deeply concerned" with the amount of work Baker and Latson had on their plates and informed Sumner that the lack of support was going to cause long-term problems. FE1 said Sumner's response was "we know and we care and we're on it."

62.     Based on FE1's decade of experience in the industry and conversations with Baker and Latson about the resources needed, FE1 concluded that Marqeta should have had between 30 and 35 people in regulatory compliance. FE1 said Carlisle and Baker developed a compliance plan for expanding the department and FE1 and others were told in December 2023 that Marqeta would be adding 11 new positions by the end of 2024. FE1 stated that even with the new hires the team would still be short by about 20 people. FE1 also recalled that in an all-hands meeting Khalaf said compliance was Marqeta's "number one responsibility." According to FE1, however, Khalaf must have known the compliance team was understaffed, because he approved hiring 11 people for the team.

63.     FE1 said that the compliance team was sidelined from the onboarding process through some management decision that occurred before FE1 was hired, which unsurprisingly led to compliance issues. FE1 said the compliance team should have been involved with the customer prior to signing the deal, obtaining the necessary documentation and data around regulations, such as Reg E, the Electronic Funds Transfer Act. FE1 said the compliance team was sidelined and required to submit a multitude of information requests to the customers. FE1 told Carlisle on multiple occasions in compliance team meetings in early 2024 that the compliance team needed to be involved with the onboarding process. FE1 was told that the legal department was involved with

onboarding and that was sufficient, which FE1 said was a fundamental misunderstanding of how regulatory compliance should work.

64.    FE1 believes that the regulatory compliance team was excluded from the onboarding process because the team would have made the process "more complicated." FE1 explained that "there are a lot of regulatory requirements you need to meet, and if you properly meet those, there are a lot of programs that wouldn't have contracts with Marqeta, because it wouldn't meet the risk threshold."

65.    FE3 said the onboarding team was isolated from the rest of the company and did not want anyone touching any of their business. FE3 believed that as the employee in charge of ensuring privacy protections, FE3 should have had access to the onboarding process. FE3 was "pushed to the side or ignored" every time FE3 reached out to the onboarding team to understand something.

66.    FE3 also said the compliance team lacked the staffing and support to make decisions to complete their tasks. FE3 noted that Marqeta constantly removed mid-level management and hired people of lesser experience, overloading people with work. FE3 specifically noted that the Know-Your-Customer "KYC" team was overloaded. FE3 explained that the person applying for the payment card would submit information to confirm their identity and sometimes additional documents, such as a utility bill, were requested to validate the information. The KYC team manually reviewed these documents, to complete the validations.

### 3.    Marqeta Identifies A Material Weakness In IT Controls, Causing Onboarding Delays

67.    According to FE2, in Q3 2023 four of Marqeta's internal controls on the IT side failed an external Sarbanes Oxley audit, which resulted a material weakness that required disclosure in Marqeta's 2023 10-K. FE2 said an earlier internal audit discovered the same weakness, yet the employees who were working on remedying the issue had been laid off and fixing these issues was pushed aside. FE2 learned this because FE2 was tasked with piecing together what happened when the external audit showed the material weakness. FE2 noted that the Head of Internal Audit reported directly to the CFO, so Marqeta's executive leadership should  have been briefed on the relevant events.

68.     With respect to the material weaknesses, Marqeta's 2023 10-K disclosed:

Management identified a material weakness related to the accounting for the Company's acquisition of Power Finance, including a lack of sufficient precision in the performance of reviews supporting the purchase price allocation accounting, and a lack of timely oversight over third-party specialists and the reports they produced to support the accounting for the Power Finance acquisition.

Management identified a material weakness related to ineffective information technology general controls ("ITGCs") in user access over certain information technology ("IT") systems that support the Company's revenue and related financial reporting processes. As a result, the related process-level IT dependent manual controls, certain change management controls, and automated application controls for certain key IT systems were also deemed ineffective.

69.     The 2023 10-K also discussed management's plan to remediate these weaknesses, stating:

Our management is committed to maintaining a strong internal control environment. As it relates to the Business Combination Material Weakness, we have and will continue to take actions to enhance the design of our business combination controls with the level of precision required to operate them in an effective manner. We will continue to enhance our management review control activities, including the review of inputs, assumptions and reports produced by third-party specialists supporting the purchase price allocation accounting and the application of technical accounting principles.

To remediate the ITGC Material Weakness, we are enhancing the design of our ITGCs over the IT systems that support the Company's revenue and related financial reporting processes, including, (i) developing and implementing additional training and awareness addressing ITGCs and policies, including educating control owners concerning the principles and requirements of each control, with a focus on user access; (ii) increasing the extent of oversight and verification checks included in operation of user access controls and processes; (iii) deploying additional tools to support administration of user access; and (iv) enhancing quarterly management reporting on the remediation measures to the audit committee of the board of directors. Although we intend to complete the remediation process as promptly as possible, we will not be able to fully remediate the ITGC Material Weakness until these steps have been completed and the controls are operating effectively.

70.     FE2 said there was a massive push to get the material weakness off the books by the second quarter of 2024 and a lot of resources got shifted to that focus. FE2 said this shift in resources contributed to onboarding delays at Marqeta.

71.     In addition, according to FE3, an external SOC audit performed by Schellman, a third-party vendor, found a significant security flaw at Marqeta in January 2024 that consumed the engineering team's time and likely resulted in some onboarding delays.

72.    FE4's team was involved in the onboarding process and was responsible for making sure that customers were set up to take phone calls and handle emails.  FE4 said this was a "much lighter" part of the process than the tech side, which involved integrating the customer into the Marqeta network.  According to FE4, in December 2023 and January 2024, onboarding times were becoming longer and longer, noting that there were times when the tech teams could not move forward to get clients into the network.  With respect to the onboarding time increasing from 150 days to 300, FE4 was said "I wouldn't be shocked if it had doubled."  FE4 said the delays were caused by an issue with the network, or waiting to get some piece of information, or focus on getting other priorities done.  FE4 said these other priorities were whatever "struck the fancy" of upper management, such as landing a larger client.  FE4 heard some of these explanations during weekly team meetings.

## V.    CLASS PERIOD EVENTS

### A.    Defendants Announce Results For Q4 And FY 2023, Issue Guidance For FY 2024, And Project Sharp Ramp Up Of Growth During Second Half Of 2024, Touting Improved Launch Times And Investments In Regulatory Compliance

73.    The Class Period starts on February 28, 2024.  On that day, Marqeta announced its financial results for Q4 2023 and FY 2023, and Defendants held an earnings call to discuss those results.

74.    In its press release announcing these results, Marqeta reported that total processing volume ("TPV") for Q4 2023 was $62 billion, a year-over-year increase of 33%, and that TPV for full year 2023 was $222 billion, a year-over-year increase of 34%.

75.    During Marqeta's earnings call on the same day, Defendants issued guidance for fiscal 2024, projecting a contraction of net revenue between 20% to 24%, but an increase in gross profit growth of 6% to 9%.  Defendants emphasized that their projections for the first half of 2024 were "meaningfully different" from their projections for the second half of 2024.  For the second half of 2024, Defendants projected *net revenue growth of 23% to 26%* and *gross profit growth of 23% to 26%*.  Thus, after a first half expected to be weighed down by issues relating to renewal of the Cash App program, Defendants expected that growth in the second half would rapidly accelerate,

in large part due to the launch and ramping up of new programs throughout the year and "a more efficient cost structure while maintaining compliance, security and innovation."

76.     As CFO Milotich explained:

*Our financial performance will be meaningfully different in the first and second halves of 2024*, primarily for two reasons. First, the lapping of the effects of the Cash App renewal will dissipate at the start of Q3. Second, *the revitalization and strength of our sales bookings since Q4 of 2022 should lead to a fair amount of new business launching and ramping on our platform throughout the year. The contribution of these bookings to net revenue and gross profit will increase each quarter, further accentuating the difference in our first and second half growth rates*. . . .

*We expect net revenue growth in the second half of 2024 to reaccelerate to 23% to 26%*, primarily driven by three factors. First, lapping the Cash App revenue presentation change. Second, realizing existing customers growth as we lap all the elevated renewal activity. And third, *benefiting from the ramping new programs as we progress through the year*.

*Second half 2024 gross profit growth is also expected to be in the 23% to 26% range, consistent with net revenue*. This second half gross profit growth is expected to be a little higher than what we shared with you at Investor Day due to a positive business mix and expected shifts in a couple of existing program constructs where we currently incur excessive network fees. . . .

*In conclusion, we are exiting 2023 with great business momentum and a solid foundation to deliver sustainable growth, profitability, and innovation in 2024 and beyond*. Our excitement and confidence is primarily driven by three factors. First, by renewing over 80% of our TPV in the last seven quarters, most of which are in contracts of at least four years, we have secured our attractive customer base and opened up potential cross selling opportunities as we continue to expand our platform capabilities. This was short-term pain for long-term gain. Second, we are starting to get contributions from ramping new use cases such as BNPL Pay Anywhere cards and accelerated wage access. *As we move through 2024, this will be combined with ramping new cohorts that result from our improved sales performance that delivered over 50% bookings growth in 2023*. Third, we are getting early customer traction with our new credit capabilities, signing our first two customers to leverage our fully modern scaled issuer credit platform for innovators. . . .

*Lastly, we have achieved a more efficient cost structure while maintaining compliance, security and innovation that will power profitable growth for years to come. Starting in the second half of 2024, our business and financial metrics are expected to reflect this momentum as we return to growth*.

77.     According to Defendants, one of the factors contributing to Marqeta's momentum entering into 2024 was a significant improvement in Marqeta's speed in launching new programs. As CEO Khalaf explained during the call:

> In addition to growing our bookings, ***we also made great strides in accelerating the time to launch for new programs signed to convert these bookings into revenue and gross profits faster. On average, the time between close and launch in Q4 of this year was about 100 days better than the previous year***. This was achieved without adding significant resources by focusing on solutions architecture and using preconfigured card constructs.

78.     However, as Defendants later disclosed at the end of the Class Period, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny.  At the time of Khalaf's comment, Q1 2024 was already 66% complete, so Marqeta's timeframe for onboarding new programs had already increased substantially.  *See* ¶¶106-10, *infra*. Thus, Khalaf's description of Marqeta's "great strides in accelerating the time to launch new programs" was materially misleading, because the positive trend of improving launch times during Q4 2023 had already degraded and reversed by the time of Khalaf's statement.

79.     During the February 28, 2024 earnings call, an analyst asked about the regulatory environment and how that might affect Marqeta's outlook.  CEO Khalaf responded by stating that Marqeta had invested significant resources in regulatory compliance and that Defendants felt comfortable with the regulatory environment.  CFO Milotich added that, despite "some disruption in the marketplace" relating to regulatory scrutiny, Marqeta's investments in regulatory compliance provided it with a competitive advantage as customers made a "flight to quality" in selecting a platform for their card programs:

> CHRIS KENNEDY, ANALYST, WILLIAM BLAIR:
>
> Can you provide an update on the regulatory environment for banking as a service and embedded finance and kind of how you view that operating environment? . . .
>
> SIMON KHALAF:
>
> Thanks, Chris. ***I would say there's no changes. There's not much that we can talk about, either positive or negative. I'd say that the environment is, remains healthy***.

I mean, the great news about a lot of what's going on in embedded finance is solutions that are catering to the unbanked and the underbanked.

There's no question that Buy Now, Pay Later has opened the credit box and provided what is effectively lending without the 29% APR. So that's definitely helping the community. And same thing with SMBs, they're kind of like the forgotten entity. So I do – there's a lot of goodness that is happening with these solutions. So I do – *we're comfortable with the regulatory environment*. The second thing I'd say is, *as a company, we have invested in program management and we've invested in compliance. We've invested in a lot of these services, because, number one, we take it very seriously*.

And the second thing is that when we target the brands, especially in embedded finance, the last thing we want is bring them regulatory trouble. So *I think we've taken this very seriously as a platform*.

MIKE MILOTICH:

And I think, as you maybe referred to, Chris, I mean, some of the announcements out there about BaaS platforms and some of the banks to do business with, the more of those announcements, you know *there's definitely a component of a flight to quality which we think we are the beneficiaries of, just given our scale and the level of investment, and we were one of the first movers in this space. So we think that although you know, it's unfortunate, you know that there's some disruption in the marketplace like that, I think, you know generally speaking, we're definitely more of a beneficiary than something that hurts us*.

80.     On February 28, 2024, Marqeta also filed its 2023 10-K with the SEC. The 2023 10-K was signed by both Khalaf and Milotich. In the "Risk Factors" section of the 2023 10-K, Defendants described in hypothetical terms certain risks Marqeta might face with respect to extended onboarding times and regulatory compliance issues.

81.     With respect to onboarding, Defendants stated that "*[i]f we fail . . . to onboard [new customers] quickly, then we may not be able to continue to grow our net revenue*." *See* ¶119, *infra* (articulating this risk factor statement more completely). This risk factor statement was materially misleading because it described the risk in purely contingent, hypothetical terms and failed to disclose that the risk had already materialized in substantial part, because Marqeta's onboarding times had dramatically increased during Q1 2024, which was already 66% complete at the time the 2023 10-K was filed.

82.     With respect to regulatory compliance, Defendants stated, *inter alia*, that "changes in . . . enforcement of existing regulations may have an adverse effect on our business, results of

operations, and financial condition . . . ."  *See* ¶121, *infra* (articulating this risk factor statement more completely).  This risk factor statement was materially misleading because it described the risk in purely contingent, hypothetical terms and failed to disclose that this risk factor had already materialized in substantial part, because Marqeta had already experienced a substantial increase in onboarding times due to heightened regulatory scrutiny, which was delaying launches.

83.     The market's reaction to Marqeta's Q4 2023 and FY 2023 financial results and its guidance for FY 2024 was mixed, but analysts were encouraged by Marqeta's projections for the second half of 2024.  According to a report published by Barclays on February 28, 2024, "MQ printed a strong Q4, beating Street estimates across net revenue, gross profit, and adj. EBITDA. *On FY24, timing issues weigh on 1H24 gross profit growth, but followed by a stronger 2H than expected*."

