Robert V. Prongay (SBN 270796)
  rprongay@glancylaw.com
Jason Krajcer (SBN 234235)
  jkrajcer@glancylaw.com
Christopher R. Fallon (SBN 235684)
  cfallon@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Tyler Hogge and Lead Counsel for the Class*

[Parties and Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MARQETA, INC. SECURITIES LITIGATION, | Case No. 4:24-cv-08874-YGR <br><br> **SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)** |

**SUPPLEMENTAL CHART OF INFORMATION
REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)**

| Statement No. | The Speaker(s), Date(s), and Medium | False and Misleading Statements | Reasons Statements Were False and Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 1 | When: Feb. 28, 204<br><br>Where: Q4 2023 and FY 2023 earnings call<br><br>Speaker: Khalaf (Compl. ¶115) | In addition to growing our bookings, *we also made great strides in accelerating the time to launch for new programs signed to convert these bookings into revenue and gross profits faster. On average, the time between close and launch in Q4 of this year was about 100 days better than the previous year*. This was achieved without adding significant resources by focusing on solutions architecture and using preconfigured card constructs. | (a) Khalaf failed to disclose that during Q1 2024, which was already approximately 66% complete at the time of Khalaf's statement, the positive trend of improving launch times had reversed itself. As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny. ¶110. Thus, Khalaf's description of the positive trend in Q4 2023 as Marqeta having "made great strides in accelerating the time to launch new programs" presented a misleading impression of the state of affairs that actually existed at the time of his statement;<br><br>(b) At the time of Khalaf's statement, Defendants were aware that both (1) the increased onboarding times during Q1 2024 were driven, in substantial part, by heightened regulatory scrutiny and (2) Marqeta lacked sufficient personnel and resources in its regulatory compliance department, which materially increased the likelihood of further worsening onboarding times, ¶¶61-62, 108-10; ¶¶144-48, 169, 172-73; | **Defendant Khalaf**<br><br>- Defendants admitted in November 2024 that "in the first few months of 2024, the regulatory scrutiny had clearly ratcheted up" and that "what we saw was an initial spike in the time to launch more than 2x the average in 2023." ¶¶110, 144. Specifically, Defendants admitted that the average time for onboarding and delivery was 150 days in 2023 but was more than 300 days during Q1 2024 and Q2 2024. ¶¶110, 144. While these admissions were made by Defendant Milotich, they apply equally to the knowledge of Defendant Khalaf (*e.g.*, "*we* saw").<br><br>- Defendants further admitted that this spike "was expected" due to the heightened regulatory scrutiny and that "we expected things to get back to where we had been in 2023" during the second half of 2024. ¶¶109-10, 144. While these admissions were made by Defendant Milotich, they apply equally to the knowledge of Defendant Khalaf (*e.g.*, "*we* expected").<br><br>- Onboarding times and launch times were core metrics that Defendants reported to |

| | | | (c) During Q3 2023, an external audit found a significant security flaw that resulted in a disclosure in Marqeta's 2023 10-K of a material weakness related to information technology general controls. ¶¶67-72; ¶¶179-80. While Marqeta disclosed the existence of this material weakness, Defendants did not disclose that their efforts to remediate this material weakness involved a substantial shift in resources, which further heightened the risk of worsening onboarding times; and<br><br>(d) In light of the foregoing, Khalaf's representation of improved launch times was materially misleading both because (1) Marqeta was already experiencing significantly longer launch times than those that he represented and (2) conditions existed that materially increased the likelihood of even longer onboarding times and further worsening launch delays. | investors and Khalaf admitted "we monitor this." ¶¶147, 152, 154-58.<br><br>- FE4 stated that in December 2023 and January 2024, onboarding times were becoming longer and longer, and FE4 "wouldn't be shocked if it had doubled." ¶72.<br><br>- Between February 2024 and April 2024, FE2 recalled that Company leaders blamed longer onboarding times on increased regulatory scrutiny. FE2 said Company leaders were told to take action, but instead they focused on cutting costs. ¶177.<br><br>- Throughout the Class Period, Khalaf repeatedly responded to questions from analysts concerning Marqeta's onboarding times, launch times, and speed of operations, demonstrating his detailed knowledge in these areas and reflecting that he closely monitored Marqeta's performance in these areas. ¶¶123, 127, 131, 133, 147.<br><br>- When Khalaf touted the 100-day improvement in launch times in Q4 2023 during the February 28, 2024 earnings call, he knew that the trend of improved launch times had already eroded and reversed during Q1 2024, yet he deliberately touted the improvement in Q4 2023 as a purported indicator of Marqeta's positive momentum going into 2024. ¶¶110, 144-45. |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

- Even though Defendants later admitted that they expected an increase in launch times during the first half of 2024 due to increased regulatory scrutiny but believed these trends would improve in the second half of the year, they did not disclose these assumptions (of worsening launch times to be followed by a bounceback) and instead allowed investors to believe that the improvement in launch times reported for Q4 2023 was part of a continuous, ongoing trend. ¶¶110, 144-45.

- Defendants' false narrative for Marqeta's 2024 growth guidance is indicative of scienter. Defendants told investors the weaker growth in the first half of 2024 was due to the renewal of Cash App, and that the second half of the year would be better as more programs launched and ramped. However, Defendants later admitted that the increase in onboarding and delivery times in Q1 and Q2 were "expected" and that Defendants "expected [onboarding and delivery times] to get back to where we had been in 2023" in Q3. ¶¶75-76, 144-48.

- At the time that Khalaf made his statement, he was aware of circumstances at Marqeta that magnified the risk of further increases in onboarding times, including a severe shortage of regulatory compliance personnel and a diversion of resources to address a material weakness in Marqeta's IT controls. Among other facts supporting this conclusion:

|  |  |  |  | • Regulatory compliance was a core operation which Defendants touted as a competitive advantage. ¶¶160-63. |
|---|---|---|---|---|

• Throughout the Class Period, Khalaf repeatedly made statements concerning Marqeta's investments into regulatory compliance and the strength of Marqeta's regulatory compliance capabilities, including what he called the Company's "Marqeta-in-a-box" solutions. ¶¶117, 123, 127, 135. His statements reflect his detailed knowledge of Marqeta's performance in these areas and their inter-relationship with Marqeta's ability to quickly onboard and launch new programs.

