Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Jason L. Krajcer (SBN 234235)
  *jkrajcer@glancylaw.com*
Christopher R. Fallon (SBN 235684)
  *cfallon@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MARQETA, INC. SECURITIES LITIGATION, | Case No. 4:24-cv-08874-YGR<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**<br><br>Date: September 30, 2025<br>Time: 2:00 p.m.<br>Judge: Honorable Yvonne Gonzalez Rogers<br>Ctrm: 1, 4th Floor: |

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR

# **TABLE OF CONTENTS**

GLOSSARY OF DEFINED TERMS ........................................................................................ vi

STATEMENT OF ISSUES TO BE DECIDED ...................................................................... vii

I.    PRELIMINARY STATEMENT ................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................................... 1

III.  THE COMPLAINT ALLEGES MATERIAL MISREPRESENTATIONS ................... 4

    A.    Defendants' Statements About Marqeta's Speed Were Materially Misleading ................ 5

        1.    Defendants' Statements About Marqeta's Metrics Were Materially Misleading... 5

        2.    Defendants' Statements About The Reasons For Marqeta's Operational Improvements Were Materially False And Misleading ........................................ 12

        3.    Defendants' Statements Comparing The Progress Of Marqeta's Launch And Ramp Times To Schedule Were Materially False And Misleading ..................... 13

    B.    Defendants' Statements Concerning The Regulatory Environment And Marqeta's Regulatory Capabilities Were Materially False And Misleading .................................. 17

    C.    Defendants' Risk Factor Statements Were Materially False And Misleading ................. 19

IV.   THE COMPLAINT ALLEGES SCIENTER ............................................................... 21

    A.    Defendants' Statements Support A Strong Inference Of Scienter ................................... 21

        1.    Defendants' Admissions Support An Inference Of Scienter ............................... 22

        2.    Defendants' False Exculpatory Statements Support An Inference Of Scienter ... 24

        3.    Defendants' Monitoring Statements Support An Inference Of Scienter ............. 25

        4.    Defendants' Evasive And Deceptive Responses To Analysts' Questions About Marqeta's Speed Of Operations Support An Inference Of Scienter..................... 26

    B.    The Core Operations Doctrine Supports A Strong Inference Of Scienter ....................... 27

    C.    The Accounts Of Former Employees Support An Inference Of Scienter ....................... 28

    D.    Defendants' Motive Arguments Fail, And A Balancing Of The Competing Inferences Yields A Strong Inference Of Scienter ......................................................................... 31

V.    CONCLUSION ............................................................................................................ 33

# TABLE OF AUTHORITIES

**CASES**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ................................................................................................. 27

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ................................................................................... 26

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................................... 19

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................................................................. 4

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ................................................................................................ 26

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ............................................................................................. 33

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ................................................................................................. 5

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ........................................................................................ *passim*

*Glazing Emps. and Glaziers Union Loc. #27 Pension and Ret. Fund v. iRhythm Techs., Inc.*,
2025 WL 1569421 n.9 (N.D. Cal. June 3, 2025) ................................................................. 32

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) .................................................................................. 5, 19, 20, 31

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ................................................................................. 7

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal Aug. 4, 2014) ...................................................................... 21

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) ................................................................... 9, 12

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ...................................................... 22, 31, 32, 33

*In re BioMarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022) .......................................................................... 16

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ........................................................................... 26

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ......................................................................... 28

*In re eHealth Inc. Sec. Litig.*,
2021 WL 5855864 (N.D. Cal. Aug. 12, 2021) ............................................................... 28

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) ............................................................................... 4, 19, 20

*In re Nimble Storage, Inc. Sec. Litig.*,
252 F. Supp. 3d 848 (N.D. Cal. 2017) ........................................................................... 13

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ......................................................................................... 16

*In re Plantronics, Inc. Sec. Litig.*,
2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ............................................................... 28

*In re Portal Software, Inc. Sec. Litig.*,
2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ............................................................... 16

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ................................................................................. *passim*

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011)............................................................................. 26

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. 2022) ..................................................................... 11, 31

*In re Vaxart, Inc. Sec. Litig.*,
576 F. Supp. 3d 663 (N.D. Cal. 2021) ............................................................................. 5

*In re Violin Memory Sec. Litig.*,
2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)........................................................... 19, 20

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009)...................................................................... 10

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
282 F. Supp. 3d 1074 (N.D. Cal. 2017) ......................................................................... 14

*In re Zillow Grp., Inc. Sec. Litig.*,
2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)............................................................ 26

*Institutional Invs. Gp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)..............................................................................................21

*Karinski v. Stamps.com, Inc.*,
   2020 WL 281716 (C.D. Cal. Jan. 17, 2020) .....................................................................24

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ............................................................................................19

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024).............................................................................................................7

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) ............................................................................................11

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
   513 F.3d 702 (7th Cir. 2008) ............................................................................................33

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)..............................................................................................................31

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014)................................................................................................5

*Miss. Pub. Emp. Ret. Sys. v. Bos. Sci. Corp.*,
   523 F.3d 75 (1st Cir. 2008)...............................................................................................27

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ............................................................................................32

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)...........................................................................................................14

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ............................................................................................21

*S. Ferry LP # 2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009)........................................................................28

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ........................................................................... 21, 26, 27, 28

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ..........................................................................................4, 7

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................28, 29, 31

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ............................................................................................... 19

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
  545 F. Supp. 3d 120 (S.D.N.Y. 2021) .................................................................................... 32

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ........................................................................................................... 21, 31

*Tricontinental Indus. Ltd. v. Anixter*,
  215 F. Supp. 2d 942 (N.D. Ill. 2002) ..................................................................................... 10

*Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*,
  2025 WL 39936 (N.D. Cal. Jan. 6, 2025) ............................................................................... 26

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2017) ................................................................................................ 15

**STATUTES**

15 U.S.C. §78u-4(b)(2) ................................................................................................................. 21

15 U.S.C. §78u-5(c)(1)(A)(i) ........................................................................................................ 15

# GLOSSARY OF DEFINED TERMS

| TERM | DESCRIPTION |
|---|---|
| 2023 10-K | Marqeta's Form 10-K for the year ended December 31, 2023 filed with the SEC on February 28, 2024. |
| ACH | Automated Clearing House |
| Acquiring Banks | The financial institutions that merchants use to hold funds and manage their business. Acquiring Banks may work with an Acquirer Processor to provide access to the Card Networks. |
| Acquirer Processor | Connectors of Acquiring Banks and merchants to the Card Networks, to facilitate the flow of card payment information to an Issuing Bank. |
| AI | Artificial Intelligence |
| AML | Anti-Money Laundering |
| APIs | Application Programming Interfaces |
| AWA | Accelerated Wage Access |
| BaaS | Banking as a Service |
| Baker | Jerry Baker, Marqeta Head of Regulatory Compliance (August 2022- March 2024). |
| Block | Block, Inc., formerly known as Square, Inc. |
| BNPL | Buy Now Pay Later |
| Bank Secrecy Act | Bank Secrecy Act |
| Card Network | The provider of the infrastructure for settlement and card payment information that flows between an Issuer Processor and an Acquirer Processor. |
| Carlisle | Alan Carlisle, Marqeta Chief Compliance Officer (December 2023-present). |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| CFPB | Consumer Financial Protection Bureau |
| Class Period | February 28, 2024 and November 4, 2024, inclusive |
| Company | Marqeta, Inc. |
| Def. RJN | Defendants' Notice Of Incorporation By Reference And Request For Judicial Notice, ECF No. 52 |
| Defendants | Marqeta, Inc., Simon Khalaf and Michael Milotich |
| Exchange Act | Securities Exchange Act of 1934 |
| FE1 | Former Employee 1 |
| FE2 | Former Employee 2 |
| FE3 | Former Employee 3 |
| FE4 | Former Employee 4 |
| FDIC | Federal Deposit Insurance Corporation |
| GTM | Go-To-Market |
| Gardner | Jason Gardner, Marqeta Founder and CEO (2010-January 2023); Director (2010-present); Executive Chairman of the Board (January 2023-present). |
| Individual Defendants | Simon Khalaf, and Michael Milotich |
| IPO | Initial Public Offering |
| JIT | Just In Time |

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR

| Latson | Graydon Latson, Marqeta Senior Compliance Manager (September 2021-March 2024). |
| --- | --- |
| Issuing Bank | A financial institution that issues a payment card (debit, prepaid, or credit) either on its own behalf or on behalf of a business. |
| Issuer Processors | Providers of a technology platform, ledger, and infrastructure to support a card issuer and connects with a Card Network to facilitate payment transactions. |
| Khalaf | Defendant Simon Khalaf |
| Milotich | Defendant Michael Milotich |
| MQ | Marqeta, Inc. |
| MSA | Master Services Agreement |
| MxM | Managed by Marqeta |
| NASDAQ | NASDAQ Stock Market |
| OCC | Office of the Comptroller of the Currency |
| PCI DSS | Payment Card Industry Data Security Standard |
| Pl. Opp. to Def. RJN | Plaintiff's Response And Objection To Defendants' Notice Of Incorporation By Reference And Request for Judicial Notice |
| Pl. RJN | Plaintiff's Request For Judicial Notice |
| PxM | Powered By Marqeta |
| Q1 2024 10-Q | Marqeta's Form 10-Q for Q1 2024 filed with the SEC on May 7, 2024. |
| Q2 2024 10-Q | Marqeta's Form 10-Q for Q2 2024 filed with the SEC on August 7, 2024. |
| Reg E | Regulation E |
| Reg Z | Regulation z |
| SEC | Securities and Exchange Commission |
| SMB | Small and Medium Sized Businesses |
| SOC | System and Organization Controls |
| Sumner | Crystal Sumner, Marqeta Chief Legal and Compliance Officer (June 2016-February 2023); Chief Legal Officer and Interim Chief People Officer (February 2024-February 2024); Chief Administrative Officer (February 2024 – present). |
| TPV | Total Processing Volume |
| VC | Venture Capital |

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR                                                vii

**STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))**

Plaintiff agrees with and incorporates by reference Defendants' statement of issues to be decided. *See* MTD i.

## I.  PRELIMINARY STATEMENT

This securities fraud class action alleges violations of Sections 10(b) and 20(a) of the Exchange Act against Marqeta, its former CEO Simon Khalaf and its CFO Mike Milotich.[1] Throughout the Class Period (February 28, 2024 to November 4, 2024), Defendants repeatedly touted Marqeta's speed of operations and improvements in the time it took to launch new programs. During Q1 and Q2 2024, however, Marqeta's average times to onboard new customers and launch new programs became longer and longer, reaching more than double the averages of 2023. Once the truth was revealed, Marqeta's stock price dropped precipitously, wiping out more than a billion dollars in market capitalization and severely harming Marqeta's shareholders.

