JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
ALEXANDER K. TALARIDES (SBN 268068)
atalarides@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    (415) 773-5700
Facsimile:    (415) 773-5759

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE MARQETA, INC. SECURITIES LITIGATION | Case No. 4:24-cv-08874-YGR<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**<br><br>Date:    September 30, 2025<br>Time:    2:00 p.m.<br>Judge:   Honorable Yvonne Gonzalez Rogers<br>Ctrm:    1, 4th Floor |

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................................1

II.   ARGUMENT ..............................................................................................................1

    A.    Plaintiff Does Not Allege a False or Misleading Statement ...........................1

        1.    Mr. Milotech's November 2024 Comments Alone Do Not Establish Any Alleged Statement Was False When Made .................................1

    B.    Plaintiff Does Not Adequately Allege the Challenged Statements Were Actionably False or Misleading When Made ...................................................4

    C.    Plaintiff Fails To Plead Facts Creating A "Strong Inference" Of Scienter..................14

        1.    Defendants' Statements Do Not Support An Inference of Scienter ...............14

        2.    The Core Operations Theory Does Not Support An Inference of Scienter ......................................................................................16

        3.    The FEs Do Not Create A Strong Inference of Scienter..................................17

        4.    A Lack of Motive Allegations Cuts Against An Inference of Scienter ...........18

III.  CONCLUSION...........................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ...................................................................................................7

*In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...............................................................................5

*In re Apple Inc. Sec. Litig.*,
    2020 WL 2857397 (N.D. Cal. June 2, 2020) ......................................................................11

*Applestein v. Medivation, Inc.*,
    861 F. Supp. 2d 1030 (N.D. Cal. 2012) ..............................................................................20

*Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*,
    2012 WL 685344 (N.D. Cal. Mar. 2, 2012)........................................................................19

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..............................................................................20

*In re Eargo, Inc. Sec. Litig.*,
    2023 WL 5663154 (N.D. Cal. Aug. 31, 2023) ....................................................................20

*In re Eargo, Inc. Sec. Litig.*,
    656 F. Supp. 3d 928 (N.D. Cal. 2023) ................................................................................19

*Eckert v. PayPal Holdings, Inc.*,
    831 F. App'x 366 (9th Cir. 2020) ........................................................................................19

*In re Eventbrite, Inc. Sec. Litig.*,
    2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ......................................................................4

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023) .................................................................................................7

*Fadia v. FireEye, Inc.*,
    2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ....................................................................15

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ...............................................................................................20

*In re Intel Corp. Sec. Litig.*,
    2023 WL 2767779 (N.D. Cal. Mar. 31, 2023),
    *aff'd*, 2024 WL 1693340 (9th Cir. Apr. 19, 2024)..............................................................15

*Kairalla v. Advanced Med. Optics, Inc.*,
    2008 WL 2879087 (C.D. Cal. June 6, 2008) ......................................................................12

## TABLE OF AUTHORITIES (CONTINUED)

**Cases**                                                                                                      **Page(s)**

*In re Leapfrog Enters., Inc. Sec. Litig.*,
    200 F. Supp. 3d 987 (N.D. Cal. 2016) ...................................................................................7

*Loc. 282 Pension Tr. & Loc. 282 Annuity Tr. Fund Dist. No. 9 v. BioMarin Pharm., Inc.*,
    2024 WL 637491 (9th Cir. Feb. 15, 2024) ............................................................................2

*Lopes v. Fitbit*,
    2020 WL 1265932 (N.D. Cal. Mar. 23, 2020).................................................................14, 15

*Lu v. Align Tech., Inc.*,
    417 F. Supp. 3d 1266 (N.D. Cal. 2019) .............................................................................2, 4

*McGovney v. Aerohive Networks, Inc.*,
    367 F. Supp. 3d 1038 (N.D. Cal. 2019) ...........................................................................6, 13

*In re Neustar Sec. Litig.*,
    83 F. Supp. 3d 671 (E.D. Va. 2015) ...................................................................................15

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ..............................................................................................19

*In re Palo Alto Networks, Inc. Sec. Litig.*,
    2025 WL 1093247 (N.D. Cal. Apr. 11, 2025) ......................................................................3

*Park v. GoPro.*,
    2019 WL 1231175 (N.D. Cal. Mar. 15, 2019)......................................................................20

*Police Ret. Sys. of St. Louis v. Intuitive Surgical*,
    759 F.3d 1051 (9th Cir.2017) .......................................................................................16, 17

*Prodanova v. H.C. Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) ............................................................................................18

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ..............................................................................................5

*Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) .....................3

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ..............................................................................................19

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ................................................................................................5

DEFENDANTS' REPLY ISO MOTION TO DISMISS
AMENDED COMPLAINT, NO. 4:24-CV-08874-YGR

# TABLE OF AUTHORITIES (CONTINUED)

**Cases** **Page(s)**

*Schuster v. Symmetricon, Inc.*,
2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) ...............................................................20

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017), (Opp. ).............................................................17

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ......................................................................................3, 15

*In re SolarCity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ....................................................................17, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S 308 (2007)....................................................................................................18, 19

*Tricontinental Indus. Ltd. v. Anixter*,
215 F. Supp. 2d 942 (N.D. Ill. 2002) ..............................................................................4

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) .........................................................................................4

*Vess v. Ciba Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) .........................................................................................2

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009), and (2) .........................................................4

*Wenger v. Lumisys, Inc.*,
2 F. Supp. 2d 1231 (N.D. Cal. 1998) .............................................................................12

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2017) ...............................................................................9, 13, 14

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ..........................................................................................20

**Rules**

Fed. R. Civ. P.
Rule 9(b) .................................................................................................................. *passim*

Fed. R. Evid.
Rule 201 ...........................................................................................................................19

DEFENDANTS' REPLY ISO MOTION TO DISMISS
AMENDED COMPLAINT, NO. 4:24-CV-08874-YGR

## I.   INTRODUCTION

Plaintiff's Opposition to the Motion to Dismiss (the "Opposition" or "Opp.") repeatedly betrays the flaw in his securities fraud claim. Though Plaintiff alleges that from February to August of 2024 Defendants made a series of statements that were misleading because they "fail[ed] to disclose known material delays in the onboarding of [Marqeta's] new customers and the launch of new programs," Opp. at 5, the Opposition cannot cite any specific allegations in the Amended Complaint ("AC") to establish when those "material delays" in fact occurred, or when they allegedly became known to Defendants. Instead, the Opposition repeatedly offers bare speculation as to when average onboarding and launch times were materially delayed, with "***assumption[s]***," "***estimates***," and guesses about what the average onboarding time "would ***have to be***," *see* Opp. at 10 n.7 (emphasis added), taking the place of the particularized allegations required by Rule 9(b) and the PSLRA to establish that each alleged statement was false ***when made***. Furthermore, as Defendants' Motion to Dismiss (the "Motion" or "Mot.) demonstrates, even if Plaintiff adequately alleged when material delays occurred, and Plaintiff does not, the challenged statements are not actionable in any event, because they are statements of uncontested historical fact, forward-looking statements shielded by the safe harbor, and/or generalized statements of optimism or puffery that are inactionable.