84.     Similarly, a report published by J.P. Morgan on February 29, 2024 stated:

> *Marqeta reported a solid 4Q with revenue, gross profit and adj. EBITDA all ahead of guidance and Street expectations*, while raising its FY24 EBITDA outlook against a reiterated gross profit expectation. *Underlying trends were encouraging*, with core verticals performing well including BNPL and AWA (now 3% of TPV), and ex-Cash App gross profit growth accelerating 5ppts+ sequentially. Full-year bookings were up 50%, *with time from close to launch improved 100 days y/y as GTM reorientation plays out. It will still take a few quarters before headwinds on MQ's business begin to fade, illustrated by an incrementally 2H weighted gross profit outlook, but we came away impressed by the momentum in the business that is expected to drive mid-20% gross profit growth in the 2H, ranking among the fastest across our coverage*.

85.     J.P. Morgan placed particular emphasis on Defendants' reported improvement in launch timeframes, stating, "*As of 4Q, the time to launch closed bookings was about 100 days shorter than the prior year. We're impressed by the momentum and efficiency of the reoriented GTM motion,[18] which we expect to start helping growth in 2H24*."

**B.     During March 4, 2024 Morgan Stanley Technology, Media & Telecom Conference, Defendants Continue To Tout Marqeta's Accelerated Launch Times**

86.     On March 4, 2024, Defendants participated in a Morgan Stanley Technology, Media

---

[18] GTM refers to Go-To-Market.

& Telecom Conference.   During this conference, Defendants continued to tout Marqeta's accelerated rate of launching new programs and its ability to quickly respond to and fulfill customer demand.

87.   One participant at the conference referred back to Khalaf's representation during the Q4 2023 earnings call that Marqeta had improved its time to launch programs by about 100 days and asked what factors led to that improvement.   CEO Khalaf responded that Marqeta's delivery speed was due to its build-out of a "ready-to-use construct that the banks would approve from a regulatory perspective" that he called "Marqeta in the box":

UNIDENTIFIED PARTICIPANT: And *one of the metrics that you offered is proof of that improvement was the time to ramp. The most recent call, you discussed the time to ramp new deals had improved significantly up to as much as 100 days faster than in 2022*, et cetera. What changes specifically has led to that improvement? And how should we think about the implications for bookings of 2023 and its time to contribute revenue share.

SIMON KHALAF: I mean, *what we guided in our investor day actually had that baked in. So yes, we've done a lot of work on speeding up delivery and I'd say the majority of that is building what I would call a ready-to-use construct that the banks would approve from a regulatory perspective. So we call them Marqeta in the box*.

Like a lot of the embedded finance use cases are embedded finance companies are not fintech savvy, nor financial services experts, like they have great ideas, but the regulators would not -- or the banks would not take on the use case. So with a small tweak, we will work with the banks and the regulators to approve those use cases.

So I mean, the Silicon Valley loves to innovate, but sometimes they never read that little -- like the nice brochure that comes with a credit card that has some fine print you need to like put something to look at it. But those have important, consumers care about those. So our ability to guide the embedded finance players into standard construct that the regulators would celebrate, and the banks will take on is the number one thing we've done.

The second thing is we integrated our solutions architect with our integration engineering team into single threaded leadership. So they're involved early on in the sales cycle. So let's not talk about beautiful constructs the regulators are going to reject.

*So from the early days of the sales cycle, we're guiding our customers towards the construct that the banks and the regulators will celebrate and that I think added a lot to speeding up the program launches.*

AMENDED COMPLAINT                 27
Case No. 4:24-cv-08874-YGR

88.    Khalaf's statements strongly suggested that the previously reported improvement in the launching timeframes was sustainable and expected to continue since Marqeta's 2024 guidance "actually had that baked in."  In other words, Marqeta's guidance was predicated on the assumption that the 100-day improvement in launching programs in Q4 2023 was not a mere blip but a sustainable operational improvement that Marqeta was relying on in its full year guidance for 2024. Khalaf also stated that Marqeta had obtained faster delivery times by using "Marqeta in the box," which was designed to "be more quickly approved by regulators" and "added a lot to speeding up the program launches."  Khalaf's response was misleading because at the time of the Morgan Stanley conference, Q1 2024 was already roughly 70% complete, and the positive trend of improved launch times had actually reversed due to heightened regulatory scrutiny which was already evident to Defendants.  *See* ¶¶106-10, *infra*.

**C.    Defendants Announce Results For Q1 2024, Maintaining Gross Profit Growth Projections For The Second Half Of 2024 And Insisting That Launch Of New Customers Was Proceeding Ahead Of Schedule**

89.    On May 7, 2024, Marqeta announced its financial results for Q1 2024.  During an earnings call on that date, Defendants provided updated financial guidance for the full year 2024 and the second half of 2024.  While Defendants made certain changes to their projections for net revenue growth, they continued to project a significant uptick in gross profit growth of 23% to 26% for the second half of the year, while emphasizing that gross profit growth was the most relevant "measure of value we deliver for our customers."  CFO Milotich stated in relevant part:

> ***Our expectations for the full year 2024 have increased for adjusted EBITDA, and gross profit remains largely unchanged while reducing net revenue growth***. We now expect net revenue to contract 24% to 27%. This is a three-point to four-point reduction from what was shared previously driven by two factors, neither of which are impactful to gross profit. First, the revenue presentation impact related to the renegotiated platform partnership is approximately 2.5 points for the year. Second, we now expect the mix of our TPV to be more heavily weighted toward the Powered by Marqeta business, which materially impacts net revenue but has a much lesser impact on gross profit. This will lower the revenue growth by approximately one point.
>
> ***Gross profit is now expected to grow 7% to 9%, lifting the bottom of the range from what we have shared previously***. TPV year-to-date has been a little stronger, helping the first half gross profit growth, but the majority of the Q1 gross profit upside was related to incentives that are specific to Q1 because of the way our incentive contracts

are structured. ***Our expectations for the second half gross profit growth remained unchanged for now at 23% to 26%.***

***These changes in our net revenue and gross profit expectations highlight why we focus on gross profit as the measure of value we deliver for our customers. Our net revenue can be noisy based on our business mix and revenue presentation.***

90.    During the call, an analyst asked about new bookings and whether Marqeta was observing any variance with regard to the ramping of new customers.  CFO Milotich responded that Marqeta was "ahead of schedule" both as to the "launching" and "ramping" of new customers.:

DARRIN PELLER, ANALYST, WOLFE RESEARCH, LLC: Guys, nice job. Thanks. Listen, just on new bookings, you obviously have talked over bookings being more material contributor in the back half of the year for those that you've already booked.

Just curious if you could touch on how the cohorts are trending, <u>any variance you guys are seeing with regard to those customers ramping</u>.

And then just a quick follow-up on, I'll ask together on credit and maybe a little more on what the pipeline's looking like there and, excuse me, spent conversion there.

MICHAEL MILOTICH: Sure. So, on your first question, Darrin, thanks for the question. So far, what we're seeing is ***we're a little bit ahead of schedule***. So we had said we expected about $20 million in revenue coming from these new cohorts for 2024 and then that ramping to $60 million next year. And in Q1, it's obviously early, but ***we are a little bit ahead based on a couple of customers launching a little more quickly than we expected, and one or two also ramping a little faster than we had projected***.

That being said, because of, as you can imagine, the ramp of a card program, it takes a little bit of time. So we're, I guess, encouraged by the first couple of months, but, you know, the real value will be generated, you know, say four to six, four to seven, eight months after the launch. When you really start to see what kind of momentum those programs have and what kind of volume they can generate. But ***we're off to a good start, a little bit ahead of schedule***.

91.    Milotich's statements that Marqeta was "ahead of schedule" due to customers "launching a little more quickly than we expected" and "ramping a little faster than we had projected" were at the very least materially misleading, if not outright false, because during Q1 2024 the time to onboard new bookings was more than double the average onboarding time in 2023.  *See* ¶¶106-10, *infra.*

92.     Another analyst asked again about Marqeta's previously reported 100-day improvement in launching timeframes and how Marqeta was "faring now" with respect to this metric.  Khalaf responded that Marqeta had made a "lot of progress" due to Marqeta-in-a-Box and that "from the moment we touch a customer all the way to realizing the gross profit, right, we've made **tremendous improvement north of 10%, which is material if you actually look at how this compounds**."  This statement once again misleadingly suggested that launch times were improving, not worsening.

93.     On May 7, 2024, Marqeta also filed with the SEC its Form 10-Q for the Q1 2024 (the "Q1 2024 10-Q").  The Q1 2024 10-Q was signed by Defendants Khalaf and Milotich.  In the Q1 2024 10-Q, Defendants stated that:

> In addition to the other information set forth in this Quarterly Report on Form 10-Q, our business, financial condition, results of operations, cash flows, future prospects, and the trading price of our Class A common stock can be affected by a number of factors, whether currently known or unknown, including but not limited to those described in Part I, Item 1A of our 2023 Annual Report under the heading "Risk Factors," **which are incorporated herein by reference**, any one or more of which could, directly or indirectly, materially and adversely affect our business, financial condition, results of operations, cash flows, future prospects, and the trading price of our Class A common stock, or cause them to vary materially from past or anticipated future results. **There have been no material changes to our risk factors since the 2023 Annual Report**.

94.     This statement incorporated the risk factors relating to extended onboarding times and regulatory compliance risks set forth in Marqeta's 2023 10-K.  *See* ¶¶119, 121, *infra*.  At the time that Marqeta filed its Q1 2024 10-Q, the risks had already materialized as Marqeta was experiencing a trend of onboarding times doubling 2023 onboarding times for an extended period of time—the entirety of Q1 2024 and roughly 41% of Q2 2024.  And these increased onboarding times and resulting launch delays were understood by Defendants to be caused by an environment of heightened regulatory scrutiny.

**D.     Defendants Continue To Represent Operational Improvements And Accelerated Program Delivery At J.P. Morgan Global Technology, Media and Communications Conference On May 20, 2024**

95.     On May 20, 2024, Defendants continued to tout the improving speed with which Marqeta deployed its programs at a J.P. Morgan Global Technology, Media and Communications

Conference, stating that deployment cycles were down 11% year-over-year.

96.    An analyst asked whether, as Marqeta started to enter into larger deals, there would be a trade-off of slower implementations.  Khalaf reiterated his claim, articulated in prior calls, that Marqeta's deployment timeframes were improving year-over-year, so Marqeta could take on larger deals without comprising the deployment time:

> TIEN-TSIN HUANG, ANALYST, J.P. MORGAN
>
> You said you're going after enterprises. At Investor Day you said you were moving away from the VC-backed players, which makes sense. And now you've got enterprise, you have marketplace. **So could we expect larger deals in general, and the trade-off could be slower implementations? How should we evaluate that?**
>
> SIMON KHALAF
>
> Yes. **We intentionally do not want to trade a large number with a slower implementation cycle, right?** So the good thing on the enterprise side is we are the program manager.
>
> So if you look at some of the deals that we've closed in fintech that took some time, we were not the program manager. So they had the relationship with the banks themselves.
>
> Things are slow. Banks are not the fastest moving organizations. **So us being the program manager, it actually makes the programs go smoother, if not even faster. So we're not trading that.**
>
> **So the answer is yes, there are going to be bigger deal, but the -- and we monitor this. The average and the median of the deployment cycles are coming down by about 11% year-over-year. So while we've broadened the pipe, we haven't compromised the deployment time.**

**E.    Defendants Announce Results For Q2 2024 And Continue To Represent That The Onboarding Of New Customers Was On Track**

97.    On August 7, 2024, Marqeta announced its financial results for Q2 2024.  During an earnings call on that date, Defendants provided updated guidance for the full year 2024 and the second half of 2024 that were largely consistent with the guidance they had provided the last quarter. CFO Milotich stated:

> Now let's shift to our second half and full-year outlook. As we move into Q3, we begin the first chapter of a new era for Marqeta, where we aim to deliver sustainable, profitable growth. We are returning to growth now that we have lapped the resetting of the large majority of our customer contracts, and the Cash App renewal in

particular. We have established longer-term partnerships with our customers where we can work together to drive growth with win-win outcomes.

In addition, we expect that the adjusted EBITDA positive going forward at an increasing rate over time, renewed expense discipline, a focus on efficiency and optimization, and the realization of our platform economies of scale as the business flourishes has put us on a clear path to GAAP profitability in the coming years.

***We expect both Q3 and Q4 net revenue growth to be between 16% to 18%, in line with what we indicated last quarter. Therefore, full-year net revenue growth is expected to contract 24% to 27%, again consistent with the expectations we shared last quarter.***

***Q3 gross profit growth is expected to grow between 25% and 27%, while Q4 is expected to grow approximately three points slower than Q3. As a result, second-half growth is consistent with the expectations we shared last quarter***. Both quarters are expected to benefit from non-Block gross profit growth of over 30%, which is accelerating from the first half as we have now lapped heavy renewal activity as well as the growing contribution from the ramping of new cohorts driven by improving sales last year.

The gross profit growth slows a little from Q3 to Q4, mostly due to the difference in year-over-year comparisons, where Q3 has a slightly easier comp due to higher bank fees last year, while Q4 has a slightly tougher comp due to a strong 2023 holiday season, particularly in BNPL, as well as lapping a platform partner bonus.

We expect the gross profit margin to be in the low 70s in both Q3 and Q4, as network incentive levels increased from Q2. Therefore, ***we expect full-year gross profit growth to be 7% to 9%, consistent with expectations we shared last quarter***.

98.    During the call, an analyst asked the balance between growth from new customers and growth from existing customers. In responding, Khalaf stated that Marqeta was "on track" with its guidance for revenue from new customers, which according to Khalaf, "speaks volumes to how fast we can onboard new customers and get them ramped up":

RAMSEY EL-ASSAL, ANALYST, BARCLAYS

I also wanted to ask, with the renewals behind you, you know, how should we think about the growth algorithm's balance between new customer versus existing customer growth? I think you guys have highlighted a lot of new opportunity on this call. I'm just kind of curious in your mind, which is shaping up to be the more powerful driver sort of today, and in your projections between sort of you know, harvesting growth from the clients you have today versus you know, new customers that you think may drive you know, kind of an incremental share of growth as we move forward?