• Defendants "anticipated" and were "very aware" of increased regulatory scrutiny, and Baker informed Khalaf that the regulatory compliance department lacked sufficient resources, yet Defendants reduced the workforce and delayed new hires. ¶¶49-57, 106, 108-09, 164-78.

• FE1 reported a lack of resources for regulatory compliance to the Chief Compliance Officer and the Chief Legal Officer. ¶¶61, 169-70, 172. FE1 stated that in or around December 2023, Defendants approved the hiring of 10 or 11 new regulatory compliance employees to be completed by the end of 2024, but by the time of the February 28, 2024 earnings

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

|  |  |  |  | call, most of these positions were not yet filled. ¶¶62, 171, 173.<br><br>• During the Q3 2024 earnings call on November 4, 2024, Defendants corroborated FE1's allegation concerning the timing of the approval of additional regulatory personnel, stating that their decisions to invest in compliance began at "the start of this year [2024]" and at the "tail-end of '23 and going into '24." ¶¶109, 150.<br><br>• Defendants' decision to delay the hiring of additional regulatory compliance personnel is further corroborated by (i) Milotich's statement on the Q3 2023 earnings call that Marqeta intended to add headcount in a lower cost jurisdiction, yet "these hires are being delayed through the middle of next year" and (ii) Defendants' statements during July and August 2024 about opening a new office in Poland and hiring additional regulatory compliance personnel in Poland. ¶¶58, 167-68, 176.<br><br>• Defendants knew that resources required to address the increased regulatory scrutiny were being diverted to remediate its material weakness. ¶¶67-71, 179-80. FE2 and FE3 believed this likely resulted in onboarding delays. ¶¶70-71, 179. |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| 2 | When: Feb. 28, 2024<br><br>Where: Q4 2023 and FY 2023 earnings call<br><br>Speakers: Khalaf, Milotich (Compl. ¶117) | CHRIS KENNEDY, ANALYST, WILLIAM BLAIR:<br>Can you provide an update on the regulatory environment for banking as a service and embedded finance and kind of how you view that operating environment? . . .<br><br>SIMON KHALAF:<br>Thanks, Chris. *I would say there's no changes. There's not much that we can talk about, either positive or negative. I'd say that the environment is, remains healthy*. I mean, the great news about a lot of what's going on in embedded finance is solutions that are catering to the unbanked and the underbanked. There's no question that Buy Now, Pay Later has opened the credit box and provided what is effectively lending without the 29% APR. So that's definitely helping the community. | (a) At the time of these statements, Marqeta's regulatory compliance department was severely understaffed, and Defendants internally acknowledged this understaffing by approving the hiring of 10 or 11 additional employees for the regulatory compliance department in December 2023. However, at the time of these statements, the vast majority of these new positions were not filled. ¶¶61-62, 169, 172-73;<br><br>(b) In light of the foregoing facts, Khalaf's statements that "[w]e've invested a lot in these [compliance] services" and that "we take [regulatory compliance] very seriously" were materially misleading, because Marqeta had not invested sufficient resources in regulatory compliance; and<br><br>(c) In light of the foregoing facts, Milotich's statements that Marqeta was the beneficiary of "a flight to quality" given Marqeta's "scale and the level of investment" were materially misleading, because Marqeta had not invested sufficient resources into regulatory compliance. | **Defendant Khalaf**<br><br>- *See* Scienter Facts for Statement No. 1.<br><br>**Defendant Milotich**<br><br>- *See* Scienter Facts for Statement No. 1.<br><br>- Throughout the Class Period, Milotich repeatedly responded to questions concerning the launching and ramping of new customers and whether the pace of that launching and ramping left Marqeta on track with its projections. ¶¶125, 137. His statements demonstrated detailed knowledge in these areas and reflected that he closely monitored Marqeta's performance in these areas. Milotich was therefore aware of significant increases in onboarding times and resulting launch delays.<br><br>- Prior to and throughout the Class Period, Milotich repeatedly made statements concerning Marqeta's investments into regulatory compliance and the strength of Marqeta's regulatory compliance capabilities. ¶¶76, 79, 109, 117, 167. His statements demonstrated detailed knowledge in these areas and reflected that he closely monitored Marqeta's performance in these areas. Milotich was therefore aware that heightened regulatory scrutiny was causing significant increases in onboarding times and resulting launch delays. |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | And same thing with SMBs, they're kind of like the forgotten entity. So I do – there's a lot of goodness that is happening with these solutions. So I do – *we're comfortable with the regulatory environment*. The second thing I'd say is, *as a company, we have invested in program management and we've invested in compliance. We've invested in a lot of these services, because, number one, we take it very seriously*. And the second thing is that when we target the brands, especially in embedded finance, the last thing we want is bring them regulatory trouble. So *I think we've taken this very seriously as a platform*.