## II.  STATEMENT OF FACTS

Marqeta provides the infrastructure for companies to offer their own branded payment cards, including debit, credit, and prepaid cards, whether for employee expenses, digital banking, or other applications. ¶39. It bridges the gap between businesses that want to issue cards and the Issuing Banks that are legally permitted to do so, essentially acting as an issuer processor and program manager. ¶¶39-42. As a program manager, Marqeta works with companies to define the rules and features of the cards, and ensures the program adheres to card network rules and regulations. ¶¶45, 121. It also handles the real-time transaction approvals and routing necessary for each card purchase and earns revenue on each transaction. ¶¶39, 44. Its customers are often referred to as fintech or embedded finance companies. *See e.g.*, ¶¶79, 87, 106, 108.

Prior to the Class Period, regulatory scrutiny on the fintech industry and banks supporting it intensified, which affected companies like Marqeta. ¶¶49-56. In April 2023, after entering into a consent order with the FDIC, Cross River Bank issued a press release stating, "Regulatory scrutiny on banks in general is increasing and … will only expand … with a specific focus on banks that support fintech." ¶49. In June 2023, the FDIC, Federal Reserve Board, and the OCC issued new interagency guidance on managing risks associated with third-party relationships, including relationships with fintech companies. ¶50. The guidance indicated that the regulators would be monitoring compliance, stating that "[s]upervisory reviews will evaluate risks and the effectiveness of risk management to determine whether activities are conducted in a safe and sound manner and in compliance with applicable laws and regulations." *Id*. In the months that followed, numerous banks

---

[1] Capitalized terms are defined in the Glossary. Unless otherwise indicated, all emphasis is added, citations are "cleaned up" and "¶_" cites are to the Complaint.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR                                                1

serving the fintech industry entered into consent orders with regulators, including Sutton Bank ("Sutton"), Marqeta's largest Issuing Bank partner by processing volume. ¶¶51-56.

Despite this increased regulatory scrutiny, which would inevitably require additional resources to address, in May 2023 Marqeta announced that it was restructuring and would be reducing headcount by 15%. ¶58. On November 7, 2023, Milotich informed investors that Marqeta intended to add headcount in a lower cost jurisdiction but noted that "these hires are being delayed through the middle of next year." *Id*. Following the restructuring, Marqeta's regulatory compliance department was severely understaffed. ¶¶59-62, 66, 165-66, 169. According to FE1, in December 2023, after repeated requests from Marqeta's Head of Regulatory Compliance for additional employees, Defendants approved the hiring of 10 or 11 new employees for the regulatory compliance team. ¶¶61-62, 171. However, Defendants delayed filling the majority of these positions until the summer of 2024. ¶¶167-68. In addition, three key members of Marqeta's regulatory compliance team resigned or were terminated in March and April of 2024. ¶174. Thus, throughout the Class Period, Marqeta's regulatory compliance team was understaffed and/or lacked experienced personnel necessary to address the increased regulatory scrutiny. ¶¶166-80.

The Class Period starts on February 28, 2024, when Marqeta announced its Q4 and FY 2023 financial results. ¶73. Defendants told investors that the first half of FY 2024 was expected to be weighed down by issues relating to Marqeta's Cash App program, but assured that growth would rapidly accelerate in the second half of 2024, with net revenue growth of 23% to 26% and gross profit growth of 23% to 26% driven in substantial part by the launch and ramping up of new programs throughout the year. ¶¶75-77. During the Q4 2023 earnings call, Khalaf touted the Company's "great strides in accelerating the time to launch" new programs, noting that it "was about 100 days better than the previous year." ¶77. This was highly misleading because, as Defendants admitted at the end of the Class Period, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but more than doubled to >300 days during Q1 2024 and Q2 2024 due to heightened regulatory scrutiny. ¶78. At the time of Khalaf's statement, Q1 2024 was already 66% complete, and the improvement in launch times had already reversed itself. *Id*.

During the Q4 2023 earnings call, analysts inquired about the regulatory environment. Khalaf claimed that Defendants were "comfortable with the regulatory environment," that Marqeta had invested "a lot" in regulatory compliance, and that Defendants took regulatory compliance "very seriously." ¶79. Milotich told

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR                                                    2

investors that despite "some disruption in the marketplace" due to regulatory scrutiny, Marqeta's investments in regulatory compliance provided it with a competitive advantage as customers made a "flight to quality" in selecting a platform for their card programs. *Id.*

Defendants made materially misleading statements throughout the Class Period about Marqeta's launch times and falsely claimed that Marqeta's onboarding of new programs was on track. ¶¶113, 115, 123, 125, 127, 133, 137. For example, during Marqeta's Q1 2024 earnings call on May 7, 2024, an analyst asked how Marqeta was "faring now" in comparison to its previously reported 100-day improvement in launching new programs and Khalaf responded by touting Marqeta's "significant operational improvements" which he said "reduce[d] a lot of the upfront cycles" and drove "tremendous improvement north of 10%." ¶127. Defendants were also asked if they were seeing any "variance" from the ramping of new customers and Khalaf assured that Marqeta was "a little bit ahead of schedule based on a couple of customers launching a little more quickly than we expected, and one or two also ramping a little faster than we had projected." ¶125.

At a May 20, 2024 J.P. Morgan conference, Khalaf said "[t]he average and the median of the deployment cycles are coming down by about 11% year-over-year" and assured investors that "we monitor this." ¶131. Then on the Company's Q2 2024 earnings call on August 7, 2024, Khalaf told investors that "new cohorts are on track to generate $20 million in revenue" and that this "speaks volumes to how fast we can onboard new customers and get them ramped up." ¶133. Khalaf also stated that regulatory scrutiny was "going to create a lot of tailwinds for Marqeta," and Milotich assured that "the new business that we're onboarding is on track." ¶¶135, 137. Defendants later admitted that at the time this statement was made, Marqeta had experienced two full quarters of >300 day onboarding times, which were dramatically out of line with the metric that Khalaf touted at the beginning of the Class Period and never updated. ¶144.

After market hours on November 4, 2024, Marqeta issued a press release reporting its Q3 2024 financial results and substantially reducing its Q4 2024 guidance due to "several changes that became apparent over the last few months with regards to the heightened scrutiny of the banking environment and specific customer program changes." ¶105. During Marqeta's earnings call that same day, Khalaf admitted that contrary to his prior statements, regulatory scrutiny "increased [the] operational burden ... on both Marqeta's and the bank's onboarding and compliance teams." ¶106. Milotich admitted that "2023 onboarding and delivery was typically around 150 days roughly. And in Q1, Q2, that rose to over 300 days." ¶110. Milotich

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR                                                                3

also admitted that at the start of Q3 "the time still remained over 200 days," an increase of "30% to 40%" compared to 2023. ¶110. He also stated that the regulatory scrutiny had delayed customers' launch plans, which resulted in a backlog of programs to launch and that these delays contributed in part to Q3 2024 gross profit growth being "2 points lower than expected." ¶108.

Defendants stated they had "expected things to get back to where we had been in 2023" at the start of Q3 2024, revealing that the Company's earlier projections assumed that launch times would radically improve during the second half of the year, contrary to the trends during the first half of the year. ¶110. Defendants not only concealed this assumption, but they affirmatively misled investors by continually representing throughout the Class Period that Marqeta was seeing speeded up launch and delivery times when in fact the trends throughout Q1 and Q2 2024 were precisely the opposite. ¶147.

During the Q3 2024 earnings call, Defendants admitted that the change in the regulatory environment occurred "last year" (*i.e.*, 2023) and that Marqeta had made substantial investments in compliance during the "tail-end of '23 and going into '24." ¶¶106, 150. Milotich stated that while Marqeta "anticipated challenges as a result of the increased scrutiny," it "significantly underestimated the impact of constrained resources and evolving processes." ¶¶106, 108. He further acknowledged that Defendants were "very aware of the scrutiny" during early 2024, but claimed that "in the past 2 to 3 months, it has become clear we greatly underestimated the magnitude and time horizon for all parties to adapt to the new standards." ¶109.

Following the news, Marqeta's stock price dropped a staggering 42.5%, wiping out over $1.3 billion in market capitalization in a single day. ¶112.

## III.     THE COMPLAINT ALLEGES MATERIAL MISREPRESENTATIONS

"In the securities fraud context, statements and omissions are actionably false or misleading if they directly contradict what the defendant knew at that time, or create an impression of a state of affairs that differs in a material way from the one that actually exists." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023). A "statement that is literally true can be misleading and thus actionable." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Although the law does not create an affirmative duty to disclose all material information, once issuers "choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016).

---

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR                                                      4

In determining whether a statement is misleading, courts should not read each statement in isolation; "the proper inquiry requires an examination of defendants' representations, taken together and in context." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). This contextual analysis includes both defendants' contemporaneous statements and their previous statements on the same subject matter. *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670 (N.D. Cal. 2021) (statements misleading when "when considered together and in the context of [defendant's] prior statements").

Whether an omission is material "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021). "These assessments are peculiarly ones for the trier of fact." *Id.* The same applies to whether a statement is misleading. *See Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) ("Like materiality, adequacy of disclosure is normally a jury question."). "[O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Id.* While scienter is subject to a "strong inference" standard, the pleading of falsity is subject to a plausibility standard. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) ("we do not impute the strong inference standard of scienter to the element of falsity; we do not require a 'strong inference of fraud.' Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility") (emphasis in original).

## A.    Defendants' Statements About Marqeta's Speed Were Materially Misleading

Throughout the Class Period, Defendants repeatedly touted improvements in the speed with which Marqeta launched and delivered new programs while failing to disclose known material delays in the onboarding of new customers and the launch of new programs. These misleading statements consist of three sub-categories: (i) statements about performance metrics, (ii) statements about operational improvements suggesting improved launch times were replicable and sustainable, and (iii) statements tracking the progress Marqeta was making in onboarding and ramping new customers.

### 1.    Defendants' Statements About Marqeta's Metrics Were Materially Misleading

Defendants made three misleading statements about specific performance metrics: (i) a February 28, 2024 statement about a 100-day improvement in launch times (Statement 1); (ii) a May 7, 2024 statement about a "north of 10%" improvement in the total time to realize gross profit (Statement 7); and (iii) a May 20,

2024 statement about an 11% improvement in "deployment" times (Statement 9). Each statement gave a misleading impression that Marqeta's speed in launching new programs was improving, whereas in reality Marqeta's speed was worsening due to significant onboarding and launch delays. Each statement was misleading on its own, but viewed together they told a highly misleading story over time and presented an impression about Marqeta's performance that was radically different from reality.