Moreover, insofar as Plaintiff's scienter allegations are predicated almost entirely on the alleged falsity of the challenged statements, Plaintiff's claims must also be dismissed because they do not raise a strong inference that any Defendant acted with scienter—which is only underscored by Plaintiff's failure to meaningfully dispute the complete absence of any plausible motive to defraud. For the reasons set forth in the Motion, and as further explained below, the AC should be dismissed.

## II.   ARGUMENT

### A.   Plaintiff Does Not Allege a False or Misleading Statement

#### 1.   Mr. Milotich's November 2024 Comments Alone Do Not Establish Any Alleged Statement Was False When Made

Putting aside the conclusory accusations of the FEs, Plaintiff's ***only*** factual allegation to establish falsity is the repeated claim that Mr. Milotich "admitted" on November 4, 2024 that Marqeta's average onboarding times had slowed to over 300 days by the start of the Class Period, or

February 24, 2024. But as the Motion explains, Mr. Milotich said nothing of the sort, and actually reported in November 2024 that due to regulatory scrutiny in the "the first few months of 2024," "15 programs [Marqeta] expected to launch in the quarter [Q3 2024] [were] delayed by an average of 70 days," causing delayed average onboarding times that "became clear" in the "two or three months" before the November 7, 2024 earnings call—*i.e.*, in August and September of 2024, after the last of the challenged statements was made. *See* Mot. at 5. Plaintiff ignores those surrounding statements, and insists that when Mr. Milotich said "in Q1, Q2, [average onboarding times] rose to over 300 days," the "most natural reading" is "that the average onboarding time was more than 300 days in both Q1 and Q2." Opp. at 9. But Plaintiff also repeatedly, if inadvertently, concedes the true import of Mr. Milotich's statement when read in context, which is that average onboarding times had been increasing to over 300 days "***during*** Q1 and Q2," *id.* at 12 (emphasis added), but only "became clear" later, as Mr. Milotich disclosed.

But even if Plaintiff's "most natural reading" is to be credited, it still is not enough to plead falsity, because Plaintiff does not allege particularized facts to show ***when*** specifically during the Class Period average onboarding times became materially delayed past the 2023 average. Rule 9(b) and the PSLRA require a plaintiff to specifically allege the "who, what, when, where, and how" of the alleged fraud, *Vess v. Ciba Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003), and because the AC does not allege facts to show when specifically during the Class Period average onboarding times were materially delayed past the 2023 average, Plaintiff fails to allege that any of the challenged statements was false when made on that basis, *see Loc. 282 Pension Tr. & Loc. 282 Annuity Tr. Fund Dist. No. 9 v. BioMarin Pharm., Inc*., 2024 WL 637491, at *2 (9th Cir. Feb. 15, 2024) ("[Plaintiff's] allegations of falsity depend on a specific chronology of events. Because [plaintiff] does not allege sufficient, particularized facts to support that proffered chronology, it fails to adequately plead falsity."); *Lu v. Align Tech., Inc*., 417 F. Supp. 3d 1266, 1278 (N.D. Cal. 2019) ("To the extent that any misrepresentations … simply cannot be buttressed by specific, particularized factual allegations that show how the statements were false or misleading when made, those claims simply cannot meet the 'higher, [more] exacting pleading standards of'" Rule 9(b) and the PSLRA).

The Opposition concedes that Plaintiff does "not allege that onboarding times were already

over 300 days at the beginning of Q1 2024," Opp. at 12, but does not cite any *factual* allegations to show when that threshold was met, or even when average onboarding times were materially delayed past the 2023 average. Instead, Plaintiff works backward from his flawed "reading" of Mr. Milotich's November statement to offer bare speculation about when onboarding times were materially delayed, hypothesizing that as of May 7, 2024 the increase in average onboarding was "much higher than 20%-30% and [probably] closer to the range of a 64% to 100% increase, *if* not higher." Opp. at 9-10.[1] Indeed, Plaintiff repeatedly (if tacitly) concedes that it can only offer "assumption[s]" and "estimates" as to when average onboarding and launch times became materially delayed, *see* Opp at 10 n.7, and consistently argues about how certain statements "*suggest[]* that the peak of increasing onboarding and launch times *likely occurred* before the end of Q2," *id.* at 24 (emphasis added), without ever offering supporting particularized facts. Those sorts of conclusory guesses do not satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. *See In re Palo Alto Networks, Inc. Sec. Litig.*, 2025 WL 1093247, *9 (N.D. Cal. Apr. 11, 2025) (dismissing falsity allegations because "Plaintiffs do not offer any factual allegations about when the issues with the Thunderdome deal materialized or when Defendants knew of those issues"). While Plaintiff argues that the falsity of the alleged misstatements can be *assumed* from Mr. Milotich's later November 2024 statements, that is "a barred 'fraud by hindsight' theory." *Id.*; *see also City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1109 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) ("Without evidence of contemporaneous falsity, an allegation of a misleading representation, which entirely rests on later contradictory statements [or state of affairs], constitutes an impermissible attempt to plead fraud by hindsight."); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) (rejecting allegations that lacked "specifics" and thus invited the court to "speculate" as to the "severity of the problems").

Plaintiff is correct that it "need not plead the exact level of average onboarding delays as of [a particular date] in order to plead falsity," Opp. at 10,[2] but Plaintiff is required by Rule 9(b) and the

---

[1] Plaintiff's conclusory assertion that if "the average onboarding time did not reach >300 days until the very end of Q2, the average onboarding time *had to be* at least 246 days by May 7," Opp. at 10 (emphasis added), is not supported by specific factual allegations.

[2] Plaintiff's cited authorities, *see* Opp. at 10, stand for the inapposite propositions that: (1) when a Plaintiff specifically alleges a "widespread and material" GAAP violation, they are not also "required

PSLRA to plead specific facts showing that onboarding times were materially delayed past the 2023 average *at the time each alleged misstatement was made*, which Plaintiff fails to do. Even if Plaintiff has "alleged sufficient facts to show that average onboarding and launch times had rapidly increased during Q1 and Q2, such that the previously reported 100-day launch-time improvement had materially eroded," *id.* at 10, absent specific facts to show *when* that "material erosion" in fact occurred, Plaintiff cannot establish the falsity of any alleged misstatement on that basis. *See In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at \*11 (N.D. Cal. Apr. 28, 2020) ("[T]he Complaint fails to allege specific facts demonstrating how the purported cost and time translated into 'material adverse effects.'"); *Align*, 417 F. Supp. 3d at 1279 ("While the Court agrees that Plaintiff needs not 'precisely quantify the impact that competition was having ... with specific figures and data points, the absence of any specificity at all makes it difficult to understand the severity of the problem or whether that actually had an impact") (cleaned up); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1086 (9th Cir. 2002) ("[T]he complaint gives no indication of what it means for a sales cycle to lengthen 'substantially,' or what the actual length of the cycle was at the time of the statement.").