SIMON KHALAF

. . . Ramsey, it is kind of yes and yes. ***So we are excited that the new cohorts are on track to generate $20 million in revenue, which is what we've guided. So we're on track with that. And again, speaks volumes to how fast we can onboard new customers and get them ramped up***. So that's a growth vector. Our customers also are growing, some of them geographically, others, they're launching multiple programs. So that also factors into our growth calculations.

99.     Khalaf's claim that onboarding was "on track" once again suggested that Marqeta had been able to sustain its improved launch times and that Marqeta was poised to achieve the projected growth for the second half of 2024 that Defendants had previously guided, which was misleading since by this point in Q3 delays in launching new programs were already resulting in lower gross profit contributions. *See* ¶¶106-10, *supra*.

100.     During the same call, an analyst asked about a recent hack with Evolve, one of Marqeta's partner banks, whether that event impacted some of the other partner banks in the ecosystem, and, more generally, whether the start of new programs might be impacted by increased regulatory scrutiny.  Khalaf responded that Marqeta did not see any impact from the Evolve hack and, more broadly, Defendants did not expect any medium-term or long-term challenges relating to regulatory scrutiny:

WILL NANCE, ANALYST, GOLDMAN SACHS

Hey, guys, appreciate you taking the question. I wanted to ask about some of the cybersecurity events that happened recently with the Evolve hack and just wondering if you could talk about maybe some of the ramifications for the broader ecosystem. And I guess A, how that's impacting some of the partner banks in the ecosystem. And then B, ***if there's any impact on pipelines or kind of new program upstarts that you know, may be impacted by increased regulatory scrutiny***.

SIMON KHALAF

Hey, Will, Simon here, thank you for the question. ***The short answer is no***. The little bit long answer is there's the CrowdStrike event that did not impact us, our predominant Mac shop. I mean, we are a customer of CrowdStrike, but thanks to the great effort by our security team, we were not impacted. Neither were our customers impacted in any major way. So that's good. ***In terms of the other security and regulatory scrutiny, I don't expect it to create medium-term or long-term challenges on the contrary, I would say they are going to create a lot of tailwinds for Marqeta, because of the flight to quality syndrome. We have demonstrated our ability to scale and -- in a compliant manner***. In terms of like Evolve, specifically, our business on Evolve is not big, but Evolve is a great partner of ours.

> But most of the issues, I'd say, do not involve Marqeta. And some of the challenges that we've actually read in the press, we don't have intimate knowledge, are something that will not impact Marqeta, because we've invested heavily in those. I'd say in the chrome around our solution, whether it's settlement or reconciliation, this is something that we've done beautifully as we've scaled. ***So I would say that we're looking good and this is actually working in favor of Marqeta***.

101.    Khalaf's statements were misleading, because, *inter alia*, heightened regulatory scrutiny had led to a significant increase in onboarding times and a backlog of unlaunched new programs, which had a material impact on Marqeta's pipeline. *See* ¶¶106-10, *infra*. These problems were compounded by the departure of senior members of Marqeta's regulatory compliance team in March and April of 2024. *See* ¶174, *infra*. While Marqeta had hired replacements, these individuals had only a few months to get up to speed and were arriving at Marqeta at a time when it was already facing huge launch delays and a significant backlog. Thus, Khalaf's description of Marqeta's demonstrated "ability to scale and – in a compliant manner" was materially misleading.

102.    During the call, another analyst asked about pipeline conversion, how Defendants' key assumptions were trending, and how that influenced Marqeta's visibility for gross profit growth. Khalaf responded that "onboarding is on track" and that "big picture-wise, we're largely on track and things are as planned."

103.    On August 7, 2024, Marqeta also filed with the SEC its Form 10-Q for the Q2 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q was signed by Defendants Khalaf and Milotich. In the Q2 2024 10-Q, Defendants stated that:

> In addition to the other information set forth in this Quarterly Report on Form 10-Q, our business, financial condition, results of operations, cash flows, future prospects, and the trading price of our Class A common stock can be affected by a number of factors, whether currently known or unknown, including but not limited to those described in Part I, Item 1A of our 2023 Annual Report under the heading "Risk Factors," ***which are incorporated herein by reference***, any one or more of which could, directly or indirectly, materially and adversely affect our business, financial condition, results of operations, cash flows, future prospects, and the trading price of our Class A common stock, or cause them to vary materially from past or anticipated future results. ***There have been no material changes to our risk factors since the 2023 Annual Report***.

104.    This statement incorporated the risk factors relating to increased onboarding times and regulatory compliance risks set forth in Marqeta's 2023 10-K. *See* ¶¶119, 121, *infra*. At the

1   time that Marqeta filed its Q2 2024 10-Q, these risks had materialized as Marqeta had already

2   experienced a trend of onboarding times doubling 2023 onboarding times due to heightened

3   regulatory scrutiny for two full quarters.

4          **F.     The Truth Emerges**

5          105.   On November 4, 2024, after market hours, Marqeta issued a press release reporting

6   the Company's Q3 2024 financial results and revising downward its Q4 2024 guidance.

7   Specifically, Marqeta reduced its guidance for Q4 2024 net revenue growth from 16%-18% to 10%-

8   12%, and it reduced its guidance for gross profit growth from 22%-24% to 13%-15%.  The press

9   release stated, "Our fourth quarter guidance reflects several changes that became apparent over the

10  last few months with regards to the heightened scrutiny of the banking environment and specific

11  customer program changes."

12         106.   During the same-day earnings call, Defendant Khalaf attributed the weaker guidance

13  to a change in the regulatory environment that occurred "last year" (*i.e.*, 2023), which "increased

14  [the] operational burden . . . on both Marqeta's and the bank's onboarding and compliance teams"

15  and "translated into delays in launching new programs":

16         With all this great progress, why is our guidance for Q4 softer than expected? ***Well,***
           ***last year, the regulatory environment changed amongst the smaller banks that***
17         ***supports many of our customers' programs.*** As a company, we anticipated this
           change and invested in program management in general and compliance services in
18         particular. We believe that these investments have positioned us well in the medium
           and long term and increase the moat around our platform, especially in embedded
19         finance. However, ***we underestimated the increased operational burden these***
           ***changes made on both Marqeta's and the bank's onboarding and compliance***
20         ***teams. The incremental scrutiny and rigor translated into delays in launching new***
           ***programs.*** These delays have also been aggravated by the increased demand from
21         new bookings in 2023 and the first half of 2024.
22
23         107.   Contrary to Defendants' prior statements touting the time to ramp and launch new

24  programs, Khalaf indicated that "new environment" caused Marqeta's launch time to increase "30%

25  to 40% from 2023."  Khalaf said Marqeta was "signing up new banks to add capacity and open up

26  new choices for our customers" and that these headwinds were "short term":

27         ***On average, the time to launch new programs grew 30% to 40% from 2023, and***
           ***we expect that increase to remain for at least 2 additional quarters, as we and our***
28         ***bank partners become more agile in launching programs in this new environment.***

AMENDED COMPLAINT                          35
Case No. 4:24-cv-08874-YGR

Given the standard ramp time for programs in our industry, these delays will cause volume and gross profit to be pushed out a few months.

Now with a more complete understanding of the implications, we're taking a more holistic approach to ramping the programs we have already signed. ***We are also signing up new banks to add capacity and open up new choices for our customers while making our processes standardized across all banks we support.*** We are confident these changes will give us the agility we need. However, it will take a few months to completely solve the problem and drain the backlog that has been built up. ***We view the headwinds from the more challenging bank environment as short term. Merely slowing down our progress rather than a change in the trajectory of our business, nor impacting our path to profitability.*** In fact, we remain confident in our strategy, business trajectory, and execution.

108.    On that same earnings call, Defendant Milotich stated that the delays in launching new programs contributed in part to Q3 2024 gross profit growth being "2 points lower than expected." Despite having previously touted the Company's compliance and having assured that it new bookings were "on track," Defendant Milotich admitted that while Marqeta "anticipated challenges as a result of the increased scrutiny," it "significantly underestimated the impact of constrained resources and evolving processes":

Gross profit growth was approximately 2 points lower than expected as a result of lower contribution from new programs in the quarter. There are two reasons for this. First, ***15 programs we expected to launch in the quarter were delayed by an average of 70 days. We were less efficient in working with our bank partners to launch new programs, which we attribute to the increased regulatory scrutiny over the last few quarters on the banking industry***, particularly the smaller banks supporting fintech and embedded finance. ***Although we anticipated challenges as a result of the increased scrutiny, we significantly underestimated the impact of constrained resources and evolving processes.***

109.    Defendant Milotich admitted that the Company was "very aware of the scrutiny" but was "***not quick enough with solutions and new processes for our bank partners***" and that "this environment also delays our customers' launch plans." Milotich stated that the Company had been "investing significantly more in our compliance efforts since the start of this year" yet only realized "in the past 2 to 3 months" that the Company "greatly underestimated the magnitude and time horizon for all parties to adapt to the new standards":

Now let me walk through our latest outlook for Q4. We expect Q4 net revenue growth to be between 10% and 12% and Q4 gross profit growth to be between 13% and 15%, a 6- and 9-point reduction, respectively, compared to what we shared in early August. The change in our expectations is primarily driven by 2 factors, both

of which stem to some degree from the heightened regulatory environment from our bank partners.

First, we now expect significantly fewer new programs will launch and ramp up in the second half of the year, lowering gross profit growth by approximately 6 points. ***We were not quick enough with solutions and new processes for our bank partners, and they are more focused on maintaining current programs in the heightened regulatory environment than launching new programs. In some cases, this environment also delays our customers' launch plans.***

Now that we have a backlog of programs to launch, it will take time to work through it. Delays of a few months pushes launches into Q4 and the first half of 2025. Because of the ramp trajectory of TPV in the first year of a program, a few months delay meaningfully impacts Q4. The impact is larger on gross profit than revenue since newer programs with subscale volume tend to have high gross margins until our customers work through the initial volume tiers in our contracts. ***Why does this change in assumptions seem so sudden? We have been very aware of the scrutiny and working through it with our bank partners, investing significantly more in our compliance efforts since the start of this year to raise our program management standards ahead of the rising tide.***

***However, in the past 2 to 3 months, it has become clear we greatly underestimated the magnitude and time horizon for all parties to adapt to the new standards.*** We are actively executing the solution for this challenge, working closely with existing bank partners to optimize our processes to improve the efficiency of program approval and onboarding. In addition, we plan to onboard at least two additional bank partners to increase our bank supply to meet our growing demand.

***The second factor is a few highly sophisticated long-term fintech customers are moving quickly to take ownership of more of the program components in this heightened environment, lowering gross profit growth by 2 to 3 points.*** We have two customers quickly shifting their resources to take on more program management responsibilities, one customer bringing more risk services in-house and three customers connecting their platforms directly to their end-users to reduce their reliance on card usage. All of these actions reduce our volume or our take rate. We do not believe these types of customer actions will become broad-based because very few want to prioritize this type of work or have the scale and sophistication to execute in a way that is accretive to their business. Outside of these two factors, the business is mostly on the trajectory we expected several months ago.

110.    Contrary to Defendants' earlier statements that Marqeta's new bookings were "on track," Defendant Milotich explained that in the first few months of 2024 "more than 10 consent orders affecting banks in [Marqeta's] space" resulted in the onboarding and delivery time more than doubling from 150 days in 2023 to >300 days in Q1 and Q2 2024, and that it remained over 200 days in Q3 2024:

Ramsey El-Assal: Hi. Thank you for taking my question this evening. Can you comment on your visibility at this point, given everything that's going on in terms of these regulatory-driven sort of changes is -- are you confident that you're seeing sort of a bottoming out of the -- of the sort of pain here or could we get to next quarter and see that things have deteriorated further. And I'm also just wondering whether there's a risk that some bookings may get terminated if the implementation timeline stretches out for too long.

* * *

Milotich: Yes, just maybe I'll just give some color on just the specifics on some of the delays, Ramsey. ***So if you look at the first few months of 2024, the regulatory scrutiny had clearly ratcheted up with more than 10 consent orders affecting the banks in our space. And so what we saw was an initial spike in the time to launch that was more than 2x the average in 2023. So 2023 onboarding and delivery was typically around 150 days roughly. And in Q1, Q2, that rose to over 300 days.*** This was expected given the sort of initial changes and sort of shock of all the changes that were happening. But at the start of Q3, we expected things to get back to where we had been in 2023. But the new programs on average took about 30% to 40% longer to launch. And so the ***time still remained over 200 days when it had previously been about 150 days.***

111.    Thus, Marqeta was not facing a situation in which its performance with respect to launch times was strong during the first part of the Class Period, but then took an unexpected turn for the worse.  Instead, Marqeta's performance with respect to launch times was ***terrible*** during the first two quarters of 2024 (>300 days) and improved in Q3 2024 (~200-210 days),[19] but did not improve enough to overcome the terrible performance during the first half of the year.  And what was misleading about Defendants' statements was not their failure to accurately predict what would happen in Q3; it was their gross mischaracterization of what was already happening during Q1 and Q2 when Defendants were representing that launch times were improving when in fact they were actually becoming much worse.

112.    Investors were shocked by these revelations.  On this news, Marqeta's stock price dropped from a close of $5.95 per share on November 4, 2024 to a close of $3.42 per share on November 5, 2024, a decline of roughly 42.5%, wiping out more than $1.3 billion in market

---

[19] The average launch time in 2023 was 150 days, and a 30%-40% increase would be 195 days to 210 days.  Because Milotich stated that the Q3 2024 launch time was "over 200 days," it is reasonable to estimate that the average launch time in Q3 2024 was about 200 days to 210 days.

capitalization.

113.    Several analysts downgraded the Company's stock and/or lowered their price targets in response to Marqeta's disclosures. For example, J.P. Morgan released a statement regarding Marqeta's recent issues, stating, in pertinent part:

> As the BIN sponsorship environment came under regulatory pressure earlier this year, **onboarding timelines became heavily extended** (from ~150 days in 2023 to >300 in 1H24), which management previously expected to improve in 3Q. For context, **this dynamic was generally undiscussed by management until now, with MQ as recently as last quarter articulating that new business onboarding was proceeding generally on track.** Ultimately, this expected bottleneck relief didn't happen, and in 3Q onboarding times were still 30-40% higher than last year, resulting in a delay in bookings conversion and lower NTM growth.