MIKE MILOTICH: And I think, as you maybe referred to, Chris, I mean, some of the announcements out there about BaaS platforms | | |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | | | |
|---|---|---|---|---|
| | | and some of the banks to do business with, the more of those announcements, you know *there's definitely a component of a flight to quality which we think we are the beneficiaries of, just given our scale and the level of investment, and we were one of the first movers in this space. So we think that although you know, it's unfortunate, you know that there's some disruption in the marketplace like that, I think, you know generally speaking, we're definitely more of a beneficiary than something that hurts us*. | | |
| 3 | When: Feb. 28, 2024<br><br>Where: 2023 10-K<br><br>Speakers: Khalaf and Milotich (Compl. ¶119) | *Future net revenue growth depends on our ability to attract new customers and retain existing customers in a cost-effective manner*.<br><br>If we are unable to attract new customers, retain existing customers on favorable terms, and grow and develop those | (a) At the time of the filing of the 2023 10-K, Marqeta already had failed to onboard new customers quickly. As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny. ¶110. At the time of the filing of the 2023 10-K, Q1 2024 was already approximately 66% complete, so Marqeta had already experienced significant increases in onboarding times; | **Defendant Khalaf**<br><br>- See Scienter Facts for Statements Nos. 1 and 2.<br><br>**Defendant Milotich**<br><br>- See Scienter Facts for Statements Nos. 1 and 2. |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | relationships to drive increased processing volumes, our business, results of operations, financial condition, and future prospects would be adversely affected.<br><br>*If we fail to attract new customers*, including customers in new use cases, industry verticals, and geographies, and to expand our platform in a way that serves the needs of these customers, *and to onboard them quickly, then we may not be able to continue to grow our net revenue*.<br><br>Our customers generally are not subject to any minimum volume commitments under their contracts and have no obligation to continue using our platform, products, or services. Accordingly, these customers may have, or may enter into in the future, similar agreements with our competitors, which could | (b) Those increased onboarding times and resulting launch delays materially threatened Marqeta's ability to grow net revenue and, more specifically, threatened Marqeta's ability to ramp up new bookings quickly enough to satisfy the net revenue and gross profit growth projections Defendants provided to investors; and<br><br>(c) The Onboarding Risk Factor presented the risk of a failure to onboard new customers quickly as a mere contingent, hypothetical event, but this risk had already materialized in substantial part, because the average time to onboard new customers had increased to a very high level. | |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | | |
|---|---|---|---|
| | | adversely affect our ability to drive the processing volume and revenue growth that we seek to achieve. Some of our customer contracts provide for a termination clause that allows our customers to terminate their contract at any time following a limited notice period.<br><br>The loss of customers or reductions in their processing volumes, particularly any loss of or reductions by Block, may adversely affect our business, results of operations, and financial condition. To achieve continued growth, we must not only maintain our relationships with our existing customers, but also encourage them to renew their contracts with us and to increase adoption and usage of our products. For example, customers can have multiple card programs on our platform across different | |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | | | |
|---|---|---|---|---|
| | | use cases and geographies. However, we cannot assure you that customers will continue to use our platform or that we will be able to continue processing transactions on our platform at the same rate as we have in the past. | | |
| 4 | When: Feb. 28, 2024<br><br>Where: 2023 10-K<br><br>Speakers: Khalaf and Milotich (Compl. ¶121) | *Our business is subject to extensive regulation and oversight in a variety of areas, directly and indirectly through our relationships with **Issuing Banks and Card Networks**, which regulations are subject to change and to uncertain interpretation. Compliance with such laws and regulations could result in additional costs and any failure to comply could materially harm our business and financial condition*.<br><br>We, our vendors, our partners, and our customers are subject to | (a) At the time of the filing of the 2023 10-K, the environment of heightened regulatory scrutiny had already adversely affected Marqeta's business by causing substantial increases in onboarding times. ¶¶106-10;<br><br>(b) Those increased onboarding times and resulting launch delays materially threatened Marqeta's ability to grow net revenue and, more specifically, threatened Marqeta's ability to ramp up new bookings quickly enough to satisfy the net revenue and gross profit growth projections Defendants had provided to investors; and<br><br>(c) The Regulatory Compliance Risk Factor presented the various risks described as mere contingent, hypothetical events, but these risks had already materialized in substantial part, because applicable regulations already (1) "impact[ed]" Marqeta by increasing onboarding times resulting in launch delays, (2) caused Marqeta to "devote significant management attention to ensure compliance" | **Defendant Khalaf**<br><br>- *See* Scienter Facts for Statements Nos. 1 and 2.<br><br>**Defendant Milotich**<br><br>- See Scienter Facts for Statements Nos. 1 and 2. |

| | | a wide variety of laws, regulations, and industry standards, including supervision and examination with respect to the foregoing by multiple authorities and governing bodies and in multiple countries, which govern numerous areas important to our business. While we currently operate our business in an effort to ensure our business itself is not subject to the same level of regulation as the Issuing Banks and Card Networks that we partner with, Issuing Banks and Card Networks operate in a highly regulated environment, and **there is a risk that those regulations could become applicable to or impact us**.

As a program manager, we are responsible for aligning compliance with Issuing Bank requirements and Card Network rules, and we help create regulatory | and (3) caused Marqeta's "Issuing Banks to alter their dealings with [Marqeta] in ways that may have adverse consequences" by delaying the launch of new programs. In addition, (4) Marqeta was not able to "quickly" and "effectively" respond to new "regulatory . . . developments"—i.e., the increased regulatory scrutiny of the FDIC—which had "impair[ed]" Marqeta's "ability to offer . . . existing or planned features, products and services" and increased Marqeta's "cost of doing business." Finally, (5) "changes in . . . enforcement of existing regulations" had "an adverse effect" on Marqeta's "business, results of operations, and financial condition" by increasing onboarding times and delaying the launch of new programs. Accordingly, many of the specific risks that Marqeta had warned about in hypothetical and contingent terms had already come to pass, in material ways that adversely impacted Marqeta's business. | |
|---|---|---|---|---|

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | compliant card programs for our customers. In some cases, we have in the past and could continue to be exposed to liability or indemnification claims from our customers or partners in connection with the services we provide.<br><br>We are directly, and indirectly through our contractual relationships with customers, Issuing Banks, and Card Networks, subject to regulation in areas which may include privacy, data protection and information security, global sanctions regimes and export controls, and anti-bribery, and those relating to payments services (such as payment processing and settlement services), AI, consumer protection, AML, escheatment, and compliance with PCI DSS. | | |
|---|---|---|---|---|