Statement 1. On February 28, 2024, during Marqeta's Q4 2023/FY 2023 earnings call, Khalaf stated that Marqeta "made *great strides in accelerating the time to launch for new programs signed to convert these bookings into revenue and gross profits faster. On average, the time between close and launch in Q4 of this year was about 100 days better than the previous year*." ¶115. This statement was misleading because Khalaf failed to disclose that by the time of the statement, which was made 66% of the way into Q1 2024, this positive trend of improving launch times had reversed itself. As Defendants later admitted, Marqeta's average time for the onboarding and delivery of new programs was roughly 150 days in 2023, but that time more than doubled to >300 days during Q1 and Q2 2024. ¶110.

Defendants first argue that Statement 1 was not misleading because it referred only to *launch times*, whereas the subsequent admission related to an increase in *onboarding times*. MTD 8.[2] But an increase in onboarding times necessarily corresponded to launch delays, because onboarding represents a significant portion of the overall time to launch. *See* MTD 3 (program timeline chart showing onboarding took roughly six months out of the total nine to twelve months to launch a program). More importantly, at the end of the Class Period, Defendants admitted that *both* onboarding times *and* launch times more than doubled during Q1 and Q2 2024: "what we saw was an initial spike in the *time to launch* that was *more than 2x the average in 2023*. So 2023 *onboarding and delivery* was typically around 150 days roughly. And in Q1, Q2, that *rose to over 300 days*." ¶110. Thus, Defendants directly admitted that there was a doubling not only of onboarding times but also of launch times during Q1 and Q2 2024.

Defendants also argue that Statement 1 was not misleading because it represented only that launch

---

[2] Defendants' admissions referred to the time for "onboarding and delivery" (¶110), not just onboarding. Ostensibly, "onboarding and delivery" consists of additional steps beyond just onboarding, although Defendants' apparent position is that this combined period is still something short of the total time to launch. MTD 8. For purposes of brevity, Plaintiff will use the terms "onboarding times" and "onboarding delays" to refer to onboarding + delivery times and onboarding + delivery delays, respectively.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR                                              6

times improved in **Q4 2023**, which they say was an accurate statement of fact. MTD 8-9. But even if Khalaf's statement was literally true, it was misleading. Khalaf did not merely report the 100-day improvement in Q4 2023, he characterized that result as Marqeta having made "great strides" in improving its speed to market, even though he knew that serious onboarding delays in Q1 had already wiped out the operational improvement he was touting.[3] At best, Marqeta had taken one stride forward in accelerating launch times in Q4 2023, followed by a larger stride in the opposite direction during the first two months of Q1 2024. Thus, Khalaf's statement was a misleading half-truth. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024) ("[h]alf-truths" or "representations that state the truth only so far as it goes, while omitting critical qualifying information" are actionable under Rule 10b-5).

Defendants also contend that "disclosures of accurate historical data accompanied by general statements of optimism are not actionable" as a matter of law. MTD 9. "But even general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017). Khalaf's representation of "great strides in accelerating the time to launch for new programs," accompanied by a statistic that no longer represented current launch times, was materially misleading. *See Schueneman*, 840 F.3d at 706.[4]

Finally, Defendants contend that accurate statements of historical fact cannot be actionable because they "contain no implicit prediction that those events or conditions will continue in the future." MTD 9. But Plaintiff's theory of falsity is not based on Defendants' failure to predict the future. It is based on the omission of facts that had already occurred at the time of the statements, including a "spike in the time to launch" during the beginning of Q1 2024. ¶110. A reasonable investor would have seen Khalaf's statement as containing an implicit representation that he was not aware of material delays in Q1 2024 that had already eroded the "great

---

[3] Defendants argue there was a lag in Defendants becoming aware of the increased onboarding and launch times in Q1 and Q2 2024. MTD 27. However, the facts support a strong inference that Defendants were aware of the delays in real time, and by the time of the Q4 2023 earnings call, Defendants were aware that the improved launch times of Q4 2023 had already been overtaken by a reversal of this trend. *See* Sec. IV.A.1, *infra*.

[4] *See also In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008) (rejecting argument that historically accurate statements were inactionable because "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors").

strides in accelerating the time to launch" that he posited.

**Statement 7**. On May 7, 2024, during Marqeta's Q1 2024 earnings call, an analyst asked Khalaf for an update on the 100-day improvement he had reported during the previous call. Rather than acknowledging that Marqeta's performance in this area had dramatically declined due to onboarding delays, Khalaf stated that Marqeta had made "tremendous improvement north of 10%" in the time to realize a gross profit, pointing to "Marqeta-in-a-Box" and "significant operational improvements that have helped tremendously":

> Analyst: ***Last couple of updates, we talked about ramps coming down about 100 days***. We're here a third of the way through the year. ***How are these faring now? What are we making progress on tangibly that's allowing this to happen?*** … can you dig in on progress, maybe penetration, ***Marqeta-in-a-Box***, helping drive that down? …

> Khalaf: … ***You're absolutely right***. I mean, ***we've made a lot of progress and I'll attribute all these … to the Marqeta-in-a-Box solution***, in addition to engaging our solution team early on in the process and not when the MSA is signed.

> ***So in a more concrete way, throughout the whole thing, as in like from the moment we touch a customer all the way to realizing the gross profit, right, we've made tremendous improvement north of 10%, which is material if you actually look at how this compounds***. And I'd say that there's Marqeta-in-a-Box, that made a huge difference engaging the solutions team, working on a good blend between commercial and consumer, commercial moves much faster than consumer. And last but not least, focused on the, I'd say, a more expansion into the existing base that ***reduces a lot of the upfront cycles***. …

> So I would say overall, there's the tailwinds that are helping us because our customers land and we expand with them, but also ***we've made significant operational improvements that have helped tremendously***.

¶127 (emphasis modified).

Defendants argue that Khalaf's statement about the 10% improvement was accurate because the statement referred to the total time to realize a gross profit, not the time to onboard or launch a new program. MTD 16-17. Khalaf's statement was nonetheless misleading, because the analyst was asking how Marqeta's more recent performance compared to the metric that Khalaf previously reported about the 100-day improvement in Q4 2023, and that metric concerned launch times.[5] While Khalaf's statement about the 10% improvement in the time to realize gross profits may have been literally accurate, his response was still

---

[5] The analyst's remark about "ramps coming down about 100 days" (¶127) was clearly a reference to Khalaf's previous statement that launch times had improved by approximately 100 days in Q4 2023. ¶115. While the analyst used the term "ramp" instead of "launch," Khalaf did not correct the analyst's conflation of the two and instead said, "You're absolutely right" before shifting to a discussion of the gross profit metric. ¶127. In this context, it was misleading for Khalaf to tout improvement in the time to realize gross profits without acknowledging the material increase in onboarding and launch times.

misleading, because Khalaf was aware of a "spike" in onboarding and launch times (¶110), and Marqeta's performance in the specific metric Khalaf was asked about had significantly degraded.

Moreover, Khalaf attributed the improvement in performance to Marqeta-in-a-Box, which was a series of practices directed at the ***onboarding phase***, not the post-launch ramp phase.[6] Thus, Khalaf's statements gave the impression that Marqeta's speed was improving during the ***early phases*** of the program timeline, even though that is the precise area where Marqeta was experiencing a material decline in performance due to onboarding delays. *E.g.*, ¶127 (claiming operational improvements "reduce[] a lot of the ***upfront cycles***").

"[W]here a party goes beyond describing historical results and touts specific factors driving those results, it is obligated to disclose negative information related to those factors." *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *10 (N.D. Cal. June 2, 2020). Here, Khalaf's description of the specific factors reducing the time for Marqeta to realize gross profits—Marqeta-in-a-Box and other operational improvements targeted at the early phases of the program timeline—obligated him to disclose negative information relating to those factors, namely that Marqeta was experiencing substantial onboarding delays that were causing Marqeta's speed in these early phases to slow down dramatically. This is particularly true under the circumstances, where (i) Defendants previously touted a 100-day improvement in launch times, (ii) Marqeta was experiencing a doubling of onboarding and launch times during Q1 and Q2, and (iii) the analyst asked how Marqeta was faring against the previously reported 100-day improvement.

Defendants argue that Milotich's post-Class Period admissions "do not establish that Marqeta's average onboarding times had already doubled when Statement 7 was made, or Defendants' knowledge of that purported 'fact.'" MTD 16. This argument fails for multiple reasons. First, the most natural reading of Milotich's admission is that the average onboarding time was more than 300 days in ***both*** Q1 and Q2. *See* ¶110 ("in Q1, Q2, that rose to over 300 days"). Second, even if Defendants' supposition was correct and average onboarding times had not yet doubled by May 7, there is nothing magical about doubling as a specific threshold for Khalaf's statements to be misleading. For example, even if the average onboarding times had increased by only 20% or 30% at the time, as opposed to doubling, Khalaf's statements still would have been extremely misleading. But the real number was much higher than 20%-30% and closer to the range of a 64%-

---

[6] *Compare* ¶123 (identifying Marqeta-in-a-Box as "a ready-to-use construct that the banks would approve") *with* MTD 3 (chart showing "[p]rogram [a]pproval" and "[f]inal [c]onfiguration" as part of onboarding phase).

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR                                                                    9

100% increase, if not higher. By May 7, Q1 had already ended, and there were only 54 days left in Q2. Thus, even assuming that the onboarding delays were getting progressively worse and that the average onboarding time did not reach >300 days until the very end of Q2, the average onboarding time had to be at least 246 days by May 7 in order to reach >300 days by June 30.[7] That 246-day average would be **64% higher** than the 150-day average for 2023, and that is the very bottom of the possible range.

Plaintiffs need not plead the exact level of average onboarding delays as of May 7 in order to plead falsity. *Cf. In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1222 (W.D. Wash. 2009) (plaintiffs pled falsity even though it was "not possible to state the precise amount by which the Allowance was understated"); *Tricontinental Indus. Ltd. v. Anixter*, 215 F. Supp. 2d 942, 947 (N.D. Ill. 2002) ("Even under the PSLRA, a complaint need not … allege the precise amount of overstatement on a period by period basis, especially where most of the evidence necessary to prove these allegations is in the hands of the defendants."). Here, Plaintiffs have alleged sufficient facts to show that onboarding and launch times had rapidly increased during Q1 and Q2, such that the previously reported 100-day launch-time improvement had materially eroded and Khalaf's statements were materially misleading. And Plaintiffs have alleged sufficient facts to show that Defendants were aware of these facts. *See* Sec. IV, *infra*.

Finally, Defendants argue that Khalaf's statements about "a lot of progress" and "significant" or "tremendous improvements" are "generalized expressions that are not capable of objective verification and thus inactionable." MTD 17. But, once again, "even general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143; *accord Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F. 4th 747, 770 (9th Cir. 2023).