In an effort to gloss over the AC's failure to allege when average onboarding times became materially delayed, the Opposition scrambles the chronological order of the alleged misstatements when discussing falsity. *See* Opp. at 5-20. But as set forth in the Motion, and as further discussed below, Plaintiff does not allege facts that establish that any of the challenged statements was actionably false when made.

**B.** **Plaintiff Does Not Adequately Allege the Challenged Statements Were Actionably False or Misleading When Made**

**Statement 1.** Plaintiff does not dispute that Statement 1, made by Mr. Khalaf on Marqeta's February 28, 2024 earnings call for Q4 2023 was a historical statement about Marqeta's Q4 2024 results. As the Motion explains, that is dispositive because disclosures of accurate historical data are

---

to quantify the [specific] amount" by which the financials were misstated, *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1222 (W.D. Wash. 2009), and (2) where the "basis of [a] fraud action is the non-disclosure of the scheme of fictitious billing," the plaintiff need not "describe each single specific transaction in detail nor allege the precise amount of over[billing] on a period by period basis," *Tricontinental Indus. Ltd. v. Anixter*, 215 F. Supp. 2d 942, 947 (N.D. Ill. 2002).

DEFENDANTS' REPLY ISO MOTION TO DISMISS
AMENDED COMPLAINT, NO. 4:24-cv-08874-YGR

not actionable a matter of law, because they "contain no implicit prediction that those events or conditions will continue in the future." *See* Mot. at 6.[3] Plaintiff argues there is an exception to that rule when the challenged "statements address specific aspects of a company's operation that the speaker knows to be performing poorly," Opp. at 9 (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017)), but the statements at issue in *In re Quality* offered "a concrete description of the past ***and present*** state of the pipeline" and "reassured investors ... that the number and type of prospective sales in the pipeline was unchanged ... compared to previous quarters." 865 F.3d at 1114 (emphasis added). Here, by contrast, Statement 1 concerns ***only*** Marqeta's past results— Mr. Khalaf plainly states he is addressing the average time to launch new products "***in Q4 of this year***," or 2023—and does not "assure investors" that onboarding times were unchanged.[4]

Moreover, as Plaintiff's cited authority recognizes, *see* Opp. at 7 n. 4, statements about past operations are actionable only where there are specific allegations to show that statements were false when made. *See In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008) ("Defendants repeatedly represented in their SEC filings that Amgen marketed its products 'for their approved indications'" at the same time they were specifically alleged to have "promoted unapproved uses and increased per-patient dosages through improper means."). Here, as discussed above, Plaintiff does not allege any specific facts to show that average onboarding times were materially delayed past the 2023 average at the time Statement 1 was made, and while Plaintiff insists that Mr. Khalaf "knew that serious onboarding delays in Q1 had already wiped out the operational improvement," Opp. at 7, Plaintiff cannot cite to any allegations in the AC that support that claim. Statement 1 must be dismissed for that reason alone.

Plaintiff also argues that while Statement 1 addresses average ***launch*** times, *see* AC ¶ 115 (Marqeta "made great strides in accelerating the time to launch for new programs"), it was nonetheless inconsistent with delayed average ***onboarding*** times, because "an increase in onboarding

---

[3] Plaintiff disputes this black-letter rule, insisting that "a reasonable investor would have seen Khalaf's statement as containing an implicit representation that he was not aware of material delays in Q1 2024 that had already eroded," Opp. at 7, but does not cite any authority for that claim.

[4] Plaintiff's citation to *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698 (9th Cir. 2016), *see* Opp. at 7, is misguided, as the cited portion of that case concerns the standards for pleading scienter, and says nothing at all about the inactionability of uncontested statements of historical fact.

DEFENDANTS' REPLY ISO MOTION TO DISMISS
AMENDED COMPLAINT, NO. 4:24-CV-08874-YGR

times necessarily corresponded to launch delays, because onboarding represents a significant portion of the overall time to launch." Opp. at 6. But there are no facts alleged to support that conclusory argument, and as Plaintiff admits, Marqeta's average program timeline affords three to six months between onboarding and soft launch, *see id.*, which is to say that delays in onboarding could easily be made up in the launch process, and that there is no reason to assume, as Plaintiff invites the Court to do, that delayed onboarding times necessarily resulted in delayed launches.

**Statement 2**. As the Motion shows, Mr. Khalaf's challenged statement on the February 28, 2024 earnings call for Q4 2023 consists solely of corporate optimism or puffery, and his comments about how Marqeta is "invested in program management," takes compliance "seriously" and has a high level of "scale and investment" in compliance are "vague, generalized, and unspecific assertions" that are not capable of objective verification, and thus cannot be used to "state actionable material misstatements of fact." *See* Mot. at 9. In response, Plaintiff argues that because regulatory compliance was "a specific area where Marqeta touted its capabilities as a competitive advantage while knowing the Company was understaffed and that it faced significant onboarding delays due to increased regulatory scrutiny" it "takes the statements out of the realm of puffery." Opp. at 18 n.12. But as discussed above, Plaintiff does not allege any specific facts to show that average onboarding times were materially delayed when Statement 2 was made, let alone that Defendants knew of it. Plaintiff also fails to allege specific facts to show Marqeta's compliance department was actually understaffed at the time, let alone that the understaffing caused onboarding delays, *see* Mot. at 10, and the conclusory opinions of the FE's establish nothing more than some Marqeta employees believed its compliance department was understaffed, *see* AC ¶ 61, and Marqeta had plans to hire more compliance employees, *id.* ¶¶ 171, 175-76. Nowhere does Plaintiff "provide allegations that quantify the actual staffing problems" necessary to "understand the severity of the problem or whether that actually had an impact on [onboarding delays]," *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1056 (N.D. Cal. 2019), and thus the FE's conclusory opinions are not enough to state a claim. Of course, even *if* the FE's opinions were supported by specific facts, and they are not, the Company's openness to adding compliance staff would not be inconsistent with Marqeta taking compliance "seriously" or having a high level of "scale and investment" in compliance such

that Statement 2 would be misleading. *See In re Leapfrog Enters., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1001 (N.D. Cal. 2016) (Plaintiff "must allege contemporaneous statements or conditions that are 'necessarily inconsistent' with the challenged statement.").