114.    Wells Fargo issued an analyst report on November 4, 2024 titled "Initial 3Q Thoughts – Blindsided By The Guide" which stated, "mgmt guided 4Q net rev growth 6% below on heightened scrutiny on the banking environment and specific customer program changes. We see today's developments as a meaningful set back to investor confidence." In a follow-up report issued the next day, Wells Fargo stated, "[w]hile management attempted to reassure investors that the challenges had 'bottomed' & revenues would return once delays were alleviated, we think this message will fall on deaf ears for the foreseeable future."

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD

### A.    Fourth Quarter and Full Year Results for 2023

115.    The Class Period starts on February 28, 2024. On that day, Marqeta announced its financial results for Q4 2023 and FY 2023, and Defendants held an earnings call to discuss those results. During that call, Defendant Khalaf stated that Marqeta had "made great strides in accelerating the time to launch new programs" and that during Q4 2023, the average time between the close and launch of new programs decreased by roughly 100 days year-over-year:

> In addition to growing our bookings, **we also made great strides in accelerating the time to launch for new programs signed to convert these bookings into revenue and gross profits faster**. **On average, the time between close and launch in Q4 of this year was about 100 days better than the previous year**. This was achieved without adding significant resources by focusing on solutions architecture and using preconfigured card constructs.

116.    The statements in ¶115 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)    Khalaf failed to disclose that during Q1 2024, which was already approximately 66% complete at the time of Khalaf's statement, the positive trend of improving launch times had reversed itself.  As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny.  *See* ¶110, *supra*.  Thus, Khalaf's description of the positive trend in Q4 2023 as Marqeta having "made great strides in accelerating the time to launch new programs" presented a misleading impression of the state of affairs that actually existed at the time of his statement;

(b)    At the time of Khalaf's statement, Defendants were aware that both (1) the increased onboarding times during Q1 2024 were driven, in substantial part, by heightened regulatory scrutiny and (2) Marqeta lacked sufficient personnel and resources in its regulatory compliance department, which materially increased the likelihood of further worsening onboarding times, *see* ¶¶61-62, 108-10, *supra*; ¶¶144-48, 169, 172-73, *infra*;

(c)    During Q3 2023, an external audit found a significant security flaw that resulted in a disclosure in Marqeta's 2023 10-K of a material weakness related to information technology general controls.  *See* ¶¶67-72, *supra*; ¶¶179-80, *infra*.  While Marqeta disclosed the existence of this material weakness, Defendants did not disclose that their efforts to remediate this material weakness involved a substantial shift in resources, which further heightened the risk of worsening onboarding times.  *Id.*; and

(d)    In light of the foregoing, Khalaf's representation of improved launch times was materially misleading both because (1) Marqeta was already experiencing significantly longer launch times than those that he represented and (2) conditions existed that materially increased the likelihood of even longer onboarding times and further worsening launch delays.

117.     During the February 28, 2024 earnings call, an analyst asked about the regulatory environment and how that might affect Marqeta's outlook.  CEO Khalaf responded by stating that Marqeta had invested significant resources in regulatory compliance and that Defendants felt comfortable with the regulatory environment.  CFO Milotich added that, despite "some disruption in the marketplace" relating to regulatory scrutiny, Marqeta's investments in regulatory compliance provided it with a competitive advantage as customers made a "flight to quality" in selecting a platform for their card programs:

CHRIS KENNEDY, ANALYST, WILLIAM BLAIR:

Can you provide an update on the regulatory environment for banking as a service and embedded finance and kind of how you view that operating environment? . . .

SIMON KHALAF:

Thanks, Chris. ***I would say there's no changes. There's not much that we can talk about, either positive or negative. I'd say that the environment is, remains healthy.*** I mean, the great news about a lot of what's going on in embedded finance is solutions that are catering to the unbanked and the underbanked.

There's no question that Buy Now, Pay Later has opened the credit box and provided what is effectively lending without the 29% APR. So that's definitely helping the community. And same thing with SMBs, they're kind of like the forgotten entity. So I do – there's a lot of goodness that is happening with these solutions. So I do – ***we're comfortable with the regulatory environment.*** The second thing I'd say is, ***as a company, we have invested in program management and we've invested in compliance. We've invested in a lot of these services, because, number one, we take it very seriously.***

And the second thing is that when we target the brands, especially in embedded finance, the last want we want is bring them regulatory trouble. So ***I think we've taken this very seriously as a platform.***

MIKE MILOTICH:

And I think, as you maybe referred to, Chris, I mean, some of the announcements out there about BaaS platforms and some of the banks to do business with, the more of those announcements, you know ***there's definitely a component of a flight to quality which we think we are the beneficiaries of, just given our scale and the level of investment, and we were one of the first movers in this space. So we think that although you know it's unfortunate, you know that there's some disruption in the marketplace like that, I think, you know generally speaking, we're definitely more of a beneficiary than something that hurts us.***

118.    The statements in ¶117 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)    At the time of these statements, Marqeta's regulatory compliance department was severely understaffed, and Defendants internally acknowledged this understaffing by approving the hiring of 10 or 11 additional employees for the regulatory compliance department in December 2023.  However, at the time of these statements, the vast majority of these new positions were not filled.  *See* ¶¶61-62, *supra*; ¶¶169, 172-73, *infra*;

(b)    In light of the foregoing facts, Khalaf's statements that "[w]e've invested a lot in these [compliance] services" and that "we take [regulatory compliance] very seriously" were materially misleading, because Marqeta had not invested sufficient resources in regulatory compliance; and

(c)    In light of the foregoing facts, Milotich's statements that Marqeta was the beneficiary of "a flight to quality" given Marqeta's "scale and the level of investment" were materially misleading, because Marqeta had not invested sufficient resources into regulatory compliance.

119.    On February 28, 2024, Marqeta filed its 2023 10-K with the SEC.  The 2023 10-K was signed by both Khalaf and Milotich.  In the "Risk Factors" section of the 2023 10-K, Defendants made the following risk disclosure concerning onboarding times (the "Onboarding Risk Factor"):

> ***Future net revenue growth depends on our ability to attract new customers and retain existing customers in a cost-effective manner***.
>
> If we are unable to attract new customers, retain existing customers on favorable terms, and grow and develop those relationships to drive increased processing volumes, our business, results of operations, financial condition, and future prospects would be adversely affected.
>
> ***If we fail to attract new customers***, including customers in new use cases, industry verticals, and geographies, and to expand our platform in a way that serves the needs of these customers, ***and to onboard them quickly, then we may not be able to continue to grow our net revenue***.
>
> Our customers generally are not subject to any minimum volume commitments under their contracts and have no obligation to continue using our platform, products, or

services. Accordingly, these customers may have, or may enter into in the future, similar agreements with our competitors, which could adversely affect our ability to drive the processing volume and revenue growth that we seek to achieve. Some of our customer contracts provide for a termination clause that allows our customers to terminate their contract at any time following a limited notice period.

The loss of customers or reductions in their processing volumes, particularly any loss of or reductions by Block, may adversely affect our business, results of operations, and financial condition. To achieve continued growth, we must not only maintain our relationships with our existing customers, but also encourage them to renew their contracts with us and to increase adoption and usage of our products. For example, customers can have multiple card programs on our platform across different use cases and geographies. However, we cannot assure you that customers will continue to use our platform or that we will be able to continue processing transactions on our platform at the same rate as we have in the past.

120.    The statements in ¶119 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)    At the time of the filing of the 2023 10-K, Marqeta already had failed to onboard new customers quickly.  As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny.  *See* ¶110, *supra*.  At the time of the filing of the 2023 10-K, Q1 2024 was already approximately 66% complete, so Marqeta had already experienced significant increases in onboarding times;

(b)    Those increased onboarding times and resulting launch delays materially threatened Marqeta's ability to grow net revenue and, more specifically, threatened Marqeta's ability to ramp up new bookings quickly enough to satisfy the net revenue and gross profit growth projections Defendants provided to investors; and

(c)    The Onboarding Risk Factor presented the risk of a failure to onboard new customers quickly as a mere contingent, hypothetical event, but this risk had already materialized in substantial part, because the average time to onboard new customers had increased to a very high level.

121.    In the "Risk Factors" section of the 2023 10-K, Defendants made the following risk disclosure concerning potential regulatory compliance issues (the "Regulatory Compliance Risk Factor"):

> ***Our business is subject to extensive regulation and oversight in a variety of areas, directly and indirectly through our relationships with Issuing Banks and Card Networks, which regulations are subject to change and to uncertain interpretation. Compliance with such laws and regulations could result in additional costs and any failure to comply could materially harm our business and financial condition***.
>
> We, our vendors, our partners, and our customers are subject to a wide variety of laws, regulations, and industry standards, including supervision and examination with respect to the foregoing by multiple authorities and governing bodies and in multiple countries, which govern numerous areas important to our business. While we currently operate our business in an effort to ensure our business itself is not subject to the same level of regulation as the Issuing Banks and Card Networks that we partner with, Issuing Banks and Card Networks operate in a highly regulated environment, and ***there is a risk that those regulations could become applicable to or impact us***.
>
> As a program manager, we are responsible for aligning compliance with Issuing Bank requirements and Card Network rules, and we help create regulatory compliant card programs for our customers. In some cases, we have in the past and could continue to be exposed to liability or indemnification claims from our customers or partners in connection with the services we provide.
>
> We are directly, and indirectly through our contractual relationships with customers, Issuing Banks, and Card Networks, subject to regulation in areas which may include privacy, data protection and information security, global sanctions regimes and export controls, and anti-bribery, and those relating to payments services (such as payment processing and settlement services), AI, consumer protection, AML, escheatment, and compliance with PCI DSS.
>
> As our business and platform continue to develop and expand, we may become subject to additional laws, rules, regulations, and industry standards, including possible additional examination and supervision, in the United States and internationally. ***New or changing laws or regulations could require us to incur significant expenses and devote significant management attention to ensure compliance and could also prompt our Issuing Banks to alter their dealings with us in ways that may have adverse consequences for our business***.
>
> ***We may not be able to respond quickly or effectively to***, or accurately predict the scope or applicability of, ***regulatory***, legislative, or other ***developments, which may in turn impair our ability to offer our existing or planned features, products, and services and/or increase our cost of doing business***. In addition, we may become subject to audits, inquiries, whistleblower complaints, adverse media coverage, investigations, or criminal or civil sanctions, all of which may have an adverse effect on our reputation, business, results of operations, and financial condition.

As a result of our business relationships, we may also be subject to direct or indirect supervision and examination by various authorities. The CFPB, for example, has indicated it has dormant authority to examine certain companies whose services may pose risk to consumers, which may include our company. The CFPB has also published guidance on third party risk management, which places additional vendor compliance oversight expectations for certain companies operating in the financial services industry. As a program manager, we may be viewed as overseeing third party relationships on behalf of our Issuing Banks and, as such, it is possible that regulators could hold us responsible for actual or perceived deficiencies in our oversight and control of third party relationships. New or expanded regulation or *changes in interpretation or enforcement of existing regulations may have an adverse effect on our business, results of operations, and financial condition due to increased compliance costs and new restrictions affecting the offering of our platform, products and services.*

122. The statements in ¶121 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)    At the time of the filing of the 2023 10-K, the environment of heightened regulatory scrutiny had already adversely affected Marqeta's business by causing substantial increases in onboarding times. *See* ¶¶106-10, *supra*;

(b)    Those increased onboarding times and resulting launch delays materially threatened Marqeta's ability to grow net revenue and, more specifically, threatened Marqeta's ability to ramp up new bookings quickly enough to satisfy the net revenue and gross profit growth projections Defendants had provided to investors; and

(c)    The Regulatory Compliance Risk Factor presented the various risks described as mere contingent, hypothetical events, but these risks had already materialized in substantial part, because applicable regulations already (1) "impact[ed]" Marqeta by increasing onboarding times resulting in launch delays, (2) caused Marqeta to "devote significant management attention to ensure compliance" and (3) caused Marqeta's "Issuing Banks to alter their dealings with [Marqeta] in ways that may have adverse consequences" by delaying the launch of new programs. In addition, (4) Marqeta was not able to "quickly" and "effectively" respond to new "regulatory . . . developments"—*i.e.*, the increased regulatory scrutiny of the FDIC—which had "impair[ed]" Marqeta's "ability to offer . . . existing or planned features, products

and services" and increased Marqeta's "cost of doing business."    Finally, (5) "changes in . . . enforcement of existing regulations" had "an adverse effect" on Marqeta's "business, results of operations, and financial condition" by increasing onboarding times and delaying the launch of new programs.  Accordingly, many of the specific risks that Marqeta had warned about in hypothetical and contingent terms had already come to pass, in material ways that adversely impacted Marqeta's business.

**B.      March 4, 2024 Morgan Stanley Technology, Media & Telecom Conference**

123.    On March 4, 2024, Defendants participated in a Morgan Stanley Technology, Media & Telecom Conference.   During this conference, one participant referred to Khalaf's prior representation made during the Q4 2023 earnings call that Marqeta had improved its time to launch programs by about 100 days and asked what factors led to that improvement.  Khalaf responded that Marqeta's delivery speed was due to its build-out of a "ready-to-use construct that the banks would approve from a regulatory perspective" that he called "Marqeta in the box":

> UNIDENTIFIED PARTICIPANT: And <u>one of the metrics that you offered is proof of that improvement was the time to ramp. The most recent call, you discussed the time to ramp new deals had improved significantly up to as much as 100 days faster than in 2022, et cetera. What changes specifically has led to that improvement?</u> And how should we think about the implications for bookings of 2023 and its time to contribute revenue share.

> SIMON KHALAF: I mean, **what we guided in our investor day actually had that baked in. So yes, we've done a lot of work on speeding up delivery and I'd say the majority of that is building what I would call a ready-to-use construct that the banks would approve from a regulatory perspective. So we call them Marqeta in the box**.

> Like a lot of the embedded finance use cases are embedded finance companies are not fintech savvy, nor financial services experts, like they have great ideas, but the regulators would not -- or the banks would not take on the use case. So with a small tweak, we will work with the banks and the regulators to approve those use cases.