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | | |
|---|---|---|---|
| | | As our business and platform continue to develop and expand, we may become subject to additional laws, rules, regulations, and industry standards, including possible additional examination and supervision, in the United States and internationally. ***New or changing laws or regulations could require us to incur significant expenses and devote significant management attention to ensure compliance and could also prompt our Issuing Banks to alter their dealings with us in ways that may have adverse consequences for our business***.<br><br>***We may not be able to respond quickly or effectively to***, or accurately predict the scope or applicability of, ***regulatory***, legislative, or other ***developments, which may in turn*** | |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | | |
|---|---|---|---|
| | | *impair our ability to offer our existing or planned features, products, and services and/or increase our cost of doing business*. In addition, we may become subject to audits, inquiries, whistleblower complaints, adverse media coverage, investigations, or criminal or civil sanctions, all of which may have an adverse effect on our reputation, business, results of operations, and financial condition.<br><br>As a result of our business relationships, we may also be subject to direct or indirect supervision and examination by various authorities. The CFPB, for example, has indicated it has dormant authority to examine certain companies whose services may pose risk to consumers, which may include our company. The CFPB has also | | |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | | |
|---|---|---|---|
| | | published guidance on third party risk management, which places additional vendor compliance oversight expectations for certain companies operating in the financial services industry. As a program manager, we may be viewed as overseeing third party relationships on behalf of our Issuing Banks and, as such, it is possible that regulators could hold us responsible for actual or perceived deficiencies in our oversight and control of third party relationships. New or expanded regulation or ***changes in interpretation or enforcement of existing regulations may have an adverse effect on our business, results of operations, and financial condition due to increased compliance costs and new restrictions affecting the offering of our*** | | |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | | | |
|---|---|---|---|---|
| | | *platform, products and services*. | | |
| 5 | When: Mar. 4, 2024<br><br>Where: Morgan Stanley Technology, Media & Telecom Conference<br><br>Speaker: Khalaf (Compl. ¶123) | UNIDENTIFIED PARTICIPANT: And <u>one of the metrics that you offered is proof of that improvement was the time to ramp. The most recent call, you discussed the time to ramp new deals had improved significantly up to as much as 100 days faster than in 2022, et cetera. What changes specifically has led to that improvement?</u> And how should we think about the implications for bookings of 2023 and its time to contribute revenue share.<br><br>SIMON KHALAF: I mean, *what we guided in our investor day actually had that baked in. So yes, we've done a lot of work on speeding up delivery and I'd say the majority of that is building what I would call a ready-to-use construct that the banks would approve from a* | (a) Khalaf failed to disclose that the 100-day improvement that Marqeta had reported for Q4 2023 had already degraded by the time of his statement and that the trend of improved launch times had actually reversed. As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny. ¶110. At the time of the Morgan Stanley conference, Q1 2024 was already roughly 70% complete, so the reversal of the positive trend of improved launch times was already evident to Defendants;<br><br>(b) Khalaf's statements strongly suggested that the previously reported improvement in the launch times was sustainable and expected to continue. Khalaf stated that Marqeta's 2024 guidance "actually had that baked in." In other words, Marqeta's guidance was predicated on the assumption that the 100-day improvement in launching programs in Q4 2023 was not a mere blip but a sustainable operational improvement that Marqeta was relying on in its full year guidance for 2024. In that context, it was misleading for Khalaf to continue to tout the 100-day metric as evidence of Marqeta's operational improvements without acknowledging that the new trend through 70% of Q1 2024 was completely at odds with the previously reported figure; and | **Defendant Khalaf**<br><br>- *See* Scienter Facts for Statements Nos. 1 and 2. |

17
SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | | |
|---|---|---|---|
| | | *regulatory perspective. So we call them Marqeta in the box.*<br><br>Like a lot of the embedded finance use cases are embedded finance companies are not fintech savvy, nor financial services experts, like they have great ideas, but the regulators would not -- or the banks would not take on the use case. So with a small tweak, we will work with the banks and the regulators to approve those use cases.<br><br>So I mean, the Silicon Valley loves to innovate, but sometimes they never read that little -- like the nice brochure that comes with a credit card that has some fine print you need to like put something to look at it. But those have important, consumers care about those. So our ability to guide the embedded finance players into standard | (c) Khalaf's description of the reasons for the "speed[ed] up delivery" also suggested that the improved timeframes were replicable and sustainable. Khalaf stated that Marqeta had obtained faster delivery times by using Marqeta's "ready-to-use construct" that he called "Marqeta in the box." Khalaf explained that Marqeta's experience in working with regulators allowed it to guide its customer to design programs that would be more quickly approved by regulators and that this expertise "added a lot to speeding up the program launches." However, as Defendants later admitted, Marqeta was already experiencing significant increases in onboarding times which resulted in launch delays due to heightened regulatory scrutiny. Thus, Khalaf's description of "Marqeta in the box" as a reliable way of speeding up delivery ignored the tangible delays that Marqeta was experiencing in launching new programs and provided a misleading impression of Marqeta's ability to onboard new customers quickly |

| | | | |
|---|---|---|---|
| | | construct that the regulators would celebrate, and the banks will take on is the number one thing we've done.<br><br>The second thing is we integrated our solutions architect with our integration engineering team into single threaded leadership. So they're involved early on in the sales cycle. So let's not talk about beautiful constructs the regulators are going to reject.<br><br>So from the early ***days of the sales cycle, we're guiding our customers towards the construct that the banks and the regulators will celebrate and that I think added a lot to speeding up the program launches***. What we're doing this year in order to improve on this is sharing the best practices.<br><br>So how do you launch a program? How do you | |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | | | |
|---|---|---|---|---|
| | | market a new program, what are the best practices? What disclosures do you have to put? How do you incentivize adoption? Like, for example, a rewards management, you're changing consumer behavior like we love rewards. I mean, American consumers love offers.<br>* * *<br>So we believe that those guidelines and best practices will not change the launch time, but they will improve on the ramp time. | | |
| 6 | When: May 7, 2024<br><br>Where: Q1 2024 earnings call<br><br>Speaker: Milotich (Compl. ¶125) | DARRIN PELLER, ANALYST, WOLFE RESEARCH, LLC: Guys, nice job. Thanks. Listen, just on new bookings, you obviously have talked over bookings being more material contributor in the back half of the year for those that you've already booked.<br><br>Just curious if you could touch on how the cohorts | (a) At the time of the Q1 2024 earnings call, Marqeta was experiencing severe increases in onboarding times for new bookings. As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny. ¶110;<br><br>(b) In light of the foregoing, it was materially misleading for Milotich to say that Marqeta was "a little bit ahead of schedule" based on "a couple of customers launching a little more quickly than we expected, and one or two also | **Defendant Milotich**<br><br>- *See* Scienter Facts for Statements Nos. 1 and 2.<br><br>- At the time this statement was made, the trend of increased onboarding times resulting in delayed launch times had persisted throughout Q1 and for 41% of Q2. This persistent trend provided Defendants with further evidence that the trend of increased onboarding times was not a short-term blip but an extended deterioration in Marqeta's ability to onboard programs at the rate reported for Q4 2023. |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

are trending, <u>any variance you guys are seeing with regard to those customers ramping</u>.

And then just a quick follow-up on, I'll ask together on credit and maybe a little more on what the pipeline's looking like there and, excuse me, spent conversion there.