Here, Marqeta's speed in launching new programs was a specific area of operations that (1) Khalaf knew was performing poorly and (2) Defendants and investors considered to be highly material. The day after

---

[7] This extreme backloading assumption is a conservative estimate in Defendants' favor and almost certainly underestimates the real level of onboarding delays as of May 7. For example, if the average onboarding time was roughly 250 days during Q1, the average time would have to be roughly 350 days during Q2 for the two-quarter average to be 300 days (assuming the same number of programs onboarded in each quarter). For this reason and others, the facts support a strong inference that the average onboarding time crossed the >300 day threshold and peaked well before the end of Q2. *See infra* at 23-25.

Khalaf first reported the 100-day improvement, J.P. Morgan published a report hyping the achievement and stating it was "impressed by the momentum and efficiency of the reoriented [Go-To-Market] motion." ¶¶84-85. Analysts followed up on two occasions with questions about the metric. ¶¶123, 127. That Khalaf's statements were a response to a question about Marqeta's progress on this metric weighs against a finding that the statements were too generalized to be actionable. *See Glazer*, 63 F. 4th 747 at 771 (optimistic statements could not "be discounted as mere puffery" where "most of the challenged statements were made in response to specific questions asked by financial analysts"); *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) ("In context, this went well beyond puffery: it was a direct response to an analyst's inquiry about a possible decline in TITAN 5500 sales."), *rev'd on other grounds*, 551 U.S. 308 (2007).

In sum, Khalaf's statements misleadingly suggested that Marqeta-in-a-Box continued to improve Marqeta's speed to market, while failing to disclose known material onboarding delays. "Because Plaintiff plausibly alleges that investors were not aware of the material adverse facts that cut against Defendants' optimistic statements, the Court cannot conclude as a matter of law, at this stage of the litigation, that a reasonable investor would have understood the challenged statements as mere corporate optimism." *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 942 (N.D. Cal. 2022).

**Statement 9**. During a May 20, 2024 conference, Khalaf was asked whether investors could "expect larger deals in general" and whether "the trade-off could be slower implementations." ¶131. Khalaf responded, "yes, there are going to be bigger deal[s], but ... ***we monitor this. The average and the median of the deployment cycles are coming down by about 11% year-over-year***. So while we've broadened the pipe, ***we haven't compromised the deployment time***." *Id.* This statement was materially misleading, because Khalaf again failed to disclose the surge in onboarding and launch times during Q1 and Q2 2024.

Though Defendants did not define "deployment time" at the time the statement was made, Defendants now assert that "deployment" means the same thing as launch (MTD 17) and thus corresponds to the metric Defendants offered at the start of the Class Period. ¶115. But whether "deployment" meant launch or onboarding (or onboarding + delivery), Khalaf's statements were materially misleading. Defendants admitted that there was "initial spike in the ***time to launch***" (¶110), not just onboarding, in the beginning of 2024. By the time of Statement 9 (May 20), Q1 had ended, and there were only 41 days left in Q2. Thus, using the same Defendant-friendly assumptions discussed above, the average onboarding time had to be ***at least*** 259 days by

May 20 in order to reach >300 days by the end of Q2. That is **73% higher** than the 150-day average onboarding time for 2023, and the actual average onboarding time as of May 20 was almost certainly higher than that.

### 2. Defendants' Statements About The Reasons For Marqeta's Operational Improvements Were Materially False And Misleading

On March 4, 2024, at a Morgan Stanley conference, an analyst asked Khalaf what factors allowed Marqeta to achieve the 100-day improvement he previously reported during the Q4 2023 earnings call. ¶123 (Statement 5). Khalaf responded that "the majority of that is building what I would call a ready-to-use construct that the banks would approve from a regulatory perspective. So we call them Marqeta in the box." *Id.* He added, "from the early days of the sales cycle, we're guiding our customers towards the construct that the banks and the regulators will celebrate and that I think added a lot to speeding up the program launches." *Id.* These statements were misleading, because they suggested that the improvements in launch times were due to factors that were replicable and sustainable, but Khalaf failed to disclose facts that severely undermined that premise, namely that Marqeta was already experiencing significant onboarding and launch delays that were degrading Marqeta's speed in launching new programs.

Defendants argue that Khalaf's statement was merely an accurate historical description of what factors allowed Marqeta to achieve the 100-day improvement in Q4 2023, so the statement was not misleading "even if current circumstances might have changed." MTD 13. But Khalaf also stated that the improved launch times were "baked in" to Marqeta's guidance (¶123), so he was implicitly representing that the improved launch times had not changed. That representation was misleading in light of the known onboarding and launch delays that Marqeta was experiencing at the time. As noted above, "where a party goes beyond describing historical results and touts specific factors driving those results, it is obligated to disclose negative information related to those factors." *Apple*, 2020 WL 2857397, at *10.

Defendants argue that Plaintiff's allegations are based on the assumption "that onboarding times were already over 300 days at the start of Q1 2024" (MTD 13), but that is a mischaracterization of the Complaint. Plaintiffs do not allege that onboarding times were already over 300 days at the beginning of Q1 2024, but that average onboarding times increased to over 300 days during Q1 and Q2. And Statement 5 was not made at the beginning of Q1. It was made on March 4, which was 71% of way into Q1. As discussed above, onboarding times did not have to double for Khalaf's statements to be materially misleading.

Finally, Defendants argue that their statements were not misleading because "Marqeta fully met its net revenue guidance in Q1, Q2, and Q3 2024, and substantially met its full-year 2024 net revenue guidance." MTD 13. But even if Marqeta *almost* met its guidance for total net revenue in 2024,[8] ***it did not meet its target for revenue from new programs***. During the Class Period, Marqeta projected it would achieve $20 million of revenue from new programs in 2024 and $60 million from new programs in 2025. ¶90. But when Marqeta announced its full-year 2024 results, it acknowledged that it fell short of the $20 million target for new program revenue, although it did not disclose the magnitude of the miss. *See* Pl. RJN., Ex. A at 6. More importantly, Marqeta revised its guidance for revenue from new programs in 2025 from $60 million to $40 million and blamed this downward revision on, *inter alia*, "launch delays." *Id.* Thus, to the extent Marqeta met its guidance for total 2024 revenues across the Company, it did so by outperforming projections for preexisting programs, not by performing as projected with new programs, which constituted an independent category of performance that mattered to investors as an indicator of future growth potential. And Marqeta's dramatic reduction of guidance for 2025 revenue from new programs showed that the launch delays Defendants concealed throughout the Class Period had a lasting and material impact on performance going forward.[9]

### 3. Defendants' Statements Comparing The Progress Of Marqeta's Launch And Ramp Times To Schedule Were Materially False And Misleading

During the Q1 and Q2 earnings calls, Defendants made misleading statements about the progress Marqeta was making in onboarding new customers and launching new programs and how that progress tracked to Marqeta's guidance. ¶125 (Statement 6) ("we are a little bit ahead [of schedule] based on a couple of customers launching a little more quickly than we expected"); ¶133 (Statement 10) ("[W]e're on track with that. And again, speaks volumes to how fast we can onboard new customers and get them ramped up."); ¶137 (Statement 12) ("we feel good that the new business that we're onboarding is on track").

---

[8] Defendants admit that Marqeta did not fully meet its original full-year 2024 net revenue guidance. MTD 5-6. At the beginning of the Class Period, Defendants projected a contraction of net revenue of 20% to 24%. ¶5. Ultimately, Marqeta's net revenue contracted by 25% in 2024. MTD 6.

[9] *In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848 (N.D. Cal. 2017) (cited by MTD at 13) is inapposite. In *Nimble*, the company did not merely meet its projections; it "consistently exceeded" them. 252 F. Supp. 3d at 851. The court also held that plaintiffs lacked "particularized facts supporting [their] claims that the commercial segment was weak throughout the Class Period." *Id.* Here, Plaintiffs have pled particularized facts supporting their claims that Marqeta was performing poorly with respect to onboarding and launch times for new programs throughout the Class Period.

Defendants argue that these statements were only about whether Marqeta was on track to achieve its revenue target of $20 million from new programs, and not about whether Marqeta was on track with respect to particular benchmarks for onboarding or launch times. *See, e.g.*, MTD 18 ("Statement 10 makes no reference to onboarding times …. so the reason Plaintiff offers as to why the statement was misleading bears no connection to the substance of the statement itself"). To be sure, these "on track" and "ahead of schedule" statements were referring to the $20 million revenue target, but they also were making both explicit and implicit representations about Marqeta's improved speed of operations that supposedly was allowing the Company to achieve that progress. *See* ¶125 (claiming "ahead of schedule" status was based on, *inter alia*, "a couple of customers launching a little more quickly than we expected"); ¶133 (claiming "on track" status "speaks volumes to how fast we can onboard new customers and get them ramped up").

These statements were misleading based on the facts known to Defendants at the time they were made. Statement 6 was made on May 7, 2024. At that point, Marqeta had already experienced material launch delays, and average onboarding times had increased to **at least** 246 days. *Supra* at 10. Even if Statement 6 only referred to a "couple of customers" launching ahead of schedule, it was still misleading to make this statement without disclosing the dramatic increase in onboarding times and delayed launches of other programs. Statements 10 and 12 were made on August 7, 2024, which was 37 days after the close of Q2. By that time, Defendants knew that average onboarding times had increased to more than 300 days and launch times had more than doubled. It was grossly misleading, therefore, for Defendants to tout "how fast we can onboard new customers." ¶133.[10]

Defendants argue that each of Statements 6, 10 and 12 are protected by the PSLRA safe harbor for

---

[10] Defendants say this was "a generalized expression that is not capable of objective verification." MTD 18-19. But Marqeta's actual onboarding times are capable of objective verification. And even generalized statements may be actionable if Defendants are aware that the Company is performing poorly in a specific area of performance. The statements are also actionable because they were made in the context of Defendants' previous statistical claims that were themselves misleading. *See In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1097 (N.D. Cal. 2017) ("there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in misrepresentations of existing facts"). Defendants' opinion statements in this case are misleading under the standards of *Omnicare*. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185, 194-95 (2015) (opinions are actionable if, *inter alia*, they "contain embedded statements of facts" or the speaker omitted material facts "whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."); *see also Glazer*, 2023 WL 2532061, at *15 (opinions actionable where defendant's assurances do "not fairly align with the information in [defendant's] possession at the time").

forward-looking statements.[11] But, at best for Defendants, these were mixed statements containing both forward-looking elements and elements concerning past and present facts, the latter of which are not protected. *See Quality Sys.*, 865 F.3d at 1142. The statement that a "couple of customers" had launched more quickly than expected was a statement of historical fact, and it was misleading for its failure to disclose other historical facts that rendered the statement misleading. The statement that Marqeta's "on track" status "speaks volumes to how fast we can onboard new customers" was a statement of existing conditions. And Defendants' statements that Marqeta was "on track" or "ahead of schedule" were also statements of present conditions.