**Statement 3.** The Motion demonstrates that risk factors like Statement 3, from Marqeta's Form 10-K for FY 2023, are not actionable because they put "investing public … on notice of the[] risks" and thus investors "cannot be heard to complain that the risks were masked as mere contingencies." Mot. at 10 (citation omitted). Plaintiff argues that rule does not apply to Statement 3 because it warned that Marqeta's failure to "attract new customers" and "onboard them quickly" could slow net revenue growth, at a time when Plaintiff asserts Marqeta "was already experiencing material onboarding and launch delays," Opp. at 19. But in sharp contrast to the authorities Plaintiff cites in support of that argument, *see id,* Plaintiff does not allege any specific facts to show Marqeta was actually experiencing material onboarding delays before Statement 3 was issued on February 28, 2024, or that Defendants were aware of it. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948-49 (9th Cir. 2023) (Form 10-K risk factor warning that the "risk of third parties improperly accessing … Facebook users' data [w]as purely hypothetical" found to be misleading because plaintiff "pleaded with particularity" that "Facebook was aware of [third-party] misconduct ***before*** … it filed its [the] 10-K with the SEC"); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703-04 (9th Cir. 2021) (Form 10-Q risk warning regarding cybersecurity issues found misleading where specific allegations established that the 10-Q was issued "***after*** the detection of Google's cybersecurity issues."). In any event, Statement 3 did not state or suggest anything about the speed with which Marqeta was then onboarding clients, and thus was not misleading in that regard. *See* Mot. at 10-11. Plaintiff insists that warning about the risks of not onboarding "quickly" was misleading, because when "read in the context of Defendants' other disclosures ... [it] misleadingly suggested that Marqeta's speed in onboarding and launching new customers was improving when it was in fact materially degrading," Opp. at 20, but Plaintiff cannot and does not cite any authority to support that illogical leap.

**Statement 4.** Statement 4 is another risk warning from Marqeta's FY 2023 Form 10-K and warns about adverse effects from changes in the regulatory environment. As the Motion shows, Statement 4 did not suggest an absence of regulatory scrutiny or say anything at all about Marqeta's

then-existing onboarding times, and thus did not affirmatively create a misleading impression in either of those regards. *See* Mot. at 11. As before, Plaintiff argues that Statement 4 is nonetheless misleading because "the statement described a hypothetical risk that regulatory developments might impair Marqeta's ability to deliver its services without acknowledging that new regulatory scrutiny had already caused material onboarding delays," Opp. at 20 n.14, but Plaintiff does not and cannot cite any allegations in the AC that support that conclusory assertion, and it is directly refuted by both Mr. Milotich's November statement and the undisputed fact that Marqeta met its revenue guidance in Q1 2024, when Statement 4 was made, *see* Mot. at 13.

**Statement 5.** Plaintiff concedes that Statement 5 was made by Mr. Khalaf in response to a question about "what factors allowed Marqeta to achieve the 100-day improvement he previously reported during the Q4 2023 earnings call." Opp. at 12. As the Motion demonstrates, Mr. Khalaf's response addressed only those Q4 2023 historical results, and as a matter of law statements of historical fact are not rendered misleading if current circumstances might have changed. *See* Mot. at 12-13. Plaintiff argues Statement 5 was nonetheless misleading because "Khalaf also stated that the improved launch times were 'baked in' to Marqeta's guidance [], so he was implicitly representing that the improved launch times had not changed" when Marqeta was experiencing "known onboarding and launch delays … at the time." Opp. at 12. Putting aside the complete absence of any fact-based allegations to show that onboarding and launch times had been materially delayed by March 4, 2024 when Statement 5 was issued, the fact that improved launch times were "baked in" to guidance says nothing whatsoever about whether average launch times could have changed since that guidance was issued. And, as noted, Marqeta in fact met its net revenue guidance in Q1 2024, *see* Mot. at 13, as well as in Q2 and Q3 2024, which only further buttresses Mr. Milotich's November disclosure that Marqeta's delayed onboarding averages, and their effect on revenues, did not "bec[o]me clear" until sometime during Q3 of 2024, *see id.* at 5.[5]

**Statement 6.** The Motion demonstrates several independent reasons why Mr. Milotich's

---

[5] Plaintiff argues that despite Marqeta hitting its revenue guidance for Q1, Q2 and Q3 2024, "it did not meet its target for [*annual*] revenue from new programs" at year end. Opp. at 14. But whether Marqeta missed target revenue for new programs *at the end of the year* does not change the fact that it met its guidance in the first three quarters of the year, when the alleged misstatements were made, and thus revenues were not materially affected by onboarding delays during that time.

DEFENDANTS' REPLY ISO MOTION TO DISMISS
AMENDED COMPLAINT, NO. 4:24-CV-08874-YGR

May 7, 2024 comments about how Marqeta was "a little bit ahead of schedule" on new customers ramping, "expected about $20 million in revenue coming from these new cohorts for 2024," and was "a little bit ahead based on a couple of customers launching a little more quickly than we expected, and one or two also ramping a little faster than we had projected" were not actionably misleading. *See* Mot. at 14-16. First, Plaintiff does not allege that any portion of that statement—that Marqeta was ahead of schedule on ramping, that Marqeta expected $20 million in revenue from new cohorts and had launched a couple of customers more quickly—was factually incorrect. *See* Opp. at 15 ("The statement that a 'couple of customers' had launched more quickly than expected was a statement of historical fact."). Second, while Plaintiff argues Statement 6 was misleading because "Marqeta had already experienced material launch delays, and average onboarding times had increased to at least 246 days," *id.* at 14, there are no specific facts alleged to support that claim, and the first part of Statement 6 does not even reference launch or onboarding times—it references **the time to ramp**. *See* Mot. at 14. As the Program Timeline shows, "ramping" can take up to twelve months after launch, and thus even if Plaintiff had alleged facts to show Defendants knew of material delays in onboarding and launch times at the time Statement 6 was made, then-current delays in onboarding and launch times would not have been inconsistent with or contradictory to the much-longer ramp times having improved. *Id.*