> So I mean, the Silicon Valley loves to innovate, but sometimes they never read that little -- like the nice brochure that comes with a credit card that has some fine print you need to like put something to look at it. But those have important, consumers care about those. So our ability to guide the embedded finance players into standard construct that the regulators would celebrate, and the banks will take on is the number one thing we've done.

The second thing is we integrated our solutions architect with our integration engineering team into single threaded leadership. So they're involved early on in the sales cycle. So let's not talk about beautiful constructs the regulators are going to reject.

***So from the early days of the sales cycle, we're guiding our customers towards the construct that the banks and the regulators will celebrate and that I think added a lot to speeding up the program launches.*** What we're doing this year in order to improve on this is sharing the best practices.

So how do you launch a program? How do you market a new program, what are the best practices? What disclosures do you have to put? How do you incentivize adoption? Like, for example, a rewards management, you're changing consumer behavior like we love rewards. I mean, American consumers love offers.

* * *

So we believe that those guidelines and best practices will not change the launch time, but they will improve on the ramp time.

124.    The statements in ¶123 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)    Khalaf failed to disclose that the 100-day improvement that Marqeta had reported for Q4 2023 had already degraded by the time of his statement and that the trend of improved launch times had actually reversed.  As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny.  *See* ¶110, *supra*.  At the time of the Morgan Stanley conference, Q1 2024 was already roughly 70% complete, so the reversal of the positive trend of improved launch times was already evident to Defendants;

(b)    Khalaf's statements strongly suggested that the previously reported improvement in the launch times was sustainable and expected to continue.  Khalaf stated that Marqeta's 2024 guidance "actually had that baked in."  In other words, Marqeta's guidance was predicated on the assumption that the 100-day improvement in launching programs in Q4 2023 was not a mere blip but a sustainable operational improvement that Marqeta was relying on in its full year guidance for 2024.  In that

1   context, it was misleading for Khalaf to continue to tout the 100-day metric as
2   evidence of Marqeta's operational improvements without acknowledging that the
3   new trend through 70% of Q1 2024 was completely at odds with the previously
4   reported figure; and

5   (c)   Khalaf's description of the reasons for the "speed[ed] up delivery" also suggested
6         that the improved timeframes were replicable and sustainable.  Khalaf stated that
7         Marqeta had obtained faster delivery times by using Marqeta's "ready-to-use
8         construct" that he called "Marqeta in the box."  Khalaf explained that Marqeta's
9         experience in working with regulators allowed it to guide its customer to design
10        programs that would be more quickly approved by regulators and that this expertise
11        "added a lot to speeding up the program launches."  However, as Defendants later
12        admitted, Marqeta was already experiencing significant increases in onboarding
13        times which resulted in launch delays due to heightened regulatory scrutiny.  Thus,
14        Khalaf's description of "Marqeta in the box" as a reliable way of speeding up
15        delivery ignored the tangible delays that Marqeta was experiencing in launching new
16        programs and provided a misleading impression of Marqeta's ability to onboard new
17        customers quickly.

18   **C.    Q1 2024 Financial Results**

19   125.   On May 7, 2024, Marqeta announced its financial results for Q1 2024 and held an
20   earnings call to discuss those results.  During the call, an analyst asked about new bookings and
21   whether Marqeta was observing any variance with regard to the ramping of new customers.
22   Milotich responded that Marqeta was "ahead of schedule" both as to the "launching" and "ramping"
23   of new customers:

24       DARRIN PELLER, ANALYST, WOLFE RESEARCH, LLC: Guys, nice job.
25       Thanks. Listen, just on new bookings, you obviously have talked over bookings
         being more material contributor in the back half of the year for those that you've
26       already booked.

27       Just curious if you could touch on how the cohorts are trending, <u>any variance you
         guys are seeing with regard to those customers ramping</u>.
28

And then just a quick follow-up on, I'll ask together on credit and maybe a little more on what the pipeline's looking like there and, excuse me, spent conversion there.

MICHAEL MILOTICH: Sure. So, on your first question, Darrin, thanks for the question. So far, what we're seeing is ***we're a little bit ahead of schedule***. So we had said we expected about $20 million in revenue coming from these new cohorts for 2024 and then that ramping to $60 million next year. And in Q1, it's obviously early, but ***we are a little bit ahead based on a couple of customers launching a little more quickly than we expected, and one or two also ramping a little faster than we had projected***.

That being said, because of, as you can imagine, the ramp of a card program, it takes a little bit of time. So we're, I guess, encouraged by the first couple of months, but, you know, the real value will be generated, you know, say four to six, four to seven, eight months after the launch. When you really start to see what kind of momentum those programs have and what kind of volume they can generate. But ***we're off to a good start, a little bit ahead of schedule***.

126.    The statements in ¶125 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)    At the time of the Q1 2024 earnings call, Marqeta was experiencing severe increases in onboarding times for new bookings.  As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny.  *See* ¶110, *supra*;

(b)    In light of the foregoing, it was materially misleading for Milotich to say that Marqeta was "a little bit ahead of schedule" based on "a couple of customers launching a little more quickly than we expected, and one or two also ramping a little faster than we had projected."  Even if a limited number of customers were launching and ramping more quickly than expected, the average time to onboard and deliver new programs was more than double what it had been in 2023;

(c)    Milotich failed to disclose certain idiosyncratic and unusual assumptions underlying his "ahead of schedule" statements.  As Defendants later explained, Defendants purportedly believed that notwithstanding the severe increases in onboarding times and resulting launch delays during the first two quarters of 2024, Marqeta would be able to reverse these trends and substantially improve onboarding times during the

second half of 2024.  *See* ¶110, *supra*; ¶¶144-48, *infra*.  Even if Defendants genuinely believed they could rapidly accelerate onboarding during the second half of 2024, it was materially misleading to describe the launching and ramping of new business as "ahead of schedule" when in order to meet that schedule, onboarding times would need to dramatically decrease compared to the those experienced during the first half of 2024; and

(d)     Milotich failed to disclose that during March and April 2024, three members of Marqeta's regulatory compliance team were fired and/or quit in rapid succession (including the Head of Regulatory Compliance and a Senior Compliance Manager), which heightened the risk of even further increasing onboarding times and worsening launch delays.  *See* ¶¶151, 174-76, *infra*.

127.    During the May 7, 2024 earnings call, an analyst asked about Marqeta's previously reported 100-day improvement in launching timeframes and how Marqeta was "faring now" with respect to this metric.  Khalaf responded that Marqeta had made a "lot of progress" due to Marqeta-in-a-Box and that "from the moment we touch a customer all the way to realizing the gross profit, right, we've made tremendous improvement north of 10%, which is material if you actually look at how this compounds":

GUS GALA, ANALYST, MONNESS, CRESPI, HARDT & CO. INC.:

Hi, team. Thank you for taking my questions. <u>Last couple of updates, we talked about ramps coming down about 100 days. We're here a third of the way through the year. How are these faring now? What are we making progress on tangibly that's allowing this to happen?</u>

And last one I'll layer in there is, <u>can you dig in on progress</u>, maybe penetration, <u>Marqeta-in-a-Box, helping drive that down?</u> Appreciate all the comments.

SIMON KHALAF:

Hi, Gus. This is Simon. ***You're absolutely right. I mean, we've made a lot of progress and I'll attribute all these to all these to the Marqeta-in-a-Box solution, in addition to engaging our solution team early on in the process and not when the MSA is signed***.

***So in a more concrete way, throughout the whole thing, as in like from the moment we touch a customer all the way to realizing the gross profit, right, we've made***

*tremendous improvement north of 10%, which is material if you actually look at how this compounds. And I'd say that there's Marqeta-in-a-Box, that made a huge difference engaging the solutions team, working on a good blend between commercial and consumer, commercial moves much faster than consumer. And last but not least, focused on the, I'd say, a more expansion into the existing base that reduces a lot of the upfront cycles*.

So they know us, they've worked with us, our bank partners know them. So I would say overall, there's the tailwinds that are helping us because our customers land and we expand with them, but also *we've made significant operational improvements that have helped tremendously*.

128.    The statements in ¶127 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)    At the time of the Q1 2024 earnings call, Marqeta was experiencing severe increases in onboarding times for new bookings.  As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny.  *See* ¶110, *supra*;

(b)    Khalaf's statement that "we've made tremendous improvement north of 10%" was particularly misleading given that the reference point in the question was the 100-day improvement in launch times that Defendants reported a quarter earlier and the question asked how these timeframes were "faring now."  Khalaf's statement would be understood by a reasonable investor to suggest that Marqeta's speed in launching new programs had improved, not that onboarding was taking more than double the time that it took in 2023; and

(c)    Khalaf's statements that "we've made significant operational improvements that have helped tremendously" and that these improvements were attributable to Marqeta-in-a-Box further suggested that launch times were improving, not worsening.

129.    On May 7, 2024, Marqeta filed with the SEC its Form 10-Q for the Q1 2024 (the "Q1 2024 10-Q").  The Q1 2024 10-Q was signed by Defendants Khalaf and Milotich.  In the Q1 2024 10-Q, Defendants stated that:

In addition to the other information set forth in this Quarterly Report on Form 10-Q, our business, financial condition, results of operations, cash flows, future prospects, and the trading price of our Class A common stock can be affected by a number of factors, whether currently known or unknown, including but not limited to those described in Part I, Item 1A of our 2023 Annual Report under the heading "Risk Factors," *which are incorporated herein by reference*, any one or more of which could, directly or indirectly, materially and adversely affect our business, financial condition, results of operations, cash flows, future prospects, and the trading price of our Class A common stock, or cause them to vary materially from past or anticipated future results. *There have been no material changes to our risk factors since the 2023 Annual Report*.

130.     The statements in ¶129 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)     The statement incorporated the Onboarding Risk Factor set forth in ¶119 and the Regulatory Compliance Risk Factor set forth in ¶121. These risk factors were materially misleading for the same reasons set forth in ¶120 and ¶122, respectively;

(b)     In addition, the statement in the Q1 2024 10-Q was even more misleading than when the risk factors were articulated in the 2023 10-K, because the risks had materialized to an even higher degree than they had at the time the 2023 10-K was filed. By the time of Q1 2024 10-Q, however, (1) Q1 2024 was fully complete, (2) Q2 2024 was roughly 41% complete, and (3) the first half of 2024 was roughly 67% complete. Thus, Marqeta had already experienced the trend of onboarding times doubling 2023 onboarding times for an extended period of time. For the same reasons, the risk of business harms arising from regulatory compliance issues had further materialized and deepened, because Marqeta was experiencing prolonged onboarding times and launch delays that it attributed a regulatory environment of heightened scrutiny; and

(c)     The statement that there had been "no material changes" to the risk factors was materially misleading, because the impacts and prolonged nature of the onboarding times and launch delays had deepened, and the failure to disclose these facts rendered the risk factor statements even more misleading.

1

**D.**    **May 20, 2024 J.P. Morgan Global Technology, Media and Communications Conference**

2

3    131.    On May 20, 2024, Defendants participated in a J.P. Morgan Global Technology,

4    Media and Communications Conference.  During this conference, an analyst asked whether, as

5    Marqeta started to enter into larger deals, there would be a trade-off of slower implementations.

6    Khalaf stated that Marqeta's deployment timeframes were improving year-over-year, so Marqeta

7    could take on larger deals without comprising the deployment time:

8    TIEN-TSIN HUANG, ANALYST, J.P. MORGAN

9    You said you're going after enterprises. At Investor Day you said you were moving
    away from the VC-backed players, which makes sense. And now you've got
10    enterprise, you have marketplace. ***So could we expect larger deals in general, and
    the trade-off could be slower implementations? How should we evaluate that?***

11

12    SIMON KHALAF

13    Yes. ***We intentionally do not want to trade a large number with a slower
    implementation cycle, right?*** So the good thing on the enterprise side is we are the
14    program manager.

15    So if you look at some of the deals that we've closed in fintech that took some time,
    we were not the program manager. So they had the relationship with the banks
16    themselves.

17    Things are slow. Banks are not the fastest moving organizations. ***So us being the
    program manager, it actually makes the programs go smoother, if not even faster.***
18    ***So we're not trading that.***

19    ***So the answer is yes, there are going to be bigger deal, but the -- and*** <u>***we monitor***</u>
    <u>***this***</u>***. The average and the median of the deployment cycles are coming down by***
20    ***about 11% year-over-year. So while we've broadened the pipe, we haven't***
    ***compromised the deployment time***.
21

22    132.    The statements in ¶131 were materially false and/or misleading when made and/or

23    omitted to state material facts necessary to make the statements not misleading, because:

24    (a)    At the time of the May 20, 2024 J.P. Morgan conference, Marqeta was experiencing

25        severe increases in onboarding times for new bookings.  As Defendants later

26        disclosed, Marqeta's average time for the onboarding and delivery of new programs

27        was roughly 150 days in 2023, but that time more than doubled to >300 days during

28        Q1 and Q2 2024 due to heightened regulatory scrutiny.  *See* ¶110, *supra*;

(b)     Khalaf's statement that "[t]he average and the median of the deployment cycles are coming down by about 11% year-over-year" was materially misleading because it suggested that Marqeta's speed in launching new programs was improving, when in fact the average time to launch new programs had more than doubled compared to 2023; and

(c)     Khalaf's statement echoed his prior statement, made during the May 7, 2024 earnings call, that "we've made tremendous improvement north of 10%," in response to a question about the previously reported 100-day improvement in launch times.  *See* ¶127, *supra*.  The similarity of these figures ("north of 10%" and "about 11%") and the similarity of the questions that were being asked (both relating to Marqeta's speed in implementing new programs) would lead a reasonable investor to interpret these statements as representations that onboarding times were improving.  That onboarding times had actually more than doubled compared to 2023 is completely inconsistent with what a reasonable investor would take from Khalaf's statements.