MICHAEL MILOTICH: Sure. So, on your first question, Darrin, thanks for the question. So far, what we're seeing is **we're a little bit ahead of schedule**. So we had said we expected about $20 million in revenue coming from these new cohorts for 2024 and then that ramping to $60 million next year. And in Q1, it's obviously early, but **we are a little bit ahead based on a couple of customers launching a little more quickly than we expected, and one or two also ramping**

ramping a little faster than we had projected." Even if a limited number of customers were launching and ramping more quickly than expected, the average time to onboard and deliver new programs was more than double what it had been in 2023;

(c) Milotich failed to disclose certain idiosyncratic and unusual assumptions underlying his "ahead of schedule" statements. As Defendants later explained, Defendants purportedly believed that notwithstanding the severe increases in onboarding times and resulting launch delays during the first two quarters of 2024, Marqeta would be able to reverse these trends and substantially improve onboarding times during the second half of 2024. ¶110; ¶¶144-48. Even if Defendants genuinely believed they could rapidly accelerate onboarding during the second half of 2024, it was materially misleading to describe the launching and ramping of new business as "ahead of schedule" when in order to meet that schedule, onboarding times would need to dramatically decrease compared to the those experienced during the first half of 2024; and

(d) Milotich failed to disclose that during March and April 2024, three members of Marqeta's regulatory compliance team were fired and/or quit in rapid succession (including the Head of Regulatory Compliance and a Senior Compliance Manager), which heightened the risk of even further increasing

- In March and April of 2024, three critical compliance employees—including the Head of Regulatory Compliance, a Senior Compliance Manager, and FE1—all were fired and/or quit. This was a disruptive event during a time of increasing regulatory scrutiny, and even if Marqeta quickly found replacements and filled the remaining positions, getting these new employees up to speed would necessarily take time. ¶¶151, 174-75.

- FE1 stated that most of the regulatory compliance positions that were approved in December 2023 were not filled until after FE1 departed in April 2024 and that the new hires who were hired before FE1 left did not have regulatory compliance knowledge or experience. ¶¶151, 175. FE3 similarly stated that Marqeta removed mid-level management and hired people of lesser experience. ¶¶66, 175.

- FE3 indicated that at the time this statement Marqeta had not completed its compliance hiring because FE3 recalled quite a few people for the compliance team were hired in the summer of 2024, confirming Milotich's statement that hiring would be in the "middle of next year." ¶¶167, 176.

- Defendants' statements in November 2024 that they made "early" investments in regulatory compliance "since the start of the year" and that it was "the largest investment

| | | | | |
|---|---|---|---|---|
| | | *a little faster than we had projected*.<br><br>That being said, because of, as you can imagine, the ramp of a card program, it takes a little bit of time. So we're, I guess, encouraged by the first couple of months, but, you know, the real value will be generated, you know, say four to six, four to seven, eight months after the launch. When you really start to see what kind of momentum those programs have and what kind of volume they can generate. But *we're off to a good start, a little bit ahead of schedule*. | onboarding times and worsening launch delays. ¶¶151, 174-76. | we've made tail-end of '23 and going into '24," failed to disclose the delayed hirings and the gutting of compliance team in March/April, demonstrating an attempt to conceal the true circumstances that caused the delays and Defendants' consciousness of guilt. ¶¶61-62, 109, 149-51, 153, 164-67, 169-73, 177-78. Similarly, Milotich's statement on the November 2024 earnings call that the impact of the heightened regulatory scrutiny only became "clear" "in the previous 2 to 3 months" contradicts Defendants' statements that they were monitoring onboarding times, further reflecting an effort to conceal how long Defendants were aware of these problems. ¶152, 154-59. These subsequent "cover up" statements not only constituted an ongoing effort to conceal Defendants' wrongdoing, but they also are indicative of scienter with respect to Defendants' earlier statements, including their statements that onboarding was on track and/or ahead of schedule. |
| 7 | When: May 7, 2024<br><br>Where: Q1 2024 earnings call<br><br>Speaker: Khalaf (Compl. ¶127) | GUS GALA, ANALYST, MONNESS, CRESPI, HARDT & CO. INC.: Hi, team. Thank you for taking my questions. <u>Last couple of updates, we talked about ramps coming down about 100 days. We're here a third of the way through the</u> | (a) At the time of the Q1 2024 earnings call, Marqeta was experiencing severe increases in onboarding times for new bookings. As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny. ¶110; | **Defendant Khalaf**<br><br>- *See* Scienter Facts for Statements Nos. 1, 2 and 6. |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | | | |
|---|---|---|---|---|
| | | year. How are these <u>faring now? What are we making progress on tangibly that's allowing this to happen?</u><br><br>And last one I'll layer in there is, <u>can you dig in on progress</u>, maybe penetration, <u>Marqeta-in-a-Box, helping drive that down</u>? Appreciate all the comments.<br><br>SIMON KHALAF: Hi, Gus. This is Simon. ***You're absolutely right. I mean, we've made a lot of progress and I'll attribute all these to all these to the Marqeta-in-a-Box solution, in addition to engaging our solution team early on in the process and not when the MSA is signed.***<br><br>***So in a more concrete way, throughout the whole thing, as in like from the moment we touch a customer all the way to realizing the gross profit, right, we've*** | (b) Khalaf's statement that "we've made tremendous improvement north of 10%" was particularly misleading given that the reference point in the question was the 100-day improvement in launch times that Defendants reported a quarter earlier and the question asked how these timeframes were "faring now." Khalaf's statement would be understood by a reasonable investor to suggest that Marqeta's speed in launching new programs had improved, not that onboarding was taking more than double the time that it took in 2023; and<br><br>(c) Khalaf's statements that "we've made significant operational improvements that have helped tremendously" and that these improvements were attributable to Marqeta-in-a-Box further suggested that launch times were improving, not worsening. | |