Defendants argue that these statements must be considered forward-looking in light of *Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2017). *See* MTD at 15, 19. But *Wochos* acknowledged that an "on track" statement will not be protected by the safe harbor if it "describes specific, concrete circumstances that have already occurred," such as a statement that "the company has actually hit certain intermediate benchmarks." 985 F.3d at 1192. Here, Defendants' "on track" statements incorporated Defendants' earlier statements about operational improvements and were intertwined with specific benchmarks that Defendants had previously reported. *See, e.g.*, ¶123 (acknowledging 100-day improvement in launch times was "baked in" to guidance). According to the Program Timeline that Defendants presented at Marqeta's November 9, 2023 Investor Day, the average time for onboarding was "~6 months." MTD 3. A reasonable investor would have construed Defendants' "on track" statements in light of these previously-reported benchmarks and would have read the statements as impliedly representing that Marqeta's current onboarding and launch times had not materially worsened in comparison to those benchmarks. By the time of Statements 10 and 12, however, the average onboarding time was more than 300 days (or ten months, compared to the six months in the Project Timeline), wiping out the 100-day improvement in launch times that was "baked in" to Marqeta's projections.

In any event, even if Court were to view some or all of the statements as forward-looking, they are not protected by the safe harbor because (1) they were not accompanied by meaningful cautionary language, and (2) Defendants had actual knowledge that the statements were misleading. First, cautionary language must be "meaningful" for the safe harbor to apply. 15 U.S.C. §78u-5(c)(1)(A)(i). "Mere boilerplate or generic warnings … are insufficient; the cautionary warning ought to be precise and relate directly to the forward-looking

---

[11] In total, Defendants claim that four statements are protected by the safe harbor: Statements 6, 10, 11, 12. *See* MTD 15, 19-21. Defendants concede the remaining statements are not protected by the safe harbor.

statements at issue." *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *13 (N.D. Cal. Aug. 10, 2005). For mixed statements, the caution "must accurately convey appropriate, meaningful information about not only the forward-looking statement but also the non-forward-looking statement." *Quality Sys.*, 865 F.3d at 1148. "If the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be sufficiently meaningful to qualify the statement for the safe harbor." *Id.* at 1146-47.

Here, Marqeta's risk warnings were not meaningful and were themselves misleading because they presented the risks as merely hypothetical when they had already materialized. *See* Sec. III.C, *infra*. For example, Marqeta's risk factors warned that "[i]f we fail … to onboard [new customers] quickly, then we may not be able to continue to grow our net revenue." ¶119. But Marqeta failed to disclose that it already had failed to onboard new customers quickly and that Defendants' statements about onboarding and launch times provided a distorted picture of the speed of Marqeta's operations. *See Glazer*, 63 F. 4th at 781 ("cautionary language is not meaningful if it discusses as a mere possibility a risk that has already materialized"); *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *8 (N.D. Cal. Jan. 6, 2022) (warnings not adequate because they were "not targeted or tailored to cautioning investors that [the challenged] statements were qualified, incomplete, untrue, or otherwise misleading").

Second, in the context of the safe harbor, actual knowledge of falsity does not mean that a defendant knows that a prediction will not come true. Rather, a forward-looking statement is made with actual knowledge of falsity if "the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010). Here, Defendants were aware of a massive increase in onboarding times and consequent launch delays, which tended to seriously undermine their statements that Marqeta's onboarding was "on track."

Finally, Defendants argue that Marqeta substantially met all of its 2024 guidance, which they claim supports the reasonability of their "on track" statements. MTD 16, 18. But Marqeta did ***not*** hit its $20 million target for revenue from new programs, which was the specific projection discussed in the challenged statements. *See* Pl. RJN, Ex. A at 6 (acknowledging Marqeta earned "***less than $20 million***" in revenue from new programs in 2024). And while Defendants did not break down Marqeta's results so that investors could understand the magnitude of this specific miss, they did revise their projections for revenue from new

programs in 2025 from $60 million to $40 million. *Id.* ("***Unfortunately, this [new guidance] is behind our $60 million goal we shared previously due to fewer new programs launching and ramping in 2024 as well as launch delays, which we believe is partly due to heightened regulatory environment from our bank partners, which we discussed in detail last quarter***.").

Ultimately, Defendants' statements are actionable because of the misleading impression they gave about Marqeta's then-existing onboarding and launch times, not because of subsequent events concerning Marqeta's performance after the end of the Class Period. But the *post hoc* narrative that Defendants are trying to spin is also inconsistent with those subsequent events, which show that Defendants' statements during the Class Period concealed material onboarding and launch delays that adversely impacted Marqeta's performance both during the Class Period and extending into 2025.

**B.    Defendants' Statements Concerning The Regulatory Environment And Marqeta's Regulatory Capabilities Were Materially False And Misleading**

Defendants made two misleading statements concerning the regulatory environment and Marqeta's regulatory compliance capabilities. First, during the Q4 2023 earnings call on February 28, 2024, an analyst asked for an update on the regulatory environment. ¶117. Khalaf stated that the regulatory environment "remains healthy" and that Defendants were "comfortable" because they "invested in compliance" and "invested in a lot of these services" because they "take it very seriously." *Id.* Milotich added that while others in the industry might face challenges due to the regulatory environment, Marqeta had a competitive advantage in this area, because "there's definitely a component of ***a flight to quality which we think we are the beneficiaries of, just given our scale and the level of investment***." *Id.*

These statements were misleading, because at that time Marqeta's regulatory compliance department was severely understaffed. According to FE1, at the time FE1 was hired in November 2023, there were only three other employees assigned to regulatory compliance. ¶59. FE1 stated that Jerry Baker, Marqeta's Head of Regulatory Compliance, made frequent requests for additional personnel due to the understaffing. ¶61. In December 2023, Defendants approved the hiring of 10 or 11 additional employees to the compliance department, but the vast majority of these employees were not hired until after FE1 left the Company in April 2024. ¶¶171, 175-76. Thus, despite Defendants' assurances about their level of commitment to and investment in regulatory compliance, Defendants were slow-rolling their investments in this area, after having engaged

in a restructuring and 15% headcount reduction in mid-2023. ¶¶58, 79, 100, 106, 109, 150.[12]

Second, during the Q2 2024 earnings call on August 7, 2024, an analyst asked about recent cybersecurity events and whether Marqeta and its partner banks "may be impacted by increased regulatory scrutiny." ¶135. While the question focused on scrutiny arising from cybersecurity issues, Khalaf's response was broader and repeated the same claims about Marqeta's compliance capabilities that Defendants had made earlier. Khalaf said, "I don't expect [the events] to create medium-term or long-term challenges[;] on the contrary, I would say they are going to create *a lot of tailwinds for Marqeta*, because of *the flight to quality syndrome. We have demonstrated our ability to scale and -- in a compliant manner*." *Id.*

Khalaf's statements—which reinforced Milotich's prior statements about "flight to quality" and the "level of investment"—were materially misleading, because Marqeta still had significant staffing problems in its regulatory compliance department. During March and April 2024, three members of the regulatory compliance team were fired or quit (including the Head of the Regulatory, a Senior Compliance Manager, and FE1), adding further disruption right at a time when Marqeta was already facing significant onboarding delays that Defendants attributed to heightened regulatory scrutiny. ¶¶101, 174. It was misleading to tout Marqeta's "ability to scale … in a compliant manner" under these circumstances.

Defendants argue that FE1's characterization of the understaffing of the regulatory compliance department consists of "conclusory and speculative opinions." ¶10. But Defendants ratified those opinions by approving the hiring of 10 or 11 new compliance employees, which would effectively triple the size of the department. ¶171. And while the approval of those hires did show a level of investment in compliance, the delayed timeline of those hires and loss of critical personnel, during a time when onboarding delays were increasing due to increased regulatory scrutiny, rendered Defendants' broad assurances about Marqeta's regulatory compliance capabilities misleading in context. ¶¶175-76.

Defendants also argue that the part of Statement 11 relating to the expectation of no medium- or long-term challenges is protected by the safe harbor. MTD 20. But the parts relating to Marqeta's "ability to scale … in a compliant matter" were statements of present fact that are not protected. To the extent the safe harbor

---

[12] Defendants claim their statements about Marqeta's compliance capabilities are too generalized to be actionable. MTD 9. But this was a specific area where Marqeta touted its capabilities as a competitive advantage while knowing the Company was understaffed and that it faced significant onboarding delays due to increased regulatory scrutiny. This context takes the statements out of the realm of puffery. *See supra* at 7.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR                                                                 18

applies to parts of Statement 11, Marqeta's cautionary language was not meaningful, because it failed to disclose that Marqeta was already experiencing material onboarding delays due to the then-existing regulatory environment, and Defendants had actual knowledge of those conditions.

### C. Defendants' Risk Factor Statements Were Materially False And Misleading

Defendants' risk warnings concerning onboarding times and regulatory issues were misleading because they described these risks as hypothetical while failing to disclose that they had already materialized in significant part. In the risk factor section of Marqeta's 2023 10-K, it warned that "[i]f we fail to attract new customers … and to ***onboard them quickly***, then we may not be able to continue to grow our net revenue." ¶119 (Statement 3). Marqeta also warned that "[w]e may not be able to respond quickly or effectively to … regulatory … developments, which may in turn impair our ability to offer our existing or planned features, products, and services and/or increase our cost of doing business." ¶121 (Statement 4). The risk factor also warned that "enforcement of existing regulations may have an adverse effect on our business, results of operations, and financial condition due to increased compliance costs and new restrictions affecting the offering of our platform, products and services." *Id.*

These risk factors were misleading because Marqeta failed to disclose that it was already experiencing material onboarding and launch delays due to an environment of heightened regulatory scrutiny. The Ninth Circuit has made clear that risk warnings can be misleading if they "warn[] that risks 'could' occur when, in fact, those risks had already materialized." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948-49 (9th Cir. 2023); *accord In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703-04 (9th Cir. 2021) ("Risk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors.").[13]

Defendants argue that Marqeta's disclosures put investors on notice of the relevant risks and that Plaintiffs therefore "'cannot be heard to complain that the risks were masked as mere contingencies.'" MTD 10 (quoting *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *12 (N.D. Cal. Oct. 31, 2014)). *Violin*, however, is inapposite. In that case, the company made "explicit disclosures that the [product at issue] ***may***

---

[13] *See also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("risks of product liability claims in the abstract" actionable because it gave "no indication that the risk may have already come to fruition"), *aff'd*, 563 U.S. 27 (2011); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1016 (9th Cir. 2018) (similar); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (similar).

*contain undetected defects*, and that [it] was a new product for which the Company had derived no meaningful revenue as of the IPO, and might never generate revenue." 2014 WL 5525946, at *12 (emphasis modified). Thus, the disclosures in *Violin* explicitly warned that the risks may have already come to pass (*e.g.*, that the products may have already contained undetected defects), but Defendants' warnings here gave no indication that Marqeta was already experiencing material onboarding delays.