Second, statements about "expecting" $20 million in revenue from new customers and being "a little bit ahead" in generating that revenue (and in ramping new customers) were forward-looking statements protected by meaningful cautionary language, and thus not actionable. *Id.* at 15 (citing *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2017)). Plaintiff argues the statements were not forward-looking because they "incorporated Defendants' earlier statements about operational improvements" and were "intertwined with specific benchmarks that Defendants had previously reported" like the "100-day improvement in launch times [being] 'baked in' to guidance." Opp. at 15. But Statement 6 does not reference or refer to launch times, and as discussed above, Marqeta in fact met its revenue guidance in Q2 2024, the quarter in which Statement 6 was made, *see* Mot. at 16, and in the following quarter, *id.*, which directly refutes Plaintiff's conclusory assertion that onboarding delays were affecting revenues by that time. Plaintiff further argues that even if Statement 6 was

forward-looking, it was not accompanied by meaningful cautionary language because the risk warnings that accompanied it, like Statement 3 above, "were not meaningful and were themselves misleading because they presented the risks as merely hypothetical when they had already materialized." Opp. at 16. But as discussed above, and as Plaintiff's own cited authorities hold, that argument fails because Plaintiff does not allege particularized facts to show Marqeta was actually experiencing material onboarding delays when the cautionary language was issued. *See id.* (citing *Glazer Cap. Mgmt., L.P. v. Forescout Techs.*, Inc., 63 F.4th 779 (9th Cir. 2023) (cautionary language in a merger agreement not "meaningful" where it warned about the risks of the merger "not consummating," yet specific factual allegations established that three days prior "Advent [had] informed Forescout that it was considering not closing the merger")). And while Plaintiff insists that Statement 6 is not shielded by the risk warnings because "Defendants were aware of a massive increase in onboarding times and consequent launch delays" and thus "had actual knowledge that the statement[] [was] misleading" Opp. at 15-16, Statement 6 is not inconsistent with or contradictory to there being materially delayed onboarding and launch times, though they are not specifically alleged to have occurred at the time of Statement 6 in any event.[6]

**Statement 7**. Mr. Khalaf's May 7, 2024 statement on Marqeta's Q1 2024 earnings call addressed how Marqeta's time "to realizing [] gross profit" had improved "north of 10%," a historical statement that Plaintiff admits was "literally accurate," Opp. at 8, together with various generalized statements about how Marqeta had made "a lot of progress" and "significant operational improvement," statements that are not capable of objective verification and thus not actionable. Mot. at 16. Plaintiff argues that because Statement 7 was made in response to a question "about the 100-day improvement in Q4 2023, and that metric concerned launch times," Statement 8 was misleading because "because Khalaf was [then] aware of a 'spike' in onboarding and launch times." Opp. at 8-9. But awareness of a "spike" in onboarding and launch times does not establish that *average* times were materially delayed as of May 7, 2024, and irrespective of the question he was asked, Mr.

---

[6] Plaintiff's Opposition appears to have abandoned the argument that Statement 6 was misleading because "in March and April of 2024, three members of Marqeta's regulatory compliance team were fired and/or quit," *see* Chart, Statement 6, and it is not hard to understand why; Statement 6 does not relate to compliance staffing issues, and thus is not inconsistent with three compliance employees having been fired or quit, *see* Mot. at 14.

DEFENDANTS' REPLY ISO MOTION TO DISMISS
AMENDED COMPLAINT, NO. 4:24-cv-08874-YGR

Khalaf's answer addressed improvements in the "time to realizing gross profit," which typically occurs twelve months after program launch, *see* Program Timeline, and therefore to the extent Statement 7 implied anything about launch times—including the reference to Marqeta-in-a-Box, which Plaintiff notes "was a series of practices directed at the onboarding phase," Opp. at 9—it would have been with regard to programs that had launched in the year prior.

Plaintiff argues that because Statement 7 "goes beyond describing historical results and touts specific factors driving those results," it was misleading for failure to "disclose [allegedly ***then-present***] negative information related to those factors," Opp. at 9 (citing *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at \*10 (N.D. Cal. June 2, 2020)). But Plaintiff misunderstands *Apple*, which stands for the proposition that historical results are actionable where they misrepresent the reasons ***for those historical results***. *See Apple*, 2020 WL 2857397 at \*11 (historical statements that "highlighted the 'abnormally high' upgrade rate for iPhone 6" were "affirmatively misleading because they create the impression that the upgrade rate ... was the result of 'ordinary' factors" when specific allegations established that Apple had been manipulating phone batteries to cause users to upgrade prematurely). By contrast, Plaintiff here does not dispute that Marqeta's 10% improvement in the time "to realizing [] gross profit" by May 7, 2024 resulted from Marqeta-in-a-Box and other "operational improvements," as Mr. Khalaf disclosed. *See* Mot. at 16.

**Statements 8 and 13.** Statements 8 and 13 are Statements 3 and 4 incorporated into later SEC filings, and are not actionable for the same reasons discussed above and in the Motion. *See* Mot. at 17. Plaintiff argues Statements 8 and 13 "were even more misleading" than Statements 3 and 4, because at the time Statement 8 was issued, "Defendants were aware that Marqeta's average onboarding times had increased to at least 246 days, representing a 64% increase over the 150-day average for 2023." Opp. at 20-21. But as before, that claim is pure speculation, and Plaintiff does not allege particularized facts to establish average onboarding times had been materially delayed at the time of Statements 8 and 13, or that Defendants were aware of it.

**Statement 9.** As the Motion shows, *see* Mot. at 17, Mr. Khalaf's May 20, 2024 statement that "[t]he average and the median of the deployment cycles are coming down by about 11% year-over-year" is an uncontested statement of historical fact—Plaintiff does not dispute that deployment

DEFENDANTS' REPLY ISO MOTION TO DISMISS
AMENDED COMPLAINT, NO. 4:24-CV-08874-YGR

cycles were down by about 11% at the time—and therefore is not misleading even if "less favorable results might be predictable by the company in the future." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998). Plaintiff argues the statement was nonetheless actionable because Defendants later "admitted that there was 'initial spike' in the time to launch, not just onboarding, in the beginning of 2024," Opp. at 11 (citing AC ¶ 110). But a "spike" in the time to launch is "not necessarily inconsistent" with the "average and median" of deployment cycles coming down, *Kairalla v. Advanced Med. Optics, Inc.*, 2008 WL 2879087, at *3 (C.D. Cal. June 6, 2008), and there are no facts alleged to show average deployment times had been materially delayed when Statement 9 was made. Instead, as before, Plaintiff offers bare speculation, "using the same … **assumptions** discussed above," to guess that "the average onboarding time **had to be at least** 259 days by May 20" or maybe even "higher than that." Opp. at 11-12 (emphasis added). Speculation does not satisfy Rule 9(b) and the PSLRA.