**E.     Q2 2024 Results**

133.    On August 7, 2024, Marqeta announced its financial results for Q2 2024 and held an earnings call to discuss those results.  During the earnings call on that date, an analyst asked about the balance between growth coming from new customers versus growth coming from existing customers.  In responding, Khalaf stated that Marqeta was "on track" with its guidance for revenue from new customers, which according to Khalaf, "speaks volumes to how fast we can onboard new customers and get them ramped up."  Their colloquy was as follows:

RAMSEY EL-ASSAL, ANALYST, BARCLAYS

I also wanted to ask, with the renewals behind you, you know, how should we think about the growth algorithm's balance between new customer versus existing customer growth? I think you guys have highlighted a lot of new opportunity on this call. I'm just kind of curious in your mind, which is shaping up to be the more powerful driver sort of today, and in your projections between sort of you know, harvesting growth from the clients you have today versus you know, new customers that you think may drive you know, kind of an incremental share of growth as we move forward?

1    SIMON KHALAF

2    . . . Ramsey, it is kind of yes and yes. ***So we are excited that the new cohorts are on
3    track to generate $20 million in revenue, which is what we've guided. So we're on
     track with that. And again, speaks volumes to how fast we can onboard new
4    customers and get them ramped up***. So that's a growth vector. Our customers also
     are growing, some of them geographically, others, they're launching multiple
5    programs. So that also factors into our growth calculations.

6        134.    The statements in ¶133 were materially false and/or misleading when made and/or

7    omitted to state material facts necessary to make the statements not misleading, because:

8        (a)    At the time of the Q2 2024 earnings call, Marqeta was experiencing severe increases

9                in onboarding times for new bookings.  As Defendants later disclosed, Marqeta's

10               average time for the onboarding and delivery of new programs was roughly 150 days

11               in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due

12               to heightened regulatory scrutiny.  *See* ¶110, *supra*;

13       (b)    In light of the foregoing, it was materially misleading for Khalaf to state that "new

14               cohorts are on track to generate $20 million in revenue" and that "we're on track with

15               that" and that this progress "speaks volumes to how fast we can onboard new

16               customers and get them ramped up."  Khalaf's statements implied that Marqeta's

17               then-current rate of onboarding new customers was sufficient to allow Marqeta to

18               achieve its projections, not that a rapid acceleration in onboarding was required to

19               hit those goals;

20       (c)    Khalaf failed to disclose certain idiosyncratic and unusual assumptions underlying

21               his "on track" statements.  As Defendants later explained, Defendants purportedly

22               believed that notwithstanding the severe increases in onboarding times and resulting

23               launch delays during the first two quarters of 2024, Marqeta would be able to reverse

24               these trends and substantially improve onboarding times during the second half of

25               2024.  *See* ¶100, *supra*; ¶¶144-48, *infra*.  Even if Defendants genuinely believed they

26               could rapidly accelerate onboarding during the second half of 2024, it was materially

27               misleading to describe the current onboarding of new customers as "on track" and to

28               tout "how fast we can onboard new customers and get them ramped up" when in

order to hit Defendants' projections, onboarding times would need to dramatically

decrease compared to the those experienced during the first half of the year. *Id.*; and

(d)    Khalaf's statements were particularly misleading in light of his previous statements

during the Class Period, in which he represented, *inter alia*, (1) that launch times

decreased by roughly 100 days during Q4 2023, *see* ¶115, *supra*, (2) that Marqeta

had made "tremendous improvement north of 10%," with respect on onboarding and

ramping up new customers, *see* ¶127, *supra*, and (3) that the "average and the median

of the deployment cycles are coming down by about 11% year-over-year," *see* ¶131,

*supra*.  All of those statements suggested that onboarding times were improving.  All

of those statements were inconsistent with the reality that average onboarding times

had more than doubled during Q1 and Q2 2024.  In this context, to represent that

onboarding was "on track" with Marqeta's projections, while failing to disclose

Defendants' assumption that onboarding would rapidly increase in order to meet

those projections, was materially misleading.

135.    During the same call, an analyst asked about a recent hack with Evolve, one of

Marqeta's partner banks, whether that event impacted some of the other partner banks in the

ecosystem, and, more generally, whether the start of new programs might be impacted by increased

regulatory scrutiny.  Khalaf responded that Marqeta did not see any impact from the Evolve hack

and, more broadly, Defendants did not expect any medium-term or long-term challenges relating to

regulatory scrutiny:

> WILL NANCE, ANALYST, GOLDMAN SACHS
>
> Hey, guys, appreciate you taking the question. I wanted to ask about some of the cybersecurity events that happened recently with the Evolve hack and just wondering if you could talk about maybe some of the ramifications for the broader ecosystem. And I guess A, how that's impacting some of the partner banks in the ecosystem. And then B, *if there's any impact on pipelines or kind of new program upstarts that you know, may be impacted by increased regulatory scrutiny*.
>
> SIMON KHALAF
>
> Hey, Will, Simon here, thank you for the question. ***The short answer is no***. The little bit long answer is there's the CrowdStrike event that did not impact us, our predominant Mac shop. I mean, we are a customer of CrowdStrike, but thanks to the

great effort by our security team, we were not impacted. Neither were our customers impacted in any major way. So that's good. ***In terms of the other security and regulatory scrutiny, I don't expect it to create medium-term or long-term challenges on the contrary, I would say they are going to create a lot of tailwinds for Marqeta, because of the flight to quality syndrome. We have demonstrated our ability to scale and -- in a compliant manner***. In terms of like Evolve, specifically, our business on Evolve is not big, but Evolve is a great partner of ours.

But most of the issues, I'd say, do not involve Marqeta. And some of the challenges that we've actually read in the press, we don't have intimate knowledge, are something that will not impact Marqeta, because we've invested heavily in those. I'd say in the chrome around our solution, whether it's settlement or reconciliation, this is something that we've done beautifully as we've scaled. ***So I would say that we're looking good and this is actually working in favor of Marqeta***.

136.    The statements in ¶135 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)    Khalaf's statement failed to disclose that heightened regulatory scrutiny had significantly increased onboarding times resulting in launch delays.  As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny.  *See* ¶110, *supra*;

(b)    In light of that omission, Khalaf's statements that "other security and regulatory scrutiny" did not "create medium-term or long-term challenges" and instead created "a lot of tailwinds for Marqeta" that were "actually working in favor of Marqeta" were materially misleading, because regulatory scrutiny had been creating material increases in onboarding times for half a year, which were resulting in launch delays and constituted a significant headwind;

(c)    As Milotich admitted during the Q3 2024 earnings call on November 4, 2024, the increased onboarding times throughout the Class Period had created a "backlog of programs to launch" that would take a "few months" for Marqeta to work through.  *See* ¶¶107, 109, *supra*.  Therefore, the increased regulatory scrutiny was clogging Marqeta's pipeline and delaying "new program upstarts" from launching and

1      generating revenue, which is precisely what the question was asking about.  In light

2      of the foregoing facts, Khalaf's answer of "no" was materially misleading; and

3      (d)    Khalaf failed to disclose that during March and April 2024, three members of

4      Marqeta's regulatory compliance team were fired and/or quit in rapid succession

5      (including the Head of Regulatory Compliance and a Senior Compliance Manager).

6      *See* ¶¶151, 174-76, *infra*.  While Marqeta had hired replacements, these individuals

7      had only a few months to get up to speed and were arriving at Marqeta at a time when

8      it was already facing huge increases in onboarding times and a significant "backlog

9      of programs to launch." *See* ¶¶107, 109, *supra*.  Thus, regulatory scrutiny had caused

10     a material impact on Marqeta's pipeline, and Khalaf's assurance of no expected

11     "medium-term" challenges was materially misleading.

12     137.    During the call, another analyst asked pipeline conversion, how Defendants' key

13   assumptions were trending, and how that influenced Marqeta's visibility for gross profit growth.

14   Khalaf responded that "onboarding is on track" and that "big picture-wise, we're largely on track

15   and things are as planned":

16   ANDREW SCHMIDT, ANALYST, CITI

17   Hey Simon. Hey, Mike. Thanks for taking my questions and congrats on the
     sustained profitability flip here. If I could just go back to the November 2023 Analyst

18   Day. I recall you had to make some assumptions around pipeline conversion and then
     you know, which segments would grow at which rates. Maybe you talk about how

19   some of those key assumptions are trending. Obviously, some good wins announced

20   in the quarter, so it seems fairly positive, but curious about how some of those key
     assumptions are trending and how that influences your visibility for gross profit

21   growth in the out years. Thanks a lot, guys.

22   MIKE MILOTICH

23   Yeah, thank you for your question. I think for the most part, of course, there's always
     puts and takes. You don't get everything right, but I would say on a bigger picture

24   level, we're very much on trend. ***We had said that we expected $20 million in***

25   ***revenue from customers who essentially had not launched prior to 2024 in the year***
     ***and we're on track to deliver that. And you know, that number is expected to go up***

26   ***to 60% or $60 million, sorry, next year. So we feel good that the new business that***
     ***we're onboarding is on track***. I think in terms of when we look at the existing

27   business and how it's trending. I would say you know, it's about as expected with

28   maybe a slightly different mix than maybe we had anticipated a year ago.

I think some of the things that Simon has highlighted in financial services and this concept were just many, many companies, particularly in embedded finance, have some neo-bank aspects to their strategy in terms of how they want to engage their users or their employees. And so I would say that's an area we're probably seeing more demand than we had thought 9 months ago. So that's probably the earliest place where we're really seeing a lot of embedded finance activity. But **big picture-wise, we're largely on track and things are as planned**, with the one exception being our ability to manage cost effectively. That's the one place where we're noticeably ahead where we expected you know, 9 months ago.

138.    The statements in ¶137 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)    At the time of the Q2 2024 earnings call, Marqeta was experiencing severe increases in onboarding times for new bookings.  As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny.  *See* ¶110, *supra*;

(b)    In light of the foregoing, it was materially misleading for Khalaf to state that "onboarding is on track" and "we're largely on track and things are as planned." Khalaf's statements implied that Marqeta's then-current rate of onboarding new customers was sufficient to allow Marqeta to achieve its projections, not that a rapid acceleration in onboarding was required to hit those goals;

(c)    Khalaf failed to disclose certain idiosyncratic and unusual assumptions underlying his "on track" statements.  As Defendants later explained, Defendants purportedly believed that notwithstanding the severe increases in onboarding times and resulting launch delays during the first two quarters of 2024, Marqeta would be able to reverse these trends and substantially improve onboarding times during the second half of 2024.  *See* ¶¶110, 144-48, *supra*.  Even if Defendants genuinely believed they could rapidly accelerate onboarding during the second half of 2024, it was materially misleading to describe the current onboarding of new customers as "on track" when in order to hit Defendants' projections, onboarding times would need to dramatically decrease compared to the those experienced during the first half of the year; and

(d) Khalaf's statements were particularly misleading in light of his previous statements during the Class Period, in which he represented, inter alia, (1) that launch times decreased by roughly 100 days during Q4 2023, *see* ¶115, *supra*, (2) that Marqeta had made "tremendous improvement north of 10%," with respect on onboarding and ramping up new customers, *see* ¶127, *supra*, and (3) that the "average and the median of the deployment cycles are coming down by about 11% year-over-year," *see* ¶131, *supra*. All of those statements suggested that onboarding times were improving. All of those statements were inconsistent with the reality that average onboarding times had more than doubled during Q1 and Q2 2024. In this context, to represent that onboarding was "on track" with Marqeta's projections, while failing to disclose Defendants' assumption that onboarding would rapidly increase in order to meet those projections, was materially misleading; and

(e) Khalaf's statements were also misleading because they were made 38 days into Q3 2024, and as Defendants later disclosed they were experiencing "lower contribution from new programs" which resulted in lower gross profits. *See* ¶108, *supra*. Defendants attributed this to new program launches being delayed by 70 days due to "the increased regulatory scrutiny over the last few quarters on the banking industry." *Id.*

139. On August 7, 2024, Marqeta filed with the SEC its Form 10-Q for the Q2 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q was signed by Defendants Khalaf and Milotich. In the Q2 2024 10-Q, Defendants stated that:

> In addition to the other information set forth in this Quarterly Report on Form 10-Q, our business, financial condition, results of operations, cash flows, future prospects, and the trading price of our Class A common stock can be affected by a number of factors, whether currently known or unknown, including but not limited to those described in Part I, Item 1A of our 2023 Annual Report under the heading "Risk Factors," **which are incorporated herein by reference**, any one or more of which could, directly or indirectly, materially and adversely affect our business, financial condition, results of operations, cash flows, future prospects, and the trading price of our Class A common stock, or cause them to vary materially from past or anticipated future results. **There have been no material changes to our risk factors since the 2023 Annual Report**.

140.    The statements in ¶139 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)    The statement incorporated the Onboarding Risk Factor set forth in ¶119 and the Regulatory Compliance Risk Factor set forth in ¶121.  These risk factors were materially misleading for the same reasons set forth in ¶¶120, 122, 130;

(b)    In addition, the statement in the Q2 2024 10-Q was even more misleading than when the risk factors were first articulated in the 2023 10-K and when the risk factors were incorporated into the Q1 2024 10-Q, because the risks had materialized to an even higher degree than they had earlier.  At the time the Q2 2024 10-Q was filed, Marqeta had already experienced a trend of onboarding times doubling 2023 onboarding times for two full quarters.  In addition, the risk of business harms arising from regulatory compliance issues had further materialized and deepened, because Marqeta was experiencing prolonged onboarding times and launch delays which were already negatively impacting profits contributions from new programs that it attributed to a regulatory environment of heightened scrutiny.  *See* ¶108, *infra*; and

(c)    The statement that there had been "no material changes" to the risk factors was materially misleading, because the impacts and prolonged nature of the increased onboarding times and launch delays had deepened, and the failure to disclose these facts rendered the risk factor statements even more misleading.

## VII.    LOSS CAUSATION

141.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

142.    Throughout the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and/or omissions.  This course of wrongful conduct caused the price of Marqeta securities to be artificially inflated.  But for Defendants' misrepresentations and/or omissions, Plaintiff and the other members of the Class would not have purchased Marqeta securities or would not have purchased such securities at artificially inflated prices.  Later, when Defendants' prior misrepresentations and/or omissions were disclosed to the market, and/or when the concealed

1    risks materialized, the price of Marqeta shares fell significantly as the prior artificial price inflation

2    was dissipated.  As a result of their purchases and/or acquisition of Marqeta securities during the

3    Class Period, Plaintiff and other members of the Class suffered economic losses, i.e., damages,

4    under the Exchange Act.  The timing and magnitude of the decline in the prices of the Company's

5    shares negate any inference that the economic losses and damages suffered by Plaintiff and other

6    members of the Class were caused by changed market conditions, macroeconomic factors, or

7    Company-specific facts unrelated to Defendants' wrongful conduct.

8        143.    As detailed in ¶¶105-14, *supra*, the truth regarding the future prospects of the

9    Company and the concealed regulatory compliance risks materialized on or about November 4,

10    2024.  As a direct result of these disclosures, the price of Marqeta's stock declined significantly,

11    precipitously, thereby damaging investors as the artificial inflation in Marqeta's stock price was

12    removed.