| | | | |
|---|---|---|---|
| | | *made tremendous improvement north of 10%, which is material if you actually look at how this compounds. And I'd say that there's Marqeta-in-a-Box, that made a huge difference engaging the solutions team, working on a good blend between commercial and consumer, commercial moves much faster than consumer. And last but not least, focused on the, I'd say, a more expansion into the existing base that reduces a lot of the upfront cycles*.<br><br>So they know us, they've worked with us, our bank partners know them. So I would say overall, there's the tailwinds that are helping us because our customers land and we expand with them, but also *we've made significant operational improvements that have helped tremendously*. | |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| 8 | When: May 7, 2024<br><br>Where: Q1 2024 10-Q<br><br>Speakers: Khalaf and Milotich (Compl. ¶129) | In addition to the other information set forth in this Quarterly Report on Form 10-Q, our business, financial condition, results of operations, cash flows, future prospects, and the trading price of our Class A common stock can be affected by a number of factors, whether currently known or unknown, including but not limited to those described in Part I, Item 1A of our 2023 Annual Report under the heading "Risk Factors," **which are incorporated herein by reference**, any one or more of which could, directly or indirectly, materially and adversely affect our business, financial condition, results of operations, cash flows, future prospects, and the trading price of our Class A common stock, or cause them to vary materially from past or anticipated future results. There have been **no** | (a) The statement incorporated the Onboarding Risk Factor set forth in ¶119 and the Regulatory Compliance Risk Factor set forth in ¶121. These risk factors were materially misleading for the same reasons set forth with respect to Statements Nos. 3 and 4, respectively;<br><br>(b) In addition, the statement in the Q1 2024 10-Q was even more misleading than when the risk factors were articulated in the 2023 10-K, because the risks had materialized to an even higher degree than they had at the time the 2023 10-K was filed. By the time of Q1 2024 10-Q, however, (1) Q1 2024 was fully complete, (2) Q2 2024 was roughly 41% complete, and (3) the first half of 2024 was roughly 67% complete. Thus, Marqeta had already experienced the trend of onboarding times doubling 2023 onboarding times for an extended period of time. For the same reasons, the risk of business harms arising from regulatory compliance issues had further materialized and deepened, because Marqeta was experiencing prolonged onboarding times and launch delays that it attributed a regulatory environment of heightened scrutiny; and<br><br>(c) The statement that there had been "no material changes" to the risk factors was materially misleading, because the impacts and prolonged nature of the onboarding times and launch delays had deepened, and the | **Defendant Khalaf**<br><br>- *See* Scienter Facts for Statements Nos. 1, 2 and 6.<br><br>**Defendant Milotich**<br><br>- *See* Scienter Facts for Statements Nos. 1, 2 and 6. |

| | | | failure to disclose these facts rendered the risk factor statements even more misleading. | |
|---|---|---|---|---|
| | | *material changes to our risk factors since the 2023 Annual Report*. | | |
| 9 | When: May 20, 2024<br><br>Where: J.P. Morgan Global Technology, Media and Communications Conference<br><br>Speaker: Khalaf (Compl. ¶131) | TIEN-TSIN HUANG, ANALYST, J.P. MORGAN<br>You said you're going after enterprises. At Investor Day you said you were moving away from the VC-backed players, which makes sense. And now you've got enterprise, you have marketplace. So could we expect larger deals in general, and the trade-off could be slower implementations? How should we evaluate that?<br><br>SIMON KHALAF<br>Yes. *We intentionally do not want to trade a large number with a slower implementation cycle, right*? So the good thing on the enterprise side is we are the program manager.<br><br>So if you look at some of the deals that we've closed in fintech that took some time, we were | (a) At the time of the May 20, 2024 J.P. Morgan conference, Marqeta was experiencing severe increases in onboarding times for new bookings. As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny. ¶110;<br><br>(b) Khalaf's statement that "[t]he average and the median of the deployment cycles are coming down by about 11% year-over-year" was materially misleading because it suggested that Marqeta's speed in launching new programs was improving, when in fact the average time to launch new programs had more than doubled compared to 2023; and<br><br>(c) Khalaf's statement echoed his prior statement, made during the May 7, 2024 earnings call, that "we've made tremendous improvement north of 10%," in response to a question about the previously reported 100-day improvement in launch times. ¶127. The similarity of these figures ("north of 10%" and "about 11%") and the similarity of the questions that were being asked (both relating to Marqeta's speed in implementing new programs) would lead a reasonable investor to interpret these statements as representations | **Defendant Khalaf**<br><br>- *See* Scienter Facts for Statements Nos. 1, 2 and 6.<br><br>- At the time this statement was made, the trend of increased onboarding times resulting in delayed launch times had persisted throughout Q1 and for 55% of Q2. This persistent trend provided Defendants with further evidence that the trend of increased onboarding times was not a short-term blip but an extended deterioration in Marqeta's ability to onboard programs at the rate reported for Q4 2023. |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | | | |
|---|---|---|---|---|
| | | not the program manager. So they had the relationship with the banks themselves.<br><br>Things are slow. Banks are not the fastest moving organizations. ***So us being the program manager, it actually makes the programs go smoother, if not even faster. So we're not trading that.***<br><br>***So the answer is yes, there are going to be bigger deal, but the --*** <u>***and we monitor this***</u>***. The average and the median of the deployment cycles are coming down by about 11% year-over-year. So while we've broadened the pipe, we haven't compromised the deployment time.*** | that onboarding times were improving. That onboarding times had actually more than doubled compared to 2023 is completely inconsistent with what a reasonable investor would take from Khalaf's statements. | |
| 10 | When: Aug. 7, 2024<br><br>Where: Q2 2024 earnings call | RAMSEY EL-ASSAL, ANALYST, BARCLAYS<br>I also wanted to ask, with the renewals behind you, you know, how | (a) At the time of the Q2 2024 earnings call, Marqeta was experiencing severe increases in onboarding times for new bookings. As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but | **Defendant Khalaf**<br><br>- *See* Scienter Facts for Statements Nos. 1, 2 and 6. |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| Speaker: Khalaf (Compl. ¶133) | should we think about the growth algorithm's balance between new customer versus existing customer growth? I think you guys have highlighted a lot of new opportunity on this call. I'm just kind of curious in your mind, which is shaping up to be the more powerful driver sort of today, and in your projections between sort of you know, harvesting growth from the clients you have today versus you know, new customers that you think may drive you know, kind of an incremental share of growth as we move forward?