Defendants argue that the term "quickly" is too vague to be actionable and that the warnings did not give an affirmative misimpression about how quickly Marqeta was onboarding its customers. MTD 10-11. But the risk factors must be read in the context of Defendants' other disclosures (including the Project Timeline and 100-day improvement statement), which did provide benchmarks for how quickly Marqeta was onboarding its customers and misleadingly suggested that Marqeta's speed in onboarding and launching new customers was improving when it was in fact materially degrading. *Supra* at 16.

Defendants also argue that Marqeta's revenue grew in Q3 and Q4 2023, so the risks had not yet materialized when the risk warnings were first made on February 28, 2024. MTD 11. But when a risk factor warns that an adverse event may cause a follow-on business harm, and only the antecedent event has occurred, that statement may still be materially misleading. *See, e.g.*, *Facebook*, 87 F.4th at 949 ("The mere fact that Facebook did not know whether its reputation was already harmed when filing the 10-K does not avoid the reality that it created an impression of a state of affairs that differed in a material way from the one that actually existed by describing the prospect of a breach as purely hypothetical when it had already occurred."). Here, Defendants misleadingly described the risk of Marqeta failing to onboard its new customers quickly as purely hypothetical, when it had already occurred.[14]

Defendants incorporated these risk factors by reference into their 10-Qs for Q1 2024 and Q2 2024 and stated that "[t]here have been no material changes to our risk factors since the 2023 Annual Report." ¶129 (Statement 8); ¶139 (Statement 13). These statements were even more misleading, because at the time they were made the materialization of these risks had deepened, as Marqeta's onboarding times had materially worsened. *See Alphabet*, 1 F.4th at 702 (statement that "[t]here have been no material changes to our risk

---

[14] Defendants say Statement 4 was not misleading because it did not suggest the absence of regulatory scrutiny or anything about onboarding times. MTD 12. But the statement described a hypothetical risk that regulatory developments might impair Marqeta's ability to deliver its services without acknowledging that new regulatory scrutiny had already caused material onboarding delays. That was misleading.

factors since our Annual Report" was misleading because statement was made after detection of cybersecurity issues and internal deliberations on those issues). By the time of the Q1 2024 10-Q (May 7, 2024), Defendants were aware that Marqeta's average onboarding times had increased to at least 246 days, representing a 64% increase over the 150-day average for 2023, resulting in substantial launch delays. *Supra* at 10. And by the time of the Q2 2024 10-Q (August 7, 2024), Defendants were aware that Marqeta's average onboarding times had increased to more than 300 days during Q1 and Q2, causing launch times to more than double. *Supra* at 15. These facts rendered Defendants' statements misleading.

## IV.    THE COMPLAINT ALLEGES SCIENTER

The PSLRA requires a complaint to state particularized facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). This mental state includes not only an "intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Quality Sys.*, 865 F.3d at 1144. "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014).

A strong inference exists if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Under this rule, "a tie goes to the Plaintiff." *In re Amgen, Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal Aug. 4, 2014). In determining scienter, a court must review "all the allegations holistically." *Tellabs*, 551 U.S. at 326. This determination may be based principally, or even entirely, on circumstantial evidence. *See, e.g.*, *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 781, 785-86 (9th Cir. 2008).

### A.    Defendants' Statements Support A Strong Inference Of Scienter

In this case, "the most powerful evidence of scienter is the content and context of [Defendants'] statements themselves." *Institutional Invs. Gp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009). Those statements include (1) Defendants' admissions made at the end of the Class Period, (2) false exculpatory statements that Defendants interwove with those admissions, (3) Defendants' statements about monitoring launch times, and (4) Defendants' pattern of evasive and deceptive responses to questions by analysts concerning the speed of Marqeta's launch operations.

1.    **Defendants' Admissions Support An Inference Of Scienter**

During the Q3 2024 earnings call on November 4, 2024, Defendants spoke extensively about the onboarding and launch delays that drove Marqeta to revise its guidance. ¶¶106-10. In these statements, Defendants admitted to certain facts and denied others. Perhaps most critically, Milotich stated:

> So if you look at **the first few months of 2024, the regulatory scrutiny had clearly ratcheted up with more than 10 consent orders affecting the banks in our space**. And so **what we saw was an initial spike in the time to launch that was more than 2x the average in 2023. So 2023 onboarding and delivery was typically around 150 days roughly. And in Q1, Q2, that rose to over 300 days. <u>This was expected</u>** given the sort of initial changes and sort of shock of all the changes that were happening. **But at the start of Q3, we expected things to get back to where we had been in 2023. But the new programs on average took about 30% to 40% longer to launch. And so the time still remained over 200 days when it had previously been about 150 days**.

¶110.

Several things are clear from this statement: (1) Defendants were aware that regulatory scrutiny had "ratcheted up" during the first few months of 2024; (2) Defendants *expected* an increase in onboarding and launch times due to the increased regulatory scrutiny, but at the start of Q3, they expected onboarding and launch times to return to their 2023 levels; (3) Defendants "saw" an "initial spike" in launch times; (4) *both* onboarding times *and* launch times more than doubled during Q1 and Q2, with the average time for onboarding and delivery increasing to more than 300 days compared to an average of 150 days in 2023; and (5) in Q3, average onboarding and delivery times did meaningfully improve from >300 days to >200 days, but those times were still 30% to 40% higher than the 2023 average of 150 days.[15]

Defendants point to Milotich's statement during the same call that "in the past 2 to 3 months, it has become clear we greatly underestimated the magnitude and time horizon for all parties to adapt to the new standards." ¶109. Defendants argue that this statement shows that Defendants did not become aware of the

---

[15] Defendants argue that Milotich's statement is not an admission, because it is not an "I knew it all along" statement. MTD 27. But the statement was an "I knew it all along" statement for certain facts, including Defendants' knowledge of the increased regulatory scrutiny during the first few months of 2024, Defendants' expectation that onboarding and launch times would spike as a result, and that Defendants "saw" an "initial spike" in launch times. The statement also admits statistical facts about onboarding and launch times, even though it does not necessarily admit the timing of Defendants' knowledge of those facts. The reasonable inferences arising from what Milotich did admit and did not admit must be considered in the context of Defendants' other statements. *Cf. In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *6 n.4 & *9 (N.D. Cal. Nov. 4, 2020) (discussing inferences arising from statement that defendant saw "particularly bad" signs in November 2019 and noting that "each case must be considered on its own facts" with respect to admissions).

magnitude of the onboarding delays until August or September. MTD 27.

There are multiple problems with Defendants' argument. First, Milotich admitted that Defendants *expected* an increase in onboarding delays *early in the year* due to regulatory scrutiny and spent significant resources to get ahead of the issue. ¶109 ("We have been very aware of the scrutiny and working through it with our bank partners, ***investing significantly more in our compliance efforts <u>since the start of this year</u> to raise our program management standards ahead of the rising tide***."). But the increased regulatory scrutiny began in mid-2023, not Q1 2024. ¶¶49-50. And Defendants approved the hiring of an additional 10-11 regulatory compliance employees in December 2023. ¶171. This suggests that Defendants recognized that they needed to get "ahead of the rising tide" at least two months before the Class Period started.

Second, even if Defendants did not know how long the onboarding and launch delays would ultimately become until later in the Class Period, it was still misleading for Defendants to tout Marqeta's improved speed in launching new programs at a time when Defendants "expected" onboarding and launch delays and Marqeta was in fact experiencing growing onboarding and launch times (which Defendants claimed they were monitoring). As discussed above, onboarding and launch times did not have to double in order for Defendants' positive statements about launch speeds to be misleading, and Defendants were, at a minimum, deliberately reckless in misleading investors with their statements. Even if Defendants expected onboarding and launch times to improve during the second half of the year, that did not give them license to make misleading statements about present-day launch times and to fail to disclose headwinds that Defendants knew Marqeta was facing in the current regulatory environment.

Third, Defendants' arguments about a lag in Defendants becoming aware of these delays are misleading. In one specific sense, there is a lag: until a quarter ends, one does not know the full range of which programs launched or onboarded during the quarter, and thus one does not know the full range of programs to be included in the average. As Defendants explained, their launch-time metric only includes programs that launch within the quarter, so a delayed program will not be included in the average if it has not yet launched. *See* MTD 8 ("Given that it only addresses programs that had already launched by Q4 2023, Statement 1 could not have been addressing programs that had yet to launch in 2024."). But as soon as a quarter ends, the full population of programs to be included in the average is fully determined. Thus, for example, by May 7, 2024, when Marqeta disclosed its Q1 2024 results, the average onboarding and launch times for Q1 were fully

known, and Defendants also had 37 days of monitoring within Q2 to observe the progress of programs that were yet-to-be-onboarded and yet-to-be-launched. By that date at the latest, Defendants were aware of extremely long onboarding and launch delays, even if the average times had not yet fully doubled.

Fourth, onboarding times significantly decreased during Q3 2024, from an average of more than 300 days during Q1 and Q2 (a 100% increase over the 2023 average) to an average of more than 200 days during Q3 (a 30% to 40% increase over the 2023 average). This suggests that the peak of increasing onboarding and launch times likely occurred before the end of Q2, and by the beginning of Q3, onboarding and launch times were already on the way down. This is consistent with Defendants' own admissions. ¶110 ("at the start of Q3, we expected things to get back to where we had been in 2023"). Thus, when Milotich stated that Defendants did not realize the full magnitude of the problem until two or three months before the November 7 call, the most plausible interpretation of that statement is not that it took that long to know the onboarding and launch times within Q1 and Q2, but it took that long to know that launch times were not improving rapidly enough within Q3 to rescue Marqeta's projection of revenue from new programs.[16]

**2.      Defendants' False Exculpatory Statements Support An Inference Of Scienter**

While explaining the reasons for the revised guidance during the Q3 2024 call and the failure to disclose the onboarding and launch delays earlier, Defendants offered two explanations to conceal and minimize their misconduct. ¶¶149-53. These misleading explanations provide evidence of Defendants' consciousness of their guilt. *See Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *16 (C.D. Cal. Jan. 17, 2020), *order clarified*, 472 F. Supp. 3d 747 (C.D. Cal. 2020) (agreeing that "Defendants' false exculpatory statements are additional indicia of scienter").