**Statement 10**. On August 7, 2024, Mr. Khalaf stated that Marqeta was "on track to generate $20 million in revenue" in 2024 from a new cohort of customers, as the Company had "guided," and that "[it] speaks volumes to how fast we can onboard new customers and get them ramped up." Opp. at 3. Plaintiff admits that the "on track" statement "w[as] referring to the $20 million revenue target," *id*. at 14-15, and cannot allege that Marqeta was **not** then "on track" to generate that revenue, because Marqeta in fact met its revenue guidance for Q2 2024, the quarter Mr. Khalaf was discussing in Statement 10, and in Q3 2024, the quarter in which the statement was made, *see* Mot. at 15. Moreover, as the Motion shows, Mr. Khalaf's "on track" statement is a forward-looking statement protected by the PSLRA safe harbor. *Id.* As before, Plaintiff argues that Statement 10 is not protected by the safe harbor because it purportedly "describes specific, concrete circumstances that have already occurred," Opp. at 15, but Plaintiff tellingly cannot cite any "specific, concrete circumstances" that are described **in Statement 10**,[7] and instead argues that Statement 10 was "intertwined with specific benchmarks that Defendants had **previously** reported," such that "a

---

[7] Statement 10's claim that "[it] speaks volumes to how fast we can onboard new customers and get them ramped up," is a generalized expression that is not capable of objective verification, and thus inactionable. *See* Mot. at 19 (citing *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal 2019)).

DEFENDANTS' REPLY ISO MOTION TO DISMISS
AMENDED COMPLAINT, NO. 4:24-CV-08874-YGR

reasonable investor would have construed [Statement 10] in light of these previously-reported benchmarks … as impliedly representing that Marqeta's current onboarding and launch times had not materially worsened in comparison to those benchmarks." *Id.* (emphasis added). As *Wochos* holds, however, "in order to establish that a challenged statement contains non-forward-looking features that [are not protected by the safe harbor], a plaintiff must plead sufficient facts to show that *the statement* … contains an express or implied *concrete assertion concerning a specific current or past fact*." 985 F.3d at 1191 (emphasis added and cleaned up). Because Plaintiff has "failed to plead that [Statement 10] contain[s] any such representation of current or past fact," *id*. at 1192, Statement 10 is forward-looking and shielded by the safe harbor, though, in any event, Plaintiff cannot cite any factual allegations to show onboarding and launch times had in fact "materially worsened" when Statement 10 was made, let alone that Defendants were aware of it. *See* Opp. at 15. Plaintiff's arguments challenging the risk warnings that accompany Statement 10 fail for the same reasons explained above with regard to Statement 6.

**Statement 11.** The Motion demonstrates that Statement 11 is not misleading because it addresses then-recent increased regulatory scrutiny and compliance efforts related to "cybersecurity," *see* Mot. at 20, and would not be rendered misleading by onboarding delays caused by other compliance issues, *id.*, though none are specifically alleged to have existed when Statement 11 was made in any event. Plaintiff argues that portions of Statement 11—addressing the "tailwinds for Marqeta," the "flight to quality syndrome" and how Marqeta had "demonstrated [an] ability to scale … in a compliant manner"—were misleading because Marqeta "still had significant staffing problems in its regulatory compliance department." Opp. at 18 (emphasis omitted). But there are no specific facts alleged to show that Marqeta had "significant staffing problems" when Statement 11 was issued, let alone that Defendants were informed about it, Mot. at 20, and while Plaintiff argues the FEs' conclusory assertions of being understaffed were "ratified" by Marqeta "approving the hiring of 10 or 11 new compliance employees," Opp. at 18, as noted above, Plaintiff does not "provide allegations that quantify the actual staffing problems" necessary to "understand the severity of the problem or whether that actually had an impact on [onboarding delays]," *McGovney*, 367 F. Supp. 3d at 1056. Plaintiff further insists the "delayed timeline of those hires" rendered Statement 11

misleading in context, Opp. at 18, but there are no facts alleged to show those hires were "delayed," as FE1 can only offer allegations about compliance department hiring through April of 2024, AC ¶ 175, and FE3 admits that "Marqeta hired quite a few people for the compliance team in the summer of 2024," *id.* ¶ 176. Of course, even if the Marqeta compliance team had been understaffed at the time, it would not contradict or be inconsistent with anything in Statement 11.

**Statement 12**. Mr. Milotich's statements on the Q2 2024 earnings call about Marqeta being "on track to deliver" $20 million in revenue "from customers who … had not launched prior to 2024" and "feel[ing] good that the new business that we're onboarding is on track" are forward-looking and not actionable for the reasons explained with regard to Statement 10. *See* Mot. at 21. As with Statement 10, Plaintiff argues Statement 12 contains non-forwarding looking features that are not protected by the safe harbor, but Plaintiff does not and cannot establish that "***the statement*** …. contains an express or implied ***concrete assertion*** concerning ***a specific current or past fact***," that is misleading. *Wochos*, 985 F.3d at 1192 (emphasis added and cleaned up). There are no allegations to show Marqeta was ***not*** on track to deliver the new customer revenue, and in any event, no allegations to support Plaintiff's conclusory assertion that Defendants "knew [at the time] that average onboarding times had increased to more than 300 days and launch times had more than doubled." Opp. at 14.

### C.   Plaintiff Fails To Plead Facts Creating A "Strong Inference" Of Scienter

Plaintiff's Section 10(b) claim also fails because, as the Motion details, the AC fails to plead specific facts creating a strong inference that Defendants acted with scienter. *See* Mot. at 21-30.

#### 1.   Defendants' Statements Do Not Support An Inference of Scienter

Plaintiff's Opposition argues that Mr. Milotich's November 4, 2024 statement during Marqeta's Q3 2024 earnings call is an "admission" of an "I knew it all along" variety as to "certain facts," including "Defendants' knowledge of the increased regulatory scrutiny during the first few months of 2024, Defendants' expectation that onboarding and launch times would spike as a result, and that Defendants 'saw' an 'initial spike' in launch times." Opp. at 22 n.15. But as the Motion articulates, "[a]n after-the-fact statement does not constitute an admission unless it ***contradicts the substance*** of an earlier statement and essentially states 'I knew it all along.'" Mot. at 27 (citing *Lopes*

*v. Fitbit*, 2020 WL 1265932, at \*11 (N.D. Cal. Mar. 23, 2020) (emphasis added)). Mr. Milotich's statement on November 4, 2024 does not contradict the substance of any earlier statement and cannot be construed as an admission probative of scienter under *Lopes*. Defendants never stated that they were **unaware** of the increased regulatory scrutiny during the first few months of 2024, or that the regulatory scrutiny would have **no** impact on onboarding. And Mr. Milotich's November 4, 2024 statement that they "expected" regulatory scrutiny could complicate onboarding is not an admission that onboarding times were materially delayed (let alone materially delayed past the 2023 average) at the time of any alleged misstatement, because as explained above, *supra* at 5, Plaintiff alleges no specific facts to show when exactly onboarding times became materially delayed.