13    **VIII.    ADDITIONAL ALLEGATIONS CONCERNING FALSITY AND SCIENTER**

14
15
16
       **A.    Particular Details In Defendants' Admissions Show That They Knew About The Increased Onboarding Times And Resulting Launch Delays During Q1 2024 And Q2 2024 But Deliberately Refrained From Disclosing Those Delays And Instead Made Misleading Claims About Marqeta's Launch Times**

17        144.    During the Q3 2024 earnings call on November 4, 2024, Defendants made a number

18    of critical admissions indicating not only that Marqeta was experiencing increased onboarding times

19    during Q1 and Q2 2024, but also that Defendants ***knew about the increased onboarding times and***

20    ***resulting launch delays in real time*** and deliberately chose not to disclose them.  Specifically,

21    Milotich admitted that Defendants knew about the elevated regulatory scrutiny during the "first few

22    months of 2024" and that Defendants ***expected*** the increases in launch times to occur:

23
24
25
26
27
> So ***if you look at the first few months of 2024, the regulatory scrutiny had clearly ratcheted up with more than 10 consent orders affecting the banks in our space***. And so ***what we saw was an initial spike in the time to launch that was more than 2x the average in 2023***. So 2023 onboarding and delivery was typically around 150 days roughly. And in Q1, Q2, that rose to over 300 days. ***<u>This was expected</u>*** given the sort of initial changes and sort of shock of all the changes that were happening. ***But at the start of Q3, we expected things to get back to where we had been in 2023***. But the new programs on average took about 30% to 40% longer to launch. And so the time still remained over 200 days when it had previously been about 150 days.

28

145.    Thus, Defendants expected that the 100-day improvement in launch times that Khalaf touted during the Q4 2023 earnings call on February 28, 2024 **would be not be sustained**, at least during the first two quarters of 2024.  Instead, Defendants expected that onboarding times would be dramatically elevated during the first two quarters of 2024, and supposedly expected that onboarding times would revert back to 2023 levels starting in Q3 2024.

146.    Indeed, Defendants told investors during the Q4 2023 earnings call that they expected growth in the first half of 2024 to be weaker than growth in the second half of 2024.  *See* ¶¶75-76, *supra*.  But they did not attribute this difference in expectations to expected increases in onboarding times and resulting launch delays or regulatory scrutiny.  Instead, Defendants explained the difference in expectations for the two halves as being related to (1) the renewal of the Cash App program and (2) expectations that more and more new programs would launch and then ramp up throughout the year, producing compounding increases in revenue.  *See* ¶¶75-76, *supra*.

147.    Defendants were asked repeatedly about the 100-day improvement metric and launch/ramp times throughout the Class Period.  *See* ¶¶115, 123, 127, *supra*.  In responding to these questions, Defendants never acknowledged increased onboarding times or launch delays.  *See* ¶¶123, 127, *supra*.  Instead, Defendants repeatedly touted Marqeta's speed in onboarding new bookings and claimed launch times were getting faster, not slower.  *See supra* at ¶115 (February 28, 2024) ("the time between close and launch in Q4 of this year was about 100 days better than the previous year"); ¶123 (March 4, 2024) ("we've done a lot of work on speeding up delivery"); ¶125 (May 7, 2024) ("we are a little bit ahead [of schedule] based on a couple of customers launching a little more quickly than we expected"); ¶127 (May 7, 2024) ("tremendous improvement north of 10%, which is material if you actually look at how this compounds"); ¶131 (May 20, 2024) ("The average and the median of the deployment cycles are coming down by about 11% year-over-year. So while we've broadened the pipe, we haven't compromised the deployment time."); ¶133 (August 7, 2024) ("we are excited that the new cohorts are on track to generate $20 million in revenue, which is what we've guided . . . . [a]nd again, speaks volumes to how fast we can onboard new customers and get them ramped up").

148. Even if Defendants genuinely believed that launch times would rapidly decrease enough during Q3 2024 to allow Marqeta to meet its projections, that does not excuse Defendants from misrepresenting present-day launch times. If Defendants told investors that launch times had doubled during Q1 and Q2 2024 but were expected to dramatically improve during Q3 2024, investors could have assessed how likely those predictions were to come to fruition. But Defendants did not make such disclosures, even though, as Defendants admitted at the end of the Class Period, they knew about the increased onboarding times and resulting launch delays in real time.

**B.     Defendants Made Misleading Statements During Q3 2024 Earnings Call In Order To Conceal And Minimize Defendants' Misconduct**

149. Even though Defendants made a number of damning admissions during the Q3 2024 earnings call, they did not come clean with all of the relevant facts and instead made a number of further misleading statements aimed at deflecting responsibility and concealing the full circumstances underlying Defendants' earlier omissions.

150. First, Defendants represented that they had invested heavily in regulatory compliance early on, suggesting that they made their best efforts to get their arms around the challenging regulatory environment and reasonably expected an improvement in launch times during the second half of 2024. *See supra* at ¶109 ("We have been very aware of the scrutiny and working through it with our bank partners, ***investing significantly more in our compliance efforts since the start of this year*** to raise our program management standards ahead of the rising tide."). Khalaf stated on the Q3 2024 earning call that "***Marqeta has taken a lot of steps early on before the increase in the regulatory scrutiny*** and/or consent orders in order to review all our programs and the procedures that put in place." Khalaf also claimed, ***"[W]e've started the investment in compliance early on. Actually, it is the largest investment we've made tail-end of '23 and going into '24."***

151. These statements were misleading because even though Defendants approved the hiring of 10 or 11 new regulatory compliance employees in December 2023, they did not begin filling most of these positions until after FE1 departed in April 2024. Moreover, Defendants did not disclose that three critical compliance employees—including the Head of Regulatory Compliance, a Senior Compliance Manager, and FE1—all were fired and/or quit their positions during March

and April of 2024.  This departure of critical regulatory compliance staff during a time of increasing regulatory scrutiny was no doubt a disruptive event, and even if Marqeta quickly found replacements and filled the remaining positions, getting these new employees up to speed was made more difficult by the gutting of the compliance team.

152.    Second, Milotich stated during the Q3 2024 earnings call that although Defendants were very aware of the heightened regulatory scrutiny during the first few months of 2024, "in the past 2 to 3 months, it has become clear we greatly underestimated the magnitude and time horizon for all parties to adapt to the new standards."  This statement was misleading, because Defendants were monitoring launch times in real time and thus knew that about the magnitude of the increase in onboarding times of >300 days throughout Q1 and Q2 2024.  *See, e.g.*, ¶131, *infra* (Khalaf stated during J.P. Morgan conference on May 20, 2024 that "*[W]e monitor this. The average and the median of the deployment cycles are coming down by about 11% year-over-year*. So while we've broadened the pipe, *we haven't compromised the deployment time*.").

153.    Even if Defendants believed that launch times would rapidly decrease starting in Q3 2024, that provides no excuse for their misrepresentations about existing launch times during Q1 and Q2 2024.  Indeed, onboarding times did decrease during Q3 2024 (from >300 days to ~200-210 days); they just did not decrease fast enough to overcome the massive increase in onboarding times and resulting launch delays that had already built up during the first half of 2024.  The problem with Defendants' Class Period statements, however, was not that Defendants underestimated how quickly launch times would improve; it is that they never disclosed the enormous increase in onboarding times in the first place, even though Defendants identified and quantified these onboarding times and launch delays in real time during Q1 and Q2 2024.  Instead, Defendants repeatedly made affirmatively misleading statements about Marqeta's launch times, speed of delivery, and operational efficiency that grossly mischaracterized existing conditions.

**C.    Onboarding Of New Customers Was A Core Operation, Launch Time Was A Critical Performance Metric, And Regulatory Compliance Was A Core Competency That Defendants Claimed Was A Competitive Differentiator**

154.    Onboarding new customers was a core operation for Marqeta.  As Marqeta explained in its risk factors, "*If we fail to attract new customers . . . and to onboard them quickly, then we*

1    *may not be able to continue to grow our net revenue.*" Analysts frequently asked questions about

2    the speed with which Marqeta was onboarding new customers and how that progress measured

3    against Marqeta's projections.

4        155.    In particular, the length of time that Marqeta took in launching new programs was a

5    critical performance metric for both Marqeta management and investors. At the beginning of the

6    Class Period, Khalaf touted Marqeta's *great strides in accelerating the time to launch for new*

7    *programs*" and stated specifically that "On average, *the time between close and launch in Q4 of*

8    *this year was about 100 days better than the previous year*."

9        156.    This 100-day improvement in launch times was identified by analysts as a

10   particularly important performance measure. On February 29, 2024, the day after Khalaf reported

11   this figure, J.P. Morgan issued a report stating, "*As of 4Q, the time to launch closed bookings was*

12   *about 100 days shorter than the prior year. We're impressed by the momentum and efficiency of*

13   *the reoriented GTM [Go-To-Market] motion, which we expect to start helping growth in 2H24*."

14       157.    On March 4, 2024, at a Morgan Stanley conference, a participant asked, "The most

15   recent call, you discussed the time to ramp new deals had improved significantly up *to as much as*

16   *100 days faster than in 2022*, et cetera. *What changes specifically has led to that improvement?*"

17   Khalaf responded by touting the Company's "Marqeta in the box" construct, which he said "added

18   a lot to speeding up the program launches." He gave no indication of the increased onboarding

19   times and resulting launch delays that Marqeta was then experiencing, *i.e.*, that onboarding times

20   were over 300 days, more than double the average in 2023, and instead implied that improved launch

21   times were a replicable, sustainable product of Marqeta's improved processes.

22       158.    On May 7, 2024, an analyst from Monness, Crespi, Hardt & Co. asked, "*Last couple*

23   *of updates, we talked about ramps coming down about 100 days*. We're here a third of the way

24   through the year. *How are these faring now?*" Khalaf responded, "*You're absolutely right*. I mean,

25   we've made a lot of progress and I'll attribute all these to all these to the Marqeta-in-a-Box solution

26   . . . . [I]n a more concrete way, throughout the whole thing, as in like from the moment we touch a

27   customer all the way to realizing the gross profit, right, *we've made tremendous improvement north*

28   *of 10%, which is material if you actually look at how this compounds*."

159.    Thus, after Khalaf first identified the 100-day improvement during Q4 2023 on the February 28, 2024 earnings call, analysts latched on this figure and repeatedly asked about it.  In responding, Khalaf never identified the increased onboarding times or updated the onboarding time metric to indicate that the average onboarding time had increased to more than 300 days, more than double the average time during 2023.  Instead, he continually spoke about improved launch times and speed of delivery.

160.    Regulatory compliance was also a core operation at the Company.  Defendants repeatedly emphasized its importance and touted it as a competitive advantage for Marqeta.  The Company's 2023 10-K noted the significance of regulatory compliance, stating that Marqeta was "subject to extensive regulation and oversight" and that "changes in . . . enforcement of existing regulations may have an adverse effect on our business, results of operations, and financial condition . . . ."

161.    On the Q4 2023 earnings call, Milotich highlighted that the Company had "achieved a more efficient cost structure while maintaining compliance."  In response to an analyst's inquiry about regulatory compliance on that call, Khalaf stated that the Company had "invested in compliance" and "take it very seriously."  Milotich added that "there's definitely a component of a ***flight to quality which we think we are the beneficiaries*** of, just given our scale and the level of investment."

162.    On the Q2 2024 earnings call, Khalaf said that given the "regulatory environment change", "the guidance we provide our customers becomes a true differentiator."  Khalaf said, "[t]hat's why we continue to enhance both program management and compliance with the launch of our new office in Warsaw, Poland, we're now equipped to support more program management capabilities for our European customers, allowing us to deepen our already successful offering in the market."

163.    Defendants were also asked about the Evolve hack and whether they were impacted by increased regulatory scrutiny on the Q2 2024 earnings call.  In response, Milotich stated, "In terms of the other security and regulatory scrutiny, I don't expect it to create medium-term or long-term challenges on the contrary, ***I would say they are going to create a lot of tailwinds for Marqeta,***

*because of the flight to quality syndrome. We have demonstrated our ability to scale and -- in a compliant manner*."

**D.    Defendants Were Aware Of Circumstances At Marqeta That Magnified The Risk Of Further Increasing Onboarding Times And Launch Delays**

164.    On the Q3 2024 earnings call, Defendants admitted that onboarding and delivery time "rose to over 300 days" in Q1 2024 and Q2 2024 from "around 150 days" in 2023.  Defendants also admitted that in Q3 2024 onboarding and delivery times remained 30% to 40% higher, or 200-210 days.  *See* ¶¶106-10, *supra*.   Throughout the Class Period, Defendants were aware of circumstances at Marqeta that magnified the risk that onboarding times would not improve and might worsen.

165.    In June 2023, the FDIC, Federal Reserve Board, and Office of the Comptroller of the Currency issued interagency guidance on managing risks associated with third-party relationships, including relationships with fintech companies.  The increased regulatory scrutiny was a topic of discussion in the industry and in the first few months of 2024 "more than 10 consent orders affected banks in [Marqeta's] space."  *See* ¶¶49-57, *supra*.  On February 1, 2024, Sutton Bank, Marqeta's largest payment processor which accounted for nearly 80% of its transactions in 2023, entered into a consent order with the FDIC which would necessarily increase the regulatory compliance burden on Marqeta.  As such, throughout the Class Period, analysts inquired about the regulatory environment and Defendants misleadingly touted their compliance efforts.  *See* ¶¶161-63, *supra.* FE1 said regulatory scrutiny and consent orders were discussed frequently at Marqeta, including at every all-hands meeting and every meeting that included the entire legal department.  FE3 similarly stated that consent orders impacted most of the banks Marqeta dealt with and were a somewhat frequent topic of conversation among Marqeta attorneys.  FE3 believed that a new program was delayed because of a consent order.