SIMON KHALAF
. . . Ramsey, it is kind of yes and yes. So we are excited that the new cohorts are on track to generate $20 million in revenue, which is what we've guided. **So we're on track with that. And again, speaks volumes to how fast we can** | that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny. ¶110;

(b) In light of the foregoing, it was materially misleading for Khalaf to state that "new cohorts are on track to generate $20 million in revenue" and that "we're on track with that" and that this progress "speaks volumes to how fast we can onboard new customers and get them ramped up." Khalaf's statements implied that Marqeta's then-current rate of onboarding new customers was sufficient to allow Marqeta to achieve its projections, not that a rapid acceleration in onboarding was required to hit those goals;

(c) Khalaf failed to disclose certain idiosyncratic and unusual assumptions underlying his "on track" statements. As Defendants later explained, Defendants purportedly believed that notwithstanding the severe increases in onboarding times and resulting launch delays during the first two quarters of 2024, Marqeta would be able to reverse these trends and substantially improve onboarding times during the second half of 2024. ¶100; ¶¶144-48. Even if Defendants genuinely believed they could rapidly accelerate onboarding during the second half of 2024, it was materially misleading to describe the current onboarding of new customers as "on track" and to tout "how fast we can onboard new customers and get them ramped up" when in order to hit Defendants' | - Defendants later admitted that when this statement touting "how fast we can onboard" was made in Q3 2024 "new programs on average took about 30% to 40% longer to launch. And so the time still remained over 200 days when it had previously been about 150 days." ¶¶107,110.

- Defendants later admitted that when this statement indicating that new cohorts were "on track" to meet Marqeta's guidance was made in Q3 2024, Marqeta was experiencing "lower contribution from new programs" which resulted in lower gross profits. ¶108. Defendants attributed this to new program launches being delayed by 70 days due to "the increased regulatory scrutiny over the last few quarters on the banking industry." ¶108. Defendants further admitted that the "backlog" of new programs would "cause volume and gross profit to be pushed out a few months." ¶¶107, 109. |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | | | |
|---|---|---|---|---|
| | | *onboard new customers and get them ramped up*. So that's a growth vector. Our customers also are growing, some of them geographically, others, they're launching multiple programs. So that also factors into our growth calculations. | projections, onboarding times would need to dramatically decrease compared to the those experienced during the first half of the year. *Id*.; and<br><br>(d) Khalaf's statements were particularly misleading in light of his previous statements during the Class Period, in which he represented, inter alia, (1) that launch times decreased by roughly 100 days during Q4 2023, ¶115, (2) that Marqeta had made "tremendous improvement north of 10%," with respect on onboarding and ramping up new customers, ¶127, and (3) that the "average and the median of the deployment cycles are coming down by about 11% year-over-year," ¶131. All of those statements suggested that onboarding times were improving. All of those statements were inconsistent with the reality that average onboarding times had more than doubled during Q1 and Q2 2024. In this context, to represent that onboarding was "on track" with Marqeta's projections, while failing to disclose Defendants' assumption that onboarding would rapidly increase in order to meet those projections, was materially misleading. | |
| 11 | When: Aug. 7, 2024<br><br>Where: Q2 2024 earnings call<br><br>Speaker: Khalaf (Compl. ¶135) | WILL NANCE, ANALYST, GOLDMAN SACHS Hey, guys, appreciate you taking the question. I wanted to ask about some of the cybersecurity events that | (a) Khalaf's statement failed to disclose that heightened regulatory scrutiny had significantly increased onboarding times resulting in launch delays. As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 | **Defendant Khalaf**<br><br>- *See* Scienter Facts for Statements Nos. 1, 2, 6 and 10. |

happened recently with the Evolve hack and just wondering if you could talk about maybe some of the ramifications for the broader ecosystem. And I guess A, how that's impacting some of the partner banks in the ecosystem. And then B, if there's any impact on pipelines or kind of new program upstarts that you know, may be impacted by increased regulatory scrutiny.

SIMON KHALAF
Hey, Will, Simon here, thank you for the question. **The short answer is no**. The little bit long answer is there's the CrowdStrike event that did not impact us, our predominant Mac shop. I mean, we are a customer of CrowdStrike, but thanks to the great effort by our security team, we were not impacted. Neither were our customers impacted in any major way. So that's good. **In**

2024 due to heightened regulatory scrutiny. ¶110;

(b) In light of that omission, Khalaf's statements that "other security and regulatory scrutiny" did not "create medium-term or long-term challenges" and instead created "a lot of tailwinds for Marqeta" that were "actually working in favor of Marqeta" were materially misleading, because regulatory scrutiny had been creating material increases in onboarding times for half a year, which were resulting in launch delays and constituted a significant headwind;

(c) As Milotich admitted during the Q3 2024 earnings call on November 4, 2024, the increased onboarding times throughout the Class Period had created a "backlog of programs to launch" that would take a "few months" for Marqeta to work through. ¶¶107, 109. Therefore, the increased regulatory scrutiny was clogging Marqeta's pipeline and delaying "new program upstarts" from launching and generating revenue, which is precisely what the question was asking about. In light of the foregoing facts, Khalaf's answer of "no" was materially misleading; and

(d) Khalaf failed to disclose that during March and April 2024, three members of Marqeta's regulatory compliance team were fired and/or quit in rapid succession (including the Head of Regulatory Compliance and a Senior Compliance Manager). ¶¶151, 174-76. While

| | | | |
|---|---|---|---|
| | | *terms of the other security and regulatory scrutiny, I don't expect it to create medium-term or long-term challenges on the contrary, I would say they are going to create a lot of tailwinds for Marqeta, because of the flight to quality syndrome. We have demonstrated our ability to scale and -- in a compliant manner*. In terms of like Evolve, specifically, our business on Evolve is not big, but Evolve is a great partner of ours.<br><br>But most of the issues, I'd say, do not involve Marqeta. And some of the challenges that we've actually read in the press, we don't have intimate knowledge, are something that will not impact Marqeta, because we've invested heavily in those. I'd say in the chrome around our solution, whether it's settlement or reconciliation, this is | Marqeta had hired replacements, these individuals had only a few months to get up to speed and were arriving at Marqeta at a time when it was already facing huge increases in onboarding times and a significant "backlog of programs to launch." ¶¶107, 109. Thus, regulatory scrutiny had caused a material impact on Marqeta's pipeline, and Khalaf's assurance of no expected "medium-term" challenges was materially misleading. | |