First, Defendants emphasized that they had started to invest heavily in regulatory compliance early on and thus could not be faulted for ignoring the environment of heightened regulatory scrutiny. *E.g.*, ¶109 (Milotich stated Marqeta began "investing significantly more in our compliance efforts since the start of this year"); ¶150 (Khalaf stated "[W]e've started the investment in compliance early on. Actually, it is the largest investment we've made tail-end of '23 and going into '24."). These statements omitted that Marqeta approved

---

[16] Defendants argue that fifteen programs expected to launch within Q3 were delayed until Q4. MTD 27. But programs that launched in Q3 or Q4 would have no impact on launch times during Q1 and Q2. The average launch times for Q1 and Q2 2024 (which more than doubled compared to 2023) were fully set by the end of Q2. Programs that launched in Q3 and Q4 would not be included in those earlier averages.

a significant increase in regulatory personnel in December 2023, but deliberately delayed filling most of those positions until the summer of 2024, and that Marqeta's compliance team lost three core members (who comprised a majority of the team at the time) in March and April of 2024. ¶151. Defendants' misleadingly incomplete characterization of their compliance investments, even while purporting to come clean about the reasons for their failures, supports an inference of scienter.

Second, Defendants claimed they did not realize the magnitude of the problem until two or three months before the Q3 2024 call (*i.e.*, in August or September). ¶¶109, 152. But the peak delays occurred well before August, and onboarding times were already coming down by the end of June. The real problem is that Marqeta's projections were based on an undisclosed assumption that onboarding and launch times would be significantly elevated during the first half of the year and would come down dramatically during the second half of the year. ¶¶144-48, 153. Defendants were entitled to make those assumptions, but by failing to disclose them and simply touting Marqeta's improved launch times, Defendants materially misled investors. And Defendants' post-Class Period narrative—that Defendants were unaware of the magnitude of the problem even though (1) they were monitoring launch times and (2) a doubling in launch times had occurred by the end of June at the latest—was a misleading attempt to minimize their culpability.

### 3.    Defendants' Monitoring Statements Support An Inference Of Scienter

Defendants told investors that they were monitoring launch times. This included Khalaf's explicit representation on May 20, 2024 that "we monitor this [*i.e.*, deployment times, which Defendants now admit is the same as launch times, MTD 17]" and Defendants' repeated statements that Marqeta was "ahead of schedule" or "on track" with respect to onboarding and launching new businesses. ¶¶125, 133, 137. For example, on May 7, 2024, Milotich stated, "we're a little bit ahead of schedule …. based on a couple of customers launching a little more quickly than we expected, and one or two also ramping a little faster than we had projected." ¶125. This statement suggests that Defendants were not only measuring launch in times in the aggregate as part of calculating a retrospective quarterly average, but that Defendants had projected schedules for each individual new program and were monitoring the progress of those programs in real time.

These statements support a strong inference that Defendants were aware of onboarding and launch times in real time and that Defendants knew that both onboarding and launch times had materially increased by the beginning of the Class Period (February 28, 2024) and that those times had either doubled or nearly

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR

doubled by the time of the Q1 2024 earnings call (May 7, 2024). *See supra* at 10; *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 939-40 (9th Cir. 2023) (strong inference of scienter where CEO "publicly stated that he carefully monitored NVIDIA's sales data" and "showed himself to be familiar with specific revenue numbers attributable to particular categories of sales"); *Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*, 2025 WL 39936, at *5 (N.D. Cal. Jan. 6, 2025) (strong inference of scienter where defendants' comments suggested they "were monitoring capital expenditure numbers").[17]

### 4.     Defendants' Evasive And Deceptive Responses To Analysts' Questions About Marqeta's Speed Of Operations Support An Inference Of Scienter

At the start of the Class Period, Khalaf reported a 100-day improvement in launch times during Q4 2023. During the Q1 2024 earnings call on May 7, 2024, an analyst asked how Marqeta was "faring" with respect to this specific metric. ¶127. Rather than answer directly, Khalaf switched the discussion to a different metric—the time to realize a gross profit—while continuing to tout Marqeta-in-a-Box as a way the Company was continuing to improve its speed during the early portions of the project timeline. *Supra* at 8-9. This evasive response supports an inference that Khalaf already knew that onboarding and launch times had materially worsened during Q1 and was deliberately avoiding a direct comparison of Q1 2024 to Q4 2023 with respect to the specific metric the analyst was asking about. *See In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 n.28 (S.D.N.Y. 2011) ("nonresponsive" answer to analyst's question supported inference that defendant "may have been avoiding the question and thus by implication avoiding the disclosure of the allegedly material omitted facts"); *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 229 (E.D. Pa. 2021) ("purposefully evasive" responses to analyst questions supported inference of scienter).

One quarter later, during the Q2 2024 earnings call on August 7, 2024, an analyst asked about how some of the "key assumptions" underlying Defendants' projections were "trending." ¶137. Milotich responded by saying that "we feel good that the new business that we're onboarding is on track" and "big picture-wise,

---

[17] *See also In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *19-20 (W.D. Wash. Apr. 19, 2019) ("scienter can be inferred where a corporate officer states that he or she … was monitoring the subject of the misleading statements"); *S. Ferry*, 542 F.3d at 785 ("specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements" support an inference of scienter); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (defendant's statements "weigh strongly in favor" of inference that he "paid special attention" to subject of fraud "or, at the least, was reckless in not doing so while continuing to publicly tout improvements").

we're largely on track and things are as planned." *Id.* At that point in time, Q2 had ended 37 days earlier, but Milotich made no mention of the fact that both onboarding times and launch times had more than doubled during Q1 and Q2. And Khalaf had admitted five months earlier that the improved launch times previously reported were one of the assumptions "baked in" to Marqeta's guidance. ¶123. Under these circumstances, Milotich's failure to disclose the material increase in Marqeta's onboarding and launch times was not only misleading; it supports an inference that Defendants were deliberately concealing these facts from investors. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."); *Miss. Pub. Emp. Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 85 (1st Cir. 2008) ("Knowingly omitting material information is probative ... of scienter.").

## B.    The Core Operations Doctrine Supports A Strong Inference Of Scienter

Under the core operations doctrine, allegations about a defendant's role in a company may support an inference of scienter in three ways. *S. Ferry*, 542 F.3d at 785. First, such allegations may be combined with other allegations and **together** give rise to the required inference. *Id.* "Second, such allegations may **independently** satisfy the PSLRA where they are particular and suggest that defendants had **actual access** to the disputed information." *Id.* at 786. Third, even without particularized allegations of actual access, core operations allegations may satisfy the PSLRA if "the nature of the relevant fact is of such prominence that it would be **absurd to suggest that management was without knowledge of the matter**." *Id.*

In this case, Plaintiff has pled scienter under all three tests. First, the complaint pleads facts supporting a strong inference that quick onboarding and launch times were part of Marqeta's core operations. Marqeta's risk factors warned that "[i]f we fail to attract new customers . . . and to onboard them quickly, then we may not be able to continue to grow our net revenue." ¶154. Defendants repeatedly touted improvements in Marqeta's launch or deployment times. *E.g.*, ¶¶76-77, 131. Analysts cited the 100-day improvement in launch times as a key indicator of Marqeta's "momentum and efficiency" and asked Defendants for updates on the metric on two occasions. ¶¶85-85, 123, 127. These facts show that Defendants and investors considered onboarding and launch times to be critical to Marqeta's performance. These core operations allegations do not stand alone. They must be considered in the context of Defendants' admissions, monitoring statements, false exculpatory statements, and purposefully evasive responses to questions about Marqeta's speed of operations,

as well as the additional details provided by former employees. *See* Sec. IV.A, *supra*; Sec. IV.C, *infra*. Viewed together holistically, these allegations support a strong inference of scienter.

Second, the Complaint pleads facts showing that Khalaf and Milotich had "actual access" to the disputed information. Both of these individuals answered detailed questions about Marqeta's onboarding and launch operations on multiple occasions, and they held themselves out as well-informed in these areas. *E.g.*, ¶¶147, 152, 154-63; *see S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1258 (W.D. Wash. 2009) (scienter pled where CEO's "statements themselves suggest that he had actual knowledge of" company's hedging operations); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1192-93 (C.D. Cal. 2008) (scienter pled where CEO represented he was knowledgeable about company's underwriting standards). These allegations are sufficient to "independently" give rise to a strong inference of scienter, even without the additional bases for scienter set forth in Sections IV.A and IV.C. *See S. Ferry*, 542 F.3d at 786.

Third, the nature of the omitted data is such that it would be absurd to suggest that Defendants were unaware of it. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1145 (N.D. Cal. 2017) ("DAU and MAU were so integral to Twitter's success that it would be 'absurd' to argue that [CEO and CFO] were unaware of trends in those two metrics"). This conclusion is underscored by the sheer magnitude of the numbers: average onboarding times more than doubled during Q1 and Q2 2024, increasing to more than 300 days, and launch times also more than doubled during this period. These results caused Marqeta's stock price to drop by 42.5% in one day, wiping out more than $1.3 billion in market capitalization. ¶112. *See In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *18-19 (N.D. Cal. Aug. 17, 2022) (inferring scienter where "undisclosed sales practice and its effects … were significant based on the $65 million channel inventory reduction announced" at end of class period); *In re eHealth Inc. Sec. Litig.*, 2021 WL 5855864, at *11 (N.D. Cal. Aug. 12, 2021) (scienter supported by "magnitude of the operational expenses at issue").

**C.     The Accounts Of Former Employees Support An Inference Of Scienter**

The accounts of former employees bolster the already-strong inference of scienter. According to FE1, a Compliance Manager who worked for Marqeta between November 2023 and April 2024,[18] Marqeta's regulatory compliance team was severely understaffed during the entirety of FE1's tenure. ¶¶35, 59-66, 169-

---

[18] The title, responsibilities and dates of employment of all of the FEs are set forth at ¶¶35-38.

75. FE1 stated that (1) Jerry Baker, Marqeta's Head of Regulatory Compliance, made frequent requests for additional personnel to Chief Compliance Officer Alan Carlisle and Chief Legal Officer Crystal Sumner and (2) FE1 made direct requests for additional resources to Carlisle and Sumner on a weekly basis. ¶¶61, 166, 169. Both Carlisle and Sumner acknowledged to FE1 that compliance was understaffed, and in December 2023, FE1 and others were told that Marqeta would be adding 10 or 11 new compliance positions by the end of 2024. ¶¶61-62, 171. However, the vast majority of those positions were not filled until after FE1 departed in April. ¶175. And several public statements made by Defendants (and the account of FE3) support the conclusion that Defendants deliberately delayed the filling of these positions until the summer of 2024.[19]

Defendants argue that (1) FE1's opinions about whether Marqeta was understaffed is irrelevant in showing Defendants' mental states, and (2) the Complaint does not plead "any facts to show how this purported understaffing had any effect on Marqeta's onboarding efforts." MTD 23.[20] However, Marqeta's Chief Compliance Officer and its Chief Legal Officer directly acknowledged to FE1 that the compliance department was understaffed. ¶61. And Defendants' approval of 10-11 additional employees—which represented a significant expansion of the size of the compliance department—provides strong circumstantial evidence that Defendants agreed that Marqeta was understaffed. ¶¶59, 171. Moreover, Defendants' post-Class Period statements show that Defendants believed that there was a relationship between the level of compliance

---

[19] During Marqeta's Q3 2023 earnings call on November 7, 2023, Milotich stated that Marqeta had reduced its workforce by approximately 20% in May 2023, but that Marqeta "intended to hire in a few priority areas" which would result in "a net reduction of just over 15%." ¶¶58, 167. However, Milotich said "some of these hires are being delayed through the middle of next year" as the Company "work[ed] to set up an office in a lower cost jurisdiction." ¶167. On June 5, 2024, Marqeta issued a press release announcing that it had opened an office in Poland. ¶168. On August 7, 2024, Khalaf stated that Marqeta was enhancing "compliance with the launch of our new office in Warsaw, Poland, [and] we're now equipped to support more program management capabilities for our European customers." *Id.* On the Q3 2024 earnings call, Khalaf discussed Marqeta's "investment in compliance," noting Marqeta "decided to onboard a lot … more tenants outside the United States as well in Poland when it comes to risk management and compliance operations." *Id.* This is consistent the account of FE3, who stated that Marqeta hired quite a few people in Poland for the compliance team in the summer of 2024. ¶176.