Plaintiff next categorizes certain of Defendants' statements on November 4, 2024 about investments in regulatory compliance and the timing of awareness of the magnitude of the onboarding delays as "false exculpatory statements" that support an inference of scienter. Opp. at 24. Plaintiff further alleges that Defendants' scienter can be inferred by two "evasive and deceptive responses [Defendants gave in response] to analysts' questions about the speed of Marqeta's operations." Opp. at 26-27. But scienter requires Plaintiff to plead actual facts, not just innuendo. *See Silicon Graphics*, 183 F.3d at 985. Absent any admissions or particularized facts establishing the falsity of these statements, for which there are none, *see supra* at 6, 8-9, Plaintiff cannot rely on Defendants' statements themselves to plead scienter. *See In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 685 (E.D. Va. 2015) ("Lead Plaintiff used the [short seller] reports to detail its allegations in the Amended Complaint and then holds out the Amended Complaint as corroboration for the allegations. Such circularity does not qualify as corroboration.").

Nor do Defendants' "monitoring statements" support an inference of scienter. Opp. at 25-26. As the Motion explains, Plaintiff fails to identify any specific data that was being monitored in May 2024 that would have revealed that onboarding times had increased to over 300 days in Q1 and Q2 2024, and "an acknowledgement that 'we' monitor certain developments does not rise to the level of particularized allegations of access." *In re Intel Corp. Sec. Litig.*, 2023 WL 2767779, at \*24 (N.D. Cal. Mar. 31, 2023), *aff'd*, 2024 WL 1693340 (9th Cir. Apr. 19, 2024); *see also Fadia v. FireEye, Inc.*, 2016 WL 6679806, at \*16 (N.D. Cal. Nov. 14, 2016) ("At a minimum, Plaintiffs needed to have

DEFENDANTS' REPLY ISO MOTION TO DISMISS
AMENDED COMPLAINT, NO. 4:24-CV-08874-YGR

provided information about … which facts the Defendants were exposed to, and why this exposure supports an inference of scienter"). While Plaintiff points to "Defendants' repeated statements that Marqeta was 'ahead of schedule' or 'on track' with respect to onboarding and launching new businesses," Opp. at 25, these statements were made in response to questions about programs "ramping," *see* Mot. at 14, and being "on track to generate $20 million in revenue," *id*. at 18, and were not about onboarding times, and thus do not suggest that Defendants were aware of any specific data that was being monitored in May 2024 that would have revealed "both onboarding and launch times had materially increased by the beginning of the Class Period" that had "either doubled or nearly doubled by the time of the Q1 2024 earnings call." Opp. at 25-26.

## 2. The Core Operations Theory Does Not Support An Inference of Scienter

Plaintiff further argues that the "core operations" doctrine applies here, because "onboarding and launch times were part of Marqeta's core operations" and Defendants "repeatedly touted improvements in Marqeta's launch or deployment times" while having access to "disputed information" and "omitted data" that was of such a nature that "it would be absurd to suggest that Defendants were unaware of it." Opp. at 27-28. This argument fails. Plaintiff does not articulate the "disputed information" or "omitted data" to which Mr. Khalaf and Mr. Milotich supposedly had access, instead stating only vaguely that Defendants "held themselves out as well-informed in these areas [*i.e.*, onboarding and launch operations]." *Id*. at 28. Plaintiff's failure to identify the specific contradictory facts to which Plaintiff claims Defendants had access is fatal to the invocation of the core operations doctrine.

As Defendants point out in their Motion, proof under the core operations doctrine "is not easy," and requires "either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations ... or witness accounts demonstrating that executives had actual involvement in creating false reports." *Police Ret. Sys. of St. Louis v. Intuitive Surgical*, 759 F.3d 1051, 1062 (9th Cir. 2017). Here, Plaintiff fails to meet either of those requirements. Nowhere does Plaintiff allege that the Individual Defendants received any reports during Q1 or Q2 2024 indicating that average onboarding times were materially delayed at the time of any challenged statement. And just as in *Intuitive Surgical*, the AC relies heavily on FEs who lack

personal knowledge of the Individual Defendants' states of mind and who do not make ***any*** specific allegations regarding the Individual Defendants' access to specific contradictory information that would have revealed the falsity of a challenged statement. Thus, unlike in *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1145 (N.D. Cal. 2017), (Opp. at 28), the AC's allegations here do not present the "rare circumstance" in which the core operations inference may be invoked because it would be "'absurd' to suggest that management was without knowledge" of the allegedly undisclosed facts.[8] *Intuitive Surgical*, 759 F.3d at 1063.

### 3. The FEs Do Not Create A Strong Inference of Scienter

As the Motion shows, Plaintiff's FE allegations do not create a strong inference of scienter because none of the FEs has "reliable personal knowledge of [any] defendant['s] mental state," *In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1009 (N.D. Cal. 2017); *see* Mot. at 21–25. Plaintiff concedes this point in a footnote, yet argues that "the [FEs] still may be used to establish facts that are relevant in the overall scienter analysis." Opp. at 29 n.20 (citing *Shenwick*, 282 F. Supp. 3d at 1146, 1149). Here, however, not only do the FEs not have personal knowledge of defendants' state of mind, unlike in *Shenwick*, none of the FEs opine on topics at the heart of Plaintiff's theory of the case— none discuss specific program or onboarding timelines. *Contra Shenwick*, 282 F. Supp. 3d at 1129– 1130 (FEs opining on adverse user trends that contradicted defendants' public statements regarding these metrics). The FEs here offer only conclusory opinions about the alleged understaffing of Marqeta's compliance department, or discuss topics that are completely irrelevant to Plaintiff's claim. *See* Mot. at 21–24 (highlighting among such irrelevant topics a material weakness in Marqeta's IT controls found in Q3 2023 and a security flaw identified by a third-party vendor). As the Motion states, only one FE, FE4, is alleged to have had any involvement with Marqeta's onboarding process[9], but FE4 fails to offer any specific information about onboarding times that would render any statement misleading at the time it was made, or that establishes that Defendants knew facts that

---

[8] In *Shenwick*, the court found scienter under the core operations doctrine where the defendants made "detailed factual statements" about their primary user engagement metric. 282 F. Supp. 3d at 1147.

[9] The AC alleges only that "FE4's ***team*** was involved in the onboarding process and was responsible for making sure that customers were set up to take phone calls and handle emails", AC ¶ 72 (emphasis added), but does not allege that FE4 had any direct involvement with setting or assessing program timelines.