166.    Given the significance of Sutton Bank to Marqeta's operations and the significance of regulatory compliance to Marqeta's business, Defendants were aware of the need for resources to handle the increased regulatory scrutiny.  Moreover, FE1 said Baker had been making requests

1  for additional compliance resources consistently for at least a year prior to FE1's hiring in November

2  2023.

3       167.   Nevertheless, as Milotich stated on the Q3 2023 earnings call, Marqeta "reduced [its]

4  workforce by approximately 20% in May [2023]" despite the anticipated increase in regulatory

5  scrutiny.  Milotich also stated that Marqeta "intended to hire in a few priority areas" which would

6  result in "a net reduction of just over 15%."  However, Milotich said "some of these hires are being

7  delayed through the middle of next year" as the Company "work[ed] to set up an office in a lower

8  cost jurisdiction."  FE2 believes the major layoff in May 2023 contributed to onboarding delays.

9       168.   On June 5, 2024, Marqeta issued a press release announcing that it had opened an

10  office in Poland.  And, on August 7, 2024, Khalaf stated that Marqeta was enhancing "compliance

11  with the launch of our new office in Warsaw, Poland, we're now equipped to support more program

12  management capabilities for our European customers."  These statements suggest that compliance

13  was one of the areas impacted by the delayed hiring announced in Q3 2024 which did not begin

14  until the end of Q2 2024.  Moreover, on the Q3 2024 earnings call, Khalaf discussed Marqeta's

15  "investment in compliance," noting Marqeta "decided to onboard a lot of more tenants outside the

16  United States as well in Poland when it comes to risk management and compliance operations."

17       169.   When FE1 joined Marqeta in November 2023, there were only three other people on

18  the regulatory compliance team.  FE1 noticed immediately that resources were a problem and made

19  direct requests to Carlisle and Sumner for additional resources, on a weekly basis, and sometimes

20  multiple times a week, and they acknowledged that compliance was understaffed either during a

21  team meeting or in the weekly one-on-one meetings between FE1 and Carlisle.  FE1 said James

22  Eagan joined the regulatory compliance team in December 2023; however, he did not have

23  regulatory compliance experience, and, therefore, was "not a proper regulatory compliance hire."

24       170.   FE1 noted that Marqeta's compliance was not particularly well-monitored or tested

25  because of the lack of resources.  As an example, FE1 described compliance testing FE1 performed

26  in Q1 2024, which involved confirming all required disclosures were sent.  FE1 explained that when

27  an account is opened certain disclosures concerning legal rights needed to be provided.  FE1 said

28  Marqeta could not prove they were in compliance with this requirement.  FE1 said Marqeta was

1  asking for the world but also asking its compliance employees not to take any time or resources to

2  complete their work.  FE1 said, "it was ridiculous."

3      171.  In December 2023, Carlisle was named Chief Compliance Officer.  Baker informed

4  Khalaf, Carlisle and Sumner of the need for additional resources and briefed FE1 on these

5  discussions.  Based on FE1's decade of experience in the industry and conversations with Baker and

6  Latson about the resources needed, FE1 concluded that Marqeta should have had between 30 and

7  35 people in regulatory compliance.  FE1 said Carlisle and Baker developed a compliance plan for

8  expanding the department and FE1 and others were told in December 2023 that Marqeta would be

9  adding 10 or 11 new positions by the end of 2024.  FE1 stated that even with the new hires the team

10  would still be short by about 20 people.

11      172.  FE1 stated, "I was not shy about the fact that we didn't have enough people."  In

12  January 2024, in a one-on-one virtual meeting over Teams, FE1 told Sumner that the regulatory

13  compliance team was understaffed and that FE1 was "deeply concerned" with the amount of work

14  Baker and Latson had on their plates.  FE1 told  Sumner in this meeting that the lack of support was

15  going to cause long-term problems and Sumner's response was "we know and we care and we're

16  on it."   FE1 said that while management would claim "we're going all-in on compliance," it that

17  was just lip service that did not play out in reality.  Baker, Latson and FE1 used to laugh at these

18  meetings and say, "You don't care about compliance.  You're just lying to our faces."

19      173.  Given Defendants' plan to delay hiring until at least Q2 2024, Defendants knew or

20  were consciously reckless in not knowing that they lacked adequate resources to address the

21  increased regulatory scrutiny without increasing onboarding times and delaying launches.  FE1

22  recalled that in an all-hands meeting Khalaf said compliance was Marqeta's "number one

23  responsibility."  According to FE1, however, Khalaf must have known the compliance team was

24  understaffed, because he approved hiring 10 or 11 people for the team.

25      174.  In March and April of 2023, Marqeta's compliance team lost three critical members,

26  which worsened the staffing shortage even further.  According to FE1 and FE3, Baker was fired in

27  March 2024.  FE1 said Latson resigned the Monday after Baker was fired because he felt the

28  compliance department was under-resourced and over-worked.  FE1 resigned two weeks later.  This

decimation of the regulatory compliance team was essentially a second restructuring, which worsened the prospects for Marqeta reducing onboarding times.

175.    Even if new staff was hired after this loss of critical personnel, the new hires would take time to get up to speed, which would be more difficult given the loss of experienced senior personnel.  FE1 said there were only two new regulatory compliance hires before FE1 left the company in April 2024, yet FE1 said they did not have the right experience explaining that one employee "came from the medical world, and the other was good with data and metrics, but did not have regulatory compliance knowledge or experience."  FE3 similarly stated that Marqeta constantly removed mid-level management and hired people of lesser experience, overloading people with work.

176.    FE3 recalled that Baker was replaced by two persons hired shortly after his departure. FE3 also stated that Marqeta hired quite a few people for the compliance team in the summer of 2024, confirming Milotich's statement that hiring would be in the "middle of next year."  However, these new hires were in Poland and were focused on European customers (*see* ¶168, *supra*), and thus were unlikely to have the experience required to address the increased regulatory scrutiny from the FDIC, Federal Reserve Board, and Office of the Comptroller of the Currency.  As such, it was unlikely that these new hires would meaningfully bring down onboarding times in the near future.

177.    In February 2024, FE2 briefed Sumner about IT risks tracked in OneTrust and told Sumner that FE2 could build out OneTrust to include regulatory compliance risks.  FE2 explained that this would provide greater visibility and transparency.  Between February 2024 and April 2024, FE2 held group calls with employees who reported to Sumner regarding tracking regulatory compliance risks in the system.  FE2 recalled that Company leaders blamed longer onboarding times on increased regulatory scrutiny.  FE2 said Company leaders were told to take action, but instead they focused on cutting costs.  FE2 believed the Company leadership had a tremendously high appetite for risk, "which was shocking."

178.    FE3 said compliance team members felt unsupported by the Company, noting that they lacked the staffing and support to make decisions to complete their tasks.  FE3 said that while every company has problems when it comes to compliance, Marqeta continuously ignored things

1    and pretended to accept the risks, no matter how high, just to sign a customer, which crossed a line,

2    particularly as a publicly traded company.  For example, FE3 said Marqeta opened an office in

3    Poland without getting the approval of a banking partner, and this quickly became a problem.  The

4    banking partner and Marqeta agreed to certain privacy protections, but the banking partner did not

5    believe the Polish vendor could honor those guardrails.

6        179.    Defendants were also aware of the need to remediate its material weakness which

7    according to FE2 was identified in an external audit in Q3 2023 and was disclosed by Defendants

8    in the 2023 10-K along with their remediation plans.  FE2 noted that the Head of Internal Audit

9    reported directly to the CFO, so Marqeta's executive leadership should have been briefed on the

10   relevant events.  FE2 said there was a massive push to get this material weakness off the books by

11   the second quarter of 2024 and a lot of resources got shifted to that focus.  FE2 said this shift in

12   resources contributed to onboarding delays.  FE3 also said an external SOC audit was performed in

13   January 2024 by Schellman, a third-party vendor, and found a significant security flaw at Marqeta

14   that consumed the engineering team's time and likely resulted in some onboarding delays.

15       180.    On February 26, 2025, Defendants filed their annual report for the fiscal year 2024,

16   which stated that "management deems these material weaknesses remediated as of the date of the

17   filing of this Annual Report on Form 10-K."  Defendants knew or were consciously reckless in not

18   knowing that the diversion of resources to remediate these weaknesses was hindering their ability

19   to bring down onboarding times and address the increased regulatory scrutiny.

20   **IX.    CLASS ACTION ALLEGATIONS**

21       181.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

22   Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased

23   or otherwise acquired Marqeta securities between February 28, 2024 and November 4, 2024

24   inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants,

25   the officers and directors of the Company, at all relevant times, members of their immediate families

26   and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants

27   have or had a controlling interest.

28

AMENDED COMPLAINT                      72
Case No. 4:24-cv-08874-YGR

1    182.    The members of the Class are so numerous that joinder of all members is

2 impracticable.  Throughout the Class Period, Marqeta's shares actively traded on the NASDAQ.

3 While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be

4 ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or

5 thousands of members in the proposed Class.  Millions of Marqeta shares were traded publicly

6 during the Class Period on the NASDAQ.  Record owners and other members of the Class may be

7 identified from records maintained by Marqeta or its transfer agent and may be notified of the

8 pendency of this action by mail, using the form of notice similar to that customarily used in securities

9 class actions.

10    183.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all

11 members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal

12 law that is complained of herein.

13    184.    Lead Plaintiff will fairly and adequately protect the interests of the members of the

14 Class and has retained counsel competent and experienced in class and securities litigation.

15    185.    Common questions of law and fact exist as to all members of the Class and

16 predominate over any questions solely affecting individual members of the Class.  Among the

17 questions of law and fact common to the Class are:

18    (a)    whether the federal securities laws were violated by Defendants' acts as alleged

19        herein;

20    (b)    whether statements made by Defendants to the investing public during the Class

21        Period omitted and/or misrepresented material facts about the business, operations, and

22        prospects of Marqeta; and

23    (c)    to what extent the members of the Class have sustained damages and the proper

24        measure of damages.

25    186.    A class action is superior to all other available methods for the fair and efficient

26 adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

27 damages suffered by individual Class members may be relatively small, the expense and burden of

28

1  individual litigation makes it impossible for members of the Class to individually redress the wrongs

2  done to them.  There will be no difficulty in the management of this action as a class action.

3  ## X.  APPLICABILITY OF PRESUMPTION OF RELIANCE

4  187.  The market for Marqeta's securities was open, well-developed and efficient at all

5  relevant times.  As a result of the materially false and/or misleading statements and/or failures to

6  disclose, Marqeta's securities traded at artificially inflated prices during the Class Period.  On

7  November 4, 2024, the Company's share price closed at a Class Period high of $5.95 per share.

8  Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's

9  securities relying upon the integrity of the market price of Marqeta's securities and market

10 information relating to Marqeta, and have been damaged thereby.

11 188.  During the Class Period, the artificial inflation of Marqeta's shares was caused by

12 the material misrepresentations and/or omissions particularized in this Complaint causing the

13 damages sustained by Lead Plaintiff and other members of the Class.  As described herein, during

14 the Class Period, Defendants made or caused to be made a series of materially false and/or

15 misleading statements about Marqeta's business, prospects, and operations.  These material

16 misstatements and/or omissions created an unrealistically positive assessment of Marqeta and its

17 business, operations, and prospects, thus causing the price of the Company's securities to be

18 artificially inflated at all relevant times, and when disclosed, negatively affected the value of the

19 Company shares.  Defendants' materially false and/or misleading statements during the Class Period

20 resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at

21 such artificially inflated prices, and each of them has been damaged as a result.

22 189.  At all relevant times, the market for Marqeta's securities was an efficient market for

23 the following reasons, among others:

24 (a)  Marqeta shares met the requirements for listing, and was listed and actively traded

25      on the NASDAQ, a highly efficient and automated market;

26 (b)  As a regulated issuer, Marqeta filed periodic public reports with the SEC and/or the

27      NASDAQ;

28

(c)     Marqeta regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Marqeta was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

190.    As a result of the foregoing, the market for Marqeta's securities promptly digested current information regarding Marqeta from all publicly available sources and reflected such information in Marqeta's share price.  Under these circumstances, all purchasers of Marqeta's securities during the Class Period suffered similar injury through their purchase of Marqeta's securities at artificially inflated prices and a presumption of reliance applies.

191.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    NO SAFE HARBOR

192.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Marqeta who knew that the statement was false when made.

## XII.    CLAIMS FOR RELIEF

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

193.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

194.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Marqeta's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

195.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Marqeta's securities in violation of Section 10(b) of the Exchange Act and

Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

196. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Marqeta's financial well-being and prospects, as specified herein.

197. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Marqeta's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Marqeta and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

198. Each Individual Defendant's primary liability and controlling person liability arises from the following facts: (i) Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each Individual Defendant, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each Individual Defendant enjoyed significant personal contact and familiarity with other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each Defendant was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

199.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Marqeta's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.    As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

200.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Marqeta's securities was artificially inflated during the Class Period.    In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Marqeta's securities during the Class Period at artificially high prices and were damaged thereby.

201.    At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.    Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Marqeta was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Marqeta securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

202.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

203.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

**Violation of Section 20(a) of The Exchange Act
Against Individual Defendants**

204.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

205.    Individual Defendants acted as controlling persons of Marqeta within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

206.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

207.    As set forth above, Marqeta and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange

Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial jury.

DATED:  April 10, 2025                    **GLANCY PRONGAY & MURRAY LLP**

By: _/s/ Jason Krajcer_
Robert V. Prongay
Jason Krajcer
Christopher Fallon
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  rprongay@glancylaw.com
          jkrajcer@glancylaw.com
          cfallon@glancylaw.com

*Counsel for Lead Plaintiff Tyler Hogge Lead Counsel for the Class*

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned, say:

I am not a party to the above case and am over eighteen years old. On April 10, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 10, 2025, at Los Angeles, California.

*/s/ Jason Krajcer*_____

AMENDED COMPLAINT
Case No. 4:24-cv-08874-YGR