31

| | | something that we've done beautifully as we've scaled. **_So I would say that we're looking good and this is actually working in favor of Marqeta_**. | | |
|---|---|---|---|---|
| 12 | When: Aug. 7, 2024<br><br>Where: Q2 2024 earnings call<br><br>Speaker: Milotich (Compl. ¶137) | ANDREW SCHMIDT, ANALYST, CITI Hey Simon. Hey, Mike. Thanks for taking my questions and congrats on the sustained profitability flip here. If I could just go back to the November 2023 Analyst Day. I recall you had to make some assumptions around pipeline conversion and then you know, which segments would grow at which rates. Maybe you talk about how some of those key assumptions are trending. Obviously, some good wins announced in the quarter, so it seems fairly positive, but curious about how some of those key assumptions are trending and how that influences your visibility for gross profit growth in | (a) At the time of the Q2 2024 earnings call, Marqeta was experiencing severe increases in onboarding times for new bookings. As Defendants later disclosed, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024 due to heightened regulatory scrutiny. ¶110;<br><br>(b) In light of the foregoing, it was materially misleading for Khalaf to state that "onboarding is on track" and "we're largely on track and things are as planned." Khalaf's statements implied that Marqeta's then-current rate of onboarding new customers was sufficient to allow Marqeta to achieve its projections, not that a rapid acceleration in onboarding was required to hit those goals;<br><br>(c) Khalaf failed to disclose certain idiosyncratic and unusual assumptions underlying his "on track" statements. As Defendants later explained, Defendants purportedly believed that notwithstanding the severe increases in onboarding times and resulting launch delays during the first two quarters of 2024, Marqeta would be able to | **<u>Defendant Milotich</u>**<br><br>- See Scienter Facts for Statements Nos. 1, 2, 6 and 10. |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | the out years. Thanks a lot, guys.<br><br>MIKE MILOTICH<br>Yeah, thank you for your question. I think for the most part, of course, there's always puts and takes. You don't get everything right, but I would say on a bigger picture level, we're very much on trend. *We had said that we expected $20 million in revenue from customers who essentially had not launched prior to 2024 in the year and we're on track to deliver that. And you know, that number is expected to go up to 60% or $60 million, sorry, next year. So we feel good that the new business that we're onboarding is on track.* I think in terms of when we look at the existing business and how it's trending. I would say you know, it's about as expected with maybe a slightly different mix | reverse these trends and substantially improve onboarding times during the second half of 2024. ¶¶110, 144-48. Even if Defendants genuinely believed they could rapidly accelerate onboarding during the second half of 2024, it was materially misleading to describe the current onboarding of new customers as "on track" when in order to hit Defendants' projections, onboarding times would need to dramatically decrease compared to the those experienced during the first half of the year; and<br><br>(d) Khalaf's statements were particularly misleading in light of his previous statements during the Class Period, in which he represented, inter alia, (1) that launch times decreased by roughly 100 days during Q4 2023, ¶115, (2) that Marqeta had made "tremendous improvement north of 10%," with respect on onboarding and ramping up new customers, ¶127, and (3) that the "average and the median of the deployment cycles are coming down by about 11% year-over-year," ¶131. All of those statements suggested that onboarding times were improving. All of those statements were inconsistent with the reality that average onboarding times had more than doubled during Q1 and Q2 2024. In this context, to represent that onboarding was "on track" with Marqeta's projections, while failing to disclose Defendants' assumption that onboarding would rapidly increase in order to meet those projections, was materially misleading; and | |

| | | | |
|---|---|---|---|
| | | than maybe we had anticipated a year ago.<br><br>I think some of the things that Simon has highlighted in financial services and this concept were just many, many companies, particularly in embedded finance, have some neo-bank aspects to their strategy in terms of how they want to engage their users or their employees. And so I would say that's an area we're probably seeing more demand than we had thought 9 months ago. So that's probably the earliest place where we're really seeing a lot of embedded finance activity. But **big picture-wise, we're largely on track and things are as planned**, with the one exception being our ability to manage cost effectively. That's the one place where we're noticeably ahead where we expected you know, 9 months ago. | (e) Khalaf's statements were also misleading because they were made 38 days into Q3 2024, and as Defendants later disclosed they were experiencing "lower contribution from new programs" which resulted in lower gross profits. ¶108. Defendants attributed this to new program launches being delayed by 70 days due to "the increased regulatory scrutiny over the last few quarters on the banking industry." ¶108. | |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| 13 | When: Aug. 7, 2024<br><br>Where: Q2 2024 10-Q<br><br>Speakers: Khalaf and Milotich (Compl. ¶139) | In addition to the other information set forth in this Quarterly Report on Form 10-Q, our business, financial condition, results of operations, cash flows, future prospects, and the trading price of our Class A common stock can be affected by a number of factors, whether currently known or unknown, including but not limited to those described in Part I, Item 1A of our 2023 Annual Report under the heading "Risk Factors," *which are incorporated herein by reference*, any one or more of which could, directly or indirectly, materially and adversely affect our business, financial condition, results of operations, cash flows, future prospects, and the trading price of our Class A common stock, or cause them to vary materially from past or anticipated future results. *There have been no* | (a) The statement incorporated the Onboarding Risk Factor set forth in ¶119 and the Regulatory Compliance Risk Factor set forth in ¶121. These risk factors were materially misleading for the same reasons set forth with respect to Statements Nos. 3 and 4, respectively;<br><br>(b) In addition, the statement in the Q2 2024 10-Q was even more misleading than when the risk factors were first articulated in the 2023 10-K and when the risk factors were incorporated into the Q1 2024 10-Q, because the risks had materialized to an even higher degree than they had earlier. At the time the Q2 2024 10-Q was filed, Marqeta had already experienced a trend of onboarding times doubling 2023 onboarding times for two full quarters. In addition, the risk of business harms arising from regulatory compliance issues had further materialized and deepened, because Marqeta was experiencing prolonged onboarding times and launch delays which were already negatively impacting profits contributions from new programs that it attributed to a regulatory environment of heightened scrutiny. ¶108; and<br><br>(c) The statement that there had been "no material changes" to the risk factors was materially misleading, because the impacts and prolonged nature of the increased onboarding times and launch delays had deepened, and the failure to disclose these | **Defendant Khalaf**<br><br>See Scienter Facts for Statements Nos. 1, 2, 6 and 10.<br><br>**Defendant Milotich**<br><br>See Scienter Facts for Statements Nos. 1, 2, 6 and 10. |

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR

| | | *material changes to our risk factors since the 2023 Annual Report*. | facts rendered the risk factor statements even more misleading. | |
|---|---|---|---|---|

SUPPLEMENTAL CHART OF INFORMATION REQUIRED BY 15 U.S.C. § 78u-4(b)(1) and (2)
CASE NO. 4:24-cv-08874-YGR