[20] Defendants argue that the lack of direct interaction between the FEs and Defendants means that the FEs do not have reliable insight into Defendants' mental states. But even if a confidential witness is unable to provide reliable evidence of a defendant's state of mind, that witness still may be used to establish facts that are relevant in the overall scienter analysis. *See Shenwick*, 282 F. Supp. 3d at 1146 ("Even if the CWs statements are unreliable as to the individual Defendants' state of mind, they reliably bolster the conclusion that DAU was Twitter's primary user engagement metric."); *id.* at 1149 (CW allegations did not "separately give rise to any inference of scienter," but did "support[] Plaintiff's core operations theory").

---

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR                                                                29

staffing and the speed with which Marqeta could be expected to onboard new customers. Milotich stated during the Q3 2024 earnings call that "[w]e have been very aware of the scrutiny and working through it with our bank partners, *investing significantly more in our compliance efforts since the start of this year to raise our program management standards ahead of the rising tide*." ¶109. In reality, Defendants did not begin to invest those resources "ahead of the rising tide" in December 2023 (when they approved the new hires), and instead they waited until the summer of 2024 before "investing significantly more in … compliance efforts." ¶¶167-68, 176.

Furthermore, FE1 stated that Baker, the Head of Regulatory Compliance, was fired in March 2024, that Senior Compliance Manager Graydon Latson resigned less than a week later because he felt the compliance department was under-resourced and over-worked, and that FE1 resigned two weeks later. ¶174. This loss of multiple key members of the compliance team—at a time when Defendants were already expecting onboarding and launch delays due to heightened regulatory scrutiny and when Defendants knew they needed to "invest[] significantly more in … compliance" to get "ahead of the rising tide" and "saw" an "initial spike in launch times"—supports an inference that Defendants knew that Marqeta's efforts to improve onboarding and launch times would be impeded by staffing issues.

Former employees identified additional factors that contributed to onboarding delays. According to FE2, there was a massive push to get the material weakness in Marqeta's internal controls off the books by Q2 2024, a lot of resources got shifted to that focus, and this shift in resources contributed to onboarding delays. ¶70. Similarly, according to FE3, an audit performed by a third-party vendor found a significant security flaw at Marqeta in January 2024 that consumed the engineering team's time and likely resulted in some onboarding delays. ¶71.

According to FE4, a Senior Operations Analyst whose team was involved in the onboarding process, onboarding times started to become longer and longer in December 2023 and January 2024. ¶¶38, 72. This timing is important, because it undercuts Defendants' suggestion that the delays only became significant during the latter portions of the Class Period. Instead, the facts reported by FE4 show that onboarding times started to materially increase during the tail-end of Q4 2023, three months before the Class Period even started, before reaching a crescendo of more than 300 days during Q1 and Q2 2024, as Defendants later admitted.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR                                                                    30

**D.    Defendants' Motive Arguments Fail, And A Balancing Of The Competing Inferences Yields A Strong Inference Of Scienter**

Defendants argue that the Complaint fails to plead a motive and the absence of insider trading undermines any inference of scienter. MTD 28-29. This argument fails for several reasons. First, a securities fraud plaintiff is not required to plead a motive. *See Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal"); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (similar); *Alphabet*, 1 F.4th at 707 (insider stock sales are "not a sine qua non" and are "not needed where, as here, other allegations in the complaint raise a strong inference of scienter"); *Apple*, 2020 WL 6482014, at *13 ("plaintiff's lack of allegations regarding motive do not defeat an inference of scienter under a holistic analysis").

Second, drawing an inference against a plaintiff due to an absence of suspicious stock sales is inappropriate when an allegation of improper financial motive is not the basis for plaintiff's pleading of scienter. *See Shenwick*, 282 F. Supp. 3d at 1149 ("absence of allegations of relevant stock sales" did not undermine inference of scienter where complaint did not allege financial motive or reference stock sales); *Splunk*, 592 F. Supp. 3d at 949 (lack of sales did not impact scienter analysis where "Plaintiff's scienter theory is not predicated on the theory that individual Defendants had an incentive to mislead investors").

Third, Defendants' argument is based on documents that are (1) not referenced or incorporated in the Complaint and (2) for which judicial notice is inappropriate because Defendants rely on these sources for the truth of their contents. *See, e.g.*, MTD at 29 n.12 (citing Form 4s to establish certain stock transactions by Defendants); Pl. Opp. to Def. RJN at 3-4. The Complaint does not mention any insider stock sales or acquisitions, let alone Form 4s, and Defendants should not be permitted to rely on these documents to create their own narrative about facts that are completely outside of the Complaint. *See* Pl. Opp. to Def. RJN at 3-4.

Fourth, even if the Court were to consider these extrinsic documents and factual matters, they do not support the inferences that Defendants claim. Defendants argue that they increased their Marqeta stock holdings during the Class Period, but they fail to mention that none of these acquisitions were made through open-market purchase transactions. Instead, all of the increases in their holdings were the result of the conversion of previously-granted equity awards of restricted stock units into common stock.[21] Thus,

---

[21] *See* Def. RJN, Exs. 16-17, Pl. RJN, Exs. B-E. Plaintiff does not seek judicial notice of these documents for the truth of their contents, but only for the limited and conditional purpose of responding to Defendants' assertions about Defendants' stock transactions, if the Court considers these collateral issues.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR                                                                 31

Defendants did not spend any money to acquire this stock, and these acquisitions do not undermine the inference of scienter. *See, e.g.*, *Glazing Emps. and Glaziers Union Loc. #27 Pension and Ret. Fund v. iRhythm Techs., Inc.*, 2025 WL 1569421, at *13 n.9 (N.D. Cal. June 3, 2025) (increase in holdings by defendants did not undermine inference of scienter because "nearly 98% of these shares were acquired through stock option grants as part of compensation packages—not through open-market purchases").

Moreover, according to Defendants' Form 4s, Khalaf and Milotich did sell Marqeta stock during the Class Period: Khalaf disposed of 303,187 shares for more than $1.6 million in gross proceeds, and Milotich disposed of 149,052 shares for more than $830,000 in gross proceeds. *See* Def. RJN, Exs. 16-17, Pl. RJN, Exs. B-E. While these were Code F transactions that ostensibly were for the purpose of covering tax liability in connection with equity awards, Defendants nonetheless benefited from these sales being executed at artificially inflated prices. Even if the sales were not the type of "suspicious" or "unusual" transactions that independently give rise to a strong inference of scienter, they certainly do not negate an inference of scienter and, if anything, provided Defendants with some incentive to delay the disclosure of bad news for as long as they could.

Fifth, Defendants argue that Marqeta's repurchase of its own stock during the Class Period undermines an inference of scienter. MTD 29. However, as this Court has recognized, this theory is flawed because "[i]ndividual defendants may often act against the interest of the company in perpetuating fraud." *Apple*, 2020 WL 6482014, at *13 (rejecting argument that repurchases undermined scienter because "it is not [the CEO] himself who spent a billion dollars buying back shares at inflated prices, but the Company"); *see Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 146 (S.D.N.Y. 2021) (argument that repurchases negated scienter was "inapplicable" where scienter allegations were not based on motive).

Defendants argue that without a motive, Plaintiff's theory of fraud "'does not make a whole lot of sense.'" MTD 30 (quoting *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020)). But *Nguyen* does not "require a specific theory of defendants' motives at the pleading stage." *Apple*, 2020 WL 6482014, at *13. And the Complaint posits a compelling explanation for Defendants' conduct: Defendants hoped that notwithstanding the extremely long onboarding and launch delays during Q1 and Q2, launch times would dramatically improve in Q3 and Q4, in which case Defendants might have been able to avoid disclosing the delays that occurred during the first half. ¶¶18, 75-76, 146, 148, 153. In fact, Defendants essentially conceded

that this is what occurred. ¶110 ("at the start of Q3, we expected things to get back to where we had been in 2023"). As the Seventh Circuit has explained, "[t]he fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008); *see also Apple*, 2020 WL 6482014, at *13 n.12 ("defendants here may have hoped that the situation in China would improve, a hope that does not justify misleading investors").

Defendants claim that Plaintiff's theory of scienter is undermined by their revision of Marqeta's guidance in November 2024, even though Marqeta ultimately came close to meeting its full-year guidance for 2024. MTD 30. But as discussed above, Marqeta did not meet its guidance for ***revenue from new customers***, and it substantially downgraded its guidance for revenue from new customers for 2025.

In any event, the ultimate question is not whether Marqeta met its guidance, or what Defendants knew in November 2024 (when they announced the Q3 2024 results and revised the full-year 2024 guidance) or February 2025 (when they announced the full-year 2024 results). The question is what Defendants knew in February 2024 through August 2024, when they made misleading statements about Marqeta's then-existing onboarding and launch times. Viewed holistically, the Complaint's allegations raise a strong inference that Defendants knew that Marqeta was experiencing very long onboarding and launch delays and that Defendants were therefore deliberately reckless in concealing these delays while touting improvements in Marqeta's launch times and speed of operations.

## V.   CONCLUSION

Defendants' motion should be denied. If the Court grants any portion of the motion, Plaintiff requests leave to amend. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).[22]

---

[22] Plaintiff has adequately alleged primary violations under § 10(b). Plaintiff has thus rebutted Defendants' only challenge to control person liability under § 20(a). Control person liability is alleged.

Dated: January 20, 2025

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Jason L. Krajcer*
Robert V. Prongay
Jason L. Krajcer
Christopher R. Fallon
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: jkrajcer@glancylaw.com
Email: cfallon@glancylaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On June 20, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 20, 2025, at Los Angeles, California.

*s/ Jason L. Krajcer*
Jason L. Krajcer

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Master File No. 4:24-cv-08874-YGR