DEFENDANTS' REPLY ISO MOTION TO DISMISS
AMENDED COMPLAINT, NO. 4:24-CV-08874-YGR

would show they were misleading. *Id.* at 25.[10]

Plaintiff's FE allegations largely concern Marqeta's alleged understaffing of its compliance team. Opp. at 29. Plaintiff argues that "Defendants' approval of 10-11 additional employees—which represented a significant expansion of the size of the compliance department—provides strong circumstantial evidence that Defendants agreed that Marqeta was understaffed", *id.*, and a "loss of multiple key members of the compliance team … supports an inference that Defendants knew that Marqeta's efforts to improve onboarding and launch times would be impeded by staffing issues", *id.* at 30. But even if Marqeta's compliance department was understaffed (a proposition for which no FE offers any specific facts), neither the FEs nor Plaintiff provides any factual connection between the purported understaffing and onboarding delays.  There is simply no explanation based on any factual allegations to show why or how the purported understaffing caused the alleged onboarding delays, and thus any knowledge of an alleged "understaffed" or "underresourced" compliance department at the Company cannot support an inference of scienter.

### 4.    A Lack of Motive Allegations Cuts Against An Inference of Scienter

It is ***Plaintiff's burden*** to plead specific facts creating an inference of scienter that is "more than merely plausible or reasonable," and that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S 308, 314 (2007). Plaintiff has not done so, and the more compelling inference here is that Defendants did ***not*** act with scienter. This conclusion is buttressed by the fact that the AC does not allege that Defendants had any motive to commit fraud. *See* Mot. at 28. While Plaintiff is correct that a lack of motive is not dispositive, *see* Opp. at 31, courts in the Ninth Circuit have repeatedly recognized that the lack of a plausible motive is nevertheless "highly probative" of an absence of scienter, *see* Mot. at 28–29 (citing cases), and creates "a substantial hurdle in establishing scienter," *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1103 (9th Cir. 2021); *see also id.* at 1108 ("[T]he lack of a plausible motive certainly makes it much less likely that a plaintiff can show a strong inference of

---

[10] Plaintiff argues in Opposition that "the facts reported by FE4 show that onboarding times started to ***materially increase*** during the tail-end of Q4 2023…." Opp. at 30 (emphasis added). But the AC provides no support for this assertion. *See* AC ¶ 72 ("According to FE4, in December 2023 and January 2024, onboarding times were becoming longer and longer….").

DEFENDANTS' REPLY ISO MOTION TO DISMISS
AMENDED COMPLAINT, NO. 4:24-cv-08874-YGR

scienter."); *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (similar); *Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*, 2012 WL 685344, at *8 (N.D. Cal. Mar. 2, 2012) (the absence of a credible motive "may significantly undermine a plaintiff's theory of fraud.").

Not only are the AC's allegations undercut by Plaintiff's failure to plead a motive to commit securities fraud, but they are further undercut by Plaintiff's inability to explain why defendants would knowingly make false statements about the timeline to onboard programs in Q1 and Q2 of 2024, knowing that the allegedly concealed onboarding delays would be revealed just a few months later, and then revise Marqeta's guidance downward and cite those delays as one of the causes for the revision. Plaintiff's explanation that essentially Defendants were hoping good events would catch up to bad events ("Defendants hoped that … launch times would dramatically improve in Q3 and Q4, [so that] Defendants might have been able to avoid disclosing the delays that occurred during the first half," Opp. at 32), does not make much sense against the backdrop that Marqeta proactively, and ultimately, unnecessarily revised its guidance downward almost two months before the close of the fiscal year on November 4, 2024.

Further, as laid out in the Motion, none of the Individual Defendants are alleged to have sold stock or otherwise profited from the alleged fraud. Mot. at 28–29. Contrary to Plaintiff's contention, *see* Opp. at 31, courts may consider the absence of suspicious stock sales as part of a holistic scienter analysis, even in cases where a plaintiff does not allege an improper financial motive. *E.g.*, *Eckert v. PayPal Holdings, Inc.*, 831 F. App'x 366, 367 (9th Cir. 2020); *In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 947 (N.D. Cal. 2023); *Solarcity*, 274 F. Supp. 3d at 988; *Cement Masons*, 2012 WL 685344, at *8. And "courts in this district [may] take[] judicial notice of SEC Form 4[s] [], even when those documents [are] not referenced in the pleadings in order to prove that stock sales were made or were not made."[11] *Solarcity*, 274 F. Supp. 3d at 988; *see also, e.g., In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012); *Cement Masons*, 2012 WL 685344, at *5 n.4, *8 n.5. Indeed, *Tellabs* instructs courts to consider **all** inferences, and the fact that the Individual Defendants

---

[11] Plaintiff asks the Court to ignore the SEC Forms 4 reflecting Milotich's and Khalaf's stock purchases that courts routinely examine when considering scienter. *See* RJN Reply at 3. But a court may consider materials, even if they are not referenced in the pleading, so long as they meet the requirements for judicial notice set forth in Federal Rule of Evidence 201. *Cement Masons*, 2012 WL 685344, at *8 n.5.

DEFENDANTS' REPLY ISO MOTION TO DISMISS
AMENDED COMPLAINT, NO. 4:24-CV-08874-YGR

did not sell any of their Marqeta stock means that they stood to lose money as a result of the alleged fraud. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 (9th Cir. 1994); *Schuster v. Symmetricon, Inc.*, 2000 WL 33115909, at *7 (N.D. Cal. Aug. 1, 2000) (fact that "defendants were actually harmed by their alleged fraud often negates an inference of scienter"); *see also Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) ("the court must consider all reasonable inferences…, including inferences unfavorable to the plaintiffs").

Plaintiff asserts that even if the Court were to consider the Individual Defendants' stock purchases, it should also consider the fact that the Individual Defendants did sell stock during the Class Period in the form of some non-discretionary trades to cover tax obligations.[12] Opp. at 32. But non-discretionary trades generally "do not support an inference of scienter." *In re Eargo*, *Inc. Sec. Litig.*, 2023 WL 5663154, at *1 (N.D. Cal. Aug. 31, 2023); *see also Park v. GoPro.*, 2019 WL 1231175, at *23 (N.D. Cal. Mar. 15, 2019); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012) ("[I]nnocent, alternative explanation for the stock sales negates an inference of scienter.").

## III.   CONCLUSION

For these reasons, the AC should be dismissed.

Dated:  July 11, 2025                      ORRICK, HERRINGTON & SUTCLIFFE LLP


                                           */s/ James N. Kramer*
                                           JAMES N. KRAMER

                                           Attorneys for Defendants Marqeta, Inc.,
                                           Simon Khalaf, and Michael Milotich

---

[12] Plaintiff also asserts that the Individual Defendants' increases in their Marqeta stock holdings during the Class Period do not undermine an inference of scienter because they were the result of the conversion of previously-granted equity awards of restricted stock units into common stock. Opp. at 31-32. But whether Defendants spent any money to acquire the stock is not determinative of scienter. *See Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1041-43 (N.D. Cal. 2012) (scienter inference rebutted where defendants held more stock at the end of the class period than at the beginning because they accumulated vested options, and as a result, suffered large personal